THIS AGREEMENT INCLUDES PROVISIONS RESTRICTING REMEDIES AVAILABLE TO THE BUYER, AND INCLUDES SPECIFIC, LIMITED REPRESENTATIONS REGARDING THE LOANS AND OTHER INTERESTS BEING SOLD. ALL REPRESENTATIONS AND WARRANTIES BY SELLER ARE STRICTLY LIMITED TO THOSE SET FORTH IN THIS AGREEMENT. THE LOANS ARE SOLD "AS IS" AND "WITH ALL FAULTS" EXCEPT ONLY AS EXPRESSLY REPRESENTED OR WARRANTED IN THIS AGREEMENT.

## LOAN SALE AGREEMENT
*Offering # DP010912*

THIS LOAN SALE AGREEMENT is dated and effective as of the date set forth below (the "**Effective Date**") by and among Seller (as defined in Article I hereof) and PREMIER CAPITAL LLC, a Limited Liability Company ("Buyer").

### RECITALS:

WHEREAS, Seller is the owner of certain described Loans, as defined below; and

WHEREAS, Seller agrees to sell and Buyer agrees to buy certain described Loans as set forth herein; and

WHEREAS, Buyer was provided with the opportunity to perform and has performed such review of the electronic data and due diligence on the Loans as Buyer deemed appropriate and did in fact perform such reviews and due diligence to Buyer's satisfaction; and

WHEREAS, First Financial Network, Inc. ("Loan Sale Advisor"), on behalf of Seller, conducted a sealed bid sale of the Loans; and

WHEREAS, Buyer, is a sophisticated and experienced purchaser of similar assets and was the successful bidder for the purchase of the Loans and Buyer has agreed to purchase the Loans for the consideration and under the express terms, provisions, conditions and limitations as set forth in the Sealed Bid Package and this Agreement; and

WHEREAS, Seller is willing, subject to the express terms, provisions, conditions, limitations, waivers and disclaimers as may be expressly set forth herein, to sell, transfer, assign and convey to Buyer all of Seller's right, title and interest, if any, in, to and under the Loans.

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

### I. DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

1.1 "**Adjusted Purchase Price**" means, with respect to the Loans listed on the Loan Schedule, an amount equal to the sum of (i) the Purchase Price, and (ii) any reasonably necessary costs or expenses advanced in the ordinary course of business by Seller on or after the Cut-off Date of this Agreement with notice and consent of Buyer for the purposes of preserving or protecting any collateral in connection with a Loan and not otherwise included in the Approximate Current Balance of such Loan

1.2 "**Aggregate Balance**" means the aggregated Approximate Current Balances of all the Loans in the Pool being sold pursuant to the terms hereof.

1.3 "Agreement" means this Loan Sale Agreement. including all Addenda. Exhibits and Schedules hereto.

1.4 "Allocated Purchase Price" means, for any Loan, the product of (i) the Approximate Current Balance of the Loan multiplied by (ii) the percentage as set forth in Buyer's Sealed Bid Form for the Pool in which the applicable Loan appears.

1.5 "Approximate Current Balance" means the approximate unpaid balance in United States Dollars for each Loan sold hereunder as set forth in the Loan Schedule to be attached hereto as **Exhibit B** supplied by Seller with respect to the Loans to be assigned on the Transfer Date. This figure may include interest (accrued or unaccrued), costs, fees and expenses and/or unearned discount on some Loans. **It is understood, acknowledged and agreed that the Loans are or may be charged-off and in an inactive status that may be Unenforceable Loans as defined herein, and that the Approximate Current Balance of some or all of the Loans may be significantly lower than as stated in Seller's books and records and on the applicable Loan Schedule, and could in fact be zero. Further, it is possible that this figure may not reflect credits for foreclosures, repossessions, and sold collateral and/or payments made by or on behalf of any Obligor prior to the Transfer Date for the Loans being sold.** This figure may also reflect payments made by or on behalf of any Obligor which have been deposited and credited to the Approximate Current Balance of such Loan, but may subsequently be returned to Seller due to insufficient funds to cover such payments. Buyer acknowledges. understands and agrees that (i) Seller makes no representations or warranties whatsoever, expressed or implied, as to the accuracy of the Approximate Current Balance, and (ii) that Buyers shall have no right. whatsoever, to make any claim against Seller should the actual unpaid balance of any Loan be different than the stated Approximate Current Balance of such Loan.

1.6 "Assignments" shall have the meaning provided in Section 3.1 hereof.

1.7 "Bid Award Notice" shall mean Seller's notification to Buyer that Seller has accepted Buyer's bid to purchase the Pool of Loans.

1.8 "Bill of Sale and Assignment" means the Bill of Sale and Assignment of Loans in the form attached hereto as **Exhibit C**, and such ther documents, as Seller in its sole and absolute discretion, deems appropriate for the transfer of its right. title and interest in and to the Loans and the Transfer Documents purchased by Buyer pursuant to this Agreement.

1.9 "Business Day" means a day that is not a Saturday, Sunday or legal holiday recognized by the Federal Government or the State of North Carolina.

1.10 "Claim" means any claim. demand. cause of action, judgment. loss. damage, liability, cost and expense (including attorneys' fees. regardless of whether suit or other legal proceedings are instituted), and whether known or unknown. liquidated or contingent.

1.11 "Closing Date" means September 28, 2001.

1.12 "Collateral" means with respect to each Loan, the real or personal property, or other interest, if any, encumbered by the Collateral Documents.

1.13 "Collateral Document(s)" means with respect to each Loan, and to the extent same exist and are available. any mortgage. deed of trust. security agreement, UCC financing statement, guaranty, letter of credit. pledge. loan agreement. title insurance policy or title opinion, modification agreement, assumption agreement. or other instruments that secure the Note for such Loan and that purport to create a security interest in. and lien upon. real and/or personal property constituting the Collateral. if any, for such Note. The Collateral Document(s) may include, without limitation, original documents or copies thereof, whether by photocopy. microfiche, microfilm or other reproduction process.

1.14 "Credit Files" means all files and documents in the possession of Seller, if any, pertaining to the Loans included in the Loan Schedule. which files may include Notes, Collateral Documents or other original documents. but shall exclude the Excluded Documents.

1.15    "Cut-off Date" means August 28, 2001.

1.16    "Escrow Account" means the account, if any, established and maintained by Seller or its Servicing Agent containing funds tendered by an Obligor for the payment of real estate taxes, insurance premiums and other assessments or invoices.

1.17    "Evidence of Indebtedness" means with respect to each Loan: (a) each Note, loan agreement, line of credit agreement, purchase money credit or security agreement, financing lease agreement or other evidence of indebtedness for such Loan; (b) any promissory note renewed by the Note, (c) any promissory note or other evidence renewing and extending the Note, (d) any judgment against any Obligor under a Note or other Evidence of Indebtedness, (e) any settlement agreements, confirmed bankruptcy plans or other evidence of compromise by the creditor relating to the amounts due under any Note or other Evidence of Indebtedness, excluding Excluded Documents; and/or (f) any other evidence, including, without limitation, any loan payment history data or computer printouts, creditor notations or any other loan summary information upon which a creditor could reasonably rely in asserting that the same represents a balance due and owing on a right of collection. THE EXISTENCE OF AN EVIDENCE OF INDEBTEDNESS SHALL NOT BE DEEMED TO IMPLY THAT THE DEBT EVIDENCED THEREBY IS VALID OR ENFORCEABLE.    THE EVIDENCE OF INDEBTEDNESS MAY EVIDENCE AN UNENFORCEABLE LOAN. The Evidence of Indebtedness may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process.

1.18    "Excluded Documents" means with respect to each Loan, any correspondence, report, information, internal analysis, internal memoranda, document, credit information, regulatory reports and/or internal assessments of valuation of the Loans, the Loan Documents, the Collateral Documents and/or the Collateral, which may be missing or excluded from the Loan File.

1.19    "Initial Deposit" means the non-refundable Twenty-five Thousand Dollars ($25,000) submitted with Buyers Sealed Bid Form (Exhibit E) and identified on the cover page of this Agreement.

1.20    "Litigation Claim" means any claim, demand, cause of action, judgment, loss, damage or liability suffered or incurred by Buyer resulting from any litigation instigated by an Obligor in a court of law or any arbitration requested or demanded by an Obligor (if such disputes are required to be resolved by arbitration under the terms of the underlying documents relating to such Obligor's Loan).

1.21    "Loans" means (a) the obligations being sold pursuant to this Agreement as identified in the Loan Schedule; (b) all rights, powers, liens or security interests of the Seller in or to any Collateral or under any Collateral Document; (c) any arbitral awards and judgments owned by Seller enforcing an Obligor's obligation under a Note or other Evidence of Indebtedness, to the extent attributable thereto, and any lien arising therefrom; and (d) the proprietary interest of Seller in any Evidence of Indebtedness, the Collateral Documents or the Collateral therefor, forming the subject matter of any litigation (including, without limitation, any foreclosure) or bankruptcy to which Seller is a party or claimant. "Loan" refers to an individual Loan and "Loans" refers, collectively, to all of the Loans purchased by Buyer pursuant to this Agreement. IT IS UNDERSTOOD, AGREED AND ACKNOWLEDGED THAT SOME OR ALL OF THE LOANS MAY BE UNENFORCEABLE LOANS AS THAT TERM IS DEFINED BELOW.

1.22    "Loan Documents" means with respect to each Loan, the Collateral Documents, Evidence of Indebtedness and the Loan File. The Loan Documents may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. It is possible that there are no Loan Documents for a particular Loan.

1.23    "Loan File" means, with respect to each Loan, all documents in the possession of Seller relating to any Loan, including, without limitation, legal opinions of Obligor's counsel, appraisals, insurance certificates, borrower estoppel certifications, subordination agreements, leases, ground leases, financial and/or operating statements, credit reports, title insurance policies, engineering reports, soil reports, environmental audit reports, architect's certificates and the like. The Loan File may include, without limitation, original

documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. The Loan File shall not include the Evidence of Indebtedness, Collateral Documents, services tapes or Excluded Documents. It is possible that there is no Loan File for a particular Loan.

1.24    "Loan Sale Advisor" means First Financial Network, Inc.

1.25    "Loan Schedule" means, collectively, the schedules of certain Loans purchased under this Agreement and to be attached as Exhibit B hereto, setting forth, without limitation, the following information concerning each Loan: the name of Obligor and the Approximate Current Balance of each of the Loans as of the Cut-off Date. Other information contained in the Loan Schedule is for informational purposes only. Seller shall not be obligated to provide any electronic information not included in the Loan Schedule. It is possible that certain information, including the loan payment history, may not be available for each Loan.

1.26    "Minimum Deposit" means the non-refundable amount which, when added to the Initial Deposit, is equal to ten percent (10%) of the total Purchase Price.

1.27    "Note" means the currently operative promissory note, or renewal promissory note, if any, executed by an Obligor for any Loan.

1.28    "Obligor" means with respect to each Loan, the obligor(s) on a Note or on any other Evidence of Indebtedness, including, without limitation, any and all makers, guarantors, sureties or other persons or entities liable on the Loan.

