UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CASE NO. C.A. 03-CV-12497

PREMIER CAPITAL, LLC,

        Plaintiff,

-vs-

BEVERLY JOHNSON PENZELL, d/b/a
Law Office of Kris E. Penzell
and BEVERLY JOHNSON PENZELL, as
Personal Representative of the
Estate of Kris E. Penzell,

        Defendants.

_____/

DEPOSITION OF BEVERLY PENZELL

VOLUME I

Tuesday, September 25, 2007
9:15 a.m. - 12:15 p.m.

Courtyard Marriott Conference Room
Miami, Florida 33156

Reported By:
MARGARET PHILLIPS, Court Reporter
Notary Public, State of Florida
Klein, Bury, Reif, Applebaum & Associates
Miami Office
Phone - (305) 373.8404

2

APPEARANCES:

    On behalf of the Plaintiff:
    THOMAS JAMES MORRISSEY, Esquire
    164 STRATMORE ROAD, SUITE 25
    P. O. BOX 1336
    BROOKLINE, MASSACHUSETTS 02446
    617-787-3434

    On behalf of the Defendants:
    JOSEPH W. CORRIGAN, Esquire
    POSTERNAK BLANKSTEIN & LUND
    800 BOYLESTON STREET
    PRUDENTIAL TOWER
    BOSTON, MASSACHUSETTS 02199
    617-973-6151

    STEVEN A. SUSSMAN, Esquire
    6 BEACON STREET
    SUITE 400
    BOSTON, MASSACHUSETTS 02108
    617-973-4800

ALSO PRESENT

    Richard Gleicher, Premier Capital

                  –   –   –


BEVERLY PENZELL                                        3


E X H I B I T S

Plaintiff's Exhibit No. 1                              5
Plaintiff's Exhibit No. 2                             72

1          Q.     Same kind of secretarial duties you
2    described with respect to Mr. Frost?
3          A.     But it was a bigger firm so we did
4    different -- yes.
5          Q.     And after working for that firm, what did
6    you do?
7          A.     I was working for my husband -- he wasn't
8    at the time -- Kris Penzell
9          Q.     Kris Penzell?
10         A.     I worked for him at Pallet, Stern, Proby
11   and Atkins, and he started another firm with another man.
12   It was two separate firms and I was secretary for them.
13         Q.     When did Mr. Penzell start his own firm?
14         A.     I don't know -- somewhere when we both
15   left, in the seventies, mid-seventies.
16         Q.     And so you worked for, if I understand this
17   correctly, your late husband who was in practice with
18   another attorney?
19         A.     He had his own firm, Law Offices of Kris E.
20   Penzell, PA, and the other gentleman had his own PA, and
21   I was secretary for both of them.
22         Q.     Again, same sort of secretarial duties?
23         A.     Yes.
24         Q.     How long did you work for the Law Offices
25   of Kris E. Penzell?

1    here.  It was a long time ago.

2        Q.    **So his practice took different forms over**

3    **time?**

4        A.    Yes.

5        Q.    **Did your ---**

6        A.    Yes, and at some point in there we became

7    married.  In 1980 we got married and when I got pregnant

8    in 1982 I stepped out of the office on a full-time basis.

9        Q.    **Did you resume work at some point for**

10   **Mr. Penzell?**

11       A.    I went to school then.

12       Q.    **In the junior college and then Florida**

13   **International at that point?**

14       A.    Yes, sir.

15       Q.    **During the period from when you began to**

16   **work for Mr. Penzell to the period that you began --**

17   **until your pregnancy, what sort of work did you do for**

18   **him?**

19       A.    I thought we covered that.  I was his

20   secretary.

21       Q.    **When you went to school, did you do so**

22   **full-time?**

23       A.    Well, I had a daughter and I did volunteer

24   work and I was in school maybe a full load but I wasn't

25   full-time.  It wasn't the only thing I did, no.  I was

1    writing a cookbook also.

2         Q.    At some point did you resume working for

3    Mr. Penzell?

4         A.    I can't remember.  I mean maybe.

5         Q.    You are not sure?

6         A.    I was always, you know, had some hand in

7    the, you know, some issues.  Now I don't know -- it is

8    very muddled for me right now.

9         Q.    What kinds of issues?

10        A.    Personnel issues, closed files, how long do

11   you have to keep them.  It is unclear, the law in

12   Florida, and I could never get a straight answer.  If you

13   have a hurricane what are you going to do if you have to

14   find a new location.  You know, the basic problems that

15   would come up in somebody who owns a business.

16        Q.    With respect to the issue of closed files

17   under Florida law, what did you do?

18        A.    I tried to get an answer of how long we had

19   to keep things.

20        Q.    How did you do that?

21        A.    I asked him.

22        Q.    "Him" being?

23        A.    My husband.

24        Q.    How did that issue come up?

25        A.    Well, because the girls were running out of

34

1  the entire file.

2        Q.    What was the nature of your husband's

3  practice?

4        A.    My husband was basically -- you know, he

5  was in business a long time so it changed.

6        Q.    How about at the beginning?

7        A.    He mostly did collection work.  He did

8  banking work, loan closings, collection work.  He did

9  business.  He helped businesses and business law.  He did

10 some divorce work for a while and for a very short period

11 of time family court work.  I can't remember what else.

12       Q.    Would that describe the nature of his

13 practice at the time you started working for him?

14       A.    At the time I started working for him I was

15 at Pallet, Stern, Proby and Atkins and we did loan

16 closings, yes.

17       Q.    Did the nature of Mr. Penzell's practice

18 change over time?

19       A.    Over 30-some years, yes, sir, it did.

20       Q.    How did it change?

21       A.    It just depended on what was happening in

22 life at that time.  I don't know what you mean.

23       Q.    Well, did he do certain kinds of work to a

24 greater degree or ---

25       A.    He did some real estate.

1      A.    Yes, sir, he has.

2          Q.    **When was that?**

3      A.    It was March 8th of 2000.

4          Q.    **Was he working as a lawyer until the time**

5  **of his death?**

6      A.    Yes, sir, he was.

7          Q.    **During the period prior to his death, say**

8  **the year prior to his death, were you working for him at**

9  **that point in time?**

10     A.    Was I working for him at the time?

11         Q.    **During that year prior to his death.**

12     A.    No.

13         Q.    **Were you engaged in any full-time**

14 **employment at that point?**

15     A.    The year before he passed?

16         Q.    **Right, during that time frame.**

17     A.    I was pretty much involved with a personal

18 family matter for my father, very much full-time for the

19 last couple of years prior to his passing.

20         Q.    **Did you have involvement with Mr. Penzell's**

21 **practice following his death?**

22     A.    As personal representative, yes, sir, I had

23 to go in.

24         Q.    **What's your understanding of your status as**

25 **personal representative?  What is that?**

1     MR. CORRIGAN:  Objection, form.

2     You can answer if you understand.

3     THE WITNESS:  Pardon?

4     MR. CORRIGAN:  If you understand his

5  question you can answer it.  If you don't, ask

6  him --

7   A. Could you repeat the question?

8   **Q. When did you become personal**

9 **representative?**

10   A. Why?

11   **Q. When?**

12   A. I don't know the legal logistics of what

13 you mean by that.  My husband passed, he had a will, I

14 was his personal representative.  I don't know if there

15 is some period of time if the Court has to appoint me or

16 approve it or not.  I don't really know.

17   **Q. Do you know when you began acting in your**

18 **capacity as personal representative?**

19   A. The day after his funeral, a couple of days

20 after, the day after I believe.

21   **Q. Generally, what sort of activity did you**

22 **engage in as personal representative?**

23   A. Well, I met with his secretary and family

24 member of mine and we, you know, assessed the situation.

25 He had hearings that needed to be attended and those were

1          A.    407 Lincoln Road, Miami Beach, Florida,

2    33139.

3          Q.    **Was that -- did that office remain the**

4    **office of the Penzell law firm following your husband's**

5    **death?**

6          A.    Yes, sir, it did.

7          Q.    **For how long?**

8          A.    I don't know.

9          Q.    **Following your husband's -- strike that.**

10               **Upon becoming involved within a week after**

11   **your husband's death, what, to your understanding, did**

12   **Mr. Rones do?**

13         A.    I don't know.

14         Q.    **He began working in connection with the**

15   **Penzell law firm at that time?**

16         A.    I don't know.

17         Q.    **I thought you testified that he became**

18   **involved with the firm within a week after your husband's**

19   **death?**

20         A.    Well, there is a calendar, my husband's

21   calendar, that he would have been doing.  Somebody had to

22   go to those appointments maybe or those hearings.  I

23   really -- I am sorry, I don't know.

24         Q.    **Are those the kinds of things that he did**

25   **at that time?**

1          MR. CORRIGAN:  Objection, form.

2     A.   Yes.

3          MR. CORRIGAN:  If you know, answer the

4     question.  If you don't know say you don't know.

5     Those are appropriate questions for Mr. Rones.

6     A.   I don't know.

7     **Q.   In the period after your husband's death**

8  **what's been your involvement with the Penzell law firm?**

9     A.   Well, as personal representative of his

10    estate I, you know, I had to make calls to people.  I had

11    to learn about things that I, you know, hadn't had a hand

12    in in a very long time.

13    **Q.   What kinds of things?**

14    A.   Well, like his malpractice insurance

15    coverage.

16    **Q.   Anything else?**

17    A.   I mean, everything that would have to do

18    with an office and it was seven years ago.  I don't

19    really remember all the things.

20    **Q.   Did you spend time at the office?**

21    A.   Yes, I did.

22    **Q.   Can you give me a general idea of what your**

23    **day-to-day attendance at the office was over this period**

24    **of time?**

25    A.   Well, you know, an inventory attorney, you

1          It's a record.

2                MR. MORRISSEY:  She hasn't identified it

3          though.

4                MR. CORRIGAN:  She can identify it by how

5          it's previously marked.  This is helping out in

6          the record.  If you want to later mark it as

7          something else, you can do so.

8                MR. MORRISSEY:  OK.  I'm sorry.  I

9          misunderstood you.

10    BY MR. MORRISSEY:

11          Q.    Is that, in fact, the agreement that is

12    referenced in the affidavit?

13          A.    It certainly looks like it.

14          Q.    OK.  Turning your attention to paragraph 13

15    of the -- strike that.

16                I wonder if we could have the -- turning

17    your attention to paragraph 13, ma'am.

18                MR. SUSSMAN:  Of Exhibit 2?

19          Q.    Of Exhibit 2, correct, the first sentence

20    refers to work done by the Penzell law firm for Barnett

21    Bank?

22          A.    Yes, sir.

23          Q.    Did you have any involvement yourself with

24    that work?

25          A.    Pardon?

1    Q. Did you have any involvement with Barnett

2 Bank at all?

3    A. Absolutely.

4    Q. What type of involvement did you have?

5    A. I was the secretary for my husband when he

6 represented Barnett Bank.

7    Q. Third sentence of paragraph 13 states that,

8 "Barnett Bank thereafter merged with NationsBank, NA, a

9 banking chartered in Charlotte, North Carolina."

10    A. Yes, sir.

11    Q. Did you have a like involvement with

12 NationsBank as part of your work for your husband?

13      MR. CORRIGAN: Objection, form.

14    A. No, it was less, but I had involvement.

15    Q. Did Mr. Penzell represent NationsBank?

16    A. Yes, sir.  He did.

17    Q. What kinds of matters?

18    A. As far as I know, collection work.

19    Q. Going on to paragraph 14 of the affidavit.

20    A. Uh-huh.

21    Q. It states, "Subsequent to the agreement

22 between NationsBank and the Law Office of Kris E.

23 Penzell, PA, the assets of NationsBank, including the

24 collection accounts, were sold to Bank of America, the

25 banking association chartered in Charlotte, North

1  Carolina."

2          What collection accounts are being referred

3  to in that paragraph?

4          A.    Subsequent to the agreement between

5  NationsBank and the Law Offices of Kris Penzell, the

6  assets of NationsBank were sold to Bank of America.  OK.

7  It would be the collection accounts that my husband

8  worked on.

9          Q.    What kinds of collection accounts?

10         A.    Drawers and drawers and drawers of files.

11         Q.    Did they include judgments?

12         A.    Yes, sir.

13         Q.    How did you become aware of the transaction

14  involving NationsBank and Bank of America referred to in

15  this part of your affidavit?

16         A.    I am sorry, which part?

17         Q.    How did you become aware of the

18  transactions referred to in paragraph 14 involving

19  NationsBank and Bank of America?

20         A.    Well, I told you in 1999 I heard over the

21  news that Bank of America was buying NationsBank.

22         Q.    Do you recall discussing that with

23  Mr. Penzell at any point in time?

24         A.    Sure, we were on holiday somewhere.  It was

25  pretty big news.

1    Q.    Did the nature of Mr. Penzell's work on the

2  collection accounts change after the transaction

3  involving NationsBank and Bank of America?

4            MR. CORRIGAN:  Objection, form.

5            You can answer if you understand.

6    A.    Could you repeat the question?

7    Q.    Did the nature of Mr. Penzell's work on the

8  collection accounts change after Bank of America entered

9  into the transaction with NationsBank?

10   A.    Did the nature of his work change?

11   Q.    Yes.

12   A.    I don't understand what you mean by that.

13   Q.    Was he doing the same work subsequent to

14 the transaction referenced?

15   A.    You mean did he go to hearings the same

16 way?  I don't understand what you mean.

17   Q.    That's what I mean.  Did his work on the

18 collection accounts change in any way after the

19 transaction?

