1

UNITED STATES DICTRICT COURT
DISTRICT OF MASSACHUSETTS

PREMIER CAPITAL, LLC,                Case No. 03-CV-12497

   Plaintiff(s),

vs.

BEVERLY JOHNSON PENZELL,
d/b/a, et al.,

   Defendant(s),
------------------------------)

DEPOSITION OF:

VICTOR RONES

On behalf of the Plaintiff

Examination of a witness beginning at 3:06 p.m. and concluding at 5:37 p.m. on Monday, September 24, 2007, taken at Freshman & Freshman, 9155 South Dadeland Boulevard, Miami, Florida, before LINDA COLUCCI, Reporter, Notary Public in and for the State of Florida at Large and Registered Professional Reporter.

U.S. Legal Support
(305) 373-8404

APPEARANCES:

Thomas James Morrissey, Esquire, Suite 25, 164 Strathmore Road, Post Office Box 1336, Brookline Massachusetts 02446, on behalf of the Plaintiff.

Joseph W. Corrigan, Esquire, of the firm of Posternak, Blankstein & Lund, LLP, 800 Boylston Street, Boston, Massachusetts 02199, on behalf of Defendant.

Steven A. Sussman, Esquire, Suite 400, 6 Beacon Street, Boston, Massachusetts 02108, on behalf of Counterclaimant.

ALSO PRESENT:

Richard Gleicher
Susan Penzell

INDEX

EXAMINATION

Direct Examination by Mr. Morrissey                3

EXHIBITS

Plaintiff's No. 1                                 20
Plaintiff's No. 2                                 22
Plaintiff's No. 3                                 29
Plaintiff's No. 4                                 44
Plaintiff's No. 5                                 65

REPORTER'S NOTE:  Exhibits retained by Mr. Morrissey.

```
 1      A.   I believe Mr. Penzell's was the first time that I
 2   had done so.
 3      Q.   Were there other occasions?
 4      A.   Yes.
 5      Q.   How many?
 6      A.   I believe there was another time that I was
 7   involved that had to do with another attorney that
 8   passed away.
 9      Q.   Do you recall when that may have occurred?
10      A.   I don't recall whether it was before or after.  I
11   think it was after Mr. Penzell.
12      Q.   Are you still engaged in that work as an
13   inventory attorney?
14      A.   No.
15      Q.   So are you currently an inventory attorney?
16      A.   No.
17      Q.   Do you recall when you became inventory attorney
18   with respect to Mr. Penzell's practice?
19      A.   In the year 2000, but I do not recall precisely
20   when.
21      Q.   What were the circumstances of your becoming
22   inventory attorney?
23      A.   The attorneys for the personal representative,
24   Mrs. Penzell, petitioned the chief judge and requested I
25   be appointed, the chief judge entered an order
```

1  appointing me to be the inventory attorney, and I was
2  appointed.
3      Q. Who were those attorneys for Mrs. Penzell?
4      A. Mr. James Slotto.
5      Q. To your knowledge, does he continue to represent
6  Mrs. Penzell?
7      A. I think so.
8      Q. And does he represent her in connection with the
9  probate of Mr. Penzell's estate?
10     A. I think so.
11     Q. Becoming an inventory attorney requires an
12  application; does it not?
13     A. If you're talking about the petition to Judge
14  Farina by the personal representative through the
15  attorney, the answer to that would be yes. If you're
16  talking about some other form of application, no.
17     Q. At some point in time did you express to anyone
18  your willingness to become inventory attorney?
19     A. I am not quite sure what the question is geared
20  toward. If the question is being asked whether or not
21  Mr. Slotto asked if I was willing to serve as inventory
22  attorney and if Judge Farina asked if I was willing to
23  serve as inventory attorney, that is true, both of them
24  asked me, and I replied in the affirmative. If there is
25  some other aspect of the question being asked, I'm

afraid I do not understand.

