UNITED STATES DICTRICT COURT
DISTRICT OF MASSACHUSETTS

PREMIER CAPITAL, LLC,                  Case No. 03-CV-12497



   Plaintiff(s),

vs.

BEVERLY JOHNSON PENZELL,

d/b/a, et al.,

   Defendant(s),

---------------------------)


DEPOSITION OF:

SUSAN IRENE NOE

On behalf of the Plaintiff


Examination of a witness beginning at 11:37 a.m. and

concluding at 2:48 p.m. on Monday, September 24, 2007,

taken at Freshman & Freshman, 9155 South Dadeland

Boulevard, Miami, Florida, before LINDA COLUCCI,

Reporter, Notary Public in and for the State of Florida

at Large and Registered Professional Reporter.

2

APPEARANCES:

Thomas James Morrissey, Esquire, Suite 25, 164
Strathmore Road, Post Office Box 1336, Brookline
Massachusetts 02446, on behalf of the Plaintiff.

Joseph W. Corrigan, Esquire, of the firm of Posternak,
Blankstein & Lund, LLP, 800 Boylston Street, Boston,
Massachusetts 02199, on behalf of Defendant.

Steven A. Sussman, Esquire, Suite 400, 6 Beacon Street,
Boston, Massachusetts 02108, on behalf of
Counterclaimant.

ALSO PRESENT:

Richard Gleicher
Susan Penzell

I N D E X

EXAMINATION

Direct Examination by Mr. Morrissey                    3

EXHIBITS

Plaintiff's No. 1                                      65
Plaintiff's No. 2                                      64
Plaintiff's No. 3                                      73
Plaintiff's No. 4                                      81
Plaintiff's No. 5                                      81
Plaintiff's No. 6                                      82

Plaintiff's No. 7                                      83

Plaintiff's No. 8                                      86

Plaintiff's No. 9                                     100

Plaintiff's No. 10                                    111

Plaintiff's No. 11                                    115

REPORTER'S NOTE:  Exhibits retained by Mr. Morrissey.

1    creditors meeting at the bankruptcy court, and I went in
2    to question the debtor, and Nick Maimonis had a whole
3    bunch of questions he wanted me to ask, and I asked
4    them;  most of them, anyway.
5        Q.  **So Premier made some contact with Mrs. Penzell?**
6        A.  Yes; a lot.
7        Q.  **When was your first contact directly with Premier**
8    **Capital?**
9        A.  Some time after that.
10       Q.  **Some time after what?**
11       A.  After their initial contact with the Penzell law
12   firm.
13       Q.  **And your understanding was that that was a**
14   **contact with Mrs. Penzell?**
15       A.  Yes.
16       Q.  **And that was essentially to notify Mrs. Penzell**
17   **that Premier had bought files?**
18       A.  Well, yes, and that they wanted to know about the
19   -- my understanding was the background on the existing
20   files that the law firm had and, you know, what was the
21   status of them, what were they doing.  These are all
22   files that had been no-asseted, so they had to be dug
23   out.
24       Q.  **When you say a file was no-asseted, what do you**
25   **mean?**

1    A.  That means that the bank deemed that they were

2    uncollectible, so they put them together and they sell

3    them to you.

4    **Q.  Was the process of no-asseting a file, was that**

5    **something that you did?**

6    A.  No.  That's the bank determines whether -- we can

7    say we can do this, this, this and this, you know, or we

8    can wait on it for a while, maybe wait for a year or two

9    on a file see if something pops up, but a lot of times a

10   bank will call in and say look, we decided we're not

11   going to spend anymore money on this or whatever, close

12   it.

13   **Q.  Did Bank of America communicate to the Penzell**

14   **law firm that a file was no-asseted?**

15   A.  You know, I think by the time that I got there,

16   like I said, everything had already been done with Bank

17   of America.  They were rolled up, pretty much.  It was

18   only the stray file that would come in occasionally from

19   somebody that had a judgment, say a judgment that had

20   been determined uncollectible but we were the attorney

21   of record, so they would contact us to find out how much

22   the lien was.

23   **Q.  Did you ever have any contact as inventory**

24   **attorney with Bank of America yourself?**

25   A.  No.

1   Q.   Was Premier a new client?

2   A.   No.

3   Q.   What was Premier, then?

4   A.   That's a good question.  You tell me.

5   Q.   Unfortunately, I get to ask the questions.  But

6   what was your understanding of --

7   A.   Premier is just a third party who bought closed

8   assets, and we have no duty to them, they weren't a

9   client of Kris Penzell, they weren't a client of Victor

10  Rones and they weren't my client.

11  Q.   Did you do legal work for Premier at any point in

12  time as inventory attorney?

13  A.   I did work for Premier, only -- not for Premier,

14  but for the estate of Kris Penzell when Premier had a

15  judgment to go in there and see if I could get any money

16  because the estate was owed money under the purchase and

17  sale agreement.

18          MR. MORRISSEY:  Can we take a break?

19          (Brief recess.)

20          MR. CORRIGAN:  I think when we left we had a

21  brief opportunity to talk about the last line of

22  questioning.  I think Susan wants an opportunity to

23  clarify her response, if that's all right.  I think

24  she's entitled to do that.

