1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CASE NO. C.A. 03-CV-12497

PREMIER CAPITAL, LLC,



        Plaintiff,

-vs-

BEVERLY JOHNSON PENZELL, d/b/a
Law Office of Kris E. Penzell
and BEVERLY JOHNSON PENZELL, as
Personal Representative of the
Estate of Kris E. Penzell,

        Defendants.
_____/

DEPOSITION OF RICHARD STORFER

Wednesday, September 26, 2007
1:30 p.m. - 5:50 p.m.

9155 S. Dadeland Blvd., Suite 1014
Miami, Florida 33156

Reported By:
MARGARET PHILLIPS, Court Reporter
Notary Public, State of Florida
Klein, Bury, Reif, Applebaum & Associates
Miami Office
Phone - (305) 373.8404

2

```
 1    APPEARANCES:

 2         On behalf of the Plaintiff:
           THOMAS JAMES MORRISSEY, Esquire
 3         164 STRATMORE ROAD, SUITE 25
           P. O. BOX 1336
 4         BROOKLINE, MASSACHUSETTS 02446
           617-787-3434
 5
           On behalf of the Defendants:
 6         JOSEPH W. CORRIGAN, Esquire
           POSTERNAK BLANKSTEIN & LUND
 7         800 BOYLESTON STREET
           PRUDENTIAL TOWER
 8         BOSTON, MASSACHUSETTS 02199
           617-973-6151
 9

10    ALSO PRESENT

11         Beverly Penzell

12                            —   —   —

13

14    RICHARD STORFER                              3

15
      Defendants' Exhibit No. 2                   10
16    Defendants' Exhibit No. 3                   23
      Defendants' Exhibit No. 4                   29
17    Defendants' Exhibit No. 5                   63
      Defendants' Exhibit No. 6                   73
18    Defendants' Exhibit Nos. 7, 8, 9 and 10     77

19

20

21

22

23

24

25
```

1    on the part of the former counsel --

2            A.    Absolutely.

3            Q.    -- to the new purchaser of that asset?

4            A.    Yes.

5            Q.    **Are you aware of the Stern case in Florida,**

6    **sir?**

7            A.    Yes.

8            Q.    **What does the Stern case say?**

9            A.    I don't know.  Why don't you tell me?

10           Q.    **Well, my understanding, sir, of the Stern**

11   **case is not important.  What's important is your**

12   **understanding of the Florida law.**

13           A.    We are not dealing with foreclosure matters

14   so I am not sure that the Stern case ---

15           Q.    **We are dealing with a claim of malpractice,**

16   **sir.**

17           A.    Right.  Well, actually -- are we?

18                 MR. MORRISSEY:  Objection.

19           Q.    **Sir, you are claiming an attorney-client**

20   **relationship.  A breach of an attorney-client**

21   **relationship is malpractice.**

22           A.    But is that what they are suing for?

23           Q.    **You tell me.  I need to know that.**

24           A.    Not my review of the compliant.

25                 MR. MORRISSEY:  The complaint is in writing

```
 1              and it speaks for itself.
 2              Q.    So what you are saying, sir, is there is no
 3     claim for attorney malpractice here?
 4                    MR. MORRISSEY:  Objection.  The complaint
 5              is in writing and the terms speak for themselves.
 6              Q.    There is no claim for negligence under the
 7     attorney-client relationship?
 8                    MR. MORRISSEY:  Objection.  The complaint
 9              is in writing and its terms speak for themselves.
10              A.    Not the compliant that I reviewed.
11              Q.    Excuse me, sir ---
12              A.    Let's go off the record one second.
13              Q.    No.  One second, sir.  Your report is
14     filled with references of what the Law Office of Kris
15     Penzell did negligently.  Can you tell me, sir, what
16     right a third party has against an attorney relative to
17     negligence, a non-client?
18              A.    Legal malpractice.
19              Q.    OK.  That is my question.  Isn't it
20     correct, sir, that under the law announced under Stern
21     that a new purchaser of an asset has no rights against
22     the former counsel as to that asset for malpractice?
23              A.    I didn't memorize the case.
24              Q.    Would you like to review it, sir?
25              A.    No, I am not going to give you an opinion
```

1      A.    No.  I am not a Massachusetts lawyer.  I am

2  not the attorney handling the case.

3            MR. CORRIGAN:  Off the record.

4            (Discussion off the record)

5            MR. CORRIGAN:  On the record.

6      **Q.    Mr. Storfer, you have acknowledged that no**

7  **contractual agreement in writing was ever reached between**

8  **the Law Office of Kris Penzell and Premier.  Correct?**

9      A.    That is my understanding.

10     **Q.    Can we agree on that?**

11     A.    Yes, I believe so.  Yes.

12     **Q.    Would you agree, sir, that in order for a**

13  **contract of a verbal kind to be reached there needs to be**

14  **some sort of meeting of the minds?**

15     A.    Yes.

16     **Q.    Basic 101 contract law?**

17     A.    Yes.

18     **Q.    If it appears that one party was saying,**

19  **no, we don't represent you, you need to go and get a**

20  **lawyer, that would probably be a fundamental failure to**

21  **meet of the minds?**

22     A.    If that had happened, yes.

23            (The documents referred to were marked for

24            identification as Defendants' Exhibit Nos. 7, 8, 9

25            and 10.)