1.29    "Pool" means a combination of one or more loans being offered for sale by Seller at the Sale, identified as such in Buyer's Sealed Bid Form (Exhibit E), and sold as a single unit or block.

1.30    "Purchase Price" shall be defined in Section 2.4.

1.31    "Repurchase Date" means the date on which Seller pays the Repurchase Price for a repurchased Loan as provided in this Agreement.

1.32    "Repurchase Price" shall be a price equal to the Loan's Approximate Current Balance, as of the date of repurchase, multiplied by the Purchase Price paid as expressed as a percentage of the Approximate Current Balance for the Pool in which the repurchased Loan was located as set forth on Buyer's Sealed Bid Form, and decreased by the aggregate amount of the escrows for real estate taxes, insurance, and for any and all other purposes for which funds are held in escrow by Buyer with respect to the Loan. Provided, however, Seller may at its sole option, where allowed by applicable laws, statutes, rules, and regulations of all federal, state, local, governmental, quasi-governmental entities or authorities having jurisdiction, accept payment from Buyer to Seller for the aggregate amount of escrow funds in lieu of decreasing the Repurchase Price. Seller shall not be responsible for and the repurchase price shall not be increased by a Loan's insufficient or negative Escrow Account.

1.33    "Retention Price" means that amount calculated in accordance with the retention of loans provisions of this Agreement.

1.34    "Sale" has the meaning set forth in the Recitals hereto.

1.35    "Seller" means Bank of America, N.A., its subsidiaries and predecessors in interest and its predecessors in interest.

1.36    "Transfer Date" means the date upon which Seller transfers the Loans to Buyer and makes the Transfer Documents available for pick-up by, or for delivery to, Buyer, which Transfer Date shall be at Seller's discretion on any date on or after full payment by Buyer of the Purchase Price, but, provided the full payment shall have been received from Buyer in accordance with this Agreement, Transfer Date shall not be later than September 28, 2001.

1.37    "Transfer Documents" means the Bill of Sale and Assignment. Limited Power of Attorney and such other documents, as Seller. in its sole and absolute discretion. deems appropriate for the transfer of its right. title and interest in and to the Loans purchased by Buyer pursuant to its Agreement.

1.38    "Unenforceable Loan" means as of the Cut-Off Date (a) a Loan with reference to which a final judgment has been entered by a court of competent jurisdiction to the effect that no Obligor on the Loan is under any enforceable obligation to pay the holder of the Loan and that the holder of the Loan shall take no action against any and all Obligor(s) or any Collateral securing the Loan; or (b) a Loan in which Seller or a predecessor in interest released all Obligors obligated on the Loan and all Collateral securing the Loan from any and all liability on the Loan; or (c) the Loan or all Obligors have been discharged in bankruptcy without a reaffirmation or the existence of Collateral securing the Loan; or (d) all Obligors on the Loan were deceased and there is no other viable means of collection on the Loan; or (e) the Loan is unenforceable under all applicable state and/or federal statutes of limitation due to the passage of time, inaction on the part of the owner of the Loan or both.

1.39    "Wire Transfer Instructions" means the wiring instructions to Bank of America, N.A., ABA No. 1030 0001 7, For Credit To: First Financial Network Inc. Special Purpose Account, Account Number 002863792469, Attention Laura Cates, Phone (405) 230-4948.

## II.    PURCHASE AND SALE OF THE LOANS

2.1    **Agreement to Sell and Purchase Loans.** Seller agrees to sell. and Buyer agrees to purchase. the Loans described in the Loan Schedule and for which Buyer was the successful bidder, subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement. The Loans shall be transferred and assigned pursuant to the Bill of Sale and Assignment of Loans purchased hereunder.

2.2    **Agreement to Assign/Buyer's Right to Act.** On the Transfer Date, Seller shall deliver to Buyer a Bill of Sale and Assignment of Loans purchased hereunder, substantially in the form of **Exhibit C** hereto, executed by Seller, which Bill of Sale and Assignment shall sell. transfer. assign, set-over, quitclaim and convey to Buyer, without recourse. warranty or representation, express or implied, except as otherwise specified herein, all right, title and interest of Seller in and to (i) each of the Loans sold, and (ii) the right to collect all principal and/or interest and/or other amounts due under the Loans and/or other proceeds of any kind paid or collected for payment thereon after the Transfer Date. **Buyer shall have no right to communicate with any Obligor or its accountants or attorneys or to otherwise take any action with respect to any Loan or any Obligor, or repossess or foreclose any Collateral, until after the Transfer Date.**

2.3    **Loan Schedule.** Seller has provided as **Exhibit B** hereto the Loan Schedule setting forth all of the Loans being sold hereunder.

2.4    **Purchase Price.** The Purchase Price of the Loans purchased hereunder by Buyer shall be the total amount. expressed as a percentage as set forth in Buyer's Sealed Bid Form, which is marked as **Exhibit E**. attached hereto and by this reference incorporated herein, multiplied by the Approximate Current Balance calculated as of August 28, 2001. subject to the adjustments as provided below.   Loan payoffs and payments received after August 28, 2001. may not be calculated until after the Closing Date and shall be paid to Buyer in accordance with Section 2.7.  The amount to be paid on the Closing Date ("Balance of the Purchase Price") shall be the Purchase Price decreased by the amount of the (i) Minimum Deposit which Seller received from Buyer in connection with Buyer's bid to purchase the Loans being sold pursuant to this Agreement, and (ii) decreased by the aggregate amount of the Escrow Accounts, if any, pertaining to the Loans purchased hereunder; provided, however, Seller may, at its sole option, where allowed by applicable laws, statutes, rules, and regulations of all federal, state, local, governmental, or quasi-governmental entities or authorities having jurisdiction, deliver a check from Seller to Buyer for the aggregate amount of Escrow Accounts in lieu of decreasing the Purchase Price hereunder.  In any event, Buyer and Seller shall comply with all applicable laws, statutes, rules, and regulations of all federal, state, local, governmental, or quasi-governmental entities or authorities having jurisdiction with respect to the

transfer of Escrow Accounts, and Buyer hereby assumes upon receipt of the credit to the Purchase Price or the payment from Seller to Buyer for the Escrowed Accounts held by the Seller all obligations and duties with respect to the establishment, holding and management of the Escrow Accounts.

2.5    **Loans Excluded.** If Seller excludes any Loan from this sale prior to the Closing Date pursuant to Section 5.1, the total Purchase Price to be paid by Buyer shall be reduced by the amount of the Purchase Price expressed as a percentage of the Approximate Current Balance of each Loan excluded.

2.6    **Payment.**

(i) **Minimum Deposit.** Buyer has delivered the amount of the Initial Deposit as set forth on the cover page of this Agreement in the form of a Cashier's Check or Wire Transfer made payable to First Financial Network Inc. Special Purpose Account as partial payment for the Loans. No later than forty-eight (48) hours after notification by Seller to Buyer of the Minimum Deposit amount, Buyer shall further deposit in the First Financial Network Inc. Special Purpose Account in accordance with the Wire Transfer Instructions, or by Cashier's Check additional funds to equal the Minimum Deposit. In the event the Initial Deposit is greater than ten percent (10%) of the Purchase Price, Buyer shall not be entitled to a refund and such amount shall become the Minimum Deposit. The Minimum Deposit shall be non-interest bearing and shall not be refundable except as otherwise expressly set forth herein.

(ii) **Balance.** On or before 1:00 p.m. Central Time, September 28, 2001, Buyer shall pay to Seller the Balance of the Purchase Price. All such funds must be in immediately available funds in United States Dollars by wire transfer to First Financial Network Inc. Special Purpose Account in accordance with the Wire Transfer Instructions, or by Cashier's Check (without intervening endorsement) made payable to First Financial Network Inc. Special Purpose Account.

2.7    **Loan Payoffs and Payments Received After Cut-off Date and Prior to Closing Date.** Except as provided in the following paragraph and subject to the adjustments provided in this Agreement, all Loan payoffs and payments received by Seller on any Loan after August 28, 2001, but prior to the Closing Date shall belong to Buyer and shall be held by Seller and forwarded without recourse and without warranties to Buyer within forty-five (45) days after Closing Date. For payments received by Seller and deposited by Seller and remitted to Buyer that subsequently are deemed insufficient to Seller, Seller will notify Buyer of any such payment and Buyer will remit such payment back to Seller within thirty (30) days of notification.

2.7.1    Negotiable Instruments **Received Prior to or on Cut-off Date.** Buyer and Seller agree that Seller retains the right to collect on any and all checks, or other negotiable instruments, which represent payments of principal, interest, or any other fees (including but not limited to attorneys' fees) or charges under any of the Loans purchased hereunder received by Seller prior to and including the Cut-off Date, regardless of whether the checks or other negotiable instruments are collected prior to or subsequent to the Cut-off Date. Notwithstanding the above, if Seller receives any payment by or on behalf of an Obligor, either prior to or after the Cut-off Date (but before the Transfer Date), which payment is designated as or is otherwise clearly intended to reimburse Seller for expenses incurred by Seller, Seller shall be entitled to accept such payments or other consideration and Buyer shall not be entitled to any credit, discount, refund or reimbursement by Seller of any portion of the Purchase Price

2.8    **Received Following Closing Date.** Any payment received by Seller subsequent to the Closing Date shall belong to Buyer, and Seller shall remit said payment to Buyer within forty-five (45) days after receipt, with negotiable instruments being endorsed by Seller without recourse and without warranties. If Seller has deposited payments received from any Obligor and issues a check or payment therefor to Buyer, Buyer shall bear the risk that any such payment so deposited by Seller may be returned due to insufficient funds. For payments received by Seller and inadvertently deposited by Seller and remitted to Buyer that subsequently are deemed insufficient to Seller, Seller will notify Buyer of any such payment and Buyer will remit such payment back to Seller within thirty (30) days of notification.

## III.    ASSIGNMENT AND DELIVERY

3.1    **Assignments**

3.1.1    **Bill of Sale.**    On the Closing Date, Seller shall deliver to Buyer a Bill of Sale and Assignment of Loans, in the form of <u>Exhibit C</u> attached hereto, executed by an authorized representative of Seller, which Bill of Sale and Assignment of Loans shall sell, transfer, assign, set-over, quitclaim and convey to Buyer all right, title and interest of Seller in and to (i) each of the Loans sold, the proceeds of the Loans, subject to Articles II, V and Article VI, received by Seller after the Cut-Off Date, if any, the Loan Documents and any Collateral Documents, and (ii) any applicable insurance proceeds and condemnation awards related to the Loans actually received by Seller or relating to rights accrued by Seller after August 28, 2001.