20   A.    Sir, I don't know.  My assumption is he did

21 the same thing.

22   Q.    I don't want you to assume that.

23   A.    Well, I ---

24            MR. CORRIGAN:  You answered the question.

25   A.    I don't know.

1      Q.    Attached as the only exhibit to this

2   affidavit, as Exhibit A to the affidavit, is the

3   contingency fee agreement you have before you that was

4   marked at the depositions yesterday.

5      A.    Uh-huh.

6      Q.    Following the transaction involving

7   NationsBank and Bank of America, did the Penzell law firm

8   enter into any agreement involving the collection

9   accounts directly with Bank of America?

10      A.    I am sorry.  Say that again.

11      Q.    After Bank of America entered into the

12   transaction with NationsBank that you describe in your

13   affidavit in paragraph 14, did the Penzell law firm enter

14   into any written agreement regarding the collection

15   accounts with Bank of America?

16      A.    I have -- yes.  There was an agreement, it

17   was dated in 1999 that I had not really known about, and

18   it was ratifying files, old Barnett cases, that

19   Mr. Penzell was to continue working.

20      Q.    When you say you hadn't really known about

21   it, what do you mean?

22      A.    Well, I really wasn't aware of it.

23      Q.    At what point in time?

24      A.    I don't know.  Throughout, ever.  It was

25   just sort of, you know, I knew there was a list of files

1   but I didn't really know what it was for.  I just knew

2   that, you know, these were files that were to be worked

3   on and these others were not, and whatever conditions are

4   on them but I just knew that there was some and then ---

5         Q.    You were just describing the nature of this

6   1999 agreement.  Is that right?

7         A.    Right.

8         Q.    It is obviously in writing?

9         A.    Yes.  This is an exhibit and the other page

10  was an exhibit and it is a list of files.

11        Q.    Were you aware of this agreement from 1999

12  at the time you executed this affidavit?

13        A.    No.

14        Q.    You were not?

15        A.    (Indicating).

16        Q.    When did you first become aware of it?

17        A.    I don't remember.  I don't really remember

18  but it was somewhat recently.

19        Q.    I beg your pardon?

20        A.    It was somewhat more recent.

21        Q.    How recent?

22        A.    Last couple of years, year and a half or

23  so, a year.

24        Q.    In connection with the litigation that we

25  are involved in today?

1     mentioned in 14, but 14 could be more accounts

2     than are described in 15.  You said are they the

3     same, she said they were included in.  There could

4     be more in 14 than 15.

5       MR. CORRIGAN:  It is not the same universe,

6     that is what she is getting at.

7       MR. MORRISSEY:  I am happy to get that

8     testimony.  That's all I'm after.

9       MR. CORRIGAN:  I know.  We all have the

10    same record that we are making longer right now.

11      (Discussion off the record)

12    **Q. Do you adopt Mr. Sussman's**

13 **characterization?**

14     A. Sir, I mean ---

15      MR. CORRIGAN:  Objection, form.  That was

16    her testimony but go ahead.

17     A. I will repeat my answer, I liked my answer,

18 I read it and thought about it and I believe that that's

19 it.

20      Now if you are talking about paragraph 13,

21 you know ---

22      MR. CORRIGAN:  Beverly, you answered his

23    question.  Wait for a question.

24    **Q. When Barnett Bank entered into a**

25 **transaction, at some point Barnett Bank entered into a**

1    transaction with NationsBank that had -- that involved

2    matters that the Penzell law firm was working on.  Is

3    that right?

4           A.    Yes.

5           Q.    After that transaction, the Penzell law

6    firm continued to work on those matters for at that point

7    NationsBank.  Right?

8           A.    Yes.  My husband worked on those Barnett

9    files that were now owned by NationsBank.

10          Q.    And an agreement was entered into in 1998

11   between the Penzell law firm and NationsBank?

12          A.    Right.

13          Q.    And then as you state in your affidavit,

14   the NationsBank assets were sold to Bank of America.

15   Right?

16          A.    OK.  NationsBank assets included more than

17   just Barnett Bank cases because I think there was a

18   period of time, quite a large period of time, that

19   NationsBank was a really big bank and they owned a lot of

20   other things and not just the Barnett matters.

21          Q.    To your understanding how did that

22   transaction --

23          A.    I have ---

24          Q.    -- differ from the transaction between Bank

25   of America and Premier that you reference in

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CASE NO. C.A. 03-CV-12497

PREMIER CAPITAL, LLC,

            Plaintiff,

-vs-

BEVERLY JOHNSON PENZELL, d/b/a
Law Office of Kris E. Penzell
and BEVERLY JOHNSON PENZELL, as
Personal Representative of the
Estate of Kris E. Penzell,

            Defendants.
_____/

DEPOSITION OF BEVERLY PENZELL

VOLUME II

Tuesday, September 25, 2007
1:15 p.m. - 5:30 p.m.

9155 S. Dadeland Blvd., Suite 1014
Miami, Florida 33156

Reported By:
MARGARET PHILLIPS, Court Reporter
Notary Public, State of Florida
Klein, Bury, Reif, Applebaum & Associates
Miami Office
Phone - (305) 373.8404

1   APPEARANCES:

2       On behalf of the Plaintiff:
        THOMAS JAMES MORRISSEY, Esquire
3       164 STRATMORE ROAD, SUITE 25
        P. O. BOX 1336
4       BROOKLINE, MASSACHUSETTS 02446
        617-787-3434
5
        On behalf of the Defendants:
6       JOSEPH W. CORRIGAN, Esquire
        POSTERNAK BLANKSTEIN & LUND
7       800 BOYLESTON STREET
        PRUDENTIAL TOWER
8       BOSTON, MASSACHUSETTS 02199
        617-973-6151
9
        STEVEN A. SUSSMAN, Esquire
10      6 BEACON STREET
        SUITE 400
11      BOSTON, MASSACHUSETTS 02108
        617-973-4800
12

13  ALSO PRESENT

14      Richard Gleicher, Premier Capital

15                      —  —  —

16

17

18                      .

19

20

21

22

23

24

25

1          A.    At what time?

2          Q.    **October of 2001 subsequent to the phone**

3    **call that you testified about.**

4          A.    After the phone call?

5          Q.    **Yes.**

6          A.    The owner of that file, the owner of the

7    debt owed my husband the fees, whoever the owner is.

8          Q.    **Prior to that phone call with Bank of**

9    **America relating to the Bank of America/Premier**

10   **transaction, did you have an understanding that the**

11   **Penzell Law Firm was owed money for work done by your**

12   **late husband?**

13         A.    My husband was always due for work that he

14   did on the file, yes.

15         Q.    **And did Bank of America owe him money at**

16   **that time?**

17         A.    Bank of America owed my husband for work

18   that was done, legal services on the files that he

19   performed.

20         Q.    **Again, sticking with the period prior to**

21   **your learning of the Bank of America to Premier**

22   **conveyance, apart from Bank of America, were there any**

23   **other entities that you believed owed the Penzell Law**

24   **Firm money for services provided by your husband?**

25         A.    I'm sorry, the owner of a file that my

1  husband performed legal services for owed my husband

2  fees.

3        Q.    And if I understand your testimony, prior

4  to the October 2001 phone call with Bank of America

5  relative to the Bank of America/Premier transaction, that

6  entity was Bank of America.  Right?

7              MR. CORRIGAN:  Objection to form.

8              You can answer.

9        A.    I am going to repeat, Bank of America,

10  NationsBank and Barnett Bank to me are all the same, you

11  know.

12        Q.    Prior again to that October 2001 phone

13  call, did anyone at the Penzell Law Firm make demand on

14  any entity for money that you believe was owed?

15        A.    I think that is way too big of a universe

16  of a question for me to be specific about.

17        Q.    How can I be more specific for you?

18        A.    Maybe if you would repeat the question.

19        Q.    OK.  Sticking with this period prior to

20  your learning of the Bank of America/Premier transaction

21  as referenced in your affidavit, sticking with this

22  period you have testified that ---

23        A.    Sticking with which period?

24        Q.    Prior to that phone call.

25        A.    Prior to being told that Premier's files

1    were sold or any?  We are talking about Premier Capital,

2    LLC files.  I am trying to figure it out.

3                    MR. SUSSMAN:  Your job is to answer

4          questions.

5          A.    Sticking with the time period, I don't

6    understand what you mean.

7          Q.    **Let's come at this in a slightly different**

8    **way.  Again, prior to the break we were all making a**

9    **collective effort to focus on the collection accounts**

10   **that Premier acquired from Bank of America, not to any**

11   **other Bank of America accounts --**

12         A.    OK.

13         Q.    **-- in which Premier had no involvement.**

14         A.    I understand.

15         Q.    **We are speaking strictly of the collection**

16   **matters conveyed by the bank to Premier.**

17         A.    I understand.

18         Q.    **And prior to that advance your testimony is**

19   **that the Penzell Law Firm was representing the bank, Bank**

20   **of America on those matters.  Is that right?**

21         A.    Yes.

22         Q.    **As well as predecessors of Bank of America.**

23   **Is that right?**

24         A.    Uh-huh, yes.

25         Q.    **So those are the matters I am addressing,**

1  simply those collection matters.

2           A.    All right.

3           Q.    If you had any belief or claim as to other

4  matters I'm not interested and obviously that's not what

5  we are not here to talk about.

6           A.    That is good.

7           Q.    So addressing only those matters, prior to

8  the telephone call that you testified about in October

9  of 2001, you had an understanding, did you not, that Bank

10 of America owed the Penzell Law Firm money -- is that

11 right?

12          A.    Yes, sir.

13          Q.    -- with respect to those matters --

14          A.    Yes, sir.

15          Q.    -- conveyed to Premier?

16          A.    Uh-huh.

17          Q.    And is it your testimony that certain of

18 Bank of America's predecessors also owed money at some

19 point in time for legal services performed by your

20 husband as to those accounts?

21          A.    Yes.

22          Q.    And which entities would those be?

23          A.    Well, sir, if a file came in when it was

24 Barnett Bank and while Barnett Bank still owned those

25 files, Barnett Bank owed my husband fees.

1    **Q. I think that is what I am looking for.**

2     MR. CORRIGAN:  Are you finished?

3     MR. SUSSMAN:  Yes.

4    **Q. To your knowledge, again up to the time of**

5 **that phone call in October of 2001, did anyone from the**

6 **Penzell Law Firm make a demand on any of these entities,**

7 **Bank of America, NationsBank, Barnett Bank for monies**

8 **claimed to be owed to the Penzell Law Firm for**

9 **Mr. Penzell's services on these accounts, on the accounts**

10 **ultimately conveyed to Premier?**

11    A. Not to my knowledge.

12     MR. SUSSMAN:  Excuse us one minute.

13     (Short break)

14 BY MR. MORRISSEY:

15    **Q. So you had a belief prior to October**

16 **of 2001 that money was owed on these accounts ultimately**

17 **conveyed to Premier.  Right?**

18    A. Yes, sir.  My husband was owed for his

19 legal services he performed on that file, yes.

20    **Q. When did you initially form that**

21 **understanding?**

22    A. From the time he first opened his office.

23 If he does work on a file, a client owes him fees.

24    **Q. So was there money owed again on these --**

25 **well, to the extent that your answer deviated from what I**

1   want to make sure we are talking about, which is the

2   accounts conveyed by the bank to Premier, that's all we

3   are talking about now.  I understand that in general your

4   husband may have been owed money on other files.  We are

5   not concerned obviously with that, but, again, my

6   question specifically has to do with the accounts

7   conveyed by the bank to Premier.

8           A.    Yes, my husband was owed fees on those

9   files.

10          Q.    On those files?

11          A.    Yes.

12                MR. SUSSMAN:  Can you wait until he asks

13          you a question?

14                THE WITNESS:  I am so sorry.

15          Q.    When did you form the understanding that

16  money was owed on those accounts?

17          A.    At all times.

18          Q.    What times are we talking about?

19          A.    From the time he first did anything on

20  those files.

21          Q.    From that time money was owed?

22                MR. SUSSMAN:  Yes or no.

23          A.    Yes.

24          Q.    At some point in time, and this includes

25  any time up to the present time, did you work on a

1          MR. SUSSMAN:  Excuse me.  Could I interject

2     something?

3          MR. MORRISSEY:  Sure.

4          MR. SUSSMAN:  I think what he is asking you

5     is have your beliefs changed since you signed the

6     answers to interrogatories.

7          THE WITNESS:  No.

8          MR. MORRISSEY:  Thank you.  Moving to the

9     next numbered exhibit.

10     **Q.    Could you identify that for the record,**

11 **please?**

12          A.    Settlement agreement and general release.

13          MR. MORRISSEY:  I have to tell you I don't

14     think I have seen that before.  If I have I stand

15     corrected if you produced it to them.

16          MR. CORRIGAN:  I think Steve might have

17     produced it.  I know I got it from him, I think.

18          MR. MORRISSEY:  I know this copy doesn't

19     bear a Bates stamped number which is not

20     necessarily significant, but I don't recall ever

21     having seen it before.

22          (Discussion off the record)

23          MR. CORRIGAN:  Let's go on the record now

24     because we are discussing a 1999 agreement between

25     the Law Offices of Kris Penzell and Bank of

1   America which adopts the 1998 agreement.  I

2   believe Victor Rones talked about this agreement

3   in his testimony yesterday.  I know we raised it

4   on the record.  I know we offered to make a copy

5   available for the purposes of having the witnesses

6   questioned on the issue.