Q. Why did you agree to become inventory attorney?

A. Because they asked and I was willing to do so.

Q. Who do you mean by they?

A. They asked, and I said I was willing to do so.

Q. They being Mr. Slotto?

A. And Chief Judge Farina.

Q. Did you have any conversations with Mrs. Penzell with respect to serving as inventory attorney prior to your appointment as inventory attorney?

A. Yes.

Q. And how many such conversations?

A. I do not recall.

Q. Do you recall the substance of those conversations?

A. Not particularly, other than being asked to serve.

Q. The probate court, Judge Farina, enters an order appointing you; is that correct?

A. That is incorrect. Chief Judge Farina is the chief judge. The judge who had been the probate judge was a different judge altogether.

Q. I stand corrected.

Prior to becoming inventory attorney, did you have any familiarity with Mr. Penzell's practice?

1   me to.
2     A.  You can identify it if you want to.
3         MR. CORRIGAN:  We can stipulate it's the
4   notice.
5     Q.  Yeah, we can stipulate it's the notice.
6         As inventory attorney, sir, did you perform
7   different kinds of legal services for different clients?
8     A.  Yes.
9     Q.  And as I understand your testimony, it would
10  depend upon the matter involved as to what the precise
11  nature was of those services, correct?
12    A.  Yes.
13        MR. MORRISSEY:  If you could mark this as
14  Exhibit 2.
15        (Plaintiff's Exhibit No. 2 was marked for
16         identification.)
17    Q.  Mr. Rones, I wonder if I could place before you a
18  one-page document that's been marked as Exhibit 2 and
19  ask you to take a look at it for me.
20    A.  Fine.
21    Q.  Have seen that document before, sir?
22    A.  Looks familiar.
23    Q.  Okay.  And can you identify it for the record,
24  please?
25    A.  Appears to be a letter dated May 17th, 2001,

1  under my signature regarding the matter of NationsBank,
2  NA, versus Hiram Senior Martinez, Sr., Case Number
3  86-2946A CA 03.
4      Q.  And directing your attention to the first
5  paragraph of this letter -- by the way, is that your
6  signature down at the bottom?
7      A.  It appears to be.
8      Q.  Was that letter prepared in connection with your
9  work as inventory attorney?
10     A.  It would appear to be so.
11     Q.  Was NationsBank a client of the Penzell law firm?
12     A.  That is correct.
13     Q.  And by the way, when I use the phrase Penzell law
14 firm, if it's acceptable to you, I'll use that as a
15 shorthand for Mr. Penzell's practice both prior to and
16 following his decease.  Is that acceptable to you just
17 as a shorthand?
18     A.  Yes, sir.
19     Q.  Directing your attention to the first paragraph
20 of that letter, it makes reference to some work that you
21 performed on behalf of the bank; is that right?
22     A.  Yes, sir.
23     Q.  I wonder if you could read for the record the
24 final sentence, the third sentence, of that paragraph.
25     A.  The third sentence states as follows, quotes,

```
 1   "Please be advised that we are returning this file to
 2   inactive status," close quotes.
 3       Q.  What was inactive status as you use that phrase
 4   in this letter, sir?
 5       A.  That was a status that was, as I understood, a
 6   term of art that the folks at NationsBank NA had
 7   assigned to particular files that they had indicated
 8   whether work was to be handled as to any further work
 9   was to be done on or not done on, in other words,
10   whether further efforts, further recordings, further
11   effort was to be placed on those, and as I recall, I
12   think this, again I'm not sure, but I think this was one
13   of the ones that the bank would not allow further work
14   to be done without permission, but I'm a little bit
15   vague on that.
16       Q.  Okay.
17       A.  And there were certain ones that the bank would
18   say on the inactive status you are not to expend another
19   dime, do another thing, nothing whatsoever and don't you
20   dare do anything further without us telling you to.
21       Q.  With reference to that sentence, who is doing the
22   return?
23       A.  I'm sorry?
24       Q.  Who is doing the return?
25       A.  The what?
```

A. Penzell's office.

Q. **Was this following your tenure as inventory attorney?**

A. The way you worded that is strange because I was inventory attorney, got a call that Denise said that Mr. Maimonis had called before and wanted to speak to the inventory attorney, and I was at the time still inventory attorney, and he spoke to me.