25  Q.   Yeah.  Let me ask it this way.  Ms. Noe, is there

1  anything relevant to our most recent line of questioning

2  you would like to clarify?

3      A.  Right.  The only thing that I had a duty under

4  the 1998 agreement is to protect existing clients.  That

5  does not include Premier because they never hired me.  I

6  never represented Premier.

7      Q.  And for the sake of being as clear as we can

8  about this, when you refer to the 1998 agreement, and

9  I'll be happy to adopt that shorthand, you're referring

10  to an agreement dating from 1998 involving Mr. Penzell;

11  is that right?

12     A.  Mr. Penzell and Bank of America.

13     Q.  Not a loan sale agreement.

14     A.  No, not the loan purchase and sale agreement.

15          MR. SUSSMAN:  Just to keep the record clean,

16  can we just describe that as the fee agreement and the

17  other as the loan sale agreement?

18     Q.  Let me show you this document, Ms. Noe, and ask

19  if you've seen that before.

20     A.  Yes, I have.

21     Q.  Can you identify that for the record?

22     A.  For the record, this is a contingency fee

23  agreement dated the 23rd of December 1998 between

24  NationsBank and Kris Penzell.  That appears to be his

25  signature on the end.

1    relationship?

2        A.   I have no idea.

3        Q.   But your understanding is there is a written

4    agreement out there somewhere between Bank of America

5    and the Penzell law firm?

6        A.   Possibly.

7        Q.   But you don't know.

8        A.   I don't know.

9        Q.   Do you know if there was a written agreement of

10   any kind between Premier and the Penzell law firm?

11       A.   No, there's never been, not as long as I've been

12   inventory attorney.

13       Q.   In looking over Exhibit 2, and if you'd need some

14   time to look through it, by all means do that.  It's got

15   a number of pages to it.  Did you as inventory attorney

16   at any time and for any entity perform work pursuant to

17   that agreement?

18       A.   I don't remember.  I don't think I did.  The only

19   work that I ever did -- are you talking about

20   NationsBank or Bank of America?

21       Q.   I'm talking about anybody.

22       A.   Well, if it was this agreement, it would have to

23   be NationsBank, and do we know who NationsBank is?

24       Q.   That was a question I had to you.  Did you do any

25   work for NationsBank pursuant to that agreement as

1  **Q. Redland Air Conditioning and Refrigeration, Inc.?**

2  A.  No.

3  **Q. William E. Gerard?**

4  A.  No.

5  **Q. Clifford Butler, Jr.?**

6  A.  No.

7  **Q. Delma's Golden Needle?**

8  A.  No.

9  **Q. James F. Ward?**

10  A.  Yes.

11  **Q. What's your recollection with regard to James F.**

12  **Ward?**

13  A.  Nick Maimonis called and said you have to go --

14  first he called Bev and said you have to send a

15  representative.  Bev says, I can't go, I'm not an

16  attorney.  I think they wanted Victor to go.  Then

17  Victor couldn't go, so Susan, you go.  I said why do I

18  have to go for?  They said well, you have to protect the

19  assets, they think there's money there and these people

20  are declaring bankruptcy and they're trying to write off

21  a bunch of assets.  I said well, I'd go on behalf of the

22  estate and see if there's money there.  Nick says why

23  don't you ask all these questions, and he called me the

24  night before and gave me a list of questions to ask

25  about some possible fraudulent conveyances that happened

1    A.   The estate of Kris Penzell.

2    **Q.   Not Premier.**

3    A.   No.

4          MR. MORRISSEY:   Mark this as the next

5    exhibit.

6          (Plaintiff's Exhibit No. 8 was marked for

7          identification.)

8    **Q.   Have you seen the document marked as Exhibit 8**

9    **before?**

10   A.   Absolutely.

11   **Q.   Could you identify it for the record, please?**

12   A.   This was a bunch of -- this was the so-called --

13   these were the files that you had and that we were doing

14   research on to see if there was any further work that

15   could be done on, what could be done, what was the

16   current status of the files, because we discussed --

17   **Q.   If I could interrupt you, we'll get into the**

18   **substance of it, but just for the record, what is it?**

19   **Is there a fax cover sheet?**

20   A.   Yes, there is.

21   **Q.   And to whom is it addressed?**

22   A.   Nick Maimonis.

23   **Q.   And from whom?**

24   A.   From Bev.

25   **Q.   And does that fax cover sheet appear to pertain**

1   and enclose other documents as part of this exhibit?

2       A.   Yeah.

3       Q.   And what are they, just for the record?

4       A.   Thirteen pages including the cover document.

5       Q.   Is there a letter that follows that fax cover

6   sheet, again just for the record?

7       A.   Yes, there is.   There's a letter on the Kris

8   Penzell letterhead.

9       Q.   And after the letter, are there any other

10  additional documents?

11      A.   Yeah.

12      Q.   And what generically is that?

13      A.   These are all the files that y'all, when I say

14  y'all, Premier, bought and they wanted to try to collect

15  on them, they said we need to hire a lawyer in Florida

16  and had been going back and forth for some weeks.   We

17  went in through all the files and said this is what

18  needs to be done so that if you guys want to hire us,

19  this is what needs to be done.

20      Q.   Who prepared that document?

21      A.   I believe we had a hire, a guy came in and did

22  it, a guy named Jose.