1      Q.    Mr. Storfer, I would like to show you what

2  we marked Defendants' Exhibit 7, 8, 9 and 10.  And we

3  will start with Number 7.  I will ask you to take a look

4  at that document.  I will represent to you that is a

5  letter dated, I believe, January 3rd, 2003, and I believe

6  it is written by Ms. Penzell and I believe it's

7  identified as a letter to Nick Maimonis of Premier

8  Capital?

9      A.    Yes.

10     Q.    Have you seen that document before?

11     A.    I don't think so.  OK.

12     Q.    Would you agree with me, sir, in reviewing

13  that letter that the parties, that is the Law Office of

14  Kris Penzell through their capacity as the inventory

15  attorney, either Susan Noe or otherwise, have not been

16  able to reach an agreement as of January 3rd, 2003 for an

17  attorney-client relationship to be retained, so to speak?

18          MR. MORRISSEY:  Objection.

19     Q.    Do you agree?

20     A.    It appears that nothing formal has been

21  drawn up, yes.

22     Q.    Would you also agree, sir, would it seem,

23  sir, as though there are differences then to the

24  fundamentals of the attorney-client relationship in that

25  document?

1          MR. MORRISSEY:  Objection.

2      A.    I am sorry, I don't understand the

3  question.

4      **Q.    Does it appear that Premier Capital, as of**

5  **the writing of that letter, January 3rd, 2003, has**

6  **retained the Law Office of Kris Penzell to represent it?**

7      A.    It appears that the person who has written

8  this letter is under the impression that there is no

9  written document yet memorializing that arrangement, yes.

10     **Q.    What arrangement?**

11     A.    The one that you just referred to.

12     **Q.    What arrangement?**

13     A.    You know, a relationship, an

14 attorney-client relationship.

15     **Q.    When you say arrangement, it seems as**

16 **though there is a meeting of the mind and my line of**

17 **questioning is directed as to that issue.**

18     A.    OK.

19     **Q.    It appears as though the parties are**

20 **agreeing as to whether a relationship exists?**

21     A.    No, it would appear from this letter, the

22 person writing this letter did not believe there to be an

23 agreement yet in place.

24     **Q.    And you being a person reading that letter,**

25 **so you get the impression that there is no agreement in**

1    place?

2         A.    I have no idea.  I can only testify as to

3    what the person -- I can only testify as to what this

4    letter says and what the person believes who wrote the

5    letter to render my opinion.

6         **Q.    I am asking as a person reviewing the**

7    **letter what your opinion is.  Does it give you the**

8    **impression ---**

9         A.    Yes, it gives me the impression that there

10   -- that this person agrees there to be no agreement in

11   place.  Yes.

12        **Q.    Is that a reasonable impression based on**

13   **your review of the letter?**

14        A.    Yes.

15        **Q.    I will ask you to take a look at what we**

16   **have labeled Exhibit Number 8.  It is a letter written**

17   **February 4th, 2003, I believe.**

18        A.    OK.

19        **Q.    Would you agree that as of the writing of**

20   **that letter the parties do not seem to be meeting as to**

21   **whether or not an attorney-client relationship exists?**

22        A.    That is correct.  It would appear from this

23   letter that Nick Maimonis did not -- I can assume that

24   Nick Maimonis would not have written this letter if there

25   had been a formal memorialization of the agreement, yes.

1   it says the judgment debtor owned real property located

2   at one two seven seven four thousand (sic) Southwest

3   263rd Terrace.

4        **Q.    Isn't it true, sir, that that property was**

5   **the gentleman's homestead?**

6        A.    I don't know.  I do know that it is

7   reflected in your expert witness's report that it is.  I

8   have no reason to doubt the man.

9        **Q.    What would be the legal effect of that?**

10       A.    There are a lot of legal effects of

11  homestead property.  It is not subject to execution.

12       **Q.    One of which is regardless that would not**

13  **be an asset that would be reachable by Premier?**

14       A.    It is not an executable asset, absolutely.

15  That is correct.

16       **Q.    So Premier would not be able to reach that**

17  **asset?**

18       A.    They would not be able to foreclose their

19  judgment lien in that asset, yes.

20       **Q.    So to the extent that Premier is claiming**

21  **damages with respect to that particular asset or the**

22  **inability to obtain money relative to the refinancing of**

23  **that asset, Premier was not damaged in any way that was**

24  **recoverable in Florida?**

25            MR. MORRISSEY:  Objection.

1    in any way?