3.1.2    **Endorsements and Assignments.**    On the Closing Date, Seller agrees to deliver a Limited Power Of Attorney in the form of <u>Exhibit D</u> which will permit Buyer to execute such endorsements of the Evidence of Indebtedness and, if any, judgments, assignment of mortgages, security interests and financing statements as Buyer deems appropriate. Any endorsement of an Evidence of Indebtedness shall state clearly in the endorsement that the Evidence of Indebtedness is assigned "AS IS", "WHERE IS", "WITH ALL FAULTS" AND WITHOUT RECOURSE AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES, AND PURSUANT TO THAT CERTAIN LOAN SALE AGREEMENT DATED SEPTEMBER 19, 2001. In the event Buyer requests Seller to execute an affidavit of lost note, endorsements, assignments or other documents in addition to the Bill of Sale and Assignment and Limited Power of Attorney, Buyer shall first furnish Seller copies of the proposed affidavit of lost note, endorsements, assignments or other documents for review, approval or amendment, as the case may be, by Seller and/or Seller's legal counsel. Provided, however, any such request for additional endorsements, assignments or other documentation shall be reasonable and shall be made by Buyer in writing and delivered to Seller within one hundred twenty (120) days of the Closing Date. The responsibility and cost of preparing any such endorsements, assignments and other documents pursuant to this Section shall be borne by Buyer. Buyer shall be responsible for recording the originals of such additional assignments, if necessary, and shall pay the costs or fees for recording or filing any document prepared by Buyer pursuant to this Section 3.1.2.

3.1.3    **Additional Documents.**    The failure of Seller to execute a document after the one hundred twenty (120) day period set forth in Section 3.1.2 shall not constitute a default on the part of Seller hereunder. Seller reserves the right to retain copies of all or any portion of the Loan Documents. Notwithstanding anything here and to the contrary, if a Loan is paid off after the Cut-off Date and prior to Closing Date, Seller shall only be responsible for sending to Buyer any funds received by Seller to pay off the Loan after the Closing Date, and in accordance with the procedures set forth in this Agreement and Seller should not be obligated to deliver to Buyer any Transfer Documents relating to such paid off Loan. In addition, Buyer shall have the sole responsibility to obtain any of the Loan Documents in the possession of any attorney, collection agency, or foreclosing trustee as set forth in Section 3.4.

3.2    **Delivery.** Seller shall, on or before the Transfer Date, execute the Transfer Documents and make available for pickup by Buyer (at Buyer's sole cost and expense) at the offices of Seller or Seller's counsel, or such other place as mutually agreed upon, the Transfer Documents and the Loan Documents. Seller shall have no obligation to deliver to the Buyer any Excluded Documents or any Loan Documents which may exist but which are not in Seller's possession or control, or which relate to Loans retained by Seller pursuant to Article V. Buyer acknowledges (i) that certain documents that may have been available to and examined by Buyer during Buyer's due diligence review of the Loans and Loan Files may be Excluded Documents, and (ii) such Excluded Documents and the contents thereof shall remain subject to the terms of any confidentiality agreement between Buyer and Seller. If, with respect to any retained Loan or any loan not transferred to Buyer under the Bill of Sale and Assignment, Seller sends to Buyer any funds received from any Obligor or amounts representing positive escrow balances or any documents or instruments, then Buyer shall immediately notify Seller and Buyer shall make arrangements for redelivery to Seller of such funds, documents and instruments from Buyer at Seller's sole cost and expense.

3.3    **Risk of Loss/Insured Collateral.** (i) From and after the Effective Date of this Agreement, Buyer assumes all risk of loss to the Collateral and/or to the value or collectibility of any Loan provided, however, that in the event any Collateral becomes uninsured and an applicable Obligor does not renew such insurance, Seller will, to the extent it has received actual notice of such non-insurance and non-renewal, obtain insurance or elect not to obtain insurance on such Collateral in accordance with Seller's customary procedures; (ii) Seller shall not have any duty to obtain or maintain any risk insurance on any Collateral; (iii) Seller reserves the right, after the Transfer Date, to cancel any existing risk insurance policies placed by Seller and to retain any refunded premium or deposit amounts relating thereto; and (iv) Buyer is responsible for having itself substituted as loss payee on, or obtaining (at its own expense) any additional or substitute coverage for any risk insurance on any Collateral in which the Seller is currently listed as a loss payee, or otherwise obtaining any additional risk insurance as Buyer deems necessary to insure its interest herein or in any Collateral, as its interest appears, as of the Transfer Date. Seller shall provide Buyer on the Transfer Date with a schedule of all risk insurance policies, if any, placed by Seller on any of the Collateral.

3.4    **Pending Legal Proceedings.** With respect to any Loan that is, as of the Transfer Date, the subject of litigation, arbitration, bankruptcy, foreclosure or other legal proceeding, Buyer agrees that it shall, to the extent applicable, at its own cost, within thirty (30) days after the Transfer Date, (i) notify the Clerk of Court, any foreclosing trustee and all counsel of record in each such proceeding of the transfer of the Loan from Seller to Buyer, (ii) file pleadings to relieve Seller's counsel of record from further responsibility in such litigation (unless said counsel has agreed, with Seller's written consent, to represent Buyer in said proceedings at Buyer's expense), and (iii) remove Seller as a party in such action and substitute Buyer as the real party-in-interest, and change the caption thereof accordingly. In connection therewith, after the Transfer Date, Buyer shall have the sole responsibility to obtain all Transfer Documents then in the possession of any such counsel or foreclosing trustee and to determine the appropriate direction and strategy for such litigation or other legal proceeding, excluding any government loan insurance program. If Buyer fails to comply with the above requirements (i) through (iii), Seller may, but is not obligated to take such actions as it deems necessary to effectuate the provisions of this Section. Buyer acknowledges that its failure to comply with the provisions of this Section may affect Buyer's rights in any such litigation or other legal proceeding including, without limitation, any dismissal with prejudice or the running of any statute of limitations if any such action or other legal proceeding is dismissed. Buyer shall reimburse and indemnify Seller for any costs and legal fees incurred by Seller in connection with such proceeding from and after the Transfer Date, including, without limitation, any fees and costs incurred by Seller in connection with Buyer's failure to comply with the above requirements (i) through (iii). Seller shall deliver notice to Buyer of any legal fees and costs billed to Seller incurred in connection with such proceeding from and after the Transfer Date, whereupon Buyer shall reimburse Seller promptly, but not later than ten (10) days following Buyer's receipt of such notice, for amounts so incurred. Buyer shall not be required to reimburse or indemnify Seller as to proceedings in which Seller is, as of the Transfer Date, a defendant, counter-defendant, respondent, or cross-defendant arising out of or otherwise pertaining to Seller's ownership of the Loans, in which event Seller may, at Seller's expense, elect to either continue with such proceedings or seek to resolve such proceedings by settlement or other methods.

## IV.    SERVICING OF THE LOANS

4.1    **Servicing After Transfer Date.** The Loans shall be sold and conveyed to Buyer on a servicing-released basis, except that any Loan which is subject to a participation agreement, and Seller is not acting as the servicer ("Participation Loans"), shall be conveyed to the Buyer subject to the terms of the participation agreement. Except for Participation Loans, as of the Transfer Date, all rights, obligations, liabilities and responsibilities with respect to the servicing of the Loans shall pass to Buyer, and Seller shall be discharged from all liability therefor. Seller shall have no obligation to perform any servicing activities with respect to the Loans from and after the Transfer Date.

4.2    **Interim Servicing/Buyer Bound.** Until the Transfer Date, Seller, subject to the provisions of Section 3.4 above, shall continue to service the Loans to be transferred and, in connection therewith, Seller shall have the right to, among other things, postpone any pending foreclosure sale or bankruptcy matter until after the Transfer Date or, if Seller deems it necessary to meet any government loan insurance

program requirement, complete any foreclosure proceeding and transfer the rights therein and in any foreclosed collateral to Buyer on the Transfer Date and/or negotiate or compromise any claim in bankruptcy or litigation. Buyer shall be bound by the actions taken by Seller prior to the Transfer Date. BUYER SHALL TAKE NO ACTION TO COMMUNICATE WITH ANY OBLIGOR OR ITS ACCOUNTANTS OR ATTORNEYS OR ENFORCE OR OTHERWISE SERVICE OR MANAGE SUCH LOANS OR TO INSPECT OR EXAMINE ANY COLLATERAL UNTIL AFTER THE TRANSFER DATE. BUYER SHALL TAKE NO ACTION TO COMMUNICATE WITH ANY SERVICING AGENT OR SELLER'S LOAN MANAGER UNLESS AND UNTIL THE PURCHASE PRICE DUE TO SELLER HEREUNDER HAS BEEN PAID IN FULL. In no event shall Buyer be deemed a third party beneficiary of any servicing contract or agreement between Seller and any servicing agent and in no event shall Seller or any servicing agent be deemed a fiduciary for the benefit of Buyer with respect to the Loans, or any of them.

4.3      **Buyer's Servicer Requirements.** Buyer shall be responsible for complying with all state and federal law, if any, with respect to the ownership and/or servicing and/or collection of any of the Loans from and after the Transfer Date, including, without limitation, the obligation to notify any Obligor of the transfer of servicing rights from Seller to Buyer. Further, Seller shall have the right, but not the obligation, to mail a notice addressed to any Obligor at the address shown in its records, notifying such Obligor of the transfer of any Loan or the servicing of the Loan from Seller to Buyer.

## V.    EXCLUSION OF LOANS AND REFUND OPTION OF SELLER PRIOR TO THE TRANSFER DATE

5.1      **Seller's Right to Exclude Loan(s).** If, after the Cut-off Date and prior to the Transfer Date, Seller determines, in its sole discretion, that any of the following circumstances exist with respect to any Loan or Loans, then Seller shall have the right, but not the obligation, to withdraw such Loan or Loans from the Loan Schedule and from the Bill of Sale and the Assignment of Loans, and retain any such Loan or Loans:

(a)      which is participated among different financial entities or depository institutions or is otherwise subject to an agreement between Seller and another depository institution or third party, which restricts or otherwise limits the sale, transfer or assignment of the Loan or the servicing of the Loan and Seller is unable to obtain the prior consent of such third party;

(b)      Seller determines (in its sole discretion) that there is a pending or threatened suit, action, arbitration, bankruptcy or other legal proceeding or investigation relating to the Loan, any Obligor or the Collateral for such Loan, and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Loan;

(c)      Seller determines (in its sole discretion) that the Loan is (i) cross-defaulted, (ii) cross-collateralized, or (iii) otherwise so inextricably related to any loan, asset, claim or right of action owned by Seller or any of Seller's predecessors in interest and not expressly transferred to Buyer pursuant to this Agreement, that Seller, in its discretion, determines that it requires retention of such Loan in order to protect Seller's interests in such other loan, asset, claim or right of action.

(d)      which forms the basis of a claim against a current or former officer, director, employee, or agent of the Seller.

5.2      **Exclusion Price.** If Seller elects to exclude a Loan from the sale as set forth above, the provisions of Section 2.5 shall apply to each such Loan or Loans.