7          That opportunity wasn't acknowledged or

8   taken by counsel for Premier.  I don't think it

9   changes legally anything relative to Premier's

10  relationship to the Law Offices of Kris Penzell.

11         That aside, here it is.  Feel free to ask

12  Ms. Penzell anything you'd like about it.

13         MR. MORRISSEY:  Well, I am happy to have

14  the opportunity to question Ms. Penzell about the

15  document.  To the extent that I have been

16  prejudiced in my ability to prepare for her

17  examination by virtue of the failure to produce

18  the document, apparently, the document having

19  originated with counsel for Ms. Penzell, I

20  certainly object to that and reserve any and all

21  rights I may have with respect to that failure to

22  produce.

23         With respect to the impact that the failure

24  to produce the document may have, it really

25  depends upon its materiality as established by

1    Ms. Penzell in her answers.  If it is a mere

2    bagatelle that has no relevance to any issues in

3    the case, then no harm, no foul.

4         If it is a document that purports to affect

5    the rights and liabilities of my client I am very

6    much going to object to its late production and

7    reserve any and all rights and remedies I may have

8    with respect to it.

9         MR. CORRIGAN:  We are not crossing the

10   Rubicon here.  This is a legal document to which

11   your client was not a party.  It either existed or

12   didn't exist.  The witnesses who testified

13   yesterday acknowledged its existence.  It was

14   offered to you yesterday.  You didn't take the

15   opportunity to ask questions about it.

16        To the extent you have been prejudiced it

17   was at your own risk and I will insist that those

18   witnesses yesterday could offer no further insight

19   to this agreement, since they were not parties to

20   it.

21        So to the extent you want to ask questions

22   about the law office's involvement to that

23   agreement you have the appropriate witness.  All

24   the other witnesses are no longer with us.

25

1    BY MR. MORRISSEY:

2          Q.    **Have you seen this document before,**

3    **Ms. Penzell?**

4          A.    Yes, sir.  I have.

5          Q.    **With apologies if I just asked this**

6    **question, when did you first see it?**

7          A.    I don't remember.  Probably close to that

8    date on the top of there, August of '06.

9          Q.    **OK.  And what date are you referring to,**

10   **ma'am?**

11         A.    The fax identification, August 3rd, 2006.

12   I mean, I have seen the exhibit before.

13         Q.    **What exhibit are you referring to?**

14         A.    Exhibit B to the agreement.

15         Q.    **Just to be clear for the record, ma'am, is**

16   **that ---**

17         A.    Exhibit B is a list of files with my

18   husband's initials at the bottom.

19         Q.    **Is that, in fact, the penultimate, the next**

20   **to last page of the document?**

21         A.    The whom?

22         Q.    **Is that the next to the last page of the**

23   **exhibit?**

24         A.    Yes, it is.

25         Q.    **By the way, there are signatures on the**

1  final page?

2          A.    Yes.

3          Q.    **Whose signatures, if you can tell?**

4          A.    Cynthia Fisher from Bank of America.

5          Q.    **And is there another signature there?**

6          A.    These are notary signatures.  Cynthia

7  Fisher was a notary and Denise Chardiet is another

8  notary.

9          Q.    **With apologies for looking over your**

10 **shoulder because it is the only copy.**

11         **How about on the third to the last page, is**

12 **there another signature there?**

13         A.    It was signed by Steven Mayo of

14 NationsBank.

15         Q.    **Anyone else?**

16         A.    And my husband, Kris E. Penzell.

17         Q.    **Was this a document that you encountered in**

18 **your files in 2006?**

19         A.    Yes.

20         Q.    **At that time, did you produce it to your**

21 **counsel?**

22         A.    Yes.

23         Q.    **Do you recall the circumstances under which**

24 **you found that?**

25         A.    Not exactly.

1     A.    No.   This is the Arroyave file and that

2   Arroyave file came in after the agreement.

3     **Q.    What's the basis of your understanding**

4   **there.   When you say came in, what do you mean?**

5     A.    The bank referred the Arroyave file, along

6   with many others that Premier bought, referred to my

7   husband to collect files that are not on this list that

8   he is due fees on because they came after this.

9     **Q.    Which bank?**

10    A.    Well, if it says NationsBank it would have

11  been NationsBank, which is generally the case.

12    **Q.    Do you have an understanding which bank it**

13  **was in the case of Arroyave?**

14    A.    My understanding is it was NationsBank.   I

15  don't have the file in front of me or anything, but my

16  understanding is it is NationsBank.   I don't know ---

17    **Q.    Is that matter referenced in Exhibit B?**

18    A.    No.   It is not on there.

19          MR. SUSSMAN:   Which one?

20          THE WITNESS:   Arroyave.

21          MR. CORRIGAN:   What number is that?

22          THE WITNESS:   We were referring to Rones

23      Exhibit 4.

24  BY MR. MORRISSEY:

25    **Q.    Do you have an understanding, ma'am,**

1  whether Exhibit 4, the settlement agreement release,

2  relates in any way to Premier Capital, LLC?

3                MR. CORRIGAN:  Objection to form.

4        A.    I am not a lawyer so I don't know, but my

5  understanding is that the fee agreement, contingency fee

6  agreement, is the operating agreement under which my

7  husband was owed fees and to the extent that Exhibit B

8  includes some of those files, you know, it really was to

9  secure his fees on these files.

10       Q.    I think you have testified that the 1998

11 contingency fee agreement ---

12       A.    Was the operating agreement, yes.

13       Q.    And I believe your testimony was that that

14 was in part -- that forms in part the basis for your

15 counter-claim.  Is that right?

16       A.    In part.

17       Q.    Does the settlement agreement in general

18 release Exhibit 4 relate in any way to your

19 counter-claim?

20       A.    I mean, I'm not the lawyer but I don't

21 think this has anything to do, you know, with you.  This

22 had to do with other than -- files other than these

23 (indicating).

24       Q.    And you are obviously referring to Premier?

25       A.    Yes, Premier Capital.

conversation?

    A.    Yes.  I told him that I knew that as owner of the files his company owed my husband fees as I had been advised by everybody, including the bank.

    **Q.    Which bank advised you that you were owed fees?**

    A.    Which bank?  The only bank we are talking about.

    **Q.    Which is Barnett, NationsBank, Bank of America?**

    A.    Barnett wasn't in existence in 2001, sir. I am not sure if it was NationsBank or Bank of America. I told you I don't know when they were what, but it was that bank, yes.

    **Q.    What did Mr. Maimonis say to you?**

    A.    It was a long time ago, but he was calling about information on the files and I told him that, you know, if he wanted to hire the inventory attorney he could do that, fully prepared, as I had been advised by Victor, to step in the shoes and continue the file and protect Kris's fees, to see the file to fruition, if the client wanted.  And now Premier Capital was the client and I knew Victor was not going to do one moment of anything on a file that he didn't have authority to work on.  I mean, that was huge.

1    Q.    Just so I understand this, ma'am, you were

2    communicating to Mr. Maimonis about work, if any, on the

3    Premier files followed a conversation you had with Mr.

4    Rones.  Is that right?

5                    MR. CORRIGAN:  Objection, form.

6                    You can answer if you understand.

7    A.    I -- yes.  I had conversations with Mr.

8    Rones that if a file was being sold he wasn't going to

9    work the file anymore.

10    Q.    Anything else that you can recall having

11    been discussed by either yourself or Mr. Maimonis in this

12    conversation?

13    A.    I told him -- I'm not sure if it was that

14    conversation or one soon after -- that the fees were

15    30 percent.

16    Q.    And by fee, do you mean contingency fee?

17    A.    Contingency fees, yes.

18    Q.    That 30 percent would apply in the event

19    Premier engaged the Penzell Law Firm?

20    A.    That was if any collection occurred on

21    those files that my husband -- it was a liability that

22    owed him 30 percent on whatever money was collected on

23    those files.

24    Q.    What was the basis of that position?

25    A.    The basis of what?

1    Q.    That position by you that if any collection

2    occurred.

3    A.    It was very common knowledge of how things

4    worked in my husband's office when he was alive and

5    after.  Nothing changed.

6    Q.    Was there ---

7    A.    And this fee agreement that we are talking

8    about, the 1999 fee agreement, is the one that I was told

9    by Bank of America after my husband passed was the

10    operative agreement and that's the agreement I knew

11    about, the agreement I saw.  It is the agreement I knew

12    the lawyers were looking at.  This is the agreement that

13    operated on all his files.

14        MR. CORRIGAN:  You meant the 1998

15        agreement?

16        THE WITNESS:  The 1998 agreement.

17        MR. CORRIGAN:  The '98 agreement?

18        THE WITNESS:  The 1998, December 23, 1998,

19        Noe 2, Rones 3 exhibit.

20        MR. CORRIGAN:  You said '99 agreement.

21        THE WITNESS:  I am so sorry.  Thank you for

22        that.  The 1998 agreement.  I don't want to

23        confuse matters.  It is very clear for me.

24    BY MR. MORRISSEY:

25    Q.    And was your message to Mr. Maimonis in

144

1   this conversation that that 30 percent would apply to any

2   subsequent recovery on the files at any point in time

3   after your call with him?

4        A.    Yes.

5        Q.    So this would apply prospectively, was your

6   understanding, right, that 30 percent would apply to

7   future recoveries, if any?

8        A.    Yes.

9        Q.    And I believe -- anything else that you can

10  recall from that initial call?

11       A.    The initial phone call?

12       Q.    Yes.

13       A.    I don't think I recall anything more.

14       Q.    And I believe you stated that there was in

15  fairly short order another phone call?

16       A.    There were a lot of phone calls from Nick

17  Maimonis.

18       Q.    Let's stick with the period, to use your

19  framework, in late 2001, the last quarter of 2001 was

20  that call that you just testified about.

21       A.    Uh-huh.

22       Q.    Were there other phone calls?

23       A.    There could have been one or two, probably

24  a couple more phone calls probably, you know, maybe

25  around five, if I had to guess.  I don't know if there is

1    Q.    Was there such discussion of an agreement

2  in connection with such possible work?

3    A.    It would have to be a new fee agreement

4  with the lawyer with the new client.

5    Q.    Did you convey that to him in those calls?

6    A.    Yes, you know ---

7    MR. CORRIGAN:  You have answered the

8    question.

9    Q.    How did he respond, if he did, to that?

10    A.    At that period of time he was receptive and

11  he seemed like he was, you know, cooperative about it,

12  was reasonable.

13    Q.    During that initial -- during the final

14  months of 2001, after that October 2001 phone call --

15    A.    October 2001, uh-huh.

16    Q.    -- when you went to the B of A/Premier

17  transaction, what was your understanding about the state

18  of those accounts that had been sent from B of A to

19  Premier?  Was the Penzell Law Firm working on those

20  accounts at that time?

21    A.    Well, when the bank would tell us that they

22  were going to no asset a file, then we put it aside

23  because we knew it was going to be sold, you know.

24    Q.    But at that point no bank was involved,

25  again focusing on that October to end of 2001 time frame.

150

1      A.      Well, sure.

2      Q.      **What was the gist of what he was telling**

3 **you?**

4      A.      I remember particularly that he called me

5 on January 11th, 2002 and he said, "Could you fax me the

6 Arroyave judgments and the fee agreement?"

7              So I went to Denise and I said, "There are

8 two judgments on Arroyave?"  I mean, I didn't know that.

9 I knew of one of them.  So she pulled them out and in

10 10 minutes I faxed it to him, the fee agreement, this

11 1998 fee agreement.

12     Q.      **That was the agreement you faxed him?**

13     A.      Two Noe and 3 Rones, right, and the two

14 judgments on Arroyave.

15     Q.      **Did he say why he needed those materials?**

16     A.      He was really kind of -- he must have

17 called me before that because he called and said send me

18 those and I said OK and I went and got them and sent them

19 to him, faxed it to him.

20     Q.      **Any other discussion at that point in time**

21 **on January 11th, 2002 about Arroyave or was that the gist**

22 **of it?**

23     A.      That was really the gist of it.

24     Q.      **And you, in fact, sent those documents to**

25 **him?**

1    files, whether the whereabouts of somebody or I don't

2    remember what else.  He was calling about the files, and

3    Denise had more information about them than I did in her

4    memory bank.  She had worked them for Kris.

5           And every once in a while I'd mention to

6    him, you know, what about the fee agreement?  You need to

7    get that down here for the inventory attorney and, you

8    know, it would always be like a promise, but in that

9    period of time he was calling more for information about

10   the files.

11           (Discussion off the record)

12   BY MR. MORRISSEY:

13      **Q.    Apart from calling with questions about**

14   **specific files, did Mr. Maimonis discuss anything else in**

15   **his conversations with you at that time?**

16      A.    He said that Premier Capital didn't have

17   counsel down here, so if the inventory attorneys were

18   interested in working with Premier on other matters he'd

19   be interested in hiring them for that.

20      **Q.    How did you respond to that?**

21      A.    I said, well, you know, sure, it is up to

22   the attorney, really.  I mean, they'd have to come to an

23   agreement but they were open to doing that.  I knew they

24   were.

25      **Q.    Did you -- to your knowledge did Mr.**

1    Maimonis in this time frame of early 2002 discuss such

2    representation directly with Mr. Rones?

3                MR. CORRIGAN:  Objection, form.

4        A.    I wasn't a party to a conversation like

5    that but I, you know, I understood that, you know, to be

6    the case because he was interested in getting the files

7    moving, it seemed.

8        Q.    Anything else come up in these discussions

9    in early 2002 with Mr. Maimonis?