Q. **And you don't recall the timeframe of that?**

A. I think 2002 or something like that. It was a couple months before Susan Noe came on board. It was a weird conversation.

Q. **How was it weird?**

A. He called, introduced himself and said Premier had taken over some of the files or some of the cases that NationsBank had had, and I said well, it's news to me, send something down showing me this, and if it's true, you need to get a new attorney or something, and I'm the inventory attorney. He said maybe we want to hire you. I said all right, fine. He said but we have a standard form that we have to hire all of our attorneys. I said good. Send it down and I'll look at it. He said okay. Never heard anything. A month or two later, he said I want to follow up. I said where's the agreement? He said oh, yeah. I never heard

1  anything.  Strange.  That was it.
2     Q.  Any letters or other written communications
3  reflecting your contact with Mr. Maimonis?
4     A.  No.  He never sent me the letter showing me that
5  it had actually happened that they'd acquired it, and
6  when I had Denise call Bank of America, they said -- it
7  was weird.  At least, that's what I recall vaguely.
8  It's strange.  There might have been a letter or
9  something.  I don't know.
10    Q.  At some point in time, did Bank of America give
11 notice to the Penzell law firm that certain litigation
12 matters had been conveyed to Premier Capital?
13    A.  I think so.
14    Q.  Do you recall what the form of that notice was?
15    A.  No.  If you show it to me, I might remember.
16    Q.  Do you recall whether it was written?
17    A.  Probably.  Show it to me.  Maybe.
18    Q.  Was it directed to you; do you remember?
19    A.  I don't know.
20    Q.  Let me show you -- let's have it marked as the
21 next numbered exhibit to Mr. Rones' deposition.
22            (Plaintiff's Exhibit No. 5 was marked for
23            identification.)
24    Q.  I'm going to show you a document that was marked
25 as Exhibit 5 to your deposition.  I wonder if you could

```
 1    A.   I don't know.
 2         Am I done with Exhibit 5?
 3    Q.   Yeah, absolutely.  Let's move on.
 4         Have you ever been involved in preparing a bill
 5    for your legal services to be submitted to Premier
 6    Capital?
 7    A.   Maybe.  I don't know.
 8    Q.   Are you owed money by Premier Capital?
 9    A.   As an individual, no.  As inventory attorney, I'm
10    owed money insofar as work was done on estate work for
11    files that pertain to work being done for NationsBank.
12    Is that what you're asking me?
13    Q.   Yes.
14    A.   But that would not be because, see, it's a little
15    complicated the way you asked the question because the
16    work that would be done would attach to the cases
17    themselves because there's no relationship, so to speak,
18    vis a vis a client because Premier was never a client.
19    It would only attach to the case itself as termination,
20    early termination of a contingency agreement or if a
21    full contingency occurred, so I'm trying to answer you
22    fully when you say that.
23    Q.   What I'm unclear about from your answer is
24    whether you believe, in testifying today, that Premier
25    Capital is liable for any legal services performed by
```

1  you for either Premier or any other entity.
2      A.  Well, the way you word that is not completely in
3  keeping with my understanding of how it would be
4  accurately reflected.  In other words, it would be a
5  claim that would be reflected, so to speak, against the
6  case itself, so it would be against the proceeds in the
7  form of a lien.  It would not be per se because I've
8  never had, nor, as I understood it, has the Penzell firm
9  ever had a relationship in any manner with Premier.
10     Q.  **But if those fees are associated with a**
11  **predecessor of Premier, under your reasoning, as I**
12  **understand it, Premier is liable to the Penzell law firm**
13  **for payment of those legal services.**
14         MR. CORRIGAN:  Objection.  His testimony
15  wasn't about a predecessor, it was about the file.
16     Q.  **Okay.  About the file.  The file involved a**
17  **client other than Premier Capital.**
18     A.  There's a big distinction between the proceeds of
19  the case versus the client.  That distinction is not --
20  I can't emphasize enough.  Sounds like it's being
21  glossed over, and it's a major distinction down here in
22  Florida.
23     Q.  **To your understanding, was Premier ever a client**
24  **of the Penzell law firm?**
25     A.  No.