23      Q.   Is Jose his first name?

24      A.   Uh-huh.

25      Q.   What's his last name?

1   right?

2       A.   Right, right.

3       Q.   And who prepared the texts for each of these?

4       A.   That's me.

5       Q.   You wrote that.

6       A.   Right.

7       Q.   What was Mr. Touron's involvement, if any?

8       A.   He did the research.

9       Q.   What research did that involve?

10      A.   We had to look in each file.  We didn't know

11  anything about these files.  Find out what had to be

12  done.  He went and looked to see if there was any assets

13  we could go after, you know, if they were around.  He's

14  very good at that.

15      Q.   Is he an inventory attorney?

16      A.   No.

17      Q.   Is he an attorney?

18      A.   No.  He used to be a PI.

19      Q.   Was he a full-time employee of the Penzell law

20  firm at the time?

21      A.   No.  At that time, no.

22      Q.   Was he hired specifically to do that task, to

23  your knowledge?

24      A.   Yes.

25      Q.   Did he engage in any other asset research

1   activity, if that characterizes his role, on any other

2   matters?

3      A.  Yeah.  He would look up assets.  We had a

4   program, he had a computer program, and he goes and

5   looks up the stuff.  He's trained to do that kind of

6   stuff.

7      Q.  In the case of the status reports that are

8   attached in part of that exhibit, as part of that, how

9   did it work as between Mr. Touron's work and your work

10   in preparing the written summaries?

11      A.  He gave me the information and I put it together.

12      Q.  Did you review the work that he had done in that

13   regard?

14      A.  Oh, absolutely.

15      Q.  What review did you perform?

16      A.  Well, he gave me what he found.  You have a

17   computer program and you look up these things.  He takes

18   the pages off and says -- like this guy says like here

19   professional licenses, this guy's got a commercial

20   pilot's license.  That shows on the program.

21      Q.  Which guy are you talking about?

22      A.  Jack Hardee, Redland Air Conditioning.  It shows

23   on the program that he's got a commercial pilot license

24   and he's an insurance broker, and he's got an SEC

25   license for NASDAQ or for the NASD.  It shows all that

1    and done the work, but...

2        Q.   **Was it your hope to work for Premier in our own**

3    **individual capacity or as an inventory attorney?**

4        A.   As inventory attorney.

5        Q.   **But not in your individual capacity.**

6        A.   I really don't have a whole lot of clients like

7    this because I don't really like doing this, but it is

8    what it is.

9        Q.   **But your hope was that things could be arranged**

10   **such that Premier would send the Penzell law firm**

11   **business, correct?**

12       A.   Right.

13       Q.   **And once that occurred that you as inventory**

14   **attorney would work on Premier cases.**

15       A.   Right.

16       Q.   **Did that ever happen?**

17       A.   No.

18       Q.   **Why not?**

19       A.   Because they never sent -- they did send a

20   proposed retainer agreement, fee agreement, but it was

21   unacceptable, and they never sent -- they kept saying

22   well, what, you know, the terms, and they never sent

23   another retainer agreement.

24       Q.   **This document dated August 6th, 2002, that's been**

25   **marked as Exhibit 8 contains status reports which**

100

1  than Ward?

2      MR. CORRIGAN:  Objection.  When you say

3  involving Premier Capital, what do you mean?

4    Q.  **Any other matter other than Ward.**

5    A.  If I did, I don't recall.

6    Q.  **Did you bill for your time in connection with**

7  **your contribution to the status reports that are part of**

8  **Exhibit 8?**

9    A.  I think we sent them a bill, and that included

10  all the costs because we had to pay Jose.  When I say

11  we, the law firm.  And we ended up paying out of our own

12  pocket because they never came up with any money.

13    Q.  **What were those costs that were billed; do you**

14  **know?**

15    A.  Whatever they say.  There was like $15.  When you

16  do the searches, we have to pay a fee for them.

17    Q.  **You're referring to various references to fees in**

18  **the status reports?**

19    A.  Yes.  These are national searches for 15 bucks,

20  and to file a judgment lien, they have to be filed in

21  Tallahassee, is 20 bucks.  Here's another one that's

22  $30.  Just things like that.

23    Q.  **Is it your understanding that Premier Capital**

24  **owes anyone any money in connection with your legal**

25  **services as inventory attorney?**

1    A.  If you want to go down to the -- well, they owe

2    the estate, they don't owe me.  They owe the estate for

3    anything that was paid to me or wasn't or wasn't paid,

4    like on the Ward matter.

5    **Q.  Is there some written record of that?**

6    A.  We went through a whole bunch of things and it

7    had fees added up, but I think we finally threw them

8    away when they wouldn't pay and I said it's not enough

9    money for me to worry about, it's not going to make a

10   change in my life.

11   **Q.  So your recollection is Premier wasn't given that**

12   **information?**

13   A.  Oh, they were given it.  They ignored it.

14   **Q.  In what form were they given that information?**

15   A.  Well, this was the one on this money.  I don't

16   think they were ever billed for the hourly fees.

17   **Q.  I'm referring to your time providing legal**

18   **services.**

19   A.  No, because it wasn't enough because I think

20   shortly thereafter is when we decided they weren't going

21   to send over a new retainer agreement and they wanted us

22   to do all this stuff and we weren't going to do it.