2         A.    Is Lenear the husband or the wife?

3         Q.    **I believe it is the wife.**

4         A.    So you are saying that the judgment was

5    against Mr. Gibson but they asked Penzell's office to

6    garnish Mrs. Gibson?

7         Q.    **I believe that is correct.**

8         A.    That would be silly.

9         Q.    **To the extent that the opposite is true,**

10   **that is to say, let's just assume for a moment that it**

11   **was against Mr. Gibson --**

12        A.    Right.

13        Q.    **-- if he was the head of household,**

14   **wouldn't that be exempt under Florida law from wage**

15   **garnishment?**

16        A.    Technically, yes, but it is a defense that

17   has to be raised.  When you garnish somebody's salary

18   they do have the ability to file a -- what's known as a

19   head of household exemption form, and then as plaintiff

20   you have the opportunity to rebut that with an affidavit,

21   and then there is a hearing to determine if the person

22   is, in fact, a head of household.

23             If a plaintiff -- I am sorry, if a

24   defendant is, in fact, head of household, which many

25   times they file these affidavits and they're in fact not,

1    if they are in fact head of household and they do prove

2    their case, the Court will dissolve the garnishment.

3    Correct.

4            Q.    **Were you aware, sir, this debtor moved out**

5    **of the jurisdiction of Florida?**

6            A.    No.

7            Q.    **Subsequently moved to Georgia.  And were**

8    **you aware, sir, that the Law Office of Kris Penzell was**

9    **not authorized to practice law in Georgia?**

10           A.    No.  I wasn't aware of that.

11           Q.    **Do you expect, sir, if Premier was aware**

12   **the Law Office of Kris Penzell was not Georgia counsel**

13   **and was aware that the debtor was in Georgia at the time,**

14   **is it -- how should I say -- appropriate for Premier to**

15   **bring a claim for failure to do something against a**

16   **debtor in Georgia against counsel in Florida?**

17           A.    Depends where he worked.

18           Q.    **Depends on where who worked?**

19           A.    The defendant whom they were asking them to

20   garnish.

21           Q.    **OK.**

22           A.    If they worked for UPS, they could have

23   garnished him here in Florida.  It doesn't matter that he

24   lives in Georgia.

25                 If he worked at Georgia Five & Dime, then,

1    Penzell's files, that the law office owns these files?

2         A.    What do you mean?

3         Q.    Well, you are an attorney.  Correct?

4         A.    Yes.

5         Q.    And you have files for work you do?

6         A.    Yes.

7         Q.    And who do you understand to be the owner

8    of the file, so to speak?

9         A.    The client.

10        Q.    OK.  You understand the client to be the

11   owner?

12        A.    Of course.

13        Q.    So if there is an attorney-client

14   relationship between you and a party --

15        A.    Right.

16        Q.    -- the file sitting in your cabinet belongs

17   to the client?

18        A.    Yep.

19        Q.    Ever heard of an attorney retaining lien in

20   Florida?

21        A.    Yes.

22        Q.    Is that a possessory right to retain a file

23   for fees claimed or owed on the file?

24        A.    Yes.

25        Q.    And isn't it correct that under Florida law

1    an attorney is entitled to hold that file until either

2    the fees are paid or adequate security is provided?

3            A.    That is the thought behind that lien, that

4    retaining lien.  Absolutely.

5            Q.    Would you not agree with me, sir, that to

6    the extent that an attorney or -- just say for example,

7    the personal representative of the estate of an attorney

8    was holding the files of that law firm for a retaining

9    lien --

10           A.    Yes.

11           Q.    -- that cause of action for conversion for

12   holding and exercising those rights under Florida law

13   cannot be brought?

14           A.    No.

15           Q.    You do not agree with that?

16           A.    No, of course not.

17           Q.    Well, tell me how you ---

18           A.    I mean, they can -- I mean, that is their

19   defense.  I mean, their defense to the conversion action

20   is, "Hey, wait a minute.  A conversion?  I was legally

21   holding those.  I had a right to hold them," that is the

22   defense, but if we prove otherwise you lose.  You prove

23   that you are right, you win.  That's the way it works.

24           Q.    All right.  Well, it is really not that

25   simple because, sir, you are here to espouse an opinion

1    **result of that inappropriate retention period?**

2           A.    Yes.

3           Q.    **It does say that?**

4           A.    Yes, but I am looking for it.

5                 Yes, here we go.  Hold on.  Let's make

6    sure.  OK.

7                 And your question is hypothetically

8    speaking if they, in fact, have a valid lien does that

9    affect Premier's right to recover under the theory of

10   conversion here in Florida?

11          Q.    **Correct.**

12          A.    I think it would be -- if they can show

13   that they had a valid enforceable lien and the Court

14   finds that they had the right to hold onto the files,

15   that is going to -- that is a valid defense to a claim

16   for conversion in Florida.