9

## VI.                    REPURCHASE OF LOANS AFTER TRANSFER DATE

6.1      **Seller's Repurchase Right.** After the Transfer Date, in the sole discretion of Seller, Seller shall have the right to repurchase any Loan described in (a), (b), (c) or (d) of Section 5.1 on a Repurchase Date. Seller shall pay to Buyer in immediately available funds the Repurchase Price and Buyer shall convey to Seller all of Buyer's right, title and interest in and to such repurchased Loan, the Transfer Documents relating to such Loan and any related Collateral. If Seller wishes to exercise its right to repurchase any Loan under this Article, Seller shall give Buyer written notice identifying such Loan, and Buyer shall be obligated to assign any such repurchased Loan to Seller within ten (10) Business Days from Buyer's receipt of such notice.

6.2      **Seller's Limited Obligation to Repurchase.** Other than Seller's right to exclude a Loan pursuant to Article V or repurchase a Loan pursuant to Section 2.5 and Section 6.1, neither Seller nor Buyer shall be entitled to require the other to facilitate a repurchase of a Loan; provided, however, that in the event that the Buyer identifies one or more Unenforceable Loans representing five percent (5%) or more of the Aggregate Balance of the Pool; and provided that the Buyer, in writing and within one hundred and twenty (120) days from the Transfer Date, presents such Unenforceable Loan(s) to Seller for repurchase; then in such instance and upon the Seller's agreement that both conditions have been met, the Seller shall repurchase from the Buyer, the Loan so identified as an Unenforceable Loan(s). Buyer shall supply Seller with reasonable evidence satisfactory to Seller that said Loan is an Unenforceable Loan. Buyer acknowledges and agrees that some or all of the Loans may be Unenforceable Loans and may have little or no value and further acknowledges and agrees that Seller shall have no obligation to repurchase any Loan sold hereunder unless the aforesaid conditions are fully satisfied.

6.3      **Buyer's Duty to Purchase Not Affected.** Seller's exclusion or repurchase of one or more of the Loans shall not affect Buyer's duty to purchase the remaining Loans on the terms and conditions set forth in this Agreement.

6.4      **Contingency Fee Agreements.** This sale includes Loans that are the subject of a contingency fee agreement or arrangement with counsel representing Seller. Buyer shall purchase such Loans subject to and shall assume all obligations of the contingency fee agreement or arrangement.

6.5      **Transfer Documentation.** Transfer of any repurchased Loan, including any related Transfer Documents or Collateral, shall be effected by the execution and delivery by Buyer of documents substantially similar to those by which such Loan, Transfer Documents and any related Collateral were transferred to Buyer. Buyer shall execute and deliver any and all such additional assignments, instruments of transfer and other documents as Seller may reasonably require in order to complete the transactions contemplated hereunder. Seller shall be responsible for, and shall pay when due and payable, all transfer, filing and recording fees and taxes, costs and expenses, and any state or county documentary taxes, if any, with respect to the filing or recording of any document or instrument contemplated hereby in connection with such repurchase and shall be responsible for preparing and recording any documents evidencing the transfers contemplated in connection with such repurchase.

6.6      **Offset Amount.** The "Offset Amount" shall be that amount (as determined by Seller in Seller's reasonable judgment) necessary to accurately and reasonably compensate Seller for the loss in value resulting from any defect or condition or relating to any Loan to be repurchased hereunder (other than a defect or condition which results solely from an action of Seller) which did not exist when such Loan was transferred to the extent that such defect or condition is attributable to the action or inaction or fault of Buyer. In particular, subject to the foregoing, the Offset Amount shall include any decrease in the value of the Loan attributable to (i) any failure of the Buyer to service or manage the Loan in accordance with applicable law and prudent loan servicing standards for similar commercial loans or prudent real property management standards for similar real property, as the case may be or (ii) Buyer's inability or failure to recovery any Collateral to Seller in the same condition (normal wear and tear excepted) as such property was in on the date of its transfer to Buyer due to Buyer's gross negligence or willful misconduct or (iii) the inability or failure of Buyer to transfer the Loan to Seller without any encumbrances other than those encumbrances in existence on the Transfer Date.

## VII.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants and covenants, to and with Seller, as of the date of this Agreement and as of the Transfer Date, that:

7.1    **No Collusion.** Neither Buyer, its affiliates, nor any of their respective officers, partners, agents, representatives, employees or parties in interest (i) has in any way colluded, conspired, connived or agreed directly or indirectly with any other bidder, firm or person to submit a collusive or sham bid, or any bid other than a bona fide bid, in connection with the Sale, or (ii) has, in any manner, directly or indirectly, sought by agreement or collusion or communication or conference with any other bidder, firm or person to fix the price or prices, or to fix any overhead, profit or cost element of the bid price or the bid price of any other bidder at the Sale resulting in Buyer being the highest bidder for the Loans subject to this Agreement, or to secure any advantages against Seller.

7.2    **Authorization.** Buyer is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject or by which its assets may be bound and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement. Buyer, if a corporation, will deliver to Seller, within ten (10) Business Days after the date of this Agreement, a certified copy of a resolution of its Board of Directors authorizing Buyer's entry into this Agreement through such representative, together with such documents as evidence Buyer's good standing and authority. If Buyer is not a corporation, Buyer shall deliver to Seller within ten (10) Business Days such evidence as the Seller may reasonably require evidencing Buyer's legal authority to enter into this Agreement and purchase the Loans, including without limitation, (i) any partnership agreements, if Buyer is a partnership, (ii) trust agreements, if Buyer is a trust, or (iii) operating agreements, if Buyer is a limited liability company.

7.3    **Binding Obligations.** Assuming due authorization, execution and delivery by each party hereto, this Agreement and all of the obligations of Buyer hereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law.)

7.4    **No Breach or Default.** The execution and delivery of this Agreement and the performance of its obligations hereunder by Buyer will not conflict with any provision of any law or regulation to which Buyer is subject or by which any of its assets may be bound or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it or any of its assets may be bound, or any order or decree applicable to Buyer.

7.5    **Nondisclosure.** Buyer is in full compliance with its obligations under the terms of any Confidentiality Agreement executed by Buyer to review the information made available by Seller to all potential bidders for the Loans, and the terms thereof are hereby incorporated herein, subject to Buyer's ownership rights and interests acquired by Buyer on the Transfer Date.

7.6    **Identity.** Buyer is a "United States person" within the meaning of Paragraph 7701(a)(30) of the Internal Revenue Code of 1986, as amended.

7.7    **No Affiliation With Seller.** Except as may have been previously disclosed to Seller in writing, Buyer is not or has not been affiliated, directly or indirectly, with Seller or any of their respective other agents or employees.

7.8    **Assistance of Third Parties.** Buyer hereby agrees, acknowledges, confirms and understands that Seller shall have no responsibility or liability to Buyer arising out of or related to any third party's failure to assist or cooperate with Buyer. In addition, Buyer is not relying upon the continued actions or efforts of Seller or any third party in connection with its decision to purchase the Loans. The risks attendant to the potential failure or refusal of third parties to assist or cooperate with Buyer and/or Seller in the effective

11

transfer, assignment, and conveyance of the purchased Loans, and/or assigned rights shall be borne by Buyer. Upon the request of Buyer from time to time, Seller, at Buyer's sole cost and expense, will cooperate and assist Buyer in documenting the chain of title to and ownership of the Loans prior to their sale to Buyer.

7.9     **Enforcement/Legal Actions.** Buyer covenants, agrees, warrants and represents that Buyer shall not (i) institute any enforcement or legal action or proceeding in the name of Seller, or any subsidiary thereof, or the Loan Sale Advisor or (ii) make reference to any of the foregoing entities in any correspondence to or discussion with any particular Obligor regarding enforcement or collection of the Loans, except to inform such Obligor that Buyer is the assignee of Seller. Buyer shall not misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Obligor the identity of Buyer or that Buyer is the owner of the Loans and has possession of the Transfer Documents. Buyer further represents, warrants and covenants not to use, adopt, exploit, or allude to Seller or any name derived therefrom or confusingly similar therewith or the name of any other local, state or federal agency or association to promote Buyer's sale, enforcement, collection, or management of the Loans. Buyer agrees, acknowledges, confirms and understands that there may be no adequate remedy at law for a violation of the terms, provisions, conditions and limitations set forth in this Section and Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof.

7.10    **Status of Buyer.** Buyer represents, warrants and certifies to Seller that it is (i) a financial institution, (ii) an institutional purchaser including a sophisticated purchaser that is in the business of buying or originating loans of the type being purchased or that otherwise deals in such loans in the ordinary course of the Buyer's business, or (iii) an entity that is defined as an accredited investor under the federal securities laws. Buyer hereby reaffirms the statements and certifications qualifying Buyer to participate as a bidder at the Sale as set forth in the documents executed in connection with the Sale.

7.11    **No Broker's/Finder's Fees.** Buyer has not dealt with any broker, agent or finder in connection with the transaction contemplated by this Agreement that would give rise to a claim for a brokerage commission or finder's fee. Buyer hereby indemnifies and agrees to defend and hold harmless Seller and Loan Sale Advisor from and against any claims for brokerage fees or commissions of any broker, agent or finder resulting from the transaction contemplated by this Agreement, which claims are made by and through Buyer. Buyer acknowledges that Seller shall have no liability for the payment of any brokerage fees, commissions or finder's fees, other than to the Loan Sale Advisor, in connection with the transaction contemplated by this Agreement.

7.12    **Notification.** Buyer shall use its best faith efforts to notify each Obligor of Buyer's purchase of the Loan within thirty (30) days after the Closing Date, and direct that payments on the Loan and requests for advances under the Loans, if applicable, after the Closing Date be made to Buyer's place of business at the address set forth in **Exhibit A** or such other place as Buyer may direct in writing. On the Closing Date, Seller shall provide Buyer a notification of sale letter substantially in the form of **Exhibit F**, which Buyer may at its sole cost provide to Obligors under the Loans.

## VIII.   REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

8.1     Representations and Warranties of Seller. Seller hereby represents and warrants to Buyer that:

Ownership/Authority.  As of the date hereof and as of the Transfer Date, Seller is the sole owner of all right, title and interest in and to the Loans except in the case of a participation interest in a Loan, free and clear of all liens and encumbrances, and has the right to transfer Seller's interest therein to Buyer on the terms and conditions set forth herein.  Seller has all requisite power and authority to perform all of its obligations under this Agreement and to execute all instruments and other documents contemplated to be executed and delivered by Seller to Buyer in connection herewith.

8.2     **Buyer's Remedies for Material Breach of Seller's Representations or Warranties.**

(a)    Remedies for Breach. In the event (i) any representation or warranty of Seller set forth hereinabove is untrue in any material respect, (ii) such untrue representation or warranty has a material adverse effect upon any Loan purchased hereunder, and (iii) Buyer gives Seller written notice of such untrue representation or warranty on or before the expiration thereof as set forth below, then Seller shall have a period of ninety (90) days from the date Seller receives such notice in which to cure such untrue representation or warranty. In the event Seller fails or refuses to cure such untrue representation or warranty to the reasonable satisfaction of Buyer, then Seller, at Seller's election, must either (i) repurchase the Loan(s) which are adversely affected by such untrue representation or warranty by paying the Repurchase Price to Buyer; or (ii) pay to Buyer the actual damages incurred by Buyer which are directly caused by such untrue representation or warranty, as such actual damages are reasonably determined by Seller. The election to be made by Seller hereunder shall be at Seller's sole and absolute discretion and shall constitute the sole and exclusive remedy of Buyer for material breach of such representations and warranties made by Seller in Section 8.1 above.