10       A.    I don't remember anything more.

11       Q.    Did you raise any issue with him?

12       A.    The issue I raised was that he owed my

13   husband fees and if he wanted -- he kept wanting -- he

14   wanted the file, he wanted the whole file, and I had been

15   advised by a lot of different attorneys, not just the

16   inventory attorney and the probate attorney.  I have a

17   lot of friends that are attorneys and I said this is what

18   is going on with me and these people want the file back

19   and I am told I can't give it back because there is a

20   retaining lien.  I don't know anything about this and

21   they all agreed so I was in this dilemma.

22       Q.    Did you convey that to Mr. Maimonis?

23       A.    Yes.  There is a retaining lien.  I can't

24   give the file back.  He has to agree to pay my husband

25   the fees.

1          Q.     Did you recall using that phrase with him,
2     retaining lien?
3          A.     I don't remember, there was a lien on the
4     file.
5          Q.     How did he respond to your statements to
6     him about the amount of ---
7          A.     It was everything from, you know,
8     complacent to, you know, trying to make a new deal, you
9     know, trying to bring it down to 25 percent was an
10     initial, which was fine, I knew it was fine with the
11     attorneys, they would have done that.  I had heard that
12     already and, you know, that he said he was going to have
13     to go back to the owners and see what he could do.
14               And I even said, you know, "Do you want to
15     take a copy of the file and agree to pay something to my
16     husband's firm?"  I felt like that was my responsibility
17     as personal representative and it was within my purview
18     to be able to do that.  I said, agree to something, and
19     you know, he had to go back to find out what he could do,
20     you know, trying to make a deal.
21          Q.     If I understand your testimony correctly,
22     and, again, correct me if I am wrong, in these
23     conversations with Mr. Maimonis, the issue of Penzell
24     fees fall into two categories, and, again, correct me if
25     I am wrong.

1          Q.    Let me show you what was marked as

2    Exhibit 3 to Ms. Noe's deposition.  It contains a number

3    of pages.  Take your time in looking at them.

4                Are you familiar with that document?

5          A.    There are a lot of them.  I have seen

6    these.  Yes, I have.

7                MR. SUSSMAN:  Collectively marked as one

8          document?

9          Q.    Yes.  There are a number of different

10   documents and they were collectively marked yesterday at

11   Ms. Noe's deposition.

12         A.    Yes.

13         Q.    Have you seen any of those documents

14   before?

15         A.    I have seen these documents, yes.

16         Q.    Do they appear to be on a form?

17         A.    They are on a form.

18         Q.    Does that form have what appears to be a

19   caption up at the top?

20         A.    It is Premier Capital, LLC, attorney

21   referral form.

22         Q.    Have you seen that document before?

23         A.    I have seen these before, yes.

24         Q.    I believe it bears -- each of those forms,

25   again, marked as an exhibit collectively, bear

159

1    handwriting down at the bottom, looks like a date and

2    perhaps a set of initials.

3              A.    Uh-huh.

4              Q.    **Whose handwriting is that, if you know?**

5              A.    I have no idea.

6              Q.    **Would it have been someone at Premier?**

7                    MR. CORRIGAN:  Objection, form.

8              Q.    **Is it your handwriting?**

9              A.    No.  That is not my handwriting.

10                   MR. SUSSMAN:  Are we going to mark these

11          for this or use the old exhibit?

12                   MR. CORRIGAN:  That is entirely your

13          prerogative.

14                   MR. MORRISSEY:  I thought we were going to

15          use the old one.

16                   MR. SUSSMAN:  Is the record clear on that?

17                   THE WITNESS:  It says Comp. 3 Noe, LC.

18                   MR. MORRISSEY:  I think that's how I

19          identified it for you.

20                   MR. SUSSMAN:  It is Exhibit 3 from Susan

21          Noe's deposition, correct?

22                   THE WITNESS:  Yes.

23    BY MR. MORRISSEY:

24             Q.    **When did you first see those documents?**

25             A.    Well, these documents started coming in,

1    you know, at different times starting, you know, sometime

2    in '02.  Very big surprise that these would start walking

3    in our door by mail.

4         Q.    **Why was it a surprise?**

5         A.    Well, because it says Beverly Penzell.  I

6    am not a lawyer.  I felt like I was being set up.

7              MR. CORRIGAN:  Beverly, just answer his

8         question.

9              THE WITNESS:  OK.

10        Q.    **When you say you felt you were being set**

11   **up, what do you mean?**

12        A.    It's unusual that somebody would send an

13   attorney referral form to me.

14        Q.    **Do you know who sent that to you?**

15        A.    Premier Capital sent it to me.

16        Q.    **Do you know specifically of any person at**

17   **Premier?**

18        A.    I don't know who sent this to me, no.

19        Q.    **Following -- and do you know when you**

20   **received them?**

21        A.    Well, I think they generally have a

22   received date from them from our office, so they are

23   different days.

24        Q.    **Exactly, and I think if you look at the**

25   **dates set forth and initials, they seem to bear the**

1    Q.    **Why did you put them in a pile by a window?**

2    A.    Because there was no attorney authorized to

3    work a file.  Until they were hired there was no work

4    could be done on a file.

5    **Q.    Did you take any other action apart from**

6    **putting them in a pile by the window with regard to those**

7    **documents?**

8    A.    Susan Noe was the inventory attorney, I

9    believe at this point in time, and I told her that these

10   things were coming in and, you know, at that point in

11   time she thought Maimonis was sending her an agreement to

12   sign.

13           So -- and we would get these threatening

14   calls from him, you know, "You are attorney of record and

15   you are responsible for this," and while that agreement

16   is supposed to be coming, then, you know, obviously, she

17   wanted to protect the estate as well and the creditor and

18   be ready to work a file thinking it is going to be an

19   upfront deal, legitimate, somebody was being honest about

20   the dealings and were going to send an agreement, that

21   she would make sure it was something she was agreed to

22   and then be ready to work a file.

23   Q.    **Were these thoughts that Ms. Noe**

24   **articulated to you at around the time these documents**

25   **were received by your office?**

1              MR. CORRIGAN:  Objection to form.

2              You can answer.

3         A.    It was a period of a couple months this was

4   going on.  It was our understanding that Premier Capital

5   was going to hire the inventory attorney to work these

6   files to whatever degree they could because we knew they

7   were already old assets, willing to perform the work to

8   protect the fees for my husband, as was, you know, our

9   job.

10        Q.    **Was it your understanding at that time that**

11   **Ms. Noe had had her own contacts with Premier relative to**

12   **a potential agreement between Premier and ---**

13        A.    I don't remember.

14              MR. CORRIGAN:  Objection, form.  Hang on.

15              What period of time are we talking about?

16              MR. MORRISSEY:  At or around the time the

17              documents marked as Exhibit 3 to Ms. Noe's

18              deposition were received by her firm.

19              MR. CORRIGAN:  Hang on a second.  These

20              documents don't cover a two-month period of time.

21              They span from April of 2002 to July 2002.

22              MR. MORRISSEY:  I stand corrected.

23              MR. CORRIGAN:  I don't want to talk in

24              generalities here.  The documents reflect when

25              they were sent and when they were received so if

1    really April through July.

2    MR. MORRISSEY:  That is well taken.

3    BY MR. MORRISSEY:

4    Q.    So my question concerns the period these

5    documents were received over the span of roughly

6    four months.

7    MR. SUSSMAN:  Three.

8    Q.    April, May, June, July of 2002.  And my

9    question to you is during that period of time, to your

10   understanding, did Ms. Noe have her own contacts with

11   Premier relative to a potential agreement between the

12   Penzell Law Firm and Premier?

13   A.    Repeat the question again.

14   Q.    During the four-month time frame, from

15   April 2002 to July 2002, when those documents were

16   received by you, by the Penzell Law Firm, during that

17   period of time, to your understanding, was Ms. Noe as

18   inventory attorney in touch with Premier about a

19   potential new agreement between Premier and the Penzell

20   Law Firm?

21   A.    My recollection is that it happened more

22   towards, you know, the earlier part of the year and that

23   when these started coming in it was like a big surprise

24   because there should have been an agreement already.

25   There was one coming but instead of an agreement these

1          A.    I don't remember specifically but I am sure

2    I, you know, looked at this and I spoke to Mr. Maimonis

3    and said, you know, there is no new agreement so, you

4    know, I am not a lawyer.  You are referring these to me.

5    There is nothing I can do.  You could ask me to jump off

6    a roof and I can't.  I won't.

7              MR. SUSSMAN:  Excuse me.  Did you take any

8          action?  Did you make a phone call?  Did you write

9          a letter?

10         A.    I mean, I don't remember exactly.  I know

11   that I spoke to Maimonis about this.

12         Q.    **So you had a conversation when you received**

13   **it?**

14         A.    Sure.

15         Q.    **What did you say in that conversation?**

16         A.    I said there needs to be a new agreement

17   signed.

18         Q.    **Why?**

19         A.    In order for work to be done.

20         Q.    **How did he respond to that?**

21         A.    "Oh, yes, I'm going to get it down to you."

22         Q.    **So your understanding at that point, if a**

23   **new agreement was signed what would happen?**

24              MR. CORRIGAN:  Objection, form.

25              You can answer, if you know.

1    my husband, you know.  But I am looking at this thing and

2    remembering I don't know some of these names, so why is

3    Premier sending new matters here.

4             MR. CORRIGAN:  Referring to Exhibit 5.

5         A.    To Exhibit 5.  I never had heard of a

6    couple of names on here.

7         Q.    **Did you tell Mr. Maimonis that?**

8         A.    I don't remember.

9         Q.    **Would it be fair to say ---**

10        A.    I don't think I did, no.

11        Q.    **Let me take a look at that just a second.**

12             **Did -- Mr. Maimonis in this letter states**

13   **in part, makes reference in part to, quote, "The process**

14   **of pursuing," unquote, these files by the law firm.  He**

15   **is asking you, is he not, to take action of some kind?**

16   **Would that be a fair characterization of what he is**

17   **asking you there?**

18             MR. CORRIGAN:  Objection, form.  First of

19             all, it is a fax, not a letter.

20             Second of all, are you asking her what he

21             was intending when he wrote that?

22             MR. MORRISSEY:  I am asking her for her

23             understanding of what he is asking.

24        Q.    **Is he asking the law firm to take action of**

25   **some kind?**

1      A.    I am sure I did.

2      Q.    **Are you assuming that you did or do you**

3  **recall having that?**

4      A.    Well, it is the same conversation I would

5  have with him over all of these communications and, you

6  know, yes.

7      Q.    **And you advised him you were not, in fact,**

8  **pursuing these cases?**

9      A.    Yes.  He needed to hire an attorney in

10  order for work to be done.

11      Q.    **Did you respond in any other way apart from**

12  **conveying that -- was that a verbal communication with**

13  **Mr. Maimonis on your part?**

14      A.    You know what?  I don't remember.

15      Q.    **Did you do anything else subsequent to the**

16  **receipt of this particular document?**

17      A.    This particular document, I don't know

18  exactly the detail.  I know I told Sue we were getting

19  these things in and they just, you know, seemed very

20  predatory and, you know, to bring this to a head.

21      Q.    **So you were communicating with Ms. Noe**

22  **about this as well in that time frame?**

23      A.    You know, yes.

24      Q.    **Did she direct you to take any action?**

25      A.    At some point she directed me to work with

1  Jose Tourn to, you know, do some research and see, you

2  know, what action that, you know, he would recommend for

3  her to take when hired.

4       Q.    **Do you know when that occurred?**

5       A.    Not exactly sure, but I think it is around

6  this period of time.

7       Q.    **That was a conversation she had with you**

8  **about Mr. Tourn?**

9       A.    Yes.

10           MR. MORRISSEY:  Let me have this marked as

11           the next exhibit.

12           (The document referred to was marked for

13           identification as Plaintiff's Exhibit No. 8.)

14       Q.    **This is a one page document marked as**

15  **Exhibit 8.  Please take a look at it.**

16           MR. CORRIGAN:  OK.

17       Q.    **Have you seen that before, Ms. Penzell?**

18       A.    Yes, sir.  I have.

19       Q.    **What, if any, response did you make to your**

20  **receipt of that letter?**

21       A.    I believe based on paragraph three or four

22  here, I was pretty upset.

23       Q.    **What are you referring to specifically?**

24       A.    "When we discussed continuing using your

25  services based on a contingency fee agreement that we

1    still have no knowledge of, we agreed to do so."

2         Q.    You were upset about that?

3         A.    When -- I believe I wrote him and I may

4    have just been starting to do e-mail a little bit at that

5    point, I wasn't that good, I was just sort of starting

6    it, when he says, "Based on a contingency fee agreement

7    that we still have no knowledge of," you know, it was

8    just so old.

9              I knew that the bank had given the

10   agreement to Premier Capital.  I knew that I had given it

11   to Premier.  I didn't remember when but I knew I had

12   given it to them.  I didn't remember what file or

13   anything at that point, but I knew I had given it to

14   them.

15        Q.    You are referring to the 1998 agreement?

16        A.    The contingency fee agreement is the 1998

17   agreement, yes, sir.

18        Q.    That is what you gave to Mr. Maimonis?

19        A.    That is what I faxed to him with Arroyave,

20   with those two judgments.  I didn't remember at the

21   moment I read this that that was the file, but I knew

22   that I had given it to him.

23        Q.    As part of that fax?

24        A.    As part of the Arroyave fax on

25   January 11th, yes, sir, I had given them the 1998

210

1          Q.     Showing you what's been marked as

2     Exhibit 12, Ms. Penzell.

3          A.     Yes.

4          Q.     Can you tell me if you have seen that

5     before?  Have you seen that before?