1   Q.  At any point in time?

2   A.  No.

3   Q.  And what's the basis of your understanding in
4   that regard?

5   A.  Number one, I checked through, I saw no retainer
6   agreement.  Number two, in all my representation I found
7   no place where I ever entered an appearance on behalf of
8   Premier.  Three, my contacts and my work, there was
9   never anything on behalf of Premier.  Four, the few
10  times I spoke with Maimonis was simply to say get your
11  own counsel in here or if you want to make a deal with
12  me, give me an agreement and I'll see if I'll live with
13  it.  He was going to send me down an agreement.  He
14  never sent me one down.  Without an agreement, I
15  wouldn't do anything.  My job was to protect existing
16  clients, and the only existing client that I had was
17  NationsBank that had anything to do with those files.
18  That was it.  So I had nothing to do with you folks.

19  Q.  Do you understand Premier to have any liability
20  in connection with the formal letter agreement that you
21  drew up that incorporated the 1999 and 1998 agreements?

22  A.  Only to the extent that we're speaking about the
23  proceeds of collections or the proceeds generated from
24  the recovery of those cases, which is different than the
25  contention that there is liability of you folks as to

1  being a client per se from the firm, and that's a
2  distinction that we have here in Florida. I don't know
3  if it's a distinction you have up where you folks are
4  from.
5     Q. We have that.
6        How about liability under that formal letter
7  agreement to the Penzell law firm of Premier for hourly
8  charges as opposed to a share of any recovery?
9     A. Same thing applies. In Florida if the
10 contingency is substantially fulfilled, then you are
11 entitled to recover the full contingency fee. If you're
12 terminated before that happens, then you're entitled to
13 recover the hourly and not the full contingency.
14    Q. Is it your understanding that such a termination
15 occurred with respect to Premier and the Penzell law
16 firm?
17    A. That is what I have been told. I do not know
18 that from factual basis of knowledge.
19    Q. Do you recall that as having occurred in
20 connection with your communications with Mr. Maimonis?
21    A. No.
22    Q. You don't?
23    A. I do not know that.
24    Q. But you did not view the message sent, the
25 information you obtained from Mr. Maimonis in his

```
 1   Penzell law firm, inclusive of you or Mrs. Noe as
 2   inventory attorneys, owe any duty in connection with
 3   such termination?
 4       A.  To NationsBank or Bank of America.  To them we
 5   owed a duty to continue whatever information or
 6   assistance we had to Bank of America and NationsBank, we
 7   owed a duty to hold on to the files, cooperate and
 8   retain those files.  If Bank of America or Nationsbank
 9   wanted the files, we could possibly tell them what
10   information we had in the file with Bank of America and
11   NationsBank.  To Premier, we had nothing.
12       Q.  And that is under the letter agreement you've
13   testified earlier?
14       A.  No.  It had nothing to do with the contract.  It
15   had to do with Florida law, how the rights and
16   everything govern that.  What happens is when you
17   appoint an inventory attorney, the obligations of the
18   inventory attorney in Florida law take precedence over
19   what I have to do, notwithstanding what the contract and
20   wonderfulness of the contract are, and that's why we had
21   that whole hearing before Judge Farina is because he had
22   to tell us what had to happen and what had to be done,
23   and he's the one that metes out what must be done,
24   notwithstanding the contract.
25       Q.  He did so in this case, didn't he?
```