23   When I say we, the firm.

24   **Q.  The law firm, Kris Penzell law firm.**

25   A.  Yes.

1    A.   No.

2    Q.   **Were you using that computer software in your own**

3    **practice that you identified earlier?**

4    A.   No, because that was for my private practice.

5    That wasn't for the Kris Penzell estate.

6    Q.   **How did you keep track of your time as inventory**

7    **attorney, then?**

8    A.   Oh, yes, I did, because I do it different.   I

9    haven't used that in a couple of years, that form.   Yes,

10   I did.   I would write the name of the case and whatever

11   time and every six minutes, a tenth of an hour.

12   Q.   **At some point subsequent to the August 6, 2002,**

13   **date of the faxed status report marked as Exhibit 8, you**

14   **came to the conclusion that a written agreement was not**

15   **forthcoming.**

16   A.   That's correct.

17   Q.   **Between the Penzell law firm and Premier; is that**

18   **right?**

19   A.   That's correct.

20   Q.   **Once you formed that understanding, what, if**

21   **anything, did you do?**

22   A.   Nothing.   I just didn't do anything else.   You

23   understand, this status report was work that was sent to

24   Premier to say look, this is what you need to do, not

25   what I need to do, and they chose to do nothing, I chose

1    to do nothing.

2    Q.   What happened to the matters referenced in the

3    status reports once you formed that conclusion?

4    A.   What do you mean?  What matters are you talking

5    about, those cases?

6    Q.   Yes.

7    A.   Those are not our cases.  Those were Premier's

8    cases.  Whatever they decided to do, they had to do what

9    they had to do.

10   Q.   Well, your role, as I understand it, as inventory

11   attorney involved -- I think you put it as wrapping

12   things up, that was part of your function.

13   A.   Correct.

14   Q.   What, if anything, did you do to wrap things up

15   with Premier subsequent to your forming the

16   understanding that there ain't no agreement forthcoming

17   between Penzell law firm and Premier?

18   A.   Well, because there was never an initial

19   agreement, so I had nothing to wrap up, so there was

20   nothing to do.

21   Q.   What became of the matters referenced in Exhibit

22   8?

23   A.   Not my problem.

24   Q.   Whose problem was it?

25   A.   Premier.

1    A.  Because I didn't owe them any duty, for one

2  thing, because they weren't my client, they weren't

3  Kris's client, they were a prospective client, we said

4  send us a retainer agreement, the retainer agreement was

5  sent back, saying it wasn't what we wanted, and Bev

6  discussed with them what we wanted, and when it wasn't

7  forthcoming, you know what?  I told Bev forget it, don't

8  deal with them anymore, we've got enough to handle here.

9    **Q.  Did you ever convey that to Mr. Maimonis?**

10    A.  No.  I don't know if he was still working --

11  shortly after here I think is when he quit or faded off

12  into the sunset somewhere.

13    **Q.  Did you ask Mrs. Penzell to convey that to Mr.**

14  **Maimonis you were not going to do any more work?**

15         MR. CORRIGAN:  Objection to form.  She never

16  testified about any work.

17         THE WITNESS:  I haven't done any work.

18    **Q.  Further work.**

19         MR. CORRIGAN:  Objection.

20    **Q.  I understand what you're saying.**

21    A.  I didn't do any further work.  I worked for the

22  estate of Kris Penzell.  I was never retained, no fee

23  agreement was signed, it wasn't Kris's client, it wasn't

24  my client, it wasn't Victor's client.

25    **Q.  Were those matters referenced in Exhibit 9 and**

1      A.   You can ask me.

2      Q.   **Have you seen the document marked as Exhibit 11**

3   **before?**

4      A.   Yes, I have; not together, but separately.

5      Q.   **Could you identify it and inclusive of its**

6   **attachments, for the record?**

7      A.   It's a cover letter to Judge Farina asking for an

8   emergency motion for direction by the court because we

9   had at this time --

10     Q.   **Before we get into the substance, just**

11  **generically identify it.**

12     A.   Emergency motion for direction by the court.

13     Q.   **Are there exhibits to that?**

14          MR. CORRIGAN:  Filed by you, correct?

15     Q.   **Filed by me, correct?**

16     A.   Yes.  Hoisington & Morrissey, a Professional

17  Association, a letter to me from you.

18     Q.   **From you being?**

19     A.   You being Tom Morrissey.  Another letter on

20  letterhead of Kris E. Penzell and then the status

21  report.

22     Q.   **Which I believe may have been attached to my**

23  **letter, is that correct, as exhibits?**

24     A.   Yes.  A copy of the original complaint against

25  Bev and the estate.

1    Q.  In the action that we're here on today; is that

2    correct?

3    A.  Yes.  And the request for hearing, a special

4    setting.

5    Q.  Why did you file that motion, ma'am?

6    A.  Because Bev had received a phone call asking for

7    the files.  Under Florida law, and I'm assuming we're

8    talking Florida law because these are Florida cases, we

9    are required to maintain the files for seven years.

10   What do you do when you give up files?  When the file is

11   old on these bank cases, you make copies, the bank gets

12   the copy, we maintain the original.  We asked direction

13   from the court what do we do now.  They want the files.

14   This letter says that Bev has withheld the files and all

15   this.  We have a duty to hold them, keep them together.