17                I don't know what the law is in

18   Massachusetts.

19          Q.    **And I wouldn't ask you to espouse an**

20   **opinion on that.**

21                **To the extent Premier was never a client of**

22   **Kris Penzell, and I understand that is different from**

23   **what your understanding of the facts are, to the extent**

24   **Premier is found to never have been a client of the Law**

25   **Office of Kris Penzell, would you agree that it has no**

1    a look at that document.

2            A.    OK.

3            Q.    And I misspoke when I said September 2004

4    because it appears that there is --

5            A.    It was even earlier.

6            Q.    -- work you performed as early as May 2004.

7    Is that correct, sir?

8            A.    Yes.

9            Q.    Tell me, sir, what information was in the

10   Law Office of Kris Penzell's file that prevented you from

11   doing work in May 2004 prior to the return of the files.

12   When I say return, I again mean it pejoratively, in

13   December 2004.

14           A.    None.

15           Q.    In fact, you didn't need anything out of

16   those files.  Correct?

17           A.    Apparently not to file that garnishment.

18           Q.    And does it stand to reason that if Premier

19   could hire you to perform work in May of 2004 that it

20   could have hired you in October of 2001?

21           A.    That is something you have to speak to

22   Premier about.  I don't know.

23           Q.    Could they have hired you in October

24   of 2001?

25           A.    Yes.  Certainly they could have asked me to

1  be their lawyer in 2001.  I would have been happy to do
2  it.
3      Q.    **Was there anything about the fact that the**
4  **Law Office of Kris Penzell had a prior entry of**
5  **appearance on the case, OK --**
6      A.    Yes.
7      Q.    **-- that would have prevented you from**
8  **performing the work you performed on this file?**
9      A.    In that -- no, obviously not, because I did
10  it.
11      Q.    **And, would you agree with me, sir, that as**
12  **to all the 19 files at issue in this case, that there**
13  **would have been nothing to prevent someone like yourself**
14  **or another attorney, other than the Law Office of Kris**
15  **Penzell, from performing work on these files?**
16      A.    No, not if it is post-judgment.  Post-
17  judgment you don't need a substitution -- you don't need
18  a stipulation for substitution of counsel.  Anyone could
19  have stepped in.
20      Q.    **So to the extent that Premier waited after**
21  **they purchased these judgments and no meeting of the**
22  **minds existed between October 2001 and I think you and I**
23  **talked about the failure of the meeting of the minds up**
24  **until Attorney Morrissey's letter in June 2003, that is**
25  **nearly a two-year period of time, sir.  Premier certainly**

```
1   could have gone and hired other counsel to do work in the
2   interim.  Correct?
3               MR. MORRISSEY:  Objection.
4        A.    They could have but it is a business
5   decision that obviously Premier felt that it wasn't the
6   right thing to do at that time.  That's something you'd
7   have to speak to Premier about.
8        Q.    All right.  Well, to the extent that there
9   were acts or omissions that Premier claims needed to be
10  performed, and Premier was aware of those acts and
11  omissions between October 2001 and June 2003, to the
12  extent that it didn't elect to hire counsel, would you
13  agree with me, sir, that Premier did so at its own risk?
14              MR. MORRISSEY:  Objection.
15       A.    That is too hypothetical a question.  I
16  mean, you have to take into consideration the efforts of
17  having to hire new counsel when you believe you already
18  have counsel.  That is my own business acumen being
19  discussed in a set of facts that I had nothing to do
20  with.  I cannot give that opinion.
21       Q.    How is it, sir, that Premier claims that it
22  had counsel when the correspondence clearly reflects no
23  agreement had been reached?
24       A.    Well, again, you are asking me to guess as
25  to what the writer of that particular correspondence that
```

1    did.  I just didn't remember the exact amounts.

2            Q.    Obviously, that is information we want to

3    get.

4                  To the extent that Premier was able to hire

5    counsel on matters that it purchased from the Bank of

6    America as early as 2002, would that reflect that it

7    didn't need to obtain anything from the Law Office of

8    Kris Penzell in order to perform collection work?

9            A.    I don't know what Premier requires in order

10   to perform its collection work.

11           Q.    I will show you what we have previously

12   marked as Gleicher Number 23 and ask you to take a look

13   at that document, sir, and I will represent to you that

14   it is a docket --

15           A.    Indeed.

16           Q.    -- from the Barnett Bank of South Florida

17   versus Advanced Forklifts, Inc. matter --

18           A.    OK.

19           Q.    -- previously labeled as Gleicher Number

20   23.

21           A.    OK.

22           Q.    If I represented to you, sir, that this is

23   one of the matters that Kris Penzell performed collection

24   work on during his lifetime, would you have any reason to

25   disagree?