(b)    Limitations/Waiver.

(i)    Notwithstanding anything herein to the contrary, (a) in no event shall any actual damages payable by Seller pursuant to this Article exceed the Repurchase Price with respect to the Loan(s) which are adversely affected by such untrue representation or warranty, as that sum is calculated in accordance with Section 8.2(a) above, and (b) if Buyer has taken any action, or failed to take any action, which impairs the enforceability or collectibility of a Loan, the Seller shall have no obligation to repurchase such Loan from the Buyer or to cure any untrue representation or warranty made by Seller with respect to such Loan.

(ii)    With respect to the representations and warranties set forth in Section 8.1, Seller shall not be liable thereon unless a court of competent jurisdiction has finally determined that the Evidence of Indebtedness is not an enforceable obligation of the maker or obligor thereof.

(iii)    Except for the enforcement of the remedies provided in this Section, Buyer hereby waives any and all rights and remedies to pursue the Seller in law, equity, arbitration or other legal proceedings for damages or other relief in the event any representation or warranty of Seller set forth in this Agreement or otherwise is untrue or misleading in any respect, including, without limitation hereby, actual, special, consequential and punitive damages.

(iv)    Expiration. **ALL REPRESENTATIONS AND WARRANTIES OF SELLER SET FORTH IN THIS ARTICLE SHALL BE DEEMED TO EXPIRE ON THE DATE WHICH IS ONE HUNDRED TWENTY (120) DAYS AFTER THE TRANSFER DATE, AND SELLER SHALL HAVE NO OBLIGATIONS OR LIABILITY UNDER SUCH REPRESENTATIONS AND WARRANTIES AFTER THE EXPIRATION THEREOF.**

8.3    **No Other Representations or Warranties.** EXCEPT AS PROVIDED IN SECTION 8.1, THE LOANS ARE BEING SOLD "AS IS" AND "WITH ALL FAULTS", WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO EITHER CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, AND SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE LOANS, THE PACKAGING OF THE LOANS, THE COLLATERAL OR THE TRANSFER DOCUMENTS. THE LOANS MAY BE UNENFORCEABLE LOANS.

## IX.    BUYER'S EVALUATION AND ACCEPTANCE OF RISK OF LOANS SOLD "AS-IS"

Buyer hereby represents, warrants, acknowledges and agrees to the following:

9.1    **Independent Evaluation.** Buyer's bid for and decision to purchase the Loans pursuant to this Agreement is and was based upon Buyer's own independent evaluation of information deemed relevant by

Buyer, including, but not limited to, the information made available by Seller to Buyer, and Buyer's independent evaluation of the Transfer Documents, Collateral, public information and other related information. Buyer acknowledges and agrees that, while some information concerning the Loans was made available to Buyer for review prior to the Sale, such information, through no fault of Seller or the Loan Sale Advisor, may not be complete. If Seller, a loan servicer or any of Seller's contractors or employees failed to deliver to Seller any or all of the Loan information in such servicer's or employee's possession, then neither Seller nor Loan Sale Advisor shall not be liable for the failure to include such Loan information in the materials made available for review by prospective bidders prior to the Sale. Buyer has relied solely on its own investigation and it has not relied upon any oral or written information provided by Seller or its personnel or agents or Loan Sale Advisor and acknowledges that no employee or representative of Seller has been authorized to make, and that Buyer has not relied upon, any statements other than those specifically contained in this Agreement.

9.2     **Due Diligence.** Buyer has been urged, invited and directed to conduct such due diligence review and analyses of the Transfer Documents, Collateral and related information, together with such records as are generally available to the public from local, county, state and federal authorities, record-keeping offices and courts (including, without limitation, any bankruptcy courts in which any Obligor(s), if any, may be subject to any pending bankruptcy proceedings), as Buyer deemed necessary, proper or appropriate in order to make a complete informed decision with respect to the purchase and acquisition of the Loans.

9.3     **Economic Risk.** Buyer acknowledges that the Loans, the Transfer Documents and the Collateral may have limited or no liquidity and Buyer has the financial wherewithal to own the Loans for an indefinite period of time and to bear the economic risk of an outright purchase of the Loans and a total loss of the Purchase Price for the Loans.

## X.    ENVIRONMENTAL RISKS AND OTHER COLLATERAL ASSESSMENTS

Buyer agrees to fully assume all environmental risks and liabilities associated with the Loans. Further, Buyer understands, acknowledges and agrees that there may be violations of Environmental Laws (as defined below) or other environmental issues and/or risks with respect to the Collateral (together with all buildings, structures and improvements situated thereon) described in the Collateral Documents or otherwise securing the payment of the Loans that may or may not be visible or apparent and which may or may not be above or below the surface thereof. A copy of a written report may or may not have been included in each Credit File evidencing the results of an environmental assessment performed on Seller's behalf or on behalf of a prior owner of the Loan or Collateral for the purpose of assessing the environmental issues concerning the Collateral ("**Environmental Assessment Report**"). Buyer understands and acknowledges that: (i) any Environmental Assessment Report that may have been in any Credit File or was otherwise provided or made available by Seller, or by its employees, agents, contractors and representative, was being provided expressly without (and with an express disclaimer of any) representations or warranties as to the qualifications or expertise of the author thereof, or the completeness or accuracy of the facts, presumptions and conclusions contained therein, and Buyer shall not rely on same in evaluating or closing the transaction contemplated hereby, and (ii) Buyer assumes the risk that any Environmental Assessment Report that may have existed but which was not provided by Seller, or its employees, agents, contractors and representatives to Buyer, may have had a direct or indirect effect upon the actual and/or Buyer's perceived valuation, risks or the assessment thereof and/or hazards associated with or related to the Collateral. "**Environmental Laws**" includes the Resource Conservation and Recovery Act (42 U.S.C. 6901, et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§7401 et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 1101 et seq.), the Clean Air Act (42 U.S.C. §§ 7401 et seq.), the Clean Water Act (33 U.S.C. §§ 1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§ 136 et seq.), and the Safe Drinking Water Act (42 U.S.C. §§ 3001 et seq.), as any of the same may be amended from time to time, and all regulations, orders, rules, procedures, guidelines and the like promulgated pursuant thereto, and any other state or local laws, regulations, orders, rules, procedures, guidelines and the

like dealing with environmental matters, regardless of whether such laws and/or regulations are in existence at the time this Agreement is executed.

## XI.    INDEMNIFICATION

11.1    **Buyer's Indemnification.** From and after the Transfer Date, Buyer shall indemnify and hold harmless Seller and Loan Sale Advisor against and from any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of, any Claim that Seller or Loan Sale Advisor shall incur or suffer as a result of (i) any gross negligence or willful misconduct of Buyer or Buyer's agents in connection with the Loans and/or its purchase of the Loans in connection with this Agreement, if such gross negligence or willful misconduct occurred after the Transfer Date, (ii) the inaccuracy of any of Buyer's representations or warranties herein, (iii) the breach of any of Buyer's covenants herein, or (iv) any Claim by any Obligor regarding the assignment, subsequent enforcement, servicing or administration of the Loan by Buyer which occurred after the Transfer Date.

11.2    **Seller's Indemnification.** From and after the Transfer Date and for a period of one hundred and twenty (120) days after the Transfer Date, Seller shall indemnify and hold harmless Buyer against and from any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of, any Litigation Claim that Buyer incurs or suffers as a result of (i) any gross negligence or willful misconduct of Seller or Seller's agents in connection with the Loans if such gross negligence or willful misconduct occurred before the Transfer Date, or (ii) the breach of any of Seller's covenants herein. Promptly (but in no event more than thirty (30) days) after receipt by Buyer of notice of the commencement of any Litigation Claim, Buyer shall notify Seller in writing of the commencement thereof. Seller shall have the right to assume the defense of any such Litigation Claim with counsel of its choosing provided that the Buyer shall have the right thereafter to participate in such defense if counsel selected by Seller is unacceptable in the reasonable judgment of Buyer or the Buyer's interests are reasonably expected to be divergent from those of Seller. Any such participation by Buyer shall be at its sole cost and expense and shall not be within the indemnification provided hereunder.

## XII.    ASSIGNMENT OF RIGHTS TO THIRD PARTIES

12.1    **Assignment of Agreement Prior to Transfer Date.** Prior to the Transfer Date, Buyer shall not assign, encumber, transfer or convey its rights under this Agreement without the prior written consent of Seller. Seller may require, as a condition of such consent and approval, that Seller have the right to approve the instrument of assignment or transfer prior to the execution thereof. Any assignment made by Buyer for the purpose of Buyer securing a line of credit or other warehouse financing arrangement shall not require the Transfer Documents to be made available to the financing assignee. ALL REQUESTS TO ASSIGN OR TRANSFER BUYER'S INTEREST IN, TO OR UNDER THIS AGREEMENT PRIOR TO THE TRANSFER DATE MUST BE MADE IN WRITING AND RECEIVED BY SELLER PURSUANT TO THE NOTICE PROVISIONS OF THIS AGREEMENT ON OR BEFORE 5:00 P.M. (CENTRAL TIME) ON THE DATE WHICH IS TEN (10) BUSINESS DAYS PRIOR TO THE SCHEDULED TRANSFER DATE.

Notwithstanding any consent by Seller to any assignment or transfer of this Agreement, no assignee or transferee shall further assign or transfer this Agreement prior to the Transfer Date without Seller's prior written consent in each instance. Without limiting the foregoing, any assignment or transfer, directly or indirectly, of the following shall constitute an assignment of this Agreement and, as such, shall be subject to the provisions of this Article, unless the transferee was theretofore an affiliate of Buyer: (a) if Buyer is a partnership, ownership or control of a total of the majority of the general partnership interest in Buyer, (b) if Buyer is a publicly held corporation, partnership or trust, ownership or control of a total of more than five percent (5%) of the equity or beneficial interests in Buyer to a single person or entity or to affiliates of that person or entity, or (c) if Buyer is not a publicly held corporation, partnership or trust, ownership or control of a total of more than thirty percent (30%) of the equity or beneficial interest in Buyer. Seller's consent under this Article shall not be unreasonably withheld or delayed. No permitted assignment or transfer (whether

15

made before or after the Transfer Date) shall relieve Buyer of any of its liabilities or obligations under this Agreement.

12.2    **Assignment After Transfer Date.** With respect to any Loan, Buyer and any subsequent owner shall have the right, at any time after the Transfer Date, to assign its rights in, under and/or to any Loan to any subsequent transferee of such Loan; provided, however, that such transferee shall be bound by all of the terms and provisions of this Agreement, and Buyer shall remain liable for all obligations of Buyer to Seller hereunder, notwithstanding such assignment.