6          A.     Yes, sir, I have.

7          Q.     When did you see it for the first time?

8          A.     Probably sometime around when it was sent,

9     February 4, 2003, one month after I had sent a letter to

10    Premier.

11         Q.     It is a one-page document, is it not?

12         A.     Yes, it is.

13         Q.     On Premier Capital, LLC letterhead?

14         A.     Uh-huh.

15         Q.     Addressed to you from Mr. Maimonis?

16         A.     Yes, yes.

17         Q.     And that references a letter sent by you to

18    him?

19         A.     Yes, sir.

20         Q.     And the third paragraph makes reference to

21    -- states in part that, quote, "You," by which I take it

22    Mr. Maimonis meant --

23         A.     Meant me.

24         Q.     -- you, Beverly Penzell?

25         A.     Yes.

1       Q.     "Should create a retainer agreement

2    exclusive to us negating any previous agreements,

3    retainers that you feel you have had in the past for the

4    above matters," end quote.

5            Did you ever create such an agreement?

6       A.     Never, sir.  I'm not a lawyer.

7       Q.     Did Ms. Noe ever create such an agreement?

8       A.     No, sir.

9       Q.     Have you generated any agreements with

10   clients for Penzell & Associates, Inc.?

11      A.     I don't think so.  I don't know.

12      Q.     Do you work with written agreements?

13      A.     I don't know to be honest with you.  I

14   don't know.

15      Q.     Do you have any written agreement with

16   Commerce Bank?

17      A.     I don't remember.

18      Q.     Do you have any familiarity with a matter

19   called Metropolitan Industries/James Ward?

20      A.     It is one of the files here, yes.

21      Q.     At some point in time did Ms. Noe, as

22   inventory attorney, engage in activity on that file in

23   2002?

24      A.     My recollection is that I was out of town

25   and Mr. Maimonis called, was threatening with a deadline

1    and Susan made a decision to, knowing this was undecided,

2    just to protect the file on behalf of the estate, go down

3    one time.

4         Q.    Did you have any discussions with her about

5    that?

6         A.    I was out of town.

7         Q.    So when she made the decision you just

8    referred to to attend this event, were you involved in

9    that decision at all?

10        A.    I was not.

11        Q.    This was something she did on her own as

12   inventory attorney?

13        A.    She may have made that decision.  Denise

14   may have told her that Maimonis was calling and

15   threatening again.

16        Q.    Do you recall any discussions you had with

17   Mr. Maimonis where it came up?

18        A.    I think he had maybe -- I think there was

19   some communication from him before that.

20        Q.    About that matter --

21        A.    About that matter.

22        Q.    -- involving you?

23        A.    Yes.

24        Q.    Do you recall what was said in that

25   communication?

1      A.    Something about where he was trying to get

2  us to do some free work again and same story, we can't

3  work without a fee agreement authority for an attorney to

4  work a file, same.

5      **Q.    Following the event that Ms. Noe attended**

6  **in Ward, did you have a discussion about what occurred?**

7      A.    No.  I really didn't.

8      **Q.    You know she attended it?**

9      A.    Well, I saw it attached to some affidavit

10  in this lawsuit, so prior to that I had not seen it.

11      **Q.    Prior to the filing of this lawsuit do you**

12  **have any knowledge that Ms. Noe had, in fact,**

13  **attended ---**

14      A.    I don't remember.

15      **Q.    You have said on several occasions in**

16  **describing your understanding of what Premier wanted that**

17  **Mr. Maimonis for Premier wanted free work, I believe is**

18  **the phrase you have used.**

19      A.    Uh-huh.

20      **Q.    What do you mean by free work?  What was**

21  **your understanding that he wanted that was free?**

22      A.    Well, he didn't want to agree to pay my

23  husband's fees and he wasn't forwarding down the fee

24  agreement that he had been promising now for a couple of

25  years and yet he was still calling for work, go do this,

1              (Short break)

2          Q.      Ms. Penzell, have you seen Exhibit 24

3     before?

4          A.      Yes, sir.

5          Q.      Could you identify it for the record?

6          A.      It's a June 4th letter from your office,

7     looks like Hoisington and Morrissey, former office maybe.

8     I don't know.

9          Q.      Addressed to you?

10         A.      Addressed to me.

11         Q.      Did you -- and it bears the date of June 4,

12    2003.  Is that right?

13         A.      Yes, sir.

14         Q.      Did you receive that?

15         A.      Yes, I did.

16         Q.      Did you have occasion to review it at or

17    about the time you received it?

18         A.      Yes, sir.

19         Q.      Did you take any action -- what if any

20    action did you take subsequent to your receipt and review

21    of the letter?

22         A.      I don't remember.  The second paragraph

23    says, "As I understand your position you have purported

24    to continue to provide legal services to Premier."  You

25    know, it was false.  It is misrepresentation and ---

1      Q.    And you just told me that now.  Right?

2      A.    I have told Maimonis that throughout.

3      Q.    Did you tell that to me previously?

4      A.    Pardon?

5      Q.    Did you tell that to me previously to what

6  you told me a couple of moments ago at the deposition?

7            MR. CORRIGAN:  Objection, form.

8      Q.    You had that reaction to the text of the

9  letter and you shared that with me today.  Did you share

10 it with me at any prior point in time?

11     A.    Not with you, no.

12           MR. MORRISSEY:  I think we are going to

13         suspend.

14           (Thereupon, at 5:30 p.m. the deposition was

15         adjourned until 10:00 a.m. of the following day.)

16                     -   -   -

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CASE NO. C.A. 03-CV-12497

PREMIER CAPITAL, LLC,

        Plaintiff,

-vs-

BEVERLY JOHNSON PENZELL, d/b/a
Law Office of Kris E. Penzell
and BEVERLY JOHNSON PENZELL, as
Personal Representative of the
Estate of Kris E. Penzell,

        Defendants.

_____/

DEPOSITION OF BEVERLY PENZELL

VOLUME III

Wednesday, September 26, 2007
10:10 a.m. - 11:40 a.m.

Courtyard Marriott Conference Room
Miami, Florida 33156

Reported By:
MARGARET PHILLIPS, Court Reporter
Notary Public, State of Florida
Klein, Bury, Reif, Applebaum & Associates
Miami Office
Phone - (305) 373.8404

APPEARANCES:

    On behalf of the Plaintiff:
    THOMAS JAMES MORRISSEY, Esquire
    164 STRATMORE ROAD, SUITE 25
    P. O. BOX 1336
    BROOKLINE, MASSACHUSETTS 02446
    617-787-3434

    On behalf of the Defendants:
    JOSEPH W. CORRIGAN, Esquire
    POSTERNAK BLANKSTEIN & LUND
    800 BOYLESTON STREET
    PRUDENTIAL TOWER
    BOSTON, MASSACHUSETTS 02199
    617-973-6151

    STEVEN A. SUSSMAN, Esquire
    6 BEACON STREET
    SUITE 400
    BOSTON, MASSACHUSETTS 02108
    617-973-4800

ALSO PRESENT

    Richard Gleicher, Premier Capital

           -   -   -

BEVERLY PENZELL                                    247

Plaintiff's Exhibit No. 26                         247
Plaintiff's Exhibit No. 26                         248
Plaintiff's Exhibit No. 27                         262
Plaintiff's Exhibit Nos. 28 and 29                 266

1    its rights for over two years after purchasing the

2    judgments in question."  What do you mean by the phrase,

3    "Sat on its rights"?

4         A.   Well, there was no attorney hired.  Premier

5    Capital didn't hire any attorney to pursue or give any

6    authority to certainly the inventory attorneys to pursue

7    these cases.  There may have been one or two that

8    somebody made an appearance we later found out, but there

9    was no notification to our office, to Kris's office, you

10   know, by anybody, you know, answering phones there or any

11   attorney there from anybody asking to be substituting in

12   on any of these files ever.

13        Q.   Do I understand what you just said to mean

14   that no other third ---

15        A.   Outside attorney attempted to call the

16   office.

17        Q.   -- outside attorney contacted your firm

18   relative to substitution of counsel?

19        A.   Yes, sir.

20        Q.   Anything else, any other basis for the

21   basis of the phrase "sat on its rights" as used in this

22   answer to interrogatory?

23          MR. SUSSMAN:  Well, I have an objection

24          because the answer itself is subject to an

25          objection so ---

1    continues on page six, quote, "The Penzell estate."  Do

2    you see that?

3          A.    Yes, sir.

4          Q.    "Has been damaged by the amount of the fees

5    not paid, the exact amount of which has not been

6    determined but is likely in excess of $100,000 to date."

7    Do you see that?

8          A.    Yes, sir.

9          Q.    Would it be a fair to read that as

10   amounting to an estimate of what you believe may be owed

11   to you?

12               MR. SUSSMAN:  Objection, owed to the law

13         office.

14         Q.    Owed to the law office, to the Penzell Law

15   Office?

16         A.    It says in excess of.

17         Q.    Is it an estimate, ma'am?

18         A.    We have never been told how much Premier

19   has collected on Arroyave so we don't know what that

20   number would be.

21         Q.    Apart from Arroyave, which I understand

22   forms part of your counter-claim --

23         A.    Yes.

24         Q.    -- there are other cases on which you

25   assert in your counter-claim you are owed money, is that

1    services on prior to you purchasing it -- prior to

2    Premier Capital purchasing it from Bank of America.

3         Q.    OK.

4         A.    And Exhibit C relates to the Arroyave

5    judgments and although, you know, we learned that Premier

6    Capital collected over $25,000, four days after I

7    forwarded the judgments to Premier Capital upon Nick

8    Maimonis's request from me, we didn't learn that there

9    was payment made on that until much later.

10        Q.    **Fair enough, ma'am.  Moving back to your**

11   **answers to interrogatories as the personal**

12   **representative ---**

13        A.    Are we finished with these?

14        Q.    **Yes.  We are.  Go back to page five that I**

15   **asked you a couple of questions on, interrogatory number**

16   **five which we looked at earlier, the objection by counsel**

17   **and the two paragraph answer.  Do you see that, ma'am?**

18        A.    Yes.

19        Q.    **It continues to page six.  You have had a**

20   **chance to review that answer.  Is that right?**

21        A.    Uh-huh, yes.

22        Q.    **Directing your attention to the next to the**

23   **last sentence in the first paragraph of your answer.**

24        A.    The next to the last sentence?

25        Q.    **Beginning with "The basis."**

1    A.    So it is on page six.

2    Q.    **Do you have the right ---**

3    A.    I do.  It is on page 6.  I am on the same

4    page.

5    Q.    **If I can quote the next to the last**

6    **sentence.  Quote, "The basis of determining the amount of**

7    **damages is described in the fee agreement between the**

8    **Penzell Law Firm and B of A."**

9    A.    Yes, sir.

10    Q.    **The amount of damages in this context is**

11    **the amount of damages owed by Premier to you, to you the**

12    **Penzell Law Firm.  Is that right?**

13    A.    Yes, sir.

14    Q.    **Do you see the reference to the fee**

15    **agreement between the Penzell Law Firm office and B of A?**

16    A.    Yes, sir.

17    Q.    **What fee agreement are you referring to**

18    **there?**

19    A.    The only fee agreement that I understand we

20    have discussed together is the 1998 fee agreement

21    identified as Susan Noe 2, and whatever else I'm not

22    sure.

23    Q.    **Fair enough.  You have made a claim under**

24    **your counter-claim for damages with respect to the**

25    **Arroyave matter?**

1              A.    Yes, sir.

2              **Q.    The Arroyave matter is form of shorthand**

3     **that is acceptable to you?**

4              A.    Arroyave, yes, sir.

5              **Q.    I wonder if you could summarize for me the**

6     **nature of your claim with respect to claim for damages**

7     **with respect to that matter.**

8              A.    Well, I have been advised by both inventory

9     attorneys and my husband in his lifetime that in Florida

10    when you have a contingency fee agreement when something

11    is substantially collected at the time the attorney is

12    entitled to his contingency fee, and so that is why

13    because Arroyave was essentially collected at the time of

14    purchase it becomes a contingency fee.

15             **Q.    Was there conduct by Premier in regard to**

16    **Arroyave that you believe in claiming your counter-claim**

17    **was improper?**

18             A.    Absolutely.

19             **Q.    What was that?**

20             A.    Well, Mr. Maimonis from Premier Capital

21    called me on January 11th.  I believe it was a Friday.

22             **Q.    Of what year?**

23             A.    2002.  And he said, "Could you send me the

24    two judgments on Arroyave and the fee agreement?"

25                   I said sure.  I was very cooperative.  I

1  was giving him everything he asked for, and I went to

2  Denise, "Are there two judgments on Arroyave," because I

3  only knew about one.

4          She goes, "Oh, yes, Beverly.  One of them

5  was forwarded to Kris from Bruce Wahoo, another attorney,

6  and the bank gave that to Kris to collect along with the

7  instructions for Kris to obtain a judgment on the next

8  debt."

9          So I forwarded that to Mr. Maimonis on

10 January 11th and years into the lawsuit we learned that

11 Premier Capital had been in communication with Ameriquest

12 Mortgage making a deal behind our back and I sent that on

13 a Friday.

14         On a Tuesday Premier Capital collected over

15 $25,000 and did it as a subordination which, you know, I

16 learned is, you know, something that wouldn't show on

17 record.  So as we were trying to find out if you had

18 collected anything since we were never advised, we

19 learned of the subordination and that I believe was

20 signed or notarized by you, your name is on there, and

21 Mr. Maimonis signed it, so I think that is very unfair

22 dealing.