16   Q.  And your duty to hold them is a matter of the

17   Florida law that you referred to?

18   A.  Yes.

19   Q.  To keep files together for a period of seven

20   years?

21   A.  Right.

22   Q.  That contains a motion, correct, after the cover

23   letter?

24   A.  Yes.

25   Q.  And it has various numbered paragraphs, is that

1  right, the emergency motion?

2  A.  That's correct.

3  Q.  **Directing your attention to paragraph 7 of the**

4  **motion.**

5  A.  Mr. Penzell, as the attorney of record on the

6  above-styled cases, worked on a contingency fee basis.

7  However, because there was no completed collection on

8  these cases, there is an attorney's lien on each file by

9  Kris E. Penzell, PA.

10  Q.  **Did you ever communicate to Premier that there**

11  **was an attorney's lien on any of those files?**

12  A.  No.  Didn't have to.

13  Q.  **Why not?**

14  A.  Because in the purchase and sale agreement you

15  stated or Premier stated, in it it states that you have,

16  and they cited whoever bought them, that they had

17  researched the files and they were aware of their duties

18  and so forth.

19  Q.  **So as of the date of that motion, was it your**

20  **understanding that because there was an attorney's lien**

21  **on those files that the files could not be returned to**

22  **Premier?**

23  A.  No.  Any file in the state of Florida, we have a

24  duty under Florida law to keep them for seven years.

25  Q.  **It had nothing to do with the attorney's lien?**



LAW OFFICES

# KRIS E. PENZELL

PROFESSIONAL ASSOCIATION
407 LINCOLN ROAD
SUITE 10-D
MIAMI BEACH, FLORIDA 33139

KRIS E. PENZELL

TELEPHONE (305) 531-3000
FACSIMILE (305) 531-5175

## FACSIMILE COVER SHEET

TO:            Nick Maimonis

COMPANY:       Premier Capital LLC

FAX #:         (978) 694-4890

FROM:          Beverly Penzell

DATE:          August 6, 2002

PAGES:     Including this cover sheet - thirteen (13)

RE:            Premier Capital, LLC Accounts


MESSAGE:      Correspondence and status report attached.


If there are any problems with the transmission, please call
(305) 531-3000 and/or Fax #(305) 531-5175

This facsimile contains **PRIVILEGED AND CONFIDENTIAL INFORMATION** intended only for the use of the addressees named above. If you are not the intended recipient of this facsimile, or the employee or agent responsible for delivering it to the intended recipient you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you receive this facsimile in error, please immediately notify us by telephone and return the original facsimile to us at the above address via the United States mail.



PLAINTIFF'S
DEPOSITION
EXHIBIT
8
9-24-07 RC

LKEP 00031

LAW OFFICES
# KRIS E. PENZELL
PROFESSIONAL ASSOCIATION
407 LINCOLN ROAD
SUITE 10-D
MIAMI BEACH, FLORIDA 33139 ‒

KRIS E. PENZELL

TELEPHONE (305) 531-3000
FACSIMILE (305) 531-5175

August 6, 2002

Sent via Facsimile (978) 694-4890
and U. S. Mail

Nick Maimonis,
Premier Capital LLC
226 Lowell Street
Wilmington, MA 01887

Dear Nick:

Attached you will please find a status summary of the diligence afforded the Premier files forwarded to this office.   The summary indicates a brief background of what we have found and what was done so far, including the date of the searches with number of pages, status of our in-house report with number of pages, what inquiry is in process, suggested immediate action, recording details and out of pocket expenses.

We have conducted a national search on each and every file over the past couple of months and methodically detailed the research and inquiry accomplished. Be advised that the initial searches. at a cost of $15.00 each, reveal, where applicable, among other information, the following:

      A.  Current addresses
      B.  Driver's Licenses
      C.  Vehicle ownership
      D.  Real property ownership
      E.  Corporate involvement
      F.  Telephone numbers
      G.  Bankruptcy
      H.  Judgment liens
      I.   Traffic infractions
      J.  Worker's Comp claims

We use the above leads to verify, explore and research many other avenues of inquiry before suggesting expending the costs of scheduling depositions, subpoenaeing records and attempting service of process. In most of the files we have prior research which has been used as a comparison.

**LKEP  00032**

Premier Capital LLC
Page Two
August 6, 2002

Our normal course of business would be to bill you monthly for costs, including out-of-pocket, postage and photocopies at 25 cents a page as well as invoiced costs, supplying a copy of the attendant invoice. Our clients remit payment on these cost bills generally by return mail.

We are prepared to accept these cases upon these terms and would like an opportunity to discuss same with you upon your receipt and review of the enclosed status.

Sincerely,

SUSAN I. NOE

SIN:bj
Enclosure

PREMIER CAPITAL LLC    Status Report    July 31, 2002

Bradley, Andrew    $24,585.50
Bradley, Therese & Bradley Boat Repairs    1/4/99 Judgment

    Dade County State Atty's office looking for Mr. Bradley for non-payment Of Child Support. BKC attemped in 1999 but dismissed; He had been sending child support payments drawn on a Bradley Boat Repair account with a last post office box address in St Thomas. however, a check there on him with the Director of Licensing and Consumer Affairs ... reveals no records on him. Bahamas inquiry and additional St Thomas inquiry needs authorization. Wife Therese is a debtor and may have asssets but she is probably considered head of household and we may not be able to collect from her. Years ago Family court records indicate Therese believed Andrew hiding assets ($76,000) while pleading poverty, visiting girlfriend in Bahamas.is a Citizen of Belize not U.S;

National Search completed 6/26/02   $15.00    (29 pages)
In house report    (4 pages)

Suggested Action: Set depositions. Decide whether to set
        both debtors at present or 1 at a time;
        Verify numerous addresses;
        Get approval to do search in Bahamas

Has Assignment been recorded?
Has Judgment lien been filed?