1    A.    No, no.

2    Q.    **Does it appear, sir, that there is work**

3    **performed in June of 2002 on these files?**

4    A.    Yep.

5    Q.    **Excuse me, this file?**

6    A.    Yes.

7    Q.    **If I represented to you, sir, that neither**

8    **the Law Office of Kris Penzell nor Susan Noe nor Victor**

9    **Rones performed that work, would it stand to reason, sir,**

10   **that some other lawyer performed that work?**

11   A.    I guess, unless Premier filed it

12   themselves, which I doubt it.

13   Q.    **OK.  So can we agree then, that as of June**

14   **24th, 2002, Premier had other counsel performing work on**

15   **Bank of America cases?**

16   A.    Well, we can agree that the Advanced

17   Forklifts case pleadings were filed in June of 2002, and

18   it is likely that they were filed by an attorney.

19   Q.    **Fair enough.  With respect to Hiram**

20   **Martinez, and I am skipping one that I think we've**

21   **covered and maybe the horse is dead but I don't want to**

22   **risk it, Hiram Martinez, isn't it true that the omission**

23   **you allege occurred was prior to October of 2001?**

24   A.    On Hiram Martinez?

25   Q.    **Yes.**

Bleicher
EXHIBIT NO. 71
12-29-05

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PREMIER CAPITAL, LLC,            )        Case No. 03-CV-12497
                                 )
            Plaintiff,           )
                                 )
      v.                         )
                                 )
BEVERLY JOHNSON PENZELL, d/b/a,  )
                                 )
            Defendant.           )

WRITTEN REPORT OF WITNESS
RETAINED TO PROVIDE EXPERT TESTIMONY,
PURSUANT TO FED. R. CIV. P. 26(a)(2),
SUBMITTED BY PLAINTIFF AND DEFENDANT-IN-COUNTERCLAIM
PREMIER CAPITAL, LLC

This constitutes the written report pursuant to Rule
26(a)(2), Federal Rules of Civil Procedure, of the witness
retained as an expert by plaintiff and defendant-in-
counterclaim Premier Capital, LLC ("Premier"), Richard B.
Storfer, Esq. (the "Witness").  The report is served without
waiving Premier's right under Fed. R. Civ. P. 26(e)(1) to
revise, correct, add to, or supplement this written report.

Statement of Opinions to Be Expressed/Data Considered.
The following sets forth the opinions which Premier
anticipates that the Witness will express at the trial of
this action.

With respect to liability issues, the Witness expects
to express the following opinions.  The defendant, in her



DEFENDANT'S
EXHIBIT
Storfer 2
mp 9-26-07

individual and/or representative capacities (the term
"defendant" shall refer to Ms. Penzell, singly and
collectively, in her individual and representative
capacities) improperly retained the litigation matters
litigated and/or pending in the State of Florida (the
"Florida Litigation Matters") during the period October,
2001, through transfer of such Matters by defendant to
Premier in December, 2004.  During that period (referred to
below as the "Retention Period"), defendant, including
persons acting as her agents and/or co-principals, including
her apparent agent, Susan I. Noe, assumed a tort and
contract-based duties of reasonable care to Premier with
respect to litigation and collection activity on the
Matters.  In addition, defendant in her representative
capacity bears legal responsibility, including liability,
for acts and omissions by her late husband, the Florida
attorney Kris E. Penzell with respect to legal services
provided by him to Premier's predecessors-in-interest in the
Florida Litigation Matters, NationsBank, N.A., and Bank of
America ("BofA").

    The data relied on for the foregoing opinions include
the Contingency Fee Agreement dated December 23, 1998 by and
between NationsBank, N.A., and "Kris Penzell", which impose
inter alia, duties of care upon Mr. Penzell and his

successors-in-interest, including defendant; the Premier-
BofA Loan Sale Agreement of 2001, in which BofA transferred
its right, title and interest in the Florida Litigation
Matters to Premier; and e-mail, status reports, requests for
information, and other correspondence by and between Premier
(including its attorneys, and employees such as Nick J.
Maimonis), on the one hand, and defendant (including,
without limitation, her apparent agent, Susan I. Noe),
during the Retention Period.  Such data includes documents,
such as documents including her late husband's firm's (the
"Penzell Law Firm") letterhead, in which defendant holds
herself, and her late husband's firm, out as a going concern
in the business of providing legal and collection services.
Such data also includes documents and other information
respecting the conduct of defendant's agents at the Penzell
Law Firm, in particular, Susan I. Noe, in agreeing and/or
purporting to provide legal services on Premier's behalf in
the Florida Litigation Matters during the Retention Period.
Such data also includes defendant's apparent, purported
claim of an attorney's lien during the Retention Period.
Such data also includes the pleadings and discovery-related
filings in this action, such as the Affidavit submitted by
defendant in connection with her Motion to Dismiss.

Defendant's breaches of her above-described duties of care included, inter alia: retaining the Matters during the Retention Period despite Premier's demands for their return; failing to engage in collection activity, even respecting court judgments against judgment debtors with assets sufficient to satisfy such judgments; and negligent conduct in purporting to provide certain legal services.