## XIII. DEFAULT/REMEDIES

13.1    **Remedies for Buyer's Default.** IF BUYER SHOULD DEFAULT IN ANY OF ITS REPRESENTATIONS, WARRANTIES, COVENANTS OR OBLIGATIONS UNDER THIS AGREEMENT, THEN SELLER SHALL HAVE THE RIGHT TO TERMINATE BUYER'S RIGHTS UNDER THIS AGREEMENT BY WRITTEN NOTICE TO BUYER, AND SELLER MAY RETAIN ANY DEPOSIT PAID HEREUNDER AND MAY ADDITIONALLY SEEK SUCH DAMAGES OR OTHER REMEDIES AS ARE AVAILABLE AT LAW OR IN EQUITY FOR SUCH BREACH.  IF SELLER ELECTS TO TERMINATE BUYER'S RIGHTS UNDER THIS AGREEMENT, SELLER SHALL BE ENTITLED TO RE-SELL THE LOANS IN ANY MANNER SELLER DEEMS APPROPRIATE, FREE AND CLEAR OF ALL CLAIMS OF BUYER.

13.2    **Remedies for Seller's Default/Right to Cure.** In the event Seller fails to perform any of Seller's obligations under this Agreement (without the fault of Buyer), Buyer shall give Seller written notice thereof, whereupon Seller shall have ten (10) Business Days to cure such failure.  If Seller fails to cure, Buyer shall be entitled to terminate this Agreement and to seek to recover from Seller Buyer's actual and verifiable out-of-pocket expenses and actual damages; in no event shall Buyer be entitled to seek specific performance, or consequential, punitive or exemplary damages.

## XIV. NOTICE OF OBLIGOR CLAIMS OR LITIGATION

Buyer shall promptly notify Seller of any Claim, threatened Claim, or litigation filed by any Obligor against Seller that arises from or relates to any of the Loans purchased hereunder.

## XV. FILES AND RECORDS

15.1    **Conformity to Law.** Buyer agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling, maintenance, servicing and collection of all Loans and in the maintenance of all documents and records relating to the Loans purchased hereunder, including, but not limited to, the length of time such documents and records are to be retained, the payment of interest on escrow accounts and making any disclosures to Obligors as may be required by law.

15.2    **Inspection by Seller.** After the Transfer Date, Buyer agrees that Seller shall have the continuing right to use, inspect, and make extracts from, or copies of, any documents or records transferred to Buyer, upon Seller's reasonable notice and request to Buyer.  Buyer further agrees, upon such reasonable request from Seller, to allow Seller the temporary possession, custody and use of original documents for any lawful purpose and upon reasonable terms and conditions.  Before destruction or disposition of any documents or files transferred hereunder, Buyer agrees to give to Seller at least sixty (60) days written notice and to allow Seller, at its own expense, to recover the same from Buyer.

15.3    **Buyer's Document Maintenance.** Buyer shall preserve and maintain the Transfer Documents transferred to Buyer pursuant to this Agreement, and shall require any successor or transferor of any such Transfer Documents to preserve and maintain such Transfer Documents, for a period equal to five (5) years from the date a Loan is resolved and the underlying Evidence of Indebtedness is canceled, or for such longer

period as may be required by applicable law; provided, however, that Buyer shall preserve and maintain any and all such Transfer Documents as may be specified by Seller for such longer period as Seller may reasonably request in writing.

## XVI. INFORMATIONAL TAX REPORTING

Buyer hereby agrees to perform all obligations arising after the Closing Date, with respect to federal and/or state tax reporting relating to or arising out of the Loans, the Collateral and/or the Transfer Documents sold and assigned pursuant to this Agreement including, without limitation, the obligations with respect to Forms 1098 and backup withholding with respect to the same, if required, for the year 2001 and thereafter.

## XVII. RETAINED CLAIMS

Buyer and Seller agree that the sale of the Loans pursuant to this Agreement shall exclude the transfer to Buyer and **Buyer shall not pursue** any and all claims and/or causes of action Seller has or may have (i) against officers, directors, employees, insiders, accountants, attorneys, other persons employed by Seller, underwriters or any other similar person or persons who have caused a loss to Seller in connection with the initiation, origination or administration of any of the Loans, or (ii) against any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of any of the Loans. Notwithstanding the foregoing, all FIRREA rights, federal holder-in-due-course and D'Oench, Dhume rights, if any, applicable to the Loans, shall be transferred to Buyer to the extent allowed by law, and without precluding Seller's use of same to the extent necessary for Seller to defend itself in any proceeding brought by an Obligor.

## XVIII. NOTICES

All notices, waivers, demands, requests and other communications required or permitted by this Agreement (collectively, "Notices") shall be in writing and given as follows: (a) personal delivery, (b) established overnight commercial courier with delivery charges prepaid or duly charged, or (c) registered or certified mail, return receipt requested, first class postage prepaid. Such Notices shall be addressed to the respective parties at the address of the recipient party set forth on **Exhibit A** hereto. Notices so given by personal delivery shall be presumed to have been received upon tender to the applicable natural person designated below to receive notices or, in the absence of such a designation, upon tender to the person signing this Agreement on behalf of the applicable party. Notices so given by overnight courier shall be presumed to have been received the next Business Day after delivery to such overnight commercial courier. Notices so given by mail shall be presumed to have been received on the third (3rd) day after deposit into the United States Postal System. All copies to the applicable persons or entity(ies) designated on **Exhibit A** to receive copies (if any) shall be given in the manner described above, and such giving shall be a prerequisite to the effectiveness of any Notice.

## XIX. WAIVER AND RELEASE

Buyer, its affiliates, officers, directors, successors or assignees thereof, and all subsequent transferees of the Loans, and all others claiming by or through Buyer or subsequent transferees, hereby disclaim and waive any right or cause of action they may now or in the future have against Seller and any of its contractors (including the Loan Sale Advisor), officers, directors, employees, attorneys, agents, and predecessors in interest as a result of the purchase of the Loans; provided, however, that this waiver and release shall not extend to any liability of Seller arising from Seller's failure to perform its obligations in accordance with the terms of this Agreement. In addition, Buyer, its affiliates, officers, directors, successors or assignees thereof, and all subsequent transferees of the Loans, and all others claiming by or through Buyer or subsequent transferees, hereby release Seller, its contractors, employees, attorneys and their successors and assigns, from any and all Claims arising from or related to the Loans, the Collateral or the Transfer Documents, or arising

out of the violation of any applicable laws (including, without limitation, state and federal securities laws and/or Environmental Laws.)

## XX. MISCELLANEOUS PROVISIONS

20.1    **Severability**. If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not materially affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

20.2    **Rights Cumulative; Waivers**. The rights of each of the parties under this Agreement are cumulative and may, be exercised as often as any party considers appropriate under the terms and conditions specifically set forth. The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such right shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

20.3    **Headings**. The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

20.4    **Construction**. In the event of any question or dispute under this Agreement, the parties agree that the terms of this Agreement shall not be construed against the drafter, but shall be construed as though all parties were the drafter.

20.5    **Assignment**. Subject to the restrictions set forth in Article XII, this Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and assigns.

20.6    **Prior Understandings**. This Agreement supersedes any and all prior discussions and agreements between Seller and Buyer with respect to the purchase of the Loans and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

20.7    **Integrated Agreement**. This Agreement and all Addenda, Exhibits and Schedules hereto constitute the final complete expression of the intent and understanding of Buyer and Seller. This Agreement shall not be altered or modified except by a subsequent writing, signed by Buyer and Seller.

20.8    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument, and either party hereto may execute this Agreement by signing any such counterpart.

20.9    **Non-Merger/Survival**. Each and every covenant herein above made by Buyer or Seller shall survive the delivery of the Transfer Documents and shall not merge into the Transfer Documents, but instead shall be independently enforceable.

20.10   **Governing Law/Choice of Forum**. This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the laws of the State of North Carolina (the "State"). The parties agree that any legal actions between Buyer and Seller regarding the purchase of the Loans hereunder shall be originated in the district court in and for the State in the county where Seller is domiciled, subject to any rights of removal Seller may have, and Buyer hereby consents to the

jurisdiction of said court in connection with any action or proceeding initiated concerning this Agreement and agrees that service by mail to the address specified on **Exhibit A** to this Agreement shall be sufficient to confer jurisdiction over Buyer in such State Court. Nothing contained in this Section is intended to waive, negate, limit or modify the provisions hereof requiring disputes among the parties be decided by binding arbitration, and the location thereof.

20.11   No Third-Party Beneficiaries. Each of the provisions of this Agreement is for the sole and exclusive benefit of the Seller, Buyer and Loan Sale Advisor, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

20.12   Calculation of Calendar/Business Days. If any date (whether calculated on the basis of calendar days or Business Days) upon which or by which action is required under this Agreement is a Saturday, Sunday or legal holiday recognized by the Federal Government or the State of North Carolina, then the date for such action shall be extended to the first day that is after such date and is not a Saturday, Sunday or legal holiday recognized by the Federal Government or the State of North Carolina.

20.13   Arbitration.   EXCEPT AS SET OUT BELOW, ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS INSTRUMENT, AGREEMENT OR DOCUMENT OR ANY RELATED INSTRUMENTS, AGREEMENTS OR DOCUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT (COLLECTIVELY, "CLAIM"), SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW), THE RULES OF PRACTICE AND PROCEDURE FOR THE ARBITRATION OF COMMERCIAL DISPUTES OF J.A.M.S./ENDISPUTE OR ANY SUCCESSOR THEREOF ("J.A.M.S."), AND THE "SPECIAL RULES" SET FORTH BELOW. IN THE EVENT OF ANY INCONSISTENCY, THE SPECIAL RULES SHALL CONTROL.   JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.   ANY PARTY TO THIS INSTRUMENT, AGREEMENT OR DOCUMENT MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY CLAIM IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION.

(a)   SPECIAL RULES. THE ARBITRATION SHALL BE CONDUCTED IN THE CITY OF CHARLOTTE, NORTH CAROLINA AND ADMINISTERED BY J.A.M.S. WHO WILL APPOINT AN ARBITRATOR; IF J.A.M.S. IS UNABLE OR LEGALLY PRECLUDED FROM ADMINISTERING THE ARBITRATION, THEN THE AMERICAN ARBITRATION ASSOCIATION WILL SERVE.   ALL ARBITRATION HEARINGS WILL BE COMMENCED WITHIN 90 DAYS OF THE DEMAND FOR ARBITRATION; FURTHER, THE ARBITRATOR SHALL ONLY, UPON A SHOWING OF CAUSE, BE PERMITTED TO EXTEND THE COMMENCEMENT OF SUCH HEARING FOR UP TO AN ADDITIONAL 60 DAYS.   ANY DISPUTE CONCERNING THIS ARBITRATION PROVISION OR WHETHER A CLAIM IS ARBITRABLE SHALL BE DETERMINED BY THE ARBITRATOR. THE ARBITRATOR SHALL HAVE THE POWER TO AWARD LEGAL FEES PURSUANT TO THE TERMS OF THIS INSTRUMENT, AGREEMENT OR DOCUMENT.