23     Q.    **Did you submit an invoice to Premier after**

24 **you learned of Premier having received money in that**

25 **matter for what you believe to be owed to the Penzell Law**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 03-CV-12497

PREMIER CAPITAL, LLC              )
       Plaintiff,              )
       v.                      )
                 )
BEVERLY JOHNSON PENZELL,          )
d/b/a Law Office of Kris E. Penzell )
and BEVERLY JOHNSON               )
PENZELL, as Personal              )
Representative of the Estate of   )
Kris E. Penzell                   )
       Defendants.              )

## AFFIDAVIT OF BEVERLY JOHNSON PENZELL IN SUPPORT OF HER MOTION TO DISMISS

I, Beverly Johnson Penzell, do hereby depose under oath and assert as follows:

1.    I am a lifelong resident of Florida.  I was born in Miami, Florida and I currently reside in Miami Beach, Florida.  I have never worked, studied or lived in Massachusetts.

2.    I attended school in Miami, Florida and graduated from college in Florida.

3.    My entire professional career has been in Florida.

4.    In 1973, I began to work for Kris E. Penzell, Esquire as his secretary, and I worked for him full time at various law firms in Florida until 1981.

5.    I married Kris E. Penzell on October 7, 1980.

6.    The Law Office of Kris E. Penzell, P.A., which was established in 1985, was confined to Florida, the only state where Kris E. Penzell was admitted to practice law.

7.    My husband's law office never conducted any business with anyone located in Massachusetts, never derived any income from Massachusetts, and never handled any case for a Massachusetts' client.

PLAINTIFF'S EXHIBIT
BP 2
m° 9-25-07

8.      Although I have been sued in my name as a d/b/a, I have never done business as the Law Office of Kris Penzell. I have never held myself out as an attorney.

9.      My husband, Kris E. Penzell, died on March 8, 2000. He was domiciled in Miami Beach, Florida at the time of his death.

10.      The probate matter involving his estate, for which I am serving as the personal representative, is currently pending in the 11th Judicial Circuit of Florida, Miami-Dade County. In my capacity as Personal Representative of the Estate of Kris E. Penzell I did not engage in business in Massachusetts, nor did I individually engage in business in Massachusetts. In conjunction with the probate matter, an administrative judge appointed an "inventory attorney" to oversee the winding down of the law firm.

11.      Under the direction of the court appointed inventory attorney, I have assisted in the winding down of my husband's law firm. All of the work I have performed relative to the winding down of my husband's law firm has occurred in Florida and is related to Florida lawsuits or judgments.

12.      The only reason I have ever visited Massachusetts was for family matters and to visit members of my family living or visiting there.

13.      The Law Office of Kris E. Penzell, P.A. provided services for Barnett Bank, a banking association chartered in Jacksonville, Florida. These services were performed solely in Florida. Barnett Bank thereafter merged with NationsBank, N.A. ("NationsBank"), a banking association chartered in Charlotte, North Carolina. On December 23, 1998, the Law Office of Kris E. Penzell, P.A. entered into a contingency fee agreement with NationsBank, pursuant to which the Law Office of Kris E. Penzell, P.A. agreed to prosecute certain collection matters in Florida arising from certain collection accounts of NationsBank (the "collection accounts").

2

Attached hereto ("Exhibit A") is a true and accurate copy of the contingency fee agreement. In any event, the contingency fee agreement itself provides that it was executed in North Carolina and is governed by North Carolina law.

14.    Subsequent to the agreement between NationsBank and the Law Office of Kris E. Penzell, P.A., the assets of NationsBank, including the collection accounts, were sold to Bank of America, a banking association chartered in Charlotte, North Carolina.

15.    In October 2001 (a year and a half after my husband's death), I learned that certain accounts of Bank of America, including certain collection accounts formerly handled by my husband's firm, were sold to Premier Capital, LLC ("Premier Capital"), a company incorporated in Delaware and headquartered in Massachusetts.

16.    Premier Capital subsequently refused to pay the estate of Kris E. Penzell the amounts due under the contingency fee agreement, giving rise to this controversy. It was the fortuitous occurrence of the collection accounts being sold to Premier Capital and Premier Capital's unilateral conduct that forced me to have contact with Premier Capital in an effort to assist in the winding down of my husband's law firm.

17.    I never purposefully solicited or conducted any business in Massachusetts. I did not cause or create the situation of my husband's client, NationsBank, selling its assets to Bank of America, which then sold certain of its assets to Premier Capital, a Delaware corporation. Any communications I had with Premier Capital were conducted to settle the fees due my husband's firm, resulting from Florida judgments he obtained for Premier's predecessor in interest -- claims which needed to be resolved in order to wind down my husband's business and close his estate.

3

ID # 375780v01/10105-40/ 02.09.2004

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _____ DAY OF

~~JANUARY~~ 2004.

*February*

Beverly Johnson Penzell

## CERTIFICATE OF SERVICE

    I, Catherine J. Savoie, hereby certify that I have served a copy of the Affidavit of Beverly Johnson Penzell in Support of Her Motion to Dismiss by first class mail, postage prepaid, this _____ day of February 2004 upon the following:

Thomas J. Morrissey, Esq.
Hoisington and Morrissey P.A.
1506 Drift Road
Westport, MA 02790

Catherine J. Savoie

4

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release ("Release") is made this the ___ day of _____, 1999 by and between Bank of America, N.A. d/b/a NationsBank, N.A. successor to Barnett Bank, N.A., successor to Barnett Bank of South Florida, its subsidiaries, parents and affiliates ("Bank") and Kris Penzell, P.A. and Kris Penzell, individually, ("Penzell"), hereinafter collectively referred to as the "Parties".

WHEREAS, prior to December 23, 1998, the Bank and Penzell entered into agreement(s) wherein Penzell agreed to provide collection-related legal services on certain accounts referred to him by the Bank and the Bank agreed to pay Penzell a certain fee upon collection ("Old Barnett Agreement").

WHEREAS, prior to December 23, 1998, the Bank referred certain accounts to Penzell to provide collection-related legal services pursuant to the terms of the Old Barnett Agreement ("Old Barnett Matters").

WHEREAS, on December 23, 1998, the Bank and Penzell entered into a new agreement, attached hereto and incorporated herein as Exhibit A, regarding the terms and conditions under which Penzell would provide collection-related legal services on accounts referred to him by the Bank and Penzell's compensation therefrom ("New Agreement").

WHEREAS, a dispute has arisen between the Parties regarding the terms and conditions under which Penzell is providing collection-related legal services on accounts referred to him by the Bank and Penzell's compensation therefrom ("Dispute").

WHEREAS, the Parties in order to resolve the Dispute and avoid confusion, desire to clarify the terms and conditions under which Penzell will provide collection-related legal services on accounts referred to him by the Bank and Penzell's compensation therefrom.

NOW, in consideration of the foregoing and other good and valuable consideration, the Parties intend to be legally bound by this Release, agree as follows:

1.  All Old Barnett Agreements are hereby terminated and are hereinafter null and void.

2.  All matters referred to Penzell for collection-related legal services on or after December 23, 1998 will be governed by the New Agreement.

3.  Penzell may provide collection-related legal services on the matters listed on Exhibit B attached hereto and incorporated herein by reference and receive compensation therefrom pursuant to the terms of the New Agreement.

4.  If Penzell desires to continue providing collection-related legal services on any of the Old Barnett Matters, which are not listed on Exhibit B, Penzell must obtain written permission from the Bank to do so. If Penzell obtains such written permission from the Bank,





PLAINTIFF'S EXHIBIT
BP 1
MP 9-25-07

the terms and conditions of the New Agreement will apply. The Bank reserves the right, without explanation and in its sole discretion, to withhold permission for any reason.

5. Unless the Bank gives Penzell written permission as stated in paragraph 4, Penzell hereby and forever releases the Bank, its predecessors, officers, managers, directors, shareholders, employees, agents, attorneys, representatives, parent corporations, subsidiaries and affiliates, from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, off sets, rights, actions and causes of action of any nature whatsoever, including, without limitation, all claims, demands, causes of action, expenses, including, but not limited to reasonable attorneys' fees and disbursements Penzell has sustained or may hereinafter sustain, which relate in any way to Old Barnett Matters, not listed on Exhibit B.

6. Penzell hereby and forever releases the Bank, its predecessors, officers, managers, directors, shareholders, employees, agents, attorneys, representatives, parent corporations, subsidiaries and affiliates from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, off sets, rights, actions and causes of action of any nature whatsoever, including, without limitation, all claims, demands, causes of action, expenses, including, but not limited to reasonable attorneys' fees and disbursements Penzell has sustained or may hereinafter sustain, which relate in any way to the Old Barnett Agreements or collection efforts related thereto.

7. The Parties' execution of this Release is not in any way based upon any reliance upon any representation, understanding or agreement not expressly set forth herein and neither party has made any representations to the other not expressly set forth herein.

8. The Parties execute this Release as a free and voluntary act without any duress, coercion or undue influence exerted by or on behalf of either party.

9. This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina and the laws of the United States of America applicable to such transactions within such state, including without limitation in relation to all matters of formation, interpretation, construction, validity, performance and enforcement.

10. In the event of any question or dispute under this Agreement, the Parties agree that the terms of this Agreement shall not be construed against the drafter but shall be construed as though all parties were the drafter.

11. This Release is a compromise of a disputed claim and this Release is not to be construed as an admission of liability by either party.

12. If any term, provision or condition of this Release is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the Release shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

13.    This Release is binding upon the Parties, their heirs, executors, administrators, assigns, successors in interest, predecessors in interest and anyone claiming by and through or under any of them.

14.    This Release constitutes the entire agreement between the Parties and is a final and complete release of those matters set forth herein and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement and General Release as of the date set forth above.

BANK OF AMERICA, N.A. d/b/a NationsBank, N.A., successor to Barnett Bank, N.A., successor to Barnett Bank of South Florida

By: _Jacqueline Cristian_
Name: _Jacqueline Cristian_
Title: _Vice President_
Date: _Dec 6, 1999_

Kris Penzell, P.A.

By: _____
Title: _____
Date: _Nov 29, 1999_

_____
Kris Penzell

EXHIBIT A

## CONTINGENCY FEE AGREEMENT

This Contingency Fee Agreement ("Agreement") is entered into this __23__ day of __December__, 199_8_, by and between NationsBank, N.A. ("Bank") and _____Kris Penzell_____ (the "Attorney").

I.    **FEES AND COSTS.**

A.    Fees.

The Attorney's fees for matters forwarded pursuant to this Agreement and the Contingency Attorney Referral attached hereto as Exhibit A ("Matters") shall be wholly contingent upon collection and shall be at the rate of thirty percent (30%) contingency basis on all amounts collected, unless otherwise designated in writing by Bank.

B.    Costs.

In no event shall the Attorney incur any reasonable expenses in excess of $250.00 with respect to any matter without the Bank's prior approval. Costs shall include actual costs incurred in connection with the preparation and prosecution of the Matter and must be within the limits set forth in the Bank's Procedures for Outside Counsel, which are hereby incorporated by reference. Costs shall be billed each month and identified as to each corresponding Matter.

C.    Application of Collected Funds.

In the event that the Attorney collects any funds as the result of prosecution of a Matter, the Firm shall be entitled to apply said funds as follows: (i) first, to reimbursement of any costs incurred and not previously reimbursed, (ii) second, to reimburse Bank for any costs already billed and paid by Bank, (iii) third, to the Attorney to pay the thirty percent (30%) contingency fee, and (iv) to the Bank.

D.    Remittance of Funds.

The Attorney shall be responsible for collection of all monies due from debtors on all Matters subject to this Agreement. The Firm shall be permitted to deduct the agreed costs and contingency fees from the funds collected and must remit the remaining balance of all such funds collected to Bank no later than fifteen (15) days from receipt of each payment in the Attorney's office. The Attorney shall provide the Bank with a full accounting of each such remittance at the time of payment

thereof. In addition to the above, the Attorney shall provide to the Bank a monthly accounting of all monies received and all payments made with respect to each Matter during the prior month. In the event the Bank directly receives funds on a Matter, Bank agrees to process such payment and forward to the Firm the appropriate contingency fee within thirty (30) days from receipt thereof.

II.    **WORK TO BE PERFORMED.**

Each Matter subject to this Agreement may require one or more of the following types of collection efforts. In addition, other methods of collection may be required. The time deadlines indicated below in Section II of this Agreement can be modified with the express consent of the Bank.

A.    **Review Credit File and Determine Litigation Probability.**

Within thirty (30) days of receipt of the Matter, the Attorney will review the credit and collateral files applicable to each Matter and will prepare a written summary report to reflect the status of the file and the Bank's position. This review includes a recommendation as to whether action, including litigation, against the collateral and/or the obligors is feasible. If it is determined that the debt is uncollectable or that the costs to collect the debt outweigh the benefits of collection, the Attorney agrees to return the file to the Bank at no charge.

B.    **Demand On Debtor.**

The Attorney will make formal written demand on the debtor for payment of the indebtedness within forty-five (45) days of receipt of the Matter.

C.    **Litigation.**

Within ninety (90) days of receipt of the Matter, if the Bank expressly determines that litigation should be filed against the debtor, the Attorney will investigate the facts necessary to prepare the lawsuit, file the lawsuit and prepare and file an initial set of discovery requests.