Brancaccio, Carmine    $24,127.86
    8/8/87 Judgment

    He owns real property with his wife which is vacant land currently being developed; another property in name of a Carmine "G" Brancaccio co-owned with Paulette Brancaccio which we cannot at present know if same family or not; Another property was transferred out of Carmine and wife's names and into Wife of Carmine and a James Lutz.Too much real property ownership and transfers thereof to ignore the possibility of fraudulent transfers. Numerous Vehicle ownership; History of arrest and conviction on Aggravated Assault with weapon...

National Searches completed 6/27/02    $15.00    (54 pages)
In house report    (4 pages)

Suggested Action: Schedule depostions immediately;
        Continue with license, etc inquiry
Record Assignment    $15.00
File Judgment Lien    $20.00

1

LAW OFFICES OF KRIS E. PENZELL. P.A. 407 LINCOLN ROAD, SUITE 10-0, MIAMI BEACH, FLORIDA 33139 · (305) 531-3000

LKEP 00034

Butler, Clifford Jr.                                    $24,317.31
                                                        4/29/91

He curently owns Opa Locka real property;
Vehicles: 2000 Ford Ranger, 1990 Lincoln Towncar
            And possibly others in name of Clifford J Butler (no jr)
            2 other vehicles under Clifford J. Butler or Diana
            Crosby Assam: 2002 Chevy & 1997 Monte Carlo
            These appear to be registered at his home address.
Was employed by Dade School Board 1993 - 1998 when he
resigned as materials handler. Appears he obtained loans on
basis of getting school board contracts which never came to
fruition.

National Search completed 6/27/02   $15.00        (31 pages)
In house report                                   (3 pages)

Suggested Action: Schedule deposition immediately;
                    Complete inquiries as to licenses,
                    Subpoena Homeside Lending Mortgage
                    Application

Record Assignment   $15.00
File Judgment Lien   $30.00


Cabanas, Carlos, Jr.                                   $46,538.09
                                                       To be confirmed
                                                       $25,075 (9/1/99)


Real property transferred to Wife in 1999 by Quit Claim Deed
Additional research needed to ascertain hidden assets, as well
as license inquiries due to his type of business.
Records production stops in May, 2000.

National Search completed 6/26/02   $15.00        (34 pages)
In house report in progress                       (2+pages)

Suggested Action: Complete research; verify addresses;
                    Licenses inquiry;
                    Set deposition within 10-15 days

Record Assignment of Summary Final Judgment    $10.50
File Judgment Lien                             $20.00


2

LKEP 00035

Chaka, Kiambu a/k/a Albert Jackson                    $159,458.72
Chaka, Idella, a/k/a Idella Jackson                   8/2/87 Judgment

> Comparison of current searches to 11/28/00 and 5/24/01
> reveals further in-depth inquiry required; real property
> at S W 263rd Terrace owned by Kiambu Chaka with
> Delinquent taxes of $5,332.43: Additional alias' noted;
> 1 vehicle registered to Kiambu: Judgment lien valid
>
> National Searches completed 6/27/02    $60.00    (40 pages)
> In House report                                  (3+pages)
>
> Suggested Action: Schedule depositions immediately
> Continue additional real property verification;
> Inquire with family court files: verify addresses (7);
> Licenses and corporate inquiry
>
> Has Assignment been recorded?
> Has Judgment Lien been filed?

Gipson, Lenear L.                                     $6,849.63
Gipson, Sylvia F.                                     8/11/97 Judgment

> Sylvia is registed agent and director of Active Fla corporation started 7/01
> and address listed is personally co-owned: Verified gainful employment
> with the US Postal Service, Confirmed $42,635 annual base salary;
> She owns 1984 Volvo, a Chevrolet and a Mercry; no BKC;
> 3 corporation searches; 1 Georgia real property;
> 1 Florida real property;
> Confirmed that Lenear no longer employed by UPS;
> 2 vehicles registered in his name: no BKC; has a criminal record.
>
> Sugested Action:    Depositions strongly suggested immediately
>                     Garnishment on her.    $137.00 filing fees
>
> National Serarches completed    6/26/02    $45.00 (70 pages)
> In house report                            (4 pages)
>
> Has Assignment been recorded?
> Has Judgment lien been filed?