Such breaches are described in more detail, with respect to specific Matters, below, in connection with opinions respecting Premier's damages.

Defendant's conduct fell below the standard of ordinary care, whether defendant is deemed to have acted: (a) as someone purporting to provide legal services on the Matters to Premier; (b) as successor-in-interest to Kris E. penzell under the Contingency Fee Agreement, referenced above; and/or (c) as a non-attorney having assumed a duty of care to provide legal and/or collection services.

The Witness also expect to express the opinion that defendant could not have asserted a legal-cognizable attorney's lien on the Florida Litigation Matters. The data relied on for such opinion includes the above-references Contingency Fee Agreement; correspondence in the file

materials produced by defendant in this action, prepared by
Victor I. Rones on behalf of the Penzell Law Firm; the
absence of any writing in which such notice of such a lien
is affirmatively communicated to Premier and/or its
predecessors-in-interest; and defendant's averments with
respect to termination of the above-referenced Contingency
Fee Agreement.

    With respect to opinions concerning Premier's claim of
damages against defendant, the above-described breaches of
legal duties proximately caused Premier damage in the
Florida Litigation Matters.  Certain such matters are
addressed specifically below.  The data considered by the
Witness in forming his opinions include the Judgments,
Bankruptcy Court and other court records, and credit reports
referenced below.  Such data is found in part in the files
returned by defendant to Premier in December, 2004, and in
part in files Premier has produced to defendant in this
litigation.  (Certain data, such as very recent credit
reports, may be the subject of supplementary production to
defendant.)

    Chaka Kiambu: Premier's unsatisfied Judgment is in the
amount of $64,418.85, and dated April 13, 1987; under
Florida law, simple interest at the rate of 10 per cent

accrues thereon, resulting in a balance as of April 28, 2005, of $181,025.79.  The judgment debtor owned real property located at 12774 SW 263rd Terrace Homestead, FL, during the Retention Period, with a value of $130,000 (according to data obtained from Homeradar.com).  Such realty was encumbered by mortgages in the amount of $113,823, according to credit report information.  The property was refinanced in March, 2004, according to credit report data.  The realty had $58,000 in equity when refinanced; however, it now has only $16,177 in equity. Meanwhile, the Judgment balance, as of March 2004, was $174,054.44.  Had defendant properly recorded and/or renewed Premier's Judgment lien, Premier's Judgment debt would have been paid, in whole or in part, at the time of the refinancing.

Multi Care Medical: Premier's 1999 Judgment is in the amount of $62,554.28.  The judgment debtor held real property with a value of  $320,205, according to a Florida county public website, and was encumbered by a tax lien in the amount of $55,000 (according the data provided verbally to Premier by the local Assessor's Office).  The realty was further encumbered by a Mortgage in the amount of $197,600, according to credit report data, and contained equity in the amount of $67,605.  Such property was sold by the debtor to

a relative on August 1, 2001.  The Judgment balance at the
time the property was sold was $65,852.10; the current
Judgment balance (as of April 28, 2005), is $88,062.86.  Had
defendant properly recorded and/or renewed Premier's
Judgment lien, Premier's Judgment debt would have been paid,
in whole or in part, at the time of the sale.


     James Ward: defendant's agent, Susan I. Noe, agreed to
attend a Section 341 creditor's meeting, and given several
questions to ask at the examination of the debtor; she
appears not to have attended the examination nor taken any
other steps to protect Premier's interests.  The debtor was
granted a discharge under Chapter 7.
The debtor refinanced real property in March 2001; at the
time of the refinancing, Premier's Judgment balance was
$58,546.14.  The Judgment was in the original amount of
$26,107.93, as of October 31, 1988.  The Judgment balance,
as of April 28, 2005, is $69,211.05.  Defendant's failure to
protect and enforce Premier's interests under the Judgment
resulted in such Judgment remaining unpaid at the time of
the refinancing.


     Top Ten Card:  Premier's judgment, dated October 2,
2987, is in the amount of $89,677.46.  The Judgment debtor
received a Chapter 7 discharge on or about September 12,

2003.  Premier instructed defendant to file an objection in
the bankruptcy proceeding to extend time, in light of
debtor's apparently having had a beneficial interest in a
trust holding real estate assets.  Such trust purchased
property in November 2002, the month the debtor filed for
bankruptcy protection. At the time of the discharge,
Premier's Judgment balance was $261,946.63; the balance as
of April 28, 2005, is $278,987.81.  Defendant's failure to
have protected Premier's interests in the bankruptcy,
including, without limitation, her failure to have pursued
the realty held in trust as a source for satisfaction of the
Judgment, resulted in damage to Premier.