(b)   RESERVATION OF RIGHTS. NOTHING IN THIS ARBITRATION PROVISION SHALL BE DEEMED TO (I) LIMIT THE APPLICABILITY OF ANY OTHERWISE APPLICABLE STATUTES OF LIMITATION OR REPOSE AND ANY WAIVERS CONTAINED IN THIS INSTRUMENT, AGREEMENT OR DOCUMENT; OR (II) BE A WAIVER BY SELLER OF THE PROTECTION AFFORDED TO IT BY 12 U.S.C. SEC. 91 OR ANY SUBSTANTIALLY EQUIVALENT STATE LAW; OR (III) LIMIT THE RIGHT OF EITHER PARTY HERETO (A) TO EXERCISE SELF HELP REMEDIES SUCH AS (BUT NOT LIMITED TO) SETOFF, OR (B) TO INITIATE A JUDICIAL ACTION FOR RELIEF SUCH AS (BUT NOT LIMITED TO) FORECLOSE AGAINST ANY REAL OR PERSONAL PROPERTY COLLATERAL, OR (C) TO OBTAIN FROM A COURT PROVISIONAL OR ANCILLARY REMEDIES SUCH AS (BUT NOT LIMITED TO) INJUNCTIVE RELIEF, WRIT OF POSSESSION OR THE APPOINTMENT OF A RECEIVER. EITHER PARTY MAY EXERCISE SUCH SELF HELP RIGHTS, INITIATE JUDICIAL ACTION, OR OBTAIN SUCH PROVISIONAL OR

ANCILLARY REMEDIES BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING BROUGHT PURSUANT TO THIS INSTRUMENT, AGREEMENT OR DOCUMENT. NEITHER THIS EXERCISE OF SELF HELP REMEDIES NOR THE INSTITUTION OR MAINTENANCE OF AN ACTION FOR ANY JUDICIAL RELIEF OR PROVISIONAL OR ANCILLARY REMEDIES SHALL CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY, INCLUDING THE CLAIMANT IN ANY SUCH ACTION, TO SUBMIT THE CLAIM TO ARBITRATION IF ANY OTHER PARTY CONTESTS SUCH ACTION FOR JUDICIAL RELIEF.

(c)     WAIVER OF CERTAIN DAMAGES. THE PARTIES HERETO WAIVE ANY RIGHT OR REMEDY EITHER MAY HAVE AGAINST THE OTHER TO RECOVER PUNITIVE OR EXEMPLARY DAMAGES ARISING OUT OF ANY CLAIM WHETHER THE CLAIM IS RESOLVED BY ARBITRATION OR BY JUDICIAL ACTION.

20.14   **Facsimile Signatures.** This Agreement shall be deemed binding when executed by the Buyer and the original or a facsimile thereof is received and executed by Seller. Facsimile signatures shall be deemed valid and binding to the same extent as the original.

IN TESTIMONY WHEREOF, the parties hereto have executed this Agreement effective September 19, 2001.

BUYER:

Premier Capital LLC, a Limited Liability Company

By: _____

Name:  Paul George

Title:  Manager

SELLER:

Bank of America, N.A. its subsidiaries and predecessors in interest

By: _____

Name:  _____

Title:  _____

# Exhibit A

*Offering #DP010912*
## ADDRESSES

## ADDRESSES

SELLER:

Bank of America, N.A.
101 N. Tryon Street, 7th Floor  (NC1-001-07-06)
Charlotte, North Carolina 28255
Attention:  Commercial Special Assets/Alison Fey

Telephone No.: (704) 388-2403

Telecopy No.:  (704) 386-1874


BUYER:

Premier Capital LLC
226 Lowell Street
Wilmington, MA  01887
Attention: Paul George

Telephone No.: (978) 661-9000

Telecopy No.: (978) 694-4890

1

# Exhibit B

*Offering #DP010912*
## LOAN SCHEDULE

# Loan Schedule

## Data as of Cut-Off date of August 28, 2001

### Bank of America, N.A. Offering # DP010912

*Prepared By First Financial Network, Inc.*

| Pool | Asset Name | Asset Number | Legal Balance | Officer Number | State | Loan Type | Days Past Due | Charge Off Date | Beacon Score |
|---|---|---|---|---|---|---|---|---|---|
| **101** | **Judgments (National)** | | | | | | | | |
| 101 | A-Flash Transport Corp. | 21-3355372-26 | 30,215.17 | CSA1J | FL | J | 556 | 04/19/2000 | 521 |
| 101 | Advance Forklifts, Inc. | 21-3766768-18 | 29,364.98 | CSA1J | FL | J | | 07/31/1983 | 719 |
| 101 | Alpha & Omega Housing | 61-211272-273 | 39,337.43 | CSA1J | MD | J | 1292 | 02/25/1998 | 568 |
| 101 | American Reveg, Ltd. | 25-0-0 | 1,296.87 | 2001J | NM | J | | | N/A |
| 101 | Arroyave, Efrain | 21-2950603-265 | 17,062.18 | CSA1J | FL | J | 1134 | 02/14/1997 | 535 |
| 101 | Arroyave, Efrain | 21-3664716-18 | 46,646.18 | CSA1J | FL | J | 1892 | 10/29/1996 | 535 |
| 101 | Asterbadi, Nabil j. | 41-115486-265 | 183,905.89 | CSA1J | DC | J | 537 | 08/06/1992 | 579 |
| 101 | Bedell, David L. | 35-10080876-18 | 10,346.08 | CSA1J | | J | 626 | 03/05/1999 | 486 |
| 101 | Bernie & Mattie, Inc. | 25-1066779-18 | 5,218.48 | 2001J | NM | J | 1140 | 09/16/1998 | 659 |
| 101 | Bolton, Brent R. | 25-1063321-18 | 54,397.65 | 2001J | NM | J | 436 | 06/23/1998 | 534 |
| 101 • | Bradley Boat Repair | 21-3676660-18 | 14,995.84 | CSA1J | FL | J | 1222 | 04/21/1998 | 595 |
| 101 | Brancaccio, Carmine | 21-3769770-18 | 9,752.68 | CSA1J | FL | J | | 08/30/1982 | 637 |
| 101 | Burgess, Bradley | 13-10017668-18 | 9,617.11 | 2001J | KS | J | 708 | | 530 |
| 101 | Burkey, Darren | 53-1194873-18 | 12,800.00 | CSA1J | IL | J | 563 | 01/27/1998 | 624 |
| 101 | Cain, Darrell G. | 35-10075793-18 | 55,391.45 | 2001J | OK | J | | 08/30/1995 | N/A |
| 101 | Calmex Welding, Inc. | 501-5011085-5001 | 73,567.00 | 0CSA1J | CA | J | | 11/15/1999 | 585 |
| 101 | Car Circus Rent to Own | 21-3927923-265 | 53,906.89 | CSA1J | FL | J | | 08/31/1999 | 628 |
| 101 | Chaka, Kiambu & Idella | 21-3770869-18 | 64,418.85 | CSA1J | FL | J | | 04/27/1987 | 629 |
| 101 | Commercial Electric Co. | 53-1198049-18 | 24,719.13 | 2001J | MO | J | 907 | 11/17/1995 | 578 |
| 101 | Cottonwood Travel Inc. | 501-2027498-7001 | 31,192.82 | 0CSA1J | CA | J | 334 | 12/13/1999 | 617 |
| 101 | Cox Motor Company | 63-10076986-18 | 34,213.54 | 2001J | AR | N | 1188 | 06/08/1998 | 544 |
| 101 | Darby, Elson | 75-104513-18 | 42,252.99 | 2001J | TX | J | 1062 | 04/09/1999 | 559 |
| 101 | Delta Metals | 53-1181938-18 | 30,476.11 | 2001J | MO | J | 1373 | 06/22/1998 | 586 |
| 101 | Design Home Remodeling | 21-3772345-18 | 2,816.24 | CSA1J | FL | J | | 11/26/1986 | N/A |
| 101 | Faw, Mercer P. | 51-144137-265 | 40,000.00 | CSA1J | VA | J | 2722 | 04/29/1994 | 611 |
| 101 | First Summit | 21-3773608-18 | 23,312.93 | CSA1J | FL | J | | 01/26/1989 | 623 |
| 101 | Florida Glass Craft | 21-4146515-18 | 30,730.38 | CSA1J | FL | J | 999 | 04/07/1997 | 592 |
| 101 | Foy-King Development | 1-627991-331 | 88,549.70 | CSA1J | NC | J | 937 | 09/17/1998 | 731 |
| 101 | Grove Enterprises Corp. | 21-3339517-265 | 67,392.63 | CSA1J | FL | J | | 07/25/2000 | 482 |
| 101 | Hallmark Electric of Miami | 21-3731846-18 | 119,144.22 | CSA1J | FL | J | 672 | 07/30/1998 | 594 |
| 101 | Hampton, Bob | 75-581058-0 | 7,784.16 | CSA1J | TX | J | | | 574 |
| 101 | Hansfield, Rodney (Nevada Urology | 26-6320-265 | 50,000.00 | CSA1J | NV | J | 498 | 02/08/2000 | N/A |
| 101 | International Grane Corp. | 21-3688657-265 | 36,498.50 | CSA1J | FL | J | | 09/01/1999 | 577 |
| 101 | J R Garner Homes Inc. | 31-3287946-26 | 38,810.73 | CSA1J | GA | J | 2740 | | 681 |
| 101 | Jayson, Jeni L. | 21-3777005-18 | 4,610.58 | CSA1J | FL | J | | 04/25/1989 | N/A |
| 101 | Kenworthy, Thomas W. | 21-3777484-18 | 5,855.51 | CSA1J | FL | J | | 03/21/1985 | 563 |
| 101 | L.S.M. Fast Foods of Athens | 31-3646216-1016 | 145,946.93 | CSA1J | GA | J | 1879 | 05/17/1996 | 696 |
| 101 | Lanier & Sons | 21-3778078-18 | 3,207.31 | CSA1J | FL | J | 3674 | 07/12/1991 | 561 |
| 101 | Leading Concept Technologies | 501-1162296-7001 | 17,613.61 | 0CSA1J | CA | J | | 12/23/1999 | 541 |
| 101 | Lee & Latina, Inc. | 21-3831240-18 | 77,643.10 | CSA1J | FL | J | 433 | 12/13/1996 | 549 |
| 101 | Lesante, Jorge | 21-3778318-18 | 3,533.00 | CSA1J | FL | J | | 10/26/1984 | N/A |
| 101 | Lioy, Antonio | 21-3778508-18 | 20,831.16 | CSA1J | FL | J | | 08/29/1984 | N/A |
| 101 | Martinez, Hiram | 21-3779282-18 | 29,090.63 | CSA1J | FL | J | | 09/30/1983 | 596 |
| 101 | Marvin Steele Enterprises | 53-1183520-26 | 170,000.00 | 2001J | | J | | | N/A |
| 101 | Marvin Steele Enterprises | 53-1183520-18 | 295,000.00 | 2001J | MO | J | | | N/A |
| 01 | Mazon, Domingo | 21-3779456-18 | 85,827.08 | CSA1J | FL | J | | 06/26/1985 | 550 |
| 101 | Metropolitan Industries | 21-3779829-18 | 26,107.93 | CSA1J | FL | J | | 04/28/1988 | 669 |
| 101 | Military Relocation Service. Inc. | 1-371194-315 | 18,363.36 | CSA1J | | J | 999 | 10/01/1991 | N/A |
| 101 | Mitchell, John G. | 25-0-0 | 7,620.21 | 2001J | NM | J | | | N/A |
| 101 | Motorama Express Inc. | 21-2968886-265 | 12,420.02 | CSA1J | FL | J | 1215 | 05/25/1997 | N/A |
| 101 | Multi Care Medical Supplies | 21-3679144-18 | 42,848.77 | CSA1J | FL | J | 466 | 07/28/1998 | 516 |
| 101 | Okair Airlines, Inc. | 35-10073632-18 | 25,064.85 | 2001J | OK | J | | 03/30/1998 | 464 |