D.    **Bankruptcy.**

If a debtor files for bankruptcy protection, the Attorney will immediately notify the Bank in writing and will thereafter file a Notice of Appearance. With the permission and assistance of the Bank, the Attorney will file a Proof of Claim, even if the bankruptcy

2

notice indicates that the Matter is a "no asset" case, and Motion For
Relief From Stay as required under the circumstances.

E.    Post-Judgment Collection Efforts.

Once a final judgment has been entered against a debtor, the Attorney
agrees to initiate appropriate post-judgment proceedings, including,
but not limited to, recording judgments in the appropriate
jurisdictions, post-judgment discovery, garnishment proceedings,
obtaining writs of execution and other proceedings as may be
appropriate in the applicable jurisdiction.

III.   STATUS REPORTS.

The Attorney shall keep the Bank informed of the status of each
Matter by timely sending the Bank a copy of all correspondence and
pleadings involved in each Matter.  In addition upon request, the
Attorney shall provide the Bank a status report on any or all Matters
that the Attorney is handling in the form attached as Exhibit B.

IV.   SETTLEMENTS.

In the event that the debtor in a particular Matter indicates a
willingness to resolve the Matter for less than the full amount of the
debt owed to Bank, the Attorney may settle such Matter only with the
written consent of Bank.

V.    COUNTERCLAIMS.

In the event a counterclaim should be filed against the Bank in any
Matter, the Attorney shall immediately notify Bank of the same and
Bank shall have the right to elect to transfer the Matter to another
counsel of Bank's choice.  On such transfer, the Firm shall provide
Bank with a written invoice showing the number of hours expended on
the Matter at an hourly rate of $110.00 per hour, and Bank may elect
to either (i) pay the invoice in full satisfaction of the Attorney's claims
as to the Matter, or (ii) pay the Attorney a reduced contingency fee of
fifteen percent (15%) of all funds collected by Bank following transfer.
In the event a counterclaim which has resulted in a transfer is later
resolved, Bank may elect to return the Matter to the Attorney at the
Attorney's regular contingency rate, and to the extent Bank has paid
the Attorney an hourly fee as set forth above, the amount of said
hourly fee paid shall be deducted from the contingency amount upon
any later collection of Bank's claim.  In the event the Matter remains

3

with the Attorney, the manner in which the counterclaim shall be handled shall be determined on a case by case basis.

## VI.   TERMINATION.

### A.   For Cause.

In the event the Attorney fails to timely or fully remit any amount due to Bank, or fails to do any other act required by this Agreement or fails to perform said act in a timely manner, Bank may at any time notify the Firm in writing of its concerns and objections. The Firm shall have thirty (30) days from the date of such notice to take corrective action. If, at the end of the thirty (30) day period, all problems have not been resolved to Bank's full satisfaction, Bank shall have the unilateral right, in its sole and absolute discretion to terminate this Agreement by notice to the Firm in writing, and to withdraw any and all files Bank deems necessary to effect the termination.

### B.   Without Cause.

At any time after one (1) year following the date of this Agreement, Bank may terminate this Agreement for any reason or for no reason at all. Notice of termination shall be in writing and shall be effective thirty (30) days after receipt.

### C.   Bank Recall.

From time to time, Bank may recall a Matter for any reason or no reason at all from Attorney and reserves the right to take such action. In such instances, the Attorney agrees to return all original files and documents related to the recalled Matter within fifteen (15) days from notification. If a matter is recalled, Attorney will be compensated as indicated in paragraph D below.

### D.   Payment Upon Termination.

Upon termination as set forth in Section A above, the Attorney shall be entitled to compensation as follows: (i) as to any Matters in which a payment agreement has been previously reached with the debtor, the Attorney shall be entitled to collect its agreed contingency fee and all funds collected under such payment agreement; and (ii) as to Matters in which no payment agreement has been reached prior to termination, the Attorney shall provide the Bank with a written invoice for each terminated Matter showing the number of hours expended on each

4

terminated Matter at the hourly rate of $110.00 per hour and as to each individual Matter Bank may thereupon elect to either (i) pay said invoice in full satisfaction of the Firm's claims to each terminated Matter or (ii) pay the Attorney at a reduced contingency fee of fifteen percent (15%) of all funds collected by Bank, if any, following termination.

Upon termination as set forth in Sections B and C above, the Attorney shall be entitled to compensation as follows: (i) as to any Matters in which a payment agreement has been previously reached with the Debtor, the Attorney shall be entitled to collect its agreed contingency fee and all funds collected under such payment agreement; and (ii) as to Matters in which no payment agreement has been reached prior to termination, the Attorney shall provide the Bank with a written invoice for each terminated Matter showing the number of hours expended on each terminated Matter at the hourly rate of $110.00 per hour, and as to each individual Matter Bank may pay said invoice in full satisfaction of the firm's claims to each terminated Matter.

E.    Attorney's Right To Terminate.

The Attorney has the right to terminate this Agreement by providing Bank with ninety (90) days' written notice of such termination. However, upon any such termination initiated by the Attorney, contingency fees for payment made after a termination date are waived.

VII.    RETENTION AND RETURN OF FILES

When a Matter is completed through collection or when collection efforts are abandoned, the Attorney shall maintain all records related thereto for a period of five (5) years.  If this Agreement is terminated as set forth above, the Attorney shall return all original files and documents to Bank along with a complete set of all pleadings filed in the case within thirty (30) days from the date of termination.

VIII.    OTHERS MATTERS

A.    Matters Outside Attorney's Service Area:

In the event  Attorney is unable to handle a particular matter due to a defendant being located outside Attorney's usual service area, Attorney shall immediately contact Bank in writing to advise Bank of the circumstances.  Bank shall thereupon have the option of authorizing attorney to employ the assistance of legal counsel in the area where

B

the defendant is located, subject to the Bank's prior written approval. In no event shall the Bank be responsible for fees beyond the agreed contingency fees set forth herein above and any proposed agreement with outside counsel engaged by Attorney shall be subject to prior written approval by Bank.

### B.   Geographic Areas.

The Attorney will handle matters under this Agreement in the following areas: _____

The Attorney acknowledges that this Agreement is not an agreement for exclusive representation of the Bank by the Attorney in the Geographic Area and that the Bank reserves the right to send matters in the Geographic Area to other attorneys.

### C.   Liability.

The Attorney will review the Bank's file and submit an accurate report based on the documents contained in the file. Since the file review is limited to the documents available in the Bank's file, the Attorney will not represent that the information is complete. Unless specifically engaged, the Attorney is not expected to search records or public filings not contained in the Bank's file. Unless expressly noted in the report, the report submitted is not a legal opinion on the perfection or priority of the Bank's lien on the collateral.

### D.   Hold Harmless.

The Attorney agrees to comply with all laws, federal, state or local and, without limitation, the Fair Debt Collection Practices Act. The Attorney agrees to indemnify, release and hold the Bank harmless from any and all damages, claims, liability, debts, causes of action, claims for relief or loss of any kind, including all attorneys' fees, legal costs and expenses, arising from the Attorney's acts or omissions, the Attorney's violation of any law or the Attorney's negligence. The Attorney also holds the Bank harmless from the acts of the Attorney's servants, employees, agents, agencies or independent contractors. The Bank agrees to indemnify, release and hold the Attorney harmless from any and all damages, claims, liability, debts, causes of action, claims for relief or loss of any kind, including all attorney's fees, legal costs and expenses arising from the Bank's acts or omissions, Bank's violation of any law or Bank's negligence. Bank also holds the Attorney

Case 1-03-cv-12497-NG    Document 53-2    Filed 10/31/2007    Page 81 of 93    PAGE. 16
AUG. 03 2006 (THU) 10:26    PENZELL ASSOC    3699315175

DEC 16 1998 17:00 FR B OF A LEGAL DEPT.    704 388 7342 TO 913055315175    P.09/10

harmless from the acts of Bank's servants, employees, agents, agencies or independent contractors.

E.    Full and Complete Agreement.

This Agreement represents the full and complete understanding of the parties with respect to the subject matter hereof. This fully integrated Agreement shall supersede all prior and contemporaneous negotiations, discussions, representations, agreements and accords that are not expressly incorporated herein.

F.    Successors and Assigns.

This Agreement shall inure to the benefit of each of the parties hereto shall be fully binding upon them and their respective heirs, personal representatives, and successors. In no event shall this Agreement be assignable by the Attorney.

G.    Applicable Law.

This Agreement has been negotiated, executed and delivered, and shall be deemed to have been made in the State of North Carolina, and the validity of this Agreement, its construction, its interpretation and enforcement and the rights of the parties hereunder, shall be determined under, and governed by and construed in accordance with the laws of the State of North Carolina.

H.    Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original. Said counterparts shall constitute but one in the same instrument and it shall be binding upon each of the undersigned individually as fully and completely as if all had signed but one instrument.

I.    Severability

To the extent that any provision in this Agreement is held to be unenforceable, the remaining portions of the Agreement shall continue to have full force and effect and shall be interpreted to achieve the overall intentions of the parties hereunder.

7

**J.**   Time is of the Essence

The Attorney agrees and acknowledges that time is of the essence to this Agreement.


NationsBank, N.A.

By: _____
Name: _Stephen A. Mapp_
Title: _Senior Counsel_

# KRIS E PENZELL P.A.

Name of Law Firm

By: _____
Name: _KRIS E PENZELL_
Title: _PRESIDENT_


i:\mayo\cont-fix\forms\penzell

8

# EXHIBIT B

| Claim No. | Title | Date | Amount | Comments |
|---|---|---|---|---|
| 833981 | A.R.P. International Inc.; Larraz, Antonio R. and Periamarina | 04/24/1984 | $ 16,311.22 | |
| 929488 | Ackerman, Raymond and Sandra G. | 11/08/1995 | 23,966.66 | Raymond - Bktc |
| 833982 | Advance Fork Lifts Inc.; Tonks, Robert M. | 02/22/1984 | 29,364.98 | |
| 864645 | Alvarez, Angel B. | 08/04/1986 | 6,473.38 | |
| 929487 | American Furniture/Sheffron, Ronald & Judith | 04/27/1992 | 209,874.59 | |
| 909185 | Battoh, Antuone & Tracy | N/A | Stipulation | owes $345.95 |
| 833908 | Biotronics Inc./Bernard and Martene Conti | 02/24/1984 | 14,901.42 | |
| 909160 | Burton, Harvey | | | continuing paym |
| 833851 | Carrasquero, Jorge F. & Amneris | 06/29/1983 | 6,311.74 | |
| 864880 | Chaka, Kiambu; Idella C. Chaka a/k/a Idella C. Jackson | 08/03/1987 | 64,418.85 | |
| 979989 | Chamberlain, John and Anamaria | N/A | Stipulation | continuing paym |
| 919327 | Cohn, Stanley & Jeanne | 07/29/1991 | 29,403.65 | |
| 874921 | Design Home Remodeling (Edelstein, Harold & Grilla, Louis) | 03/31/1987 | 5,658.50 | partial payment |
| 929510 | Diversified Aerospace/R. Syx; M. Davis and W. David | 05/17/1993 | 173,674.74 | $78,905 Paid |
| 9710000 | Doherty, Henry | N/A | Stipulation | continuing paym |
| 919339 | Einhorn, Donald M. | 09/04/1991 | 30,432.10 | |
| 919330 | Equinox Productions Inc./Dennis R. Linn | 11/04/1991 | 59,102.82 | |
| 898936 | First Summit Corp.; Robert Crows | 04/24/1989 | 23,312.93 | |
| 875019 | Golden Razor Barber Shop; Carmine Brancaccio | 08/03/1987 | 9,752.68 | |
| 909187 | Green, Morgan & Debra | 09/18/1990 | 1,758.19 | |
| 833977 | Guerra-Nunez, Mirta | 03/16/1984 | 8,777.39 | |
| 899126 | Herrera, Jose | 10/03/1989 | 109,208.22 | continuing paym |
| 929529 | J. Lynn Development Corp. and Bernd D. Hargreaves | 07/08/1993 | 8,759.56 | |
| 899028 | Jayson, Jeni L. d/b/a/ Infant Wear | 11/30/1989 | 7,460.58 | partial payment |
| 844234 | Kappa Fashions Inc./Liebert Bass and Doris Horwitz | 06/19/1985 | 24,053.67 | |
| 854390 | Kenworthy, Thomas W. | 07/08/1986 | 5,855.51 | |
| 899076 | Khawly, Roosey | 02/11/1985 | 572,554.67 | continuing paym |
| 919366 | Lanier & Sons Steam Clean Carpet Service/Sylvia Gibson | 07/01/1998 | 7,412.47 | |
| 844248 | Le Esplanade Time & Gold Shop Inc.; Isabel and William Cobb | 02/15/1985 | 9,145.47 | |
| 854437 | Le Sante, Jorge G. | 12/03/1984 | 3,833.24 | |
| 864786 | Licy, Antonio | 10/24/1988 | 20,831.16 | |
| 833976 | Loredo, Felix, G. | 03/01/1984 | 13,405.29 | |
| 909189 | Mar Gil Inc. d/b/a Light King; Martin Norris & Gilbert Arenella | 09/26/1990 | 4,981.66 | |
| 864731 | Martinez, Hiram | 02/20/1987 | 29,090.63 | |
| 888900 | Metro Fire & Safety; Knoepfle, Ken | 04/15/1996 | 77,071.06 | partial payment |
| 887076 | Metropolitan Industries Inc.; Ward, James F. | 10/31/1988 | 26,107.93 | |
| 875015 | Oliveros, Generoso and Marisela | 06/30/1987 | 7,215.91 | |
| 887080 | Pauls, James D. Sr. | 03/23/1990 | 20,017.98 | |
| 919310 | Quadradial Studio/Robert Ingria | 09/17/1991 | 97,826.46 | Ingria only |
| 899031 | Rainbow Exports Inc.; Consalvo, Alberto, Oscar & Delfa N. | 11/07/1988 | 4,978.35 | |
| 887064 | Record Land Export Inc.; Palmero, Jose & Miguel; Monserrat, Jaime | 08/26/1988 | 27,512.26 | Palmero paid 5K |
| 899117 | Redlands Airconditioning & Refrigeration Inc.; Acor & Hardee, Jack | 04/27/1999 | 13,317.98 | Acor paid $7200 |
| 844209 | Rios, Ricardo and Ben Gross | 11/27/1984 | 12,310.66 | |
| 854434 | Sabatini, Giorgio | 05/08/1985 | 54,505.71 | |
| 978990 | Santiago Medical Center Corp. and Carmen D. Perez-Bovdet | 05/20/1994 | 40,499.00 | Perez-Bovdet onl |
| 909249 | Schindler, Jerry & Abramowitz, Rochelle | 01/04/1991 | 19,967.11 | Abramowitz - 5K |
| 844060 | Top Ranking International Inc./Turian M. Hutchinson | 05/09/1985 | 98,552.10 | |
| 929524 | Top Ten Card Co. Inc.; West, Gary & Jennair | 10/02/1987 | 89,677.46 | |
| 919306 | Velmas Golden Needle/Butler, Velma | 05/24/1991 | 9,505.25 | |
| 899016 | Vittum, David & Ceslyn | 04/14/1989 | 88,115.80 | |
| 909264 | Wetstein, Patricia Araujo/Andro Care | 01/27/1992 | 52,049.42 | partial payment |
| 864628 | Wolfe, Clifford | 07/14/1999 | 21,122.34 | |