3

LKEP 00036

Grilla, Louis                                          $12,862.75
Edelstein, Harold MK                                   3/31/87

Grilla. Years ago file indicates possible transfer of assets to Grilla's
parents.  Same address currently shows up on debtor Grilla's driver's
license no, issued 2002 till 2008.(wrong address and incomplete
Folio # given to bank years ago).Current owners: Giovanna Grilla and Maria
Milian 12 corporate inquiries reveal no current activity; No Fla BKC records;
Also years ago, garnishment for wages on Home Emergency Services
Edelstein. Possible death claim for him SSI 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
Dade Medical Examiner has no information on name this SSI
Vital Records also denied any records. verbally.
Some information as to Ruth using this social and a death claim
More background research needed to be done

National Searches completed 7/15/02      $30.00      (68 pages)
In house report                                      (7 pages)

Suggested Action: Set Grilla for Deposition immediately
                  Research add'l leads on Edelstein

Has Assignment been recorded?
Has Judgment lien been filed?

Hardee, Jack                                          $26,899.06
Redlands Air Conditioning                            4/27/89 Judgment

Professional licenses searched: Commerical Pilot license with FAA,
Insurance broker, Securities and Exchange license with NASD, Florida
Mortgage Broker, Florida Real Estate Broker, retired US Air Force
Colonel (may have bank account with USAA in Texas); No BKC filed;
6 real estate records checked, 2 satisfied judgment liens with MacDill
Federal Credit Union in Hillsborough County; Real property in name of
His wife and 2002 Ford in his and wife's  name; 6 Corporation checks.
Shining Star Productions:3 listed, 2 inactive-1 of which was Hardee,
Other inactive a possible relative (Neil) showing as on Statewide
Statewide Properties:RA &PTS dissolved 2000

National Search completed 6/26/02   $15.00      (61 pages)
In-house report completed 7/24/02               (6 pages)

Suggested Action:  Set deposition immediately;
Do searches on Corporate FEINs & numerous address verifications

Record Assignment of Judgment      $15.00
File Judgment Lien with Sec. State  $20.00

4

LKEP 00037

Jeni L. Herman-Jayson                                      $17,582.17
                                                           11/30/89 Judgment

She has altered the name she uses and has nothing in her name
except co-ownership of real estate with husband; They sold Dade
County Condo in 1996 and bought a Broward Home same time.
Perhaps her change of name precluded lien revelation?

Suggested Action: Schedule deposition immediately.

National Searches completed 7/22/02      $30.00      (47 pages)
In House report completed 7/21/02                    (3 pages)

Has Assignment been recorded?
Has Lien been filed?

Kenworthy, Thomas                    .                     $15,148.62
                                                           7/8/86 Judgment

He has been in jail and is no longer a member of the Florida Bar.
On probation for 4 years, ending 1995, for fraud, grand theft, etc.,
Current security officer license; Since he's out of jail he may
be working in some non professional role in legal work.
No real estate found to date, 2 more checks to be done;
1986 deposition revealed no home ownership, rented;
No stocks, bonds, mutuals, older autos no real value,
Sailboat over financed.
Home, numerous autos and 2 boats in name of Jr.;

National Search completed 6/27/02   $15.00      (49 pages)
In house report                                 (7 pages)

Suggested Action:   Schedule Deposition;
                    Pursue real estate inquiry

Has Assignment been recorded?
Has Judgment lien been filed?

5

LKEP 00038

Lioy, Antonio

$54,437.24
10/24/88 judgment

This one is difficult as he has nearly disappeared. He has
effectively transferred his ownership in corporations with
occupational licenses that matched Beverage licenses.
No Dade county real property ownership; no Fla BKC;
No professional licenses; no criminal history;
European Bakery, Inc. no licenses showing;

National Searches completed     6/26/02     $30.00
In House report completed                   (4 pages)

Suggested Action: Subpoena Beverage License records
                  Including financial data re: transfers;
                  Subpoena possible INS records

Record Assignment          $15.00
File Judgment Lien          $20.00


Mangue, Michael B. individually                  $51,239.39
& as Trustee, Supernet Online, Inc.              12/19/00

We obtained this judgment by serving through Publication
as his listed address was foreclosed on; 2 alternate possible
Addresses were unsuccessful. Current national search matches
Exactly the 6/22/01 national search we conducted. Debtor
Appears to have effectively relocated. More research will
Need to be done.

National Search completed 7/11/02          (11 pages)
In house report                            (5 pages)

Suggested Action: Additional inquiry before any action

Has Assignment been recorded?
Has Judgment lien been filed?

6

LKEP 00039

Mazon, Domingo                                           $130,612.49
Mazon, Maria                                             6/18/89 Judgment
M & R Laztin American, Inc.

> After BKC, wherein this debt survived due to fraud,
> Domingo Mazon took title 5/26/99 to a 1989 Cadillac
> And Maria C. Mazon appears to have purchased
> Residence at 158th Avenue 9/2000. Searches on 9
> remaining potential real properties in progress as
> well as 9 corporate leads, however inactive

> National Searches completed  6/26/02        $30.00    (50 pages)
> In House report in progress                           (4+pages)

> Suggested Action: Set depositions immediately
>                         Complete diligence on properties,
>                         a/k/a names for both debtors;

> Has Assignment been recorded?
> Has Judgment Lien been filed?

Martinez, Hiram                                          $86,072.45
                                                         2/20/87 Judgment

> Not much indicated upon file review,
> 1987 deposition indicated unemployed
> and severe financial losses & foreclosure;
> 1986 financial statement idicated net worth
> of $3.7 million, real property equity; Current
> handicap parking permit, Possible INS records;
> $1,033 judgment lien, Dade County

> National Search completed    6/26/02       $15.00    (44 pages)
> In house report                                      ( 3 pages)

> Suggested Action: Schedule deposition immediately.
>                         Complete inquiry as to real property,
>                         Licenses, and inactive corporations
>                         Need license inquiry
>                         Property and corporation license

> Assignment recorded?
> Has Judgment Lien been filed?