    Redland Air Condition/Hardee:  Premier's Judgment is
dated April 27, 1989, in the amount of $13,317.98; the
balance is $31,694.30, as of April 28, 2005.  The judgment
debtor sold realty at 5104 Tennis Court Circle, #84, Tampa
Florida, in 1999 for $46,000.00; no mortgage encumbrance on
the realty was found, based on Lexis credit report data.
Debtor also refinanced realty in 2004 at 513 Richlyne St.,
Temple Terrance, Fla., with a value of $98,510, according to
county public website data, which was encumbered with a
mortgage in the amount of $47,029, according to Lexis and
other credit report data sources.

Defendant's failure to protect and enforce Premier's interests under the Judgment resulted in such Judgment remaining unpaid at the time of the above-referenced real estate transactions.

Lenear Gipson:  Premier's Judgment is in the original amount of $4,286.31, as of August 11, 1997.  The debtor works at UPS; materials were sent by Premier to defendant in 2002, some 29 months ago, to pursue a wage attachment.  Such attachment was not obtained; it would have resulted in $100.00 in proceeds to Premier over that 29-month span.  The current judgment balance is $10,868.07, as of April 28, 2005.  Defendant's failure to fulfill her duty to Premier with respect to collection activity, such as the wage attachment, damaged Premier in the amount of $2900.00.

Velma's Golden Needle: The Judgment debtor sold real property on or about January 31, 2003, for $131,500.00; such realty had a mortgage balance of $49,000 at time of such sale, resulting in surplus proceeds from the sale of approximately $82,500.00.  Premier's Judgment was obtained on April 29, 1991; it was recorded in Miami-Dade County on May 23, 1991.  Under Florida law, a judgment acts as a lien on real property for 7 years, unless timely renewed. Defendant, through her agent, Victor Rones, sought to renew

the Judgment on May 31, 2001, some three years after the judgment lien on the above realty expired, and and one month after the 10-year period for enforceability of the Judgment expired. For these reasons, a title company found Premier's lien to have expired and been unenforceable at the time of the above sale. At the time of the sale, the Judgment balance was $23,009.83; the amount owed to Premier as of April 26, 2005, is $25,572.34. But for defendant's failure to have protected Premier's interests under the Judgment, Premier would have recovered 100% of the Judgment balance at the time of the sale.

Carmine Brancaccio: Premier's Judgment is in the original amount of $9,752.68, and dated August 3, 1987. Defendant owned realty which was refinanced on or about December 31, 2001. According to county public website data, the value of such realty was $172,760, subject to a mortgage in the amount of $98,388. The realty thus had equity in the amount of $74,372. The balance of the Judgment was $28,890.06 on the date of the refinancing. Defendant's failure to protect and enforce Premier's interests under its Judgment resulted in such Judgment remaining unpaid at the time of the above-referenced real estate transaction.

Ramdata: Defendant obtained a Judgment against debtor on July 27, 1999, in the amount of $31,187.67. Debtor

Richard Ramos subsequently filed for bankruptcy protection, a Chapter 13 proceeding which, in or about November, 1999, provided that secured creditors were to be paid 100 per cent of their claims. Defendant failed to timely file a proof of Claim, attempting to do so on or about May 22, 2001; the claim was disallowed as untimely on or about August 20, 2002. Debtor Ramos received a discharge. Defendant's failure, despite, <u>inter alia</u>, relevant provisions of the Contingency Fee Agreement, to properly protect Premier's interests resulted in Premier's failure to recover its judgment balance, the current value of which is $31,694.30 as of April 28, 2005. Further, debtor Ramos was able to refinance realty in 2003, which had equity, after accounting for a $13,562 mortgage, of $99,375.00 (according to county public website data). Defendant's failure to protect Premier's interests under its Judgment resulted in the loss of its Judgment balance.

Wisteria Branch/William Gerald: Premier's Judgment is in the amount of $79,377.76, as of February 2, 2001. In May, 2002, Premier, through Nick J. Maimonis, asked defendant to pursue a wage attachment as well as debtor realty located at 244 Marilyn Drive, Lafayette, LA, data obtained by defendant in a 2001 examination of the debtor. The examination indicated the debtor was employed. No wage

attachment was obtained; such an attachment is likely to
have resulted in income to Premier of $100 monthly for 29
months.   Premier is damaged in this amount; further, debtor
transferred realty to his parents' names following entry of
Judgment against him.   Defendant's failure to pursue a wage
attachment, undertake further collection activity, and
otherwise protect Premier's interests under the Judgment
damaged Premier.

Bradley Boat Repair/Andrew and Therese Bradley:
Premier's Judgment is in the amount of $18,567.57, and dated
January 4, 1999,and is valid against Therese Bradley only,
Andrew Bradley having filed for bankruptcy protection, and
the state court litigation against him was dropped.   The
bankruptcy proceeding, however, was dismissed on September
21, 1999, and suit was not re-instituted against him; he has
since left the USA.   Collection efforts against Therese
Bradley during the period after return of the Penzell file
materials in December, 2004, have been unsuccessful.   The
defendant's failure to pursue collection activity against
Andrew, and post-judgment collection activity against
Therese, damaged Premier in an amount up to a ceiling of the
current Judgment balance, $36,152.63.