| Pool | Asset Name | Asset Number | Legal Balance | Officer Number | State | Loan Type | Days Past Due | Charge Off Date | Beacon Score |
|---|---|---|---|---|---|---|---|---|---|
| 101 | Pat Ward Masonary, Inc. | 21-4032731-18 | 38,381.84 | CSA1J | FL | J | 1325 | 08/14/1997 | 534 |
| 101 | Pauls, James D. Sr. | 21-3781825-18 | 11,101.10 | CSA1J | CA | J | | 03/29/1984 | N/A |
| 101 | Ramdata, Inc. | 21-3702201-18 | 29,411.61 | CSA1J | FL | J | 1267 | 02/04/1998 | 641 |
| 101 | Redlands Air Conditioning | 21-3782922-18 | 6,107.98 | CSA1J | FL | J | | 01/27/1986 | 677 |
| 101 | Reliable Carpet, Inc. | 21-3558553-26 | 37,777.78 | CSA1J | FL | J | 1877 | 09/03/1996 | 655 |
| 101 | Reliable Carpet, Inc. | 21-3558553-18 | 39,987.50 | CSA1J | FL | J | 1918 | 10/09/1998 | 655 |
| 101 | Repcon International, Inc. | 53-1187034-18 | 83,079.11 | 2001J | MO | J | | 12/09/1998 | 539 |
| 101 | Reymar Quality Care, Inc. | 21-3762213-18 | 30,993.96 | CSA1J | FL | J | 934 | 05/25/1999 | N/A |
| 101 | Riggan, Don | 75-155192-18 | 5,186.24 | CSA1J | TX | J | 909 | 07/27/1984 | N/A |
| 101 | Rios, Ricardo/Gross, Ben | 21-3783185-18 | 12,310.66 | CSA1J | FL | J | | 07/27/1984 | N/A |
| 101 | Sas, Tadeusz | 21-2467020-265 | 31,523.29 | CSA1J | FL | J | 670 | 01/16/1996 | 635 |
| 101 | Smith, Charles & Edith | 21-3422594-18 | 75,924.50 | CSA1J | FL | J | 476 | 05/24/2000 | 489 |
| 101 | Square Metal Fabrication & Pipe, Inc. | 35-10074242-18 | 38,061.77 | 2001J | OK | J | 1036 | 12/24/1996 | 479 |
| 101 | Stewart, John Jr. | 21-3587990-18 | 73,409.83 | CSA1J | FL | J | 999 | 06/30/1997 | 704 |
| 101 | Systems Consultants Group, Inc. | 53-1185541-18 | 90,500.00 | 2001J | MO | J | 1400 | 12/14/1998 | N/A |
| 101 | Taylor, William N | 75-111518-18 | 24,934.51 | CSA1J | TX | J | 3575 | 04/09/1999 | 672 |
| 101 | Teichman, John | 53-1186473-18 | 18,716.43 | 2001J | MO | J | | 12/22/1998 | 594 |
| 101 | The Supernet Online Inc. | 21-3702243-18 | 31,281.00 | CSA1J | FL | J | 1304 | 08/31/1998 | N/A |
| 101 | The Western Branch /Wisteria Branch | 21-4032145-18 | 49,955.00 | CSA1J | FL | J | 1515 | 07/08/1997 | 480 |
| 101 | Top Ten Card | 21-3786329-18 | 89,677.46 | CSA1J | GA | J | | 02/24/1987 | N/A |
| 101 | Triad Technology Corp. | 16-1158-265 | 142,938.37 | CSA1J | AZ | J | 789 | 07/16/1999 | 629 |
| 101 · | Vanatta, Robert W. | 0-0-0 | 58,925.56 | | | J | 999 | | 606 |
| 101 | Velma's Golden Needle, Inc. | 21-3658569-18 | 7,078.62 | CSA1J | FL | J | 3817 | 01/18/1991 | 654 |
| 101 | Wei, Micheal | 43-20078647-18 | 24,368.25 | 2001J | KS | J | 421 | | N/A |
| 101 | Wei, Micheal | 43-20078647-26 | 50,630.34 | 2001J | KS | J | 1381 | | N/A |
| 101 | Wei, Micheal | 43-20078647-34 | 113,398.79 | 2001J | KS | J | 1365 | | N/A |
| 101 | Whitaker, J. W. | 31-3110429-265 | 87,800.95 | CSA1J | GA | J | 3236 | 05/08/1992 | 625 |
| 101 | Williams, David B | 53-1191853-18 | 28,843.22 | 2001N | MO | N | 1113 | 07/18/2000 | 514 |
| 101 | Williams, David B | 53-1191820-18 | 51,554.76 | 2001J | | J | 518 | 04/16/1999 | 518 |
| 101 | Window Concepts | 21-4061201-18 | 154,208.78 | CSA1J | FL | J | 843 | 06/28/1990 | 674 |
| 101 | Wood, Jackie D. | 75-157271-18 | 6,874.27 | CSA1J | TX | J | 2227 | 04/09/1999 | 699 |
| | Pool Totals | 84 | 4,518,193.04 | | | | | | |

| | | | | |
|---|---|---|---|---|
| Grand Totals | 84 | | 4,518,193.04 | |

# Exhibit C

*Offering #DP010912*

**BILL OF SALE AND ASSIGNMENT OF LOANS**

## BILL OF SALE AND ASSIGNMENT OF LOANS

The undersigned Bank of America, N.A., its subsidiaries and predecessors in interest, ("Seller"), hereby sells, transfers, assign, and conveys to Premier Capital LLC ("Buyer"), without recourse or warranty, express or implied, except only as specifically provided in that certain Loan Sale Agreement Offering #DP010912 ("Agreement"), between Seller and Buyer and having an Effective Date of September 19, 2001, all of Seller's right, title, and interest in the Loans identified on **Exhibit B** to the Agreement (the "Loans") and the Collateral associated therewith.

All rights, obligations, liabilities, and responsibilities with respect to the Loans and the servicing thereof except Participation Loans are hereby transferred, assigned, and conveyed to Buyer, who hereby assumes and agrees to perform all obligations thereunder that hereafter accrue, and Seller is hereby discharged from all liability therefor.

EXCEPT AS EXPRESSLY SET FORTH IN THE AGREEMENT DESCRIBED ABOVE, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER, OR NATURE WITH RESPECT TO THE LOANS OR ANYTHING RELATING THERETO (INCLUDING THE COLLATERAL OR THE TRANSFER DOCUMENTS. FURTHERMORE, THE TRANSFER, ASSIGNMENT, AND CONVEYANCE EFFECTED BY THIS BILL OF SALE IS MADE WITHOUT ANY REPRESENTATIONS OR WARRANTIES BY SELLER REGARDING:     (I)   THE COLLECTIBILITY,   VIABILITY   OR   VALUE   OF   THE   LOANS;   (II)   THE CREDITWORTHINESS OF ANY OBLIGOR; (III) THE VALUE OF ANY COLLATERAL OR (IV) PRIORITY OR PERFECTION OF ANY SECURITY INTEREST OR LIEN THAT MAY APPEAR TO RELATE TO THE LOANS.

Capitalized terms contained herein shall have the same definition set forth in the Agreement.

This Agreement shall be governed by and interpreted in accordance with the laws of the State of North Carolina.

IN WITNESS WHEREOF, this Bill of Sale is executed on September 27, 2001.

SELLER:                                            BUYER:

BANK OF AMERICA, N.A.,                             PREMIER CAPITAL LLC
its subsidiaries and predecessors in interest

By: _____                       By: _____

Name: _____J. Wyatt DeWitt. Jr._____              Name: __PAUL  GEORGE__

Title: _____Senior Vice President_____             Title: _____MANAGER_____

# Exhibit D

*Offering #DP010912*
## LIMITED POWER OF ATTORNEY

## LIMITED POWER OF ATTORNEY

Reference is made to that certain Loan Sale Agreement #DP010912 (the "Agreement") effective as of September 19, 2001, by and between BANK OF AMERICA, N.A., its subsidiaries and predecessors in interest, having a notice address of 101 N. Tryon Street, 7th Floor (NC1-001-07-06), Charlotte, North Carolina, 28255, Attn. Alison Fey ("Seller") and Premier Capital LLC, a Limited Liability Company organized under the laws of the state of Massachusetts, with a notice address of 226 Lowell Street, Wilmington, MA 01887 Attention Paul George (Buyer").

In accordance with the Agreement, Seller hereby makes, constitutes, appoints and confers upon Buyer, its successors and assigns, Seller's irrevocable, limited power of attorney to endorse Seller's name and collect any checks or other forms of payment received from Obligors, under the related Evidence of Indebtedness sold by Seller to Buyer under the Agreement; and to endorse and sign any documents necessary to assign, transfer, extend, release or otherwise carry out the intent of the Agreement with respect to Loans, mortgages, security instruments, or other instruments related to an Evidence of Indebtedness. Provided, however, any such endorsement of a Loans or other Evidence of Indebtedness shall state clearly in the endorsement that the Loans or Evidence of Indebtedness is assigned "AS IS", "WHERE IS", "WITH ALL FAULTS" AND WITHOUT RECOURSE AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES, AND PURSUANT TO THAT CERTAIN LOAN SALE AGREEMENT DATED SEPTEMBER 19, 2001.

This Limited Power of Attorney shall expire one year from the date of execution hereof.

The capitalized terms shall have the same meaning as in the Agreement.

IN WITNESS WHEREOF, Seller has caused its name to be subscribed hereto by its duly authorized officer this 20th day of September, 2001.

BANK OF AMERICA, N.A., its subsidiaries and predecessors in interest

By:_____

Title:_____Senior Vice President_____

STATE OF MISSOURI)
COUNTY OF CLAY )
         Jackson
    I CERTIFY that on September 28, 2001, _____J. Wyatt DeWitt, Jr._____ personally came before me and this person acknowledged under oath, to my satisfaction, that: (a) this person signed, sealed and delivered the attached document as Senior Vice President of BANK OF AMERICA named in this document; and (b) this document was signed and made by BANK OF AMERICA as its voluntary act and deed by virtue of authority from its Board of Directors.
(NOTARIAL SEAL)

MARSHA R. NICODEMUS
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires: May 28, 2002

_____
NOTARY PUBLIC

My Commission Expires: _____