Initial _K??_    Date _11/29/c_

STATE OF NORTH CAROLINA

COUNTY OF *Union*

The foregoing instrument was acknowledged before me this *6th* day of *December*, 199*9*, by *Jacqueline Cristiano*, as *Vice President* of BANK OF AMERICA, N.A., a national banking association, on behalf of said association. ~~He~~/She is personally known to me or has produced _____ as identification.

*Cynthia H. Fisher*
NOTARY PUBLIC, State of North Carolina
Name: *Cynthia H. Fisher*
Serial No.: _____
My Commission Expires: *9-02-2001*
(SEAL)

STATE OF FLORIDA

COUNTY OF *Dade*

The foregoing instrument was acknowledged before me this *29* day of *Nov*, 199*9*, by *Kris E. Penzell*, as *President* of *Kris E Penzell PA*, a professional association, on behalf of said association.. He/~~She~~ is personally known to me or has produced _____ as identification.

Witness my hand and seal,

*D. Chardiet-Storey*
NOTARY PUBLIC, State of Florida
Name: *Denise Chardiet-Storey*
Serial No.: *CC753398*
My Commission Expires:
(SEAL)

NOTARY PUBLIC - STATE OF FLORIDA
DENISE CHARDIET-STOREY
COMMISSION # CC753398
EXPIRES 10/11/2002
BONDED THRU ASA 1-888-NOTARY1

# *PREMIER CAPITAL, LLC*

## FACSIMILE TRANSMISSION

| TO:<br>Beverly Penzell | FROM:<br>Nick J. Maimonis  (e-mail address:<br>maimonis@premiercapitalnet.com) |
|---|---|
| COMPANY: | DATE:<br>SEPTEMBER 25, 2002 |
| FAX NUMBER:<br>305 531-5175 | PHONE NUMBER:<br>305 531-3000 |
| RE:<br>Response to 8/6/02 Status Report | TOTAL NO. OF PAGES INCLUDING COVER:<br>5 |

☐ URGENT    ☐ FOR YOUR REVIEW    ☐ PER YOUR REQUEST    ☐ PLEASE REPLY    ☐ OTHER

NOTES/COMMENTS:

Beverly,

Following is my assessment/review of the August 6, 2002 Status Report that you provided on the matters that you are currently working for us.

Please review my comments, suggestions and or concerns and either call me before you leave for vacation, or have Susan call me to discuss these matters so we can get going on them.

As far as the fees for the asset searches, I have no problem in getting you a check to pay this cost. However, I would also like to receive a copy of each of these reports, so I can assess their value going forward for these, as well as other matters. Also, with regard to one of the charges set at $45.00. I don't understand why this would be so high, especially where the information that came back appears to be of no value, etc.

Let me know.

Thanks!

PLAINTIFF'S
EXHIBIT
BP 11
MP 9-25-07

# *Premier Capital, LLC*

Response to August 6, 2002 Status Report(Penzell)                9/25/02 (NM)

Bradley Boat Repair      Why don't we file a wage garnishment and if she raises defenses, we have a built in debtor's exam at that point in time.  As I advised months ago, I believe she works at Biscayne Pilots.  As far as numerous addresses, I think if we file our garnishment, we can get all necessary info to come out in the wash if and when she raises any defenses. Let me know.

Brancaccio               My understanding is that you conducted a debtor's exam a few years ago and came up with no information.  As I indicated on my referral form, we should look at attaching this guy's real estate; serve info subpoenas on some of his more recent creditors; and forget the debtor's exam for now.

Butler                   Forget the deposition for now. Serve the info subpoena on Home side Lending and see what info we come up with.  Pursue the possible real estate that you have eluded to in your status report, as well as his owner occupied property (record the Judgment lien)

Cabanas                  You state that a National Search has been completed, but you want to complete the research?? Assuming the initial research came up empty, what additional research is being proposed here? Cost?

Chaka                    When I referred this matter back to you, my instructions were to serve info subpoena's on 3 creditors (BofA, HBSBNA and Capital One) I also gave you information as to a possible business interest that he has/had (Jackson Holding Corp). Before we go as far as setting this for deposition, we need to get our ducks lined up here, so we at least have a foundation to start with, should we need to.

Premier Capital LLC.
Page: 2
September 25, 2002

| | |
|---|---|
| Gipson | Why are we so focused on a deposition here? We have a job on her and the one that I gave you for him you state he is no longer employed at. Why don't we simply serve the wage garnishment and let her bring any defenses to the table, at which point we can also possibly address some of the issues that we'd address in a deposition. What about the corp.'s? If she is indeed the owner, why haven't we pursued attaching her interests? |
| Grilla | Assuming we have nothing to go with on these guys, I would agree that we should conduct a debtor's exam for Grilla. Prior to the exam, I would like to review the line of questioning, as well as what information we have qualified before hand. |
| Hardee | The information that is provided on the status report is essentially a reiteration of what I presented to you upon referral. I don't see conducting a debtor's exam quite yet, at least not until more homework has been done. i.e. can we prove he has ownership interest in any of the corp.'s? If so, can we attach those interests? If we have exhausted these avenues, then debtor exam in order. |
| Jayson | If our Judgment was obtained in 1989 and it supposedly liened the real estate that she owned, the fact that she was able to sell that property should be explored. What is our recourse regarding this? Do we have a title insurance claim here? Etc. I don't see conducting a deposition here, as when I spoke with her months ago, she stated that she is a stay at home mom w/2 infants, etc. She also stated that the original loan was taken out by her on behalf of her dad for business (straw deal) Do we have recourse here? Let's at least entertain the issue of the real estate being sold from under "us" back in 1996. |
| Kenworthy | Assuming we can find this guy as a matter of fact, what could we expect to possible find out that he'd volunteer to us at a deposition? Unless we have some ammunition to corner him, no reason for deposition at this stage. And, if we have/had this ammunition, we would be looking to execute on it anyway. You state that there were 2 more asset checks to be completed on this guy? Has this been completed? Have any specific assets been established for this guy that we can go after now? |
| Lioy | Your suggested action of serving subpoena's on license and INS records. What is would we be looking at here, both from an informational, as well as a cost perspective? Depending on your answer, this sounds good to me! |

Premier Capital LLC.
Page: 3
September 25, 2002

| | |
|---|---|
| Mangue | What do you mean by additional inquiry before any action?? |
| Mazon | Assuming she/he purchased a property subsequent to our judgment and their bankruptcy. Wouldn't our judgment lien be sr to any mortgage, if it was properly recorded within the given county? If so, can we pursue title claim, etc? As far as a deposition at this stage, it would appear to make more sense to exhaust your research efforts first, whereby the 9 additional properties, as well as the corporate leads have been confirmed, one way or another. |
| Martinez | Before we entertain a deposition, we should finalize the outstanding asset search issues, (real estate and corp. possibilities) then conduct the deposition. |
| Moreno | I'm not sure I quite understand this update/suggested action. It seems more needs to be done before we depose. Let me know |
| Ramos | My understanding on this matter is that you/the bank, filed a late Proof of Claim, thus not being made part of the Plan. Assuming these debtors included financial information as it related to the business in their bankruptcy, it would probably make sense to access such information. The research on 6 properties, as well as on the corporations would also be in order here before we set this for deposition. |
| Rios | Complete research is agreed. However, you indicate a $45.00 charge for the searches that have been completed to date. Why so high and what did this reveal?? If we go forward with additional research, what can we expect the cost to grow to?? |
| Wisteria | The information that I gave you upon referral was to attach his wages at Asadoria Rug Co. Additionally, there is the distinct possibility that he fraudulently transferred his LA real estate to his folks. We need to get at that information, so we can pursue this in LA at the same time. |
| Ward | As indicated on my fax and discussion with you yesterday, this guy filed chapter 7. It appears there are many questions that would surround this filing, however, I can't access the Pacer documents to see what he filed, etc. As such, we need all schedules so we can establish any inconsistencies that we may be able to raise at a 341 meeting, which is set for 10/8/02. |

Premier Capital LLC.
Page: 4
September 25, 2002

West                    Aside from the possibility that these debtors have an ownership
                        interest in a/some corporations, I agree that additional research
                        is in order here, then depose them and establish anything that we
                        can work with??

**HOISINGTON & MORRISSEY**
A Professional Association
1506 Drift Road
Westport, Massachusetts 02790
Tel. (508) 636-7363

Miles E. Hoisington*
Thomas James Morrissey

*also admitted in New York
Fax (508) 636-3133

June 4, 2003

BY CERTIFIED MAIL
No. 7099 3400 0010 8707 1396
RETURN RECEIPT REQUESTED
Beverly Penzell
Law Offices of Kris E. Penzell
407 Lincoln Road, Suite 10-D
Miami Beach, Florida 33139

        Re:    <u>Premier Capital, LLC Litigation Matters</u>

Dear Ms. Penzell:

        I represent Premier Capital, LLC ("Premier").  I have
been asked to contact you regarding Premier's longstanding
concerns with your office's handling of various collection
matters (the "matters") in which Premier succeeded to the
interests of Bank of America, N.A. ("B. of A.").

        As I understand your position, you have purported to
continue to provide legal services to Premier regarding the
matters, despite the following facts: Premier has never
entered into an agreement for legal services with your
office; Mr. Penzell passed away before Premier purchased
title to the matters from B. of A.; and neither you, nor
anyone else at your office, is an attorney.  Nonetheless,
you have represented that your office has some right of lien
with respect to the matters, a position you have
communicated to Premier to justify your retention of the
matters.  In any event, your office has performed no
collection work of any significance in the matters since
Premier succeeded B. of A.

        This state of affairs is grossly unsatisfactory to
Premier.  Nick J. Maimonis of Premier has made this clear to
you in numerous telephone, e-mail and facsimile messages
over the past several months.  Premier has attempted to
address your retention of the matters in several ways.
Premier has contacted you over and over again to obtain



Beverly Penzell
June 4, 2003
Page Two

information on the status of the matters and to determine
what collection activity, if any, your office can now
perform in light of Mr. Penzell's death.  Indeed, Premier
sought your agreement to its specific instructions regarding
collection strategy. These repeated contacts have been
ignored: it has been virtually impossible even to obtain
status information from your office.  Obviously, absent such
information, Premier cannot formulate a collection strategy
going forward.

Finally, in April, 2003, Premier made a final attempt
to create a working relationship with your office.  Premier
sent your office a draft agreement for collection work for
your review.  Please be advised that Premier has maintained,
and continues to maintain, that there is no agreement
currently in effect between your office and Premier
respecting the matters; Premier is not a party to, nor bound
by, whatever agreement Mr. Penzell may have had with B of A.
In the draft agreement, therefore, Premier sought to
establish a relationship with your office.  You ignored the
draft agreement.  You also ignored Premier's repeated e-mail
and other messages regarding the agreement.

Much time has passed as Premier has made these urgent,
fruitless efforts to communicate with you.  Substantial
prejudice to Premier's interests in the matters can be
presumed.  (Absent status reports, however, the extent of
such prejudice cannot be definitively established.)  To
prevent further damage to its interests, Premier must bring
this damaging impasse with your office to a close.

Accordingly, Premier demands that your office transfer
to it forthwith any and all files in your custody or control
on each and all of the matters. Such files should be
returned directly to Mr. Maimonis at Premier's offices, 226
Lowell Street, Wilmington, MA 01887.  Such files are to be
returned on or before fifteen days from the date of this
letter, or on or before June 20, 2003.

Your immediate attention to this matter is urgently
requested.  Please be advised that Premier reserves all of

Beverly Penzell
June 4, 2003
Page Three


its rights and remedies, at law and in equity, with respect
to the subject matter of this letter.


                              Very truly yours,


                              Thomas James Morrissey


cc:  Paul W. George, Nick J. Maimonis, Premier Capital, Inc.