7

LAW OFFICES OF KRIS E. PENZELL, P.A. 407 LINCOLN ROAD, SUITE 10-D, MIAMI BEACH, FLORIDA 33139 • (305) 531-3000

LKEP 00040

Moreno, Cesar G.                                    $79,874.11
Grove Enterprises, Inc.                             7/25/00 Judgment

      2 vehicles in his name registered in Davie address
      Owned by relative who was a VP on one of Cesar's
      Corporations, now inactive however:
      Mo & D Trading is active, Cesar is RA& a Director
      Other 2 directors' names have doctor occupationals
      In Dade County, not sure if same; New York address:

      National Searches completed 6/26/02     $15.00      ( 26 pages)
      In House report                                       ( 3+ pages)

      Suggested Action: Set deposition immediately
                Additional research on NY assets,
                Florida property, licenses:
                (Pull Hugo Moreno collection file from archives)

      Record Assignment of Judgment            $19.50
      File Judgment Lien                       $25.00

Ramos, Richard                                     $39,809.14
Ramdata Inc.                                       7/29/99 Judgment

      Our only recourse seems to be that we pursue collection efforts
      solely as to Ramdata, Inc. and its assets. He owns home which is
      the last address shown on report and is the same address whereby
      we were attempting to Serve a Rule to Show Cause just
      before he filed for BKC; Active corporation with his and wife's
      Addresses indicated, possible other corporation

      National Searches completed 6/27/02     $15.00     (35 pages)
      In House report                                    (3+pages)

      Suggested Action: Complete research on 6 real properties,
                Verify corporate inquiries and licenses
                Inquiry pertinent.   Schedule
                Deposition within 15 days

      Has Assignment been recorded?
      Has Judgment Lien been filed?

8

LKEP 00041

Rios, Ricardo                                                       $33,775.05
Rios, Ben                                                          11/27/84 Judgment

On Rios, 10 possible property addresses to
Complete research on; 2 possible on Gross
No BKC on either in Florida, SS and name
License searches in process;
Death claim alert for Gross, no location,
Initial inquiry on this reveals no record locally.
1989 attempted service of process indicated Gross
Moved to Boca Raton after selling home.
Possible out of state property; No active corporate
Activity records on Rios or Gross so far

National Searches completed 6/27/02          $45.00          (30 pages)
In House report in progress                                   (4+ pages)

Suggested Action: Complete research to determine if
                          Whereabouts can be determined
                          (Nearly 20 years on the judgment)

Has Assignment been recorded?
Has Judgment Lien been filed?

Wisteria Branch                                                   $89,903.47
Gerald, William E.                                               2/2/01 Judgment

Possible real property ownership of vacant lot in Florida
Louisiana Folio # obtained; numerous vehicles;
No Fla or Louisiana BKC on file; License inquiries
reveal no records as yet;

National Search completed 6/27/02            $15.00          ( 32 pages)
In House report                                              ( 4 pages)

Suggested Action: Schedule deposition immediately
                          Research employment;
                          Obtain Louisiana property records;

Record Assignment                $10.50
File Judgment Lien               $20.00

9

LKEP 00042

Ward, James E.                                                          S61,593.26
Metropolitan Industries                                                10/23/88 Judgment

        2 active corporations; Vasquez-Ward is RA and Pres.of Perfect Painters
Group, Inc. (James Ward Not on officer/director list however address of
Corporation is in care of him and his address); Perfect Painters Enterprises
Inc., 5/3/01 incorporated With James Ward RA and President Ward's
address; 1-2 vehicles; 2 real estate properties showing; criminal record.
narcotics and trafficking; His tax returns for 1999 and 2000 require
explanation on his part as wife taking in the income for painting
businesses; No Fla BKC; life insurance and investments indicated..

National Search completed     6/27/02        $15.00     (56 pages)
In House report                                         (4+ pages)

Suggested Action: Schedule deposition immediately;
                Determine if subpoeanas appropriate;
                6 additional property inquiries;
                License and NY asset inquiries

Has Assignment been recorded?
Has Judgment Lien been filed?


West, Gary E.                                                          S300,225.39
West, Jennair A.                                                       10/2/87 Judgment

7/15/2002 inquiry with Clerk of Court, Lehigh County, PA
revealed Non Pros Judgment 1994 Against Gary West, no dollar
amount, case active;No BKC in Florida nor Pennsylvania on either Def.
Appear to use falsified addresses on Driver Licenses Jennair corporately
active, also active notary license. vehicle in WPB; Nothing active on 15
corporate checks on Gary; Prior file research indicates huge debts and
judgments already being formed at the time of funding of the loan.
Appear to be back in West Palm Beach.

National Searches completed 7/1/202     $30.00     (61 pages)
In house report                                    (7 pages)

Suggested Action: Verify Addresses; Complete additional
inquiry including possible developer Relationship in WPB

Has Assignment been recorded?
Has Judgment lien been filed?


10

LKEP 00043