Design Home Remodeling:   Premier's Judgment entered in
the amount of $5,657.50, as of March 3, 1987; the current

balance is $14,659.27. One of the two judgment debtors died
on May 29, 1999; there is no record of defendant having
filed a timely claim against that debtor's estate.   The
defendant's failure to pursue collection activity against
Andrew, and post-judgment collection activity against
Therese, damaged Premier in an amount up to a ceiling of the
current Judgment balance, $36,152.63.

Hiram Martinez: Premier's Judgment is dated February
20, 1987, in the amount of $29,090.63; the Judgment balance
is now $82,298.59. The defendant's failure to pursue
collection activity including post-judgment collection
activity, damaged Premier in an amount up to a ceiling of
the current Judgment balance.

Antonio Lioy: Premier's Judgment entered on October 24,
1988, in the amount of $20,831.16; the current balance is
$55,439.42. The defendant's failure to pursue collection
activity including post-judgment collection activity,
damaged Premier in an amount up to a ceiling of the current
Judgment balance.

Thomas W. Kenworthy:   Premier's Judgment entered on
July 8, 1986, in the amount of $5,855.51; the current
balance thereon is $17,030.09. The defendant's failure to
pursue collection activity, including post-judgment

collection activity, damaged Premier in an amount up to a ceiling of the current Judgment balance.

Jeni Jayson: Premier's Judgment entered on November 30, 1989, in the amount of $7,460.58; the current balance is $20,894.45. Defendant was able to sell realty at 435 N.E. 210 Terrace, Miami, on 2/12/96; the Judgment balance at the time of the sale, on February 12, 1996, was $11,045.85. The defendant's failure to protect Premier's rights under the judgment and to pursue collection activity, including post-judgment collection activity, damaged Premier in an amount up to a ceiling of the current Judgment balance.

Domingo Mazon: Premier's Judgment is dated June 18, 1989, in the amount of $85,827.08; the current balance is $222,844.72. One of the judgment debtors sold realty at 7340 SW 158th Avenue, Miami, on or about August 8, 2003; both debtors had or have an interest in Mr. Latin American, Inc. The defendant's failure to protect Premier's rights under the judgment and to pursue collection activity, including post-judgment collection activity, damaged Premier in an amount up to a ceiling of the current Judgment balance.

The Supernet Online, Inc.: Premier's Judgment, dated December 19, 2000, is in the amount of $44,349.96; the

current balance is $64,094.81. The defendant's failure to pursue collection activity, including post-judgment collection activity, damaged Premier in an amount up to a ceiling of the current Judgment balance.

Ricardo Rios/Ben Gross: Premier's Judgment is dated November 27, 1984, in the amount of $12,310.66; the current balance is $37,048.18. One of the Judgment debtors died on March 15, 1990; there is no record of a claim having been filed against the debtor's estate. The defendant's failure to pursue collection activity, including post-judgment collection activity, damaged Premier in an amount up to a ceiling of the current Judgment balance.

Qualifications of the Witness: Mr. Storfer is an attorney, admitted to practice and in good standing in the State of Florida. He is a graduate of the University of Florida (B.A., 1989), and Nova University law School (J.D., 1993), where he was a staff member of the Nova Law Review. His practice consists of litigation, including post-judgment collection-related litigation. He is partner in the Fort Lauderdale, Florida, firm of Rothstein, Rosenfeldt, Adler.

Compensation: Mr. Storfer shall be paid $175.00 per hour for study and testimony in connection with this matter.

The foregoing report is signed below, pursuant to the
provisions of Rule 26(a)(2)(B), Federal Rules of Civil
Procedure.

_____
Richard B. Storfer, Esq.,
Individually As Witness
Retained to Provide Expert
Testimony

Address:

Richard B. Storfer, Esq.
Rothstein, Rosenfeldt, Adler
300 S.E. 2nd Street,
Suite 860
Fort Lauderdale, FLA 33301

## CERTIFICATE OF SERVICE

The undersigned, counsel for the plaintiff and defendant-in-counterclaim Premier Capital, LLC, certify that I served a copy of the foregoing Report upon counsel of record for defendant Beverly Johnson Penzell, individually, et al., Catherine Savoie, Esq., Posternak, Blankstein & Lund, L.L.P., Prudential Tower, 800 Boylston Street, Boston, Massachusetts 02199-8004, and Steven A. Sussman, Esq., 6 Beacon St., Suite 400, Boston, MA 02108, by facsimile transmission and by first class mail, postage prepaid, this 29th day of April, 2005.

Thomas James Morrissey
BBO# 547077