1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CASE NO. C.A. 03-CV-12497

PREMIER CAPITAL, LLC,

        Plaintiff,

-vs-

BEVERLY JOHNSON PENZELL, d/b/a
Law Office of Kris E. Penzell
and BEVERLY JOHNSON PENZELL, as
Personal Representative of the
Estate of Kris E. Penzell,

        Defendants.
_____/

DEPOSITION OF JERALD A. FRESHMAN

Thursday, September 27, 2007
10:09 a.m. - 1:00 p.m.

9155 S. Dadeland Blvd., Suite 1014
Miami, Florida 33156
_ _ _ _ _

Reported By:
MARGARET PHILLIPS, Court Reporter
Notary Public, State of Florida
Klein, Bury, Reif, Applebaum & Associates
Miami Office
Phone - (305) 373.8404

2

APPEARANCES:

     On behalf of the Plaintiff:
     THOMAS JAMES MORRISSEY, Esquire
     164 STRATMORE ROAD, SUITE 25
     P. O. BOX 1336
     BROOKLINE, MASSACHUSETTS 02446
     617-787-3434

     On behalf of the Defendants:
     JOSEPH W. CORRIGAN, Esquire
     POSTERNAK BLANKSTEIN & LUND
     800 BOYLESTON STREET
     PRUDENTIAL TOWER
     BOSTON, MASSACHUSETTS 02199
     617-973-6151

ALSO PRESENT

     Beverly Penzell

                              —   —   —

                    I N D E X

Jerome A. Freshman. . . . . . . . . . . . . 3


Plaintiff's Exhibit 1. . . . . . . . . . . .3
Plaintiff's Exhibit 2. . . . . . . . . . . 17
Plaintiff's Exhibit 3. . . . . . . . . . . 78

5

1       A. I am testifying -- I would assume that my

2    testimony would cover both as set forth in my report.  I

3    am testifying as an expert in the field of debtors' and

4    creditors' rights as to whether there was any deficient

5    performance of activities, legal activities.

6       **Q.** **Have you ever been deposed before, sir?**

7       A. Yes, I have.

8       **Q.** **How many times?**

9       A. I would say half a dozen.

10      **Q.** **So you are familiar with the drill?**

11      A. Yes, I am.

12      **Q.** **Have you ever testified as an expert?**

13      A. Yes, I have.

14      **Q.** **How many times?**

15      A. I would say four or five times.

16      **Q.** **Now, are those four or five occasions**

17   **included within the six occasions you mentioned a moment**

18   **ago?**

19      A. Yes.

20      **Q.** **And in what --**

21      A. In fact, I'd correct that.  I'd say about a

22   dozen times I have testified as an expert, sir, in my

23   34-year practice.  I apologize.

24      **Q.** **A dozen times?**

25      A. Yes.

8

```
 1   mortgage liens.  So I have testified in connection with
 2   mortgage liens.
 3         Q.    How about retaining liens asserted by
 4   attorneys?
 5         A.    No.  No, I have not.
 6         Q.    Have you ever been employed by either of
 7   the defendants in this case before?
 8         A.    Before this case, no.
 9         Q.    As an expert?
10         A.    No.
11         Q.    How about in any other capacity?
12         A.    No.
13         Q.    Could you state, sir, your educational
14   background beginning with college?
15         A.    Sure.  I was a business major, graduated
16   from George Washington University.  I went to the
17   University of Miami law school and graduated in 1973 cum
18   laud, and I have been practicing law, admitted to the
19   Florida Bar and the Federal Bar since 1973.
20         Q.    Any other state Bars apart from Florida?
21         A.    No.
22         Q.    Have you been engaged in the practice of
23   law continuously since 1973?
24         A.    Yes.
25         Q.    You stated that you were admitted to
```

1    various federal courts.  Which ones?

2         A.    The Southern District.

3         Q.    Of Florida?

4         A.    Florida, yes, and that's the only one I am

5    admitted to.

6         Q.    Have you had occasion over the years to

7    participate in any continuing legal education programs?

8         A.    Yes, I have.

9         Q.    Can you describe that generally?

10        A.    Well, I have actually authored and lectured

11   for the Florida Bar in the area of debtors' and

12   creditors' rights here in Florida on three occasions, in

13   1979, 1981 and 1988 or '89, where I specifically wrote on

14   the topic of debtors' and creditors rights in Florida.

15        Q.    What form did this writing take?

16        A.    It was actually a book, continuing

17   education rights book.  I wrote a chapter in each of

18   those books.

19        Q.    Do you know who the publisher was?

20        A.    I have one of the books.  I can bring it

21   in.  I don't know.

22        Q.    I would be interested in taking a look at

23   it.

24        A.    If you have a second I can bring it in.

25        Q.    Sure.  Why don't you bring it in?

1  deposition.

2          A.    Uh-huh.

3          Q.    I believe you will see that the next to the

4  last sentence states, and it is fairly short so I'll

5  read, quote:  "Plaintiff's principal complaint is that

6  the defendants failed to engage in certain collection

7  activities which resulted in damage to the plaintiff."

8  Do you see that?

9          A.    Sure.

10          Q.    What is the basis of that statement?

11          A.    I will summarize that for you.  As I looked

12  at the complaint and the report of your expert, it

13  appeared that the plaintiff was complaining about the

14  failure to either re-record judgments that resulted in

15  property being resold or mortgages encumbering the

16  property or garnishment proceedings not being followed

17  such that wages that could have been available were not

18  garnished and, therefore, available to pay off all or a

19  portion of the creditors' claim.

20          So that was -- the genesis of the complaint

21  is that there was insufficient collection activities by

22  Penzell.

23          Q.    So your review of Mr. Storfer's report, if

24  I understand your testimony, caused you to form an

25  assessment of what the gravamen, as it were, of the

1  plaintiff's complaint is.  Is that right?

2       A.    I read the complaint also, but I saw that.

3  You know, my report was really geared toward the issue of

4  damages and I was essentially saying I am not giving an

5  opinion with regard to the issues of liability, but with

6  regard to the issue of damages on the occasions that are

7  described in my report, the property was exempt from

8  claims of creditors and, therefore, assuming something

9  was done wrong, which I am not assuming, but even if you

10 make that assumption, the property was exempt from the

11 claims of the plaintiff as a creditor.

12      Q.    Fair enough.  Let me show you what I

13 believe was marked yesterday at Mr. Storfer's deposition

14 as Exhibit 6 and ask if you have seen that before.

15      A.    OK.  Yes, I have seen it.

16      Q.    What is it?

17      A.    It's a complaint that was filed in the

18 Commonwealth of Massachusetts State Court, Premier

19 Capital, LLC versus Beverly Johnson Penzell, and there is

20 a style to the case.

21      Q.    I will represent to you, sir, that the

22 Commonwealth of Massachusetts has since been replaced by

23 the federal court caption because the action was removed

24 by the defendants.

25      A.    All right.

1   would be no.

2       Q.     Looking at page 2 of your report, sir --

3       A.     Yes.

4       Q.     -- there is a reference to a certain legal

5   matter that is one of the roughly twenty at issue in this

6   case.

7       A.     Uh-huh.

8       Q.     And you have captioned it as Chaka Kiambu

9   and Idella.  Do you see that?

10      A.     I do.

11      Q.     And you have a summary of characterization

12  of Premier's claim in the first paragraph of that sub-

13  heading number one.  Correct?

14      A.     Yes, I do.

15      Q.     And you go on to set forth what you caption

16  the response.  Your response I assume is your opinion?

17      A.     That's correct.

18      Q.     And there is a reference to homestead?

19      A.     Yes.  There is.

20      Q.     And if you wanted to take a moment in fact

21  to read that paragraph up until, I suppose, number two, I

22  will just ask a couple of questions about that.

23          MR. CORRIGAN:  I will be right back.  You

24          can keep going.

25      Q.     Do you see that?

1    the course of your report in which the issue of homestead

2    comes up.  Is that right?

3         A.    Yes.

4         Q.    Because it appears in reading your report

5    you make repeated reference to homestead, Florida law

6    concerning homestead as it relates to judgment liens.

7              And my question to you with reference to

8    this sentence, which appears to summarize that law, is

9    what is your understanding of the relationship between

10   homestead rights and judgment liens?

11        A.    As an attorney who has really represented a

12   lot of creditors over the years, I have a very good

13   understanding of homestead law.  It is kind of unique in

14   Florida as compared to other states where the Florida

15   Constitution has a provision which gives citizens the

16   homestead protection.  And the basis of that is to

17   protect the family and the home against the house being

18   taken and economic misfortune causing the family to

19   disband their home.

20             So it is a principle that's well-settled

21   here in Florida.  It is not a legislative principle, it

22   is a Constitutional provision and it is unique because

23   the homestead exemption means that unless you have a

24   mortgage on your house or labor done which benefits your

25   house, that if a party has a judgment the judgment does

1    not attach to the homestead.

2              It is like a force field such that the

3    judgment never affects or touches or has any impact on

4    homestead property such that a party against whom a

5    judgment is obtained would be able to refinance, resell

6    or convey the property in any manner they would, without

7    having to address payoff or in any way concern themselves

8    with judgments that are not mortgages or judgments for

9    improvement of real property.

10             So it is a very unique law but it is

11   well-founded in our constitution and, you know, the cases

12   have consistently upheld homestead exemption.

13        **Q.    Are there legislative provisions tied to**

14   **that constitution?**

15        A.    I believe that there are, I believe that

16   there are, but everything gets back to the constitution.

17   If you read a case it will inevitably cite you to

18   Article 10, Section 4 of the Florida Constitution.

19        **Q.    Is there any dollar value ceiling**

20   **associated with homestead?**

21        A.    Not in state court, no.  There might be

22   some bankruptcy rules that I don't know about but I'm

23   talking about Florida state rules, no.

24        **Q.    The protection that the homestead**

25   **constitutional provision affords, as you describe it, in**

38

1      A.    Correct.

2          Q.    With respect to this matter, Multi-Care

3    Medical Supplies/Cocia as with the previous matter Chaka

4    Kiambu, am I correct to conclude that your analysis of

5    the homestead exemption is the same?

6          A.    It is.   The only caveat I would make, Chaka

7    was a refinance and Multi-Care Medical was an actual sale

8    of the property.   But the fact that the homestead rule

9    applied in both of those cases is the meaningful point

10   but I did want to make note of the exceptions of

11   different facts.

12         Q.    Is that a material distinction?

13         A.    I wanted you to be aware of the variety of

14   where the homestead exemption comes in.   It comes in not

15   only in the sale of the property but if you're

16   refinancing the property as well.

17         Q.    But the rights of the debtor are the same

18   under either scenario?

19         A.    That is correct.   And, again, you get to

20   that point in time where you have that force field which

21   prevents the judgment from attaching to the real estate.

22         Q.    Do you, sir, have a bankruptcy practice?

23         A.    No.

24         Q.    Have you ever been involved as an attorney

25   representing a creditor in bankruptcy court?

1   file, and I did not see any documents and, again, not

2   being an expert in bankruptcy but having a little bit of

3   background, generally I see in the context of debtors'

4   and creditors' rights obtaining credit under false

5   pretenses is the kind of premiere reason why a creditor

6   would try to prevent dischargeability of debtor.  I

7   didn't see anything in the file that gave any suspicion

8   that was the case in this matter.

9           Q.     **In formulating that opinion under Ward,**

10  **you were relying, I take it, on what Premier was**

11  **asserting by way of its purported grounds for asserting**

12  **that the defendants had caused the damage?**

13          A.     Correct, and the report of your expert.

14          Q.     **So in formulating that opinion -- in**

15  **preparing your report you had occasion to review the**

16  **expert report of the plaintiff.  Is that right?**

17          A.     That's right.

18          Q.     **Let me show you what was marked as**

19  **Exhibit 2 yesterday to Mr. Storfer's deposition.**

20          A.     OK.

21          Q.     **Back to page 4 in the response we have been**

22  **discussing, is that conclusion based in whole or in part**

23  **on what Mr. Storfer asserts to be the case with respect**

24  **to Premier's argument?**

25          A.     No, my opinion is -- and this is one of

1    those cases where it is compelling.  The report from your
2    expert suggests that because certain steps weren't taken
3    in bankruptcy court a property owned by the debtor was
4    sold or financed, and had actions been taken that would
5    not have occurred.
6              As I set forth in my report, the property
7    that you are discussing was actually owned by Mr. Ward
8    individually and -- I mean the judgment against Mr. Ward
9    was individually, I misspoke, and the property was owned
10   by Mr. Ward and his wife.  And here in Florida, I think
11   it is the same in Massachusetts, that is called tenants
12   by the entireties.
13             Q.    Right.
14             A.    So if you have a judgment against the
15   husband but not a judgment against the husband and the
16   wife, the judgment lien does not attach.
17             So even assuming that this debt was
18   discharged, the property that is being referred to in
19   this paragraph is property that would not have been
20   available to the creditor.
21             Q.    Is that reasoning, apart from what you go
22   on to summarize as the homestead exemption?
23             A.    No.  This is not homestead.  This is ---
24             Q.    That is what I mean.  They are two
25   different concepts?

43

1      A.    Yes.  This is the concept of tenants by the
2   entireties, husband and wife property which would not be
3   affected if there is a judgment against either the
4   husband or the wife.  It has to be a judgment against
5   both for a judgment lien to affect the property.
6      **Q.    And then you go on towards the end of your**
7   **response under Ward to reference the homestead**
8   **protection?**
9      A.    Right, and on top ---
10     **Q.    I assume your reasoning there is the same?**
11     A.    Correct, and on top of that the documents
12  in your file show that Mr. and Mrs. Ward applied for and
13  obtained homestead exemption.
14     **Q.    Reviewing the last sentence of your**
15  **response under Ward which states, quote:  "Plaintiff**
16  **suffered no damages since it was not entitled to any**
17  **proceeds from the refinance," unquote --**
18     A.    Right.
19     **Q.    -- is it fair for me to read that sentence**
20  **to draw a connection between Premier lacking damages on**
21  **the one hand with a lack of legal entitlement to the**
22  **proceeds from the refinance?**
23     A.    I am sorry, I don't understand your
24  question.
25     **Q.    In other words, the reasoning appears to be**

```
 1    school right now, that is why it is appropriate.
 2              Q.     Sorry to hear that.
 3              A.     That is the first thing they come in to
 4    you.  They talk about the tenancies, the tenancies in
 5    common tenants, tenancies by the entirety.
 6              Q.     I hated that course.
 7              A.     I hated that, too but ---
 8              MR. CORRIGAN:  You learned it.
 9              Q.     I am not sure I did, quite frankly.
10              A.     So there were actually two reasons in Ward
11    why I felt there were no damages.
12              Q.     Either of which are a good illustration of
13    the same thing?
14              A.     Independent of one another each would stand
15    on its own.
16              Q.     OK.  Thank you.
17                     Moving on to the fourth matter, Top Ten
18    Card Company, Inc./West, which is on page five of your
19    report, your number four, you have, the second sentence
20    under claim, a characterization of Premier's contentions
21    with respect to a beneficial ownership interest in real
22    estate that was conveyed to a trust.  Do you see that?
23              A.     I do.
24              Q.     Again, there, as I assume elsewhere in your
25    report, you are relying on Premier's characterization of
```

1    **what it believes?**

2         A.    I was relying on the report of your expert

3    witness --

4         **Q.    OK.**

5         A.    -- as it pertained to this.  Let me get

6    that report.

7              MR. CORRIGAN:  That is it.

8         **Q.    If you could look through the Storfer**

9    **report and find what you are relying on, I would**

10   **appreciate it.**

11        A.    Yes, I am reading from the report, Premier

12   -- and this is on page -- they are not numbered.

13             MR. CORRIGAN:  They are not numbered.

14        A.    Top of eight, "Premier instructed the

15   defendant to file an objection in the bankruptcy

16   proceeding to extend time in light of debtor's apparently

17   having a beneficial interest in a trust holding real

18   estate assets."

19        **Q.    And that was the basis for your description**

20   **of Premier's claim in your report?**

21        A.    That's correct.

22        **Q.    Did you perform any other analysis with**

23   **respect to what Premier was claiming in this case?**

24        A.    As pertaining to this paragraph, no.

25        **Q.    Right.  OK.**

47

1          A.    Actually, let me amend that.  I see at the
2     bottom of my answer here there was reference to the fact
3     that Premier -- this is page six of my report, Paragraph
4     Number 4.  Premier sent --
5          Q.    **Excuse me, sir, do you mean five?  Is that**
6     **possible?**
7          A.    It says six of 19, Top Ten Card.
8          Q.    **Yes.  I have page 5.**
9          A.    It is the next page, six, before it goes on
10    to Redlands.
11         Q.    **Sorry.  I beg your pardon.**
12         A.    That is all right.  It says on April 3rd,
13    2002 Premier sent the debtor a settlement letter advising
14    that it would accept $60,000 in full and complete
15    satisfaction of the debt, and I refer to, parentheses, PC
16    0687, end parenthesis.
17              So besides the report I obviously looked at
18    another document that was inside Premier's file.
19         Q.    **Anything else?**
20         A.    No.
21         Q.    **You probably have the answer to this but**
22    **have you ever filed an objection to discharge in**
23    **bankruptcy?**
24         A.    No.
25         Q.    **Moving to the very last portion of the**

1    response under Top Ten Card, in fact, what you just
2    referred to, the last two sentences, you state, quote:
3    "There is also some question regarding plaintiff's scope
4    of damages.  On April 3, 2002, Premier sent the debtor a
5    settlement letter advising that it would accept $60,000
6    in full and complete satisfaction of the debt," with the
7    reference you describe which I gather is a Bates stamped
8    reference?
9              A.    Right.
10             Q.    When you say there is also some question,
11   what do you mean?
12             A.    The amount that the plaintiff is claiming
13   in the report of your expert suggests that the damages,
14   as of April 28th, 2005, was $278,987.81.  So I was noting
15   that there was a correspondence from the plaintiff
16   evidencing the fact that it would take $60,000 in full
17   and complete satisfaction of the debt.
18             Q.    And that $60,000 figure appears to be less
19   than the outstanding judgment amount.  Is that right?
20             A.    That is correct.
21             Q.    What do you conclude from that settlement
22   offer?
23             A.    That the amount that Premier was willing to
24   accept as full and complete satisfaction of this debt was
25   less than the amount that it sued for in this complaint.

1    collect, whatever they collect is basically a found asset
2    for the bank.
3         Q.    **Saves money in terms of cost of collection,**
4    **too, doesn't it?**
5         A.    It depends.  On occasion it does.
6         Q.    **In your work for lenders, do you work on a**
7    **contingency fee basis?**
8         A.    Never.
9         Q.    **Only hourly?**
10        A.    Yes.
11              MR. MORRISSEY:  Off the record.
12              (Discussion off the record)
13        Q.    **Back on the record.  Under number five,**
14   **Redlands Air Conditioning.**
15        A.    Yes.
16        Q.    **Here, too, we have reference under response**
17   **to the debtor's homestead rights as you see them.  Right?**
18        A.    Right.  And this again, is a case where the
19   judgment lien was against, I believe it was, Mr. Jack D.
20   Hardee, but the property in question that the plaintiff
21   complains about that it was either sold or refinanced was
22   owned by Mr. Hardee and his wife.
23              So it is not only the homestead exemption
24   but the fact that this is property owned by the husband
25   and wife as tenants by the entirety and the judgment is

1    only against the husband, such that the judgment lien
2    would never extend to this property.
3         Q.    **Is it similar in that respect to the Ward**
4    **matter?**
5         A.    Yes, Ward would be the same.  I have a
6    little cheat sheet here.
7         Q.    **Without trying to put words in your mouth,**
8    **would the analysis be similar in Ward?**
9         A.    Very similar.  The judgment was only
10   against Mr. Ward, the property was sold by the husband
11   and wife as tenants by the entirety and, therefore, that
12   judgment held by the plaintiff would not attach to this
13   property.
14        Q.    **Under number six, Gibson on page seven,**
15   **sir.**
16        A.    Yes.
17        Q.    **The claim concerns one of the defendants**
18   **allegedly failing to file for a wage garnishment.  Is**
19   **that right?**
20        A.    That is correct.
21        Q.    **I wonder if you could state for me your**
22   **understanding of any exemption to garnishment.**
23        A.    Yes.  Under Florida law they have an
24   exemption from wage garnishments for individuals who are
25   considered to be head of the household, which has

1    judicially been interpreted to mean that if they are
2    responsible for the support of more than 50 percent of
3    somebody else.
4            With regard to people who are head of
5    households, their wages would be exempt from any claims
6    and then garnishment would not be allowed to proceed.
7            Generally how that works is that if a
8    creditor tries to file a garnishment, a debtor will file
9    an affidavit of exemption.  Unless the creditor within
10   two days can show with proof that the debtor is not the
11   head of the household, automatically the garnishment is
12   dissolved.
13       Q.    **Is that assertion of protection as head of**
14   **household a matter that is litigated?**
15       A.    Yes.
16       Q.    **Frequently?**
17       A.    Well, as I say, the trigger there is if a
18   creditor has reason to believe that the debtor is not the
19   head of the household, then they would file a document --
20   there is a name for that document and I don't remember it
21   right now -- in which they object to the declaration, but
22   they have to have facts and evidence to describe why they
23   are objecting to the homestead wage garnishment issue and
24   that issue is then tried.
25       Q.    **Have you ever yourself had occasion to**

54

1   is --

2           Q.    Do you know what they are?

3           A.    You know, I don't off the top of my head

4   and I have lectured and written about garnishments, but I

5   don't know off the top of my head about out-of-state

6   garnishments.

7           I have to look at the book because

8   generally my practice is you try to freeze a bank account

9   locally, wherever it is.  If the account is in another

10  state I retain counsel in another state because you

11  really want to freeze the account.

12          Q.    Are you referring now to assets located

13  within Florida where the debtor has moved outside of

14  Florida?

15          A.    Well, if the debtor has moved -- that's

16  what I am saying.  I have never really had a case in

17  which I have tried to garnish an out-of-state debtor.  I

18  haven't had that in a case.  I think there is something

19  under Florida Statutes under garnishment that permits you

20  to do that.  I just never had occasion to do that myself.

21          Q.    Moving on to the next matter of Velma's

22  Golden Needle, Inc./Clifford Cutler, Junior, which is on

23  page seven of your report, here, too, in what is rapidly

24  becoming a refrain in our deposition, there is an

25  analysis of the homestead right.  Is that correct?

1        A.    Right.   There are several points to this
2    case.   One is the homestead right which you correctly
3    pointed out that the records from Premier that I reviewed
4    from Premier established that this was in fact the
5    debtor's homestead, but there is also reference to Victor
6    Rones, who is an attorney on behalf of the defendant,
7    notified the plaintiff that this was a no asset case and
8    closed his file.
9             So in addition to homestead there did not
10   appear to be other assets available to satisfy Premier's
11   judgment.
12       **Q.    Would it be fair to say that in that second**
13   **paragraph under response you were relying on Mr. Rones'**
14   **judgement in that regard?**
15       A.    I was relying on the correspondence in the
16   file that I saw.
17       **Q.    In connection with your work as an expert**
18   **in this matter, have you spoken with Mr. Rones?**
19       A.    I just said hello to him in the hallway
20   whenever he came to appear, but I did not speak to him
21   about the case.
22       **Q.    Do you know who he is?**
23       A.    Yes.
24       **Q.    Who is he?**
25       A.    He is a commercial lawyer.

1     Q.    Does he have any involvement, do you know,
2  with the defendants?
3     A.    I don't know.  I have heard -- you know,
4  this is what I have heard:  That he was involved in
5  helping to close out Kris Penzell's practice after he
6  passed away, but I have no personal knowledge of that.
7  It is just something that I heard.
8           MR. MORRISSEY:  I wonder if we could take a
9           two-minute break?
10          THE WITNESS:  Sure.
11          (Short break)
12          MR. MORRISSEY:  Read back the last question
13          and answer.
14          (Thereupon, the previous question and
15          answer were read back by the reporter as above
16          recorded.)
17  BY MR. MORRISSEY:
18     Q.    Moving on to Carmen Brancaccio, d/b/a
19  Golden Razor Barber Salon, if you could take a look at
20  your response.
21     A.    In brief response this was a case where
22  Premier complained about the fact that the defendants
23  failed to re-record or renew a judgment and the lien was
24  extinguished which enabled the debtor to refinance, and
25  this was a case again where the property was owned by, I

```
 1   think it is, Mr. Brancaccio -- strike that.
 2               The judgment was against Mr. Brancaccio but
 3   the real estate that was refinanced was owned by Mr. and
 4   Mrs. Brancaccio, again, tenants by the entirety, husband
 5   and wife, undivided interest in the whole.  The judgment
 6   lien would not attach, and as a second reason, as I set
 7   out, this property was also homestead exemption.
 8               MR. MORRISSEY:  Off the record.
 9               (Discussion off the record)
10          Q.   So we are returning to our theme of rights
11   as tenants by the entirety and homestead.  Correct?
12          A.   That is correct.
13          Q.   Would it be safe for me to conclude that
14   your reasoning is the same as in other matters in which
15   those rights have been involved?
16          A.   Yes, it would.
17               MR. CORRIGAN:  He is unwavering.
18               MR. MORRISSEY:  He is certainly repetitive
19          if not unwavering, but then so am I.
20               THE WITNESS:  That is OK.
21   BY MR. MORRISSEY:
22          Q.   You state in the final sentence under
23   Brancaccio, quote, "For these reasons, again, tenants by
24   entirety of rights, homestead rights, Premier's lien
25   never attached to this property and it was therefore not
```

1    on any of these matters is continuing it is Premier's

2    duty to supplement its discovery responses in timely

3    fashion.

4            With respect to any matter in which Premier

5    is able to reach a settlement with a debtor, obviously,

6    we will be providing information to the defendants about

7    that.

8        A.    It is very important, Tom, to understand,

9    all things being equal, if a debtor volunteers to make a

10   payment and they give up their rights, I mean they have a

11   right to give up rights.  That doesn't mean that in any

12   way my analysis of the fact that these properties are

13   immune from your judgment -- my opinions are not in any

14   way affected.

15           As I say, the only way they would be

16   affected is the fundamental underlying principles of my

17   opinion based upon records.  If you had a document where

18   someone said, "That is not my homestead" or someone said,

19   "That wasn't really my wife" or something dramatic like

20   that, that would alter the picture, but the fact that a

21   debtor volunteered to make a payment to Premier in my

22   opinion has nothing whatever to do with whether they were

23   required to make the payment.

24           In other words, creditors send out letters

25   to debtors even though the judgment might not be

1    enforceable.  If the debtor volunteers to make payment

2    that does not affect potential damages in this case

3    against the defendants here.

4         Q.    I believe you testified earlier, correct me

5    if I am wrong, that in your own practice the occasions in

6    which debtors have volunteered, to use your word, to

7    forego their homestead and other related legal protection

8    are few, if any.

9         A.    My experience is in the context of somebody

10   coming to me.  I don't send out demand letters to debtors

11   and say to debtors, so you have to understand the context

12   in which I am involved with commercial litigation.

13        Q.    Is that something clients would have done

14   prior to your involvement?

15        A.    I usually get a judgment.  I don't do post

16   collection discovery.  We don't have a volume, like in

17   this case, of all these judgments where I would be

18   sending out letters to hundreds of people and asking them

19   to pay judgments.  That is a whole different -- that is

20   why I don't see people volunteering to make payments

21   because I don't engage in that type of practice, I don't

22   do contingency practice.  I do an hourly practice.  I

23   don't get involved in those mass collection matters.

24        Q.    Have you ever had occasion in your practice

25   to send out a default letter to a debtor?

1    I think of it more as a contingency fee volume practice.
2    I mean, that is not my practice, but I do on behalf of
3    lenders, banks primarily, sue individual who sign
4    promissory notes, security agreements, notes, mortgages.
5        Q.    So when you sue on a promissory note in
6    your own practice, to take a typical example of that, you
7    would not refer to that as collection activity?
8        A.    No.   I think in my mind everybody has their
9    own definition.
10       Q.    I am just looking for the right phrase to
11   use.
12       A.    Yes, I think of it as creditors' rights.
13   Collection activity to me is more of a volume practice,
14   contingency.
15       Q.    Under number nine, Ramdata/Richard Ramos,
16   we have here yet another instance in which there is a
17   homestead analysis by you.
18       A.    Relying on documents that were provided by
19   Premier, correct.
20       Q.    Could you explain to me what you mean by
21   part of that response, quote, "The criteria for homestead
22   exemption for taxes," unquote?
23       A.    There are two homestead exemptions.   There
24   is the one that we have been talking about all morning,
25   which is the homestead exemption which immunizes your

1    property from judgment liens attaching, and then there is
2    the homestead exemption which gives you a tax benefit
3    such that if you have all the criteria for homestead,
4    that you are residing in the property, that you have a
5    tax benefit, you file with the tax collector a notice
6    that you have the property as homestead and they'll give
7    you, I think it is $25,000.
8            We only have real property taxes in
9    Florida, we don't have income taxes, so it gives you very
10   little reduction in real property taxes by filing the
11   homestead tax exemption.
12           But the criteria for the tax exemption is
13   identical to the criteria for homestead exemption under
14   the debtors'/creditors' issue we are talking about.
15       Q.    **If you have a homestead exemption, what's**
16   **called a generic homestead exemption, do you also get the**
17   **homestead exemption ---**
18       A.    Exactly.  Pretty much.  I have never seen a
19   case ever where you haven't, because it is the same
20   criteria for both.
21           MR. MORRISSEY:  Off the record.
22           (Discussion off the record)
23       Q.    **So Ramdata/Ramos would involve by you the**
24   **same analysis that you have done under other matters**
25   **having to do with homestead exemption?**

1         A.    That is correct.

2         Q.    **Notwithstanding the fact that there is an**

3    **additional circumstance of homestead exemption for taxes?**

4         A.    Correct, because, as I said, the criteria

5    for the homestead exemption for taxes is the identical

6    criteria for the homestead exemption for protection for

7    either debtors/creditors context.

8              In fact, I say the criteria for homestead

9    exemption for taxes are identical to the requirements

10   under Article 10, Section 4, of the Florida Constitution.

11   That is in my response.

12        Q.    **Under Wisteria Branch at the bottom of page**

13   **nine, your number 10.**

14        A.    Yes.

15        Q.    **Your response makes reference to a debtor**

16   **who apparently is located out of state in Louisiana.  Do**

17   **you see that?**

18        A.    I do.

19        Q.    **Is your analysis in that regard similar to**

20   **your analysis under Gibson in which in Gibson, the debtor**

21   **moved to Georgia.  That is to say Premier pursued them in**

22   **another jurisdiction.**

23        A.    Right.  The only additional caveat in this

24   case is that based on Wisteria Branch is it appears the

25   debtors owned real property in Louisiana, such that had

1  Premier retained counsel in Louisiana they did have an
2  asset, or it did have asset to go against in Louisiana.

3      **Q.     Did you perform any analysis in Wisteria**
4  **Branch with respect to whether Premier, had it chosen to**
5  **sue in Florida, would have had personal jurisdiction over**
6  **the debtor?**

7              MR. CORRIGAN:   In Florida or Louisiana?
8              MR. MORRISSEY:   In Florida.

9      A.     Well, if they signed a note in Florida,
10  then the cause of action would accrue in Florida and
11  there is a long arm statute that you would be able to sue
12  such that even if people moved out of state you can sue
13  under Florida law and reach them, even if they move to
14  another state.

15      **Q.     Apart from the long arm statute you just**
16  **referred to, is it your understanding under Florida law**
17  **that the execution of a promissory note within the State**
18  **of Florida would give a Florida court jurisdiction over**
19  **the parties to that note?**

20      A.     No, it would not, which is the reason
21  generally if I have a case in which there is assets in
22  another jurisdiction or state, I retain counsel in the
23  other state to pursue the remedy.  Generally what I like
24  to do is if a bank has a mortgage, obviously foreclose.
25  If not a mortgage then if it is prejudgment, I need to

1  ask for an attachment.  If it is post-judgment I have the
2  judgment recorded obviously in the state where the
3  property is located so that the judgment becomes a lien
4  in that jurisdiction.
5      **Q.    Are you familiar with a matter regarding a**
6  **debtor named Arroyave?**
7      A.    No.
8      **Q.    Turning to number eleven on page ten of**
9  **your report, Bradley Boat Repair, I wonder if you would**
10 **take a moment to read through your response.**
11     A.    I have reviewed it.
12     **Q.    The first sentence of that response, bottom**
13 **of page 10, states, quote:  "Plaintiff's damages are too**
14 **speculative to warrant recovery."  What do you mean by**
15 **speculative?**
16     A.    I mean that the complaint is that the
17 Penzell defendants failed to pursue post-judgment
18 collection efforts such as garnishment and with regard to
19 Mrs. Bradley an attempt was made to garnish her salary.
20 She filed an exemption that she was the head of the
21 household, which was dismissed.
22          With regard to Mr. Bradley the documents I
23 examined established that he had moved to the Bahamas and
24 that it was difficult, if not impossible, to re-locate
25 him and, therefore, even on good efforts there did not

1            But that was more of a transactional matter

2   and I am a litigation lawyer, so I wasn't the one who was

3   the scrivener preparing the documents.  They just crossed

4   my desk.

5        Q.    I apologize for not being precise, but I am

6   wondering if you were involved in litigation concerning a

7   sale between the RTC on the one hand and a purchaser on

8   the other?

9        A.    Oh, no.  No.

10       Q.    Moving on to Hiram Martinez, page 12.

11       A.    OK.

12       Q.    In forming your opinion under response

13   under Martinez, you are relying on what you saw in the

14   files.  Is that right?

15       A.    This is a good example of a different type

16   of matter.  The other matters that we saw Premier recite

17   a specific piece of real estate and say insufficient

18   collection activities resulted in no recovery.

19       Q.    Just to interrupt for a moment, those are

20   cases, perhaps you will agree with me, that fall under

21   the category of homestead or tenancy by the entirety and

22   so on.  Right?

23       A.    That's correct.  This is a little

24   different.  In Hiram Martinez there was no assets that

25   were located by Premier or anyone else such that there is

1   no criticism you should have or could have missed the
2   opportunity to take this specific piece of real estate.
3                    So in my analysis of this case I determined
4   that there were no assets that could have been located
5   such that there would have been collection and recovery
6   on them.  There were no assets.
7                    In fact, I mention in the middle of the
8   report that the plaintiff itself had done a state search,
9   a real estate search and was unable to locate real
10  property.
11       **Q.    Was that a real estate search, by the way,**
12  **plaintiff acknowledges that it did a --**
13       A.    Yes, real estate search.
14       **Q.    In the final sentence you make reference to**
15  **an event that occurred in May of 2001.  Is that right?**
16       A.    My memory of the file, looking and
17  refreshing my memory with this, is that the defendant
18  took what we call a deposition in aid of execution where
19  they tried to locate assets, and based upon my analysis
20  there was no assets that could be found.
21       **Q.    There is a quote, is there not, of the**
22  **phrase inactive status?**
23       A.    Yes, excuse me.
24            MR. MORRISSEY:  Let's take a break.
25            (Short break)

1                    (The document referred to was marked for

2           identification as Plaintiff's Exhibit No. 3.)

3    BY MR. MORRISSEY:

4           Q.    **Sir, let me put before you what I have had**

5    **marked as Exhibit 3 to your deposition.**

6           A.    OK.

7           Q.    **Is that a document you have seen before?**

8           A.    Yes, it is.

9           Q.    **And that, I believe is on the letterhead of**

10   **Victor Rones?**

11          A.    Yes, it is.

12          Q.    **And it has the date --**

13          A.    Actually, on the letterhead of Kris E.

14   Penzell, actually.

15          Q.    **I beg your pardon, but it appears to have**

16   **been written by Victor Rones?**

17          A.    Yes.

18          Q.    **What is the date of that letter?**

19          A.    May 17, 2001.

20          Q.    **Is that the document that forms the context**

21   **of your statement at the end of your analyses of**

22   **Martinez?**

23          A.    Yes, it is.

24          Q.    **And, in fact, I think there is at least one**

25   **other circumstance that we have discussed earlier in**

1    which you made reference to Mr. Rones reaching a like

2    conclusion about the unavailability of assets.  Right?

3         A.    By the way, there was a Bates stamped

4    number that I just don't see on here.  I am not sure if

5    that means anything.

6         Q.    I think that means you have my rogue copy

7    of that letter.

8         A.    OK.  Just wanted to make that point.

9         Q.    Moving on to Antonio Lioy, I believe that

10   is L-i-o-y, it doesn't quite appear to be in this copy.

11              Is this another matter, again similar to

12   what we discussed under Design Home Remodeling, where the

13   absence of assets lead you to believe that Premier

14   suffered no damages?

15        A.    That's correct.

16        Q.    If you look at about a third of the way

17   down on page 13, the sentence that begins, quote:  "For

18   this reason, Penzell's office recommended that the matter

19   be closed as a no asset case," unquote.

20              Again, you are adopting that recommendation

21   and its reference to a lack of assets as the factual

22   basis for your conclusion?

23        A.    That is one of the documents I looked at

24   and relied on.  There were other documents, Premier's

25   documents above I mentioned, but that letter was also a

1    document that I saw and looked at and referenced in the

2    letter -- referenced in my report, I apologize.

3            Q.    **In the last sentence of that response down**

4    **at the bottom of the page, it states:  It, meaning**

5    **Premier, notified the debtor that it, meaning Premier,**

6    **was willing to accept $7,000 in full and complete**

7    **satisfaction of this claim which contradicts its claim**

8    **that it has been damaged up to the ceiling amount of the**

9    **current judgment balance.**

10            **Is making an offer of settlement for**

11   **substantially less than the face amount of the judgment**

12   **contradictory to the claim that Premier has been damaged**

13   **in the full judgment amount?**

14            MR. CORRIGAN:  Object to the form.

15            A.    In the context of this case I think that it

16   is because in the context of this case Premier bought a

17   bundle of assets for a reduced price and then they sent

18   demand letters out for substantially less than that

19   amount hoping to collect because they had paid such a

20   nominal sum for these judgments that if they collected

21   it wasn't dollar-for-dollar as if they were creditor

22   where they were out-of-pocket.

23            So they bought a bundle of assets and they

24   did the best that they could to collect a fraction of the

25   amount that was owed.  And that is how these bundles

1    have occasion to review such agreements yourself?

2              MR. CORRIGAN:   Objection, form.

3         A.   I think I have seen them once or twice.

4         Q.   But it is not the practice of your client

5    who engages a new lawyer to do post-judgment collection

6    to have you review whatever fee agreement it enters into

7    with such post-judgment lawyer?

8         A.   Generally, I am representing banks.  My

9    experience is if they want to hire someone post-judgment,

10   they'll enter into an agreement with them.  They don't

11   generally ask me to say grace over their post-judgment

12   retainer agreement with other lawyers, no.

13        Q.   Turning to Jeni Jayson on page 15, is this,

14   again, under the ring of homestead?

15        A.   Yes.

16        Q.   Actually, we have a two-for here.  We have

17   homestead and we have tenants by the entirety?

18        A.   Yes.  This is the same two issues we

19   discussed before, homestead and the fact that the

20   judgment was only against one of the parties, either the

21   husband or the wife, and the property was owned by both

22   the husband and the wife.

23              MR. CORRIGAN:   I think we should interject

24        now.  On Monday, Jerry, I received a report

25        revised by Mr. Storfer with some additional

1    They were talking about the enforceability of the

2    creditors' right to collect on this judgment.  Under

3    tenants by the entirety and homestead, would, as I said

4    before, be a bar to their recovery.  It doesn't mean that

5    a debtor cannot volunteer to make a payment.  That would

6    not affect my opinion.

7          **Q.    The Maria Mazon/MR Latin America, Inc. is**

8    **the next matter in your report down at the bottom of**

9    **page 15.  This, too, to return to our refrain, appears**

10   **to, according to your analysis, involve the debtors'**

11   **homestead rights as limitation on Premier's damages.**

12   **Right?**

13         A.    Give me one moment if you could.

14         **Q.    Absolutely.  It is a fairly lengthy**

15   **response.**

16         A.    I see that.  That is why I am taking my

17   time.

18               Yes.  Homestead applies and also -- the

19   report speaks for itself.  There are other grounds but

20   the homestead exemption would apply.

21         **Q.    There is also a reference down at the**

22   **bottom of your response to a settlement offer of $50,000?**

23         A.    Right.  There was a letter that I saw in

24   the file from Premier in which they notified the debtor

25   that it would be willing to accept $50,000 as full and

1    final settlement of the debt.

2         Q.    Does the fact of such a settlement offer

3    have the same relevance per your analysis in this matter

4    as it has had in other matters?

5              MR. CORRIGAN:   Form.

6         A.    Yes, it does.

7         Q.    Supernet On-Line, Inc. on page 17 of 19.  I

8    think that also has a fairly lengthy response if you want

9    to take just a minute to look at that.

10        A.    Thank you.  OK.

11        Q.    Is that another matter in which your

12   analysis focuses on the absence of assets generally?

13        A.    Yes, and I explain in some detail what my

14   analysis includes.  I am not going to repeat it.

15        Q.    Yes, of course.  I wouldn't want you to

16   recapitulate it.

17        A.    But it is there and that is a fair summary

18   of what my opinion is with regard to Supernet alone.

19        Q.    There is also a reference to a settlement

20   offer of $12,000 towards the bottom of your analysis.

21   Right?

22        A.    Yes.

23        Q.    Does the extension of that settlement offer

24   by Premier to the debtor have the same relevance to this

25   matter as it has in other matters?

1          A.    Yes, it does.

2          Q.    **Ricardo Rios is the next matter, Ricardo**

3    **Rios and Ben Gross.**

4          A.    OK.

5          Q.    **Down about, I think, five lines or so into**

6    **your response you state, quote:  "Plaintiff could have**

7    **mitigated its damages by not accepting this file," end**

8    **quote.  Do you see that?**

9          A.    Yes, I do.

10         Q.    **Is that based on an analysis of the Bank of**

11   **America/Premier sale agreement that you have had occasion**

12   **to look at earlier?**

13         A.    Yes.  In fact, the next sentence says,

14   "Plaintiffs' duties are set out in Paragraph 9.2 of the

15   agreement of the lender."

16         Q.    **Do you believe Premier breached these**

17   **duties?**

18         A.    No.  I think it was a right, as mentioned

19   before, that Premier had under the agreement with their

20   bank that they didn't avail themselves of that right.

21   Had they, they could have prevented this loss.

22         Q.    **And that had to do with Premier's**

23   **opportunity to perform due diligence.  Is that right?**

24         A.    That's correct.

25         Q.    **Do you have any present intention as you**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PREMIER CAPITAL, LLC            )            Case No. 03-CV-12497
                                )
        Plaintiff               )
                                )
vs.                             )
                                )
BEVERKLY JOHNSON PENZELL        )
etc. et al.                     )
                                )
        Defendant.              )
_____

### WRITTEN REPORT OF WITNESS
### RETAINED TO PROVIDE EXPERT TESTIMONY
### PURSUANT TO FED. R. CIV. P. 26(a) (2),
### SUBMITTED BY DEFENDANT, BEVERLY JOHNSON PENZELL et al.

**Background:**

I have been retained by Defendant, **Beverly Johnson Penzell et al.,**
as an expert to examine certain documentation and provide an
opinion concerning selective issues that have arisen in this case.
Specifically, I have been retained as an expert in the field of
debtors' and creditors' rights in Florida.   The request for an
opinion is based on certain legal matters arising from Plaintiff's
complaint that the Defendants were deficient in their performance
of legal services.   Plaintiff's principal complaint is that the
Defendants failed to engage in certain collection activities which
resulted in damage to the Plaintiff.  My report will be directed to
the issue of damages.

In formulating my opinions I have relied on the following:

1.   Documents contained in the files you forwarded to me which
     originated from the office of Defendant.
2.   Documents produced by Premier during the course of discovery.
3.    Contract agreements between Penzell and the banks which
     retained his services.
4.   Contracts between Premier and the lenders for the sale of
     assets which were assigned to Premier and which are the
     subject of the instant litigation.
5.   The Florida Constitution. (Article X, Section 4 regarding
     homestead.
6.   Florida statutes relating to debtors' and creditors' rights
     and privileges in Florida.

PLAINTIFF'S
EXHIBIT
JF 2
mp 9·27·07

For ease of reference my report is chronicled in the same order as Plaintiff's expert report.  Plaintiff shall be collectively referred to as "Plaintiff" or "Premier" and Defendant shall be collectively referred to as "Defendant" or "Penzell."  In response to your request for an opinion you should know the following:

1.   **Chaka, Kiambu and Idella**

**Claim**:   Premier held an unsatisfied judgment which it referred to Defendant for collection.  Plaintiff complains that the Defendant failed to record or renew its judgment which extinguished Plaintiff's lien and enabled the judgment debtors to refinance real property without satisfying all or any portion of the Plaintiff's outstanding judgment.  Plaintiff contends that the property had $50,000 in equity before the refinance but that the equity has now been reduced to $16,177.00.

**Response**:   Documents contained in Premier's files (PC0047) establish that the above referenced property was the debtors' homestead. Plaintiff suffered no loss because its judgment lien never attached to this property.  The result would be the same even if Plaintiff's contention is correct that Penzell failed to properly record and/or renew the judgment lien.   Plaintiff suffered no loss because under Florida law homestead property is exempt from judgment liens and Plaintiff was therefore not entitled to any of the proceeds from the refinance. The Homestead Exemption is part of the Florida Constitution, Article X, Section 4.   It establishes that a judgment may not be a lien on the

homestead.   Homestead is recognized in the Florida Constitution and Statutes.   The stated purpose of homestead laws is to promote the stability and welfare of the state by encouraging property ownership and independence on the part of citizens and by preserving a home where a family may be sheltered and live beyond the reach of economic misfortune.   The law is well settled in Florida that the homestead provisions of the Constitution are to be liberally construed. The proceeds from the judgment debtors' sale or refinance of homestead property are exempt from levy by unsecured judgment creditors.     *Orange Brevard Plumbing and Heating Company v. Lacorix*, 137 So.2d 201 (Fla. 1962).

2.   **Multicare Medical Supplies/Pedro and Maria Garcia**

**Claim:**   Plaintiff holds a judgment that remains unsatisfied. It contends that the Defendants failed to record or renew its judgment which extinguished Plaintiff's lien and prevented the Plaintiff's judgment from being satisfied when the debtors' sold real property in August of 2001.

**Response:** Documents contained in Premier's file (PC0444) and the public records of Miami-Dade County, Florida establish that the property was the debtors' homestead at the time of sale. Plaintiff's judgment lien never attached to this property and therefore the Plaintiff was not entitled to any of the proceeds from the sale or refinance and, as a result, it suffered no damages in this case.   In connection with the debtor's sale of

Page 3 of 19

this property it is therefore legally irrelevant that Penzell failed to record or renew the judgment.

### 3. **Ward, James and Deborah M. Ward/Metropolitan Industries, Inc.**

**Claim:** Plaintiff contends that Defendant's agent, Susan I. Noe, agreed, but failed to attend a Creditor's Meeting in Bankruptcy. Premier also claims that it had given Ms. Noe several questions to ask the debtor at the examination. Debtor was granted a discharge in bankruptcy. Premier claims that in MARCH 2001 the debtors' refinanced real property. Plaintiff contends the Defendant's failure to protect and enforce Premier's interest resulted in the judgment remaining unpaid at the time of refinancing.

**Response:** There has been no showing that attending the bankruptcy examination or asking the questions suggested by Premier would have prevented the debtor from being discharged in bankruptcy. Plaintiff has failed to enunciate any grounds which would have prevented the debt from being discharged. Moreover, even if the debt had not been discharged, Plaintiff would not have received proceeds from the refinance since its judgment was against James Ward, individually, and the property was owned by Mr. Ward and his wife. Under Florida law a husband and wife hold title to property by the "entireties" with each having an undivided interest in the whole. Premier's judgment against Mr. Ward would not affect or create a lien on real estate owned by Mr. Ward and his wife.

Finally, documents in Premier's files establish that Mr. and Mrs. Ward applied for and obtained the homestead exemption (PC0051). As mentioned above, homestead property is exempt from the claims of creditors. Plaintiff suffered no damages since it was not entitled to any proceeds from the refinance.

### 4. Top Ten Card Company, Inc./Gary and Jennair West

**Claim:** Premier claims to have instructed the Defendant to file a motion in bankruptcy to extend the date for filing objections to the debtor's discharge. Plaintiff contends that the debtor transferred the beneficial ownership interest in real estate to a trust and that the Defendant's failure to pursue the trust enabled the debtor to be discharged in bankruptcy. Plaintiff complains that Defendant's failure to pursue the real estate held in trust as Premier's source of satisfaction for its judgment resulted in damage to the Plaintiff.

**Response:** Undersigned counsel has examined the Schedules in Bankruptcy and documents provided in discovery by Premier and Penzell but was unable to locate any record transmitted by the Plaintiff to Penzell which suggested that the objection to the discharge of debtor would be based on real estate owned by the debtors that had been transferred to a trust. Premier's transmittals to Penzell made no reference to property conveyed in trust but suggested that it wanted Penzell to obtain an extension of time so that it could have the "ability" to file an objection (PC0591 & 0593). Moreover, the schedules of creditors in bankruptcy

establish that there were a substantial number of judgment creditors who had superior rights relative to the Plaintiff because they held earlier recorded judgments. Under Florida law, such judgments have priority.  The dollar amounts of these superior judgments exceed Five Million Dollars. Plaintiff has failed to demonstrate that it would have received any benefit by preventing the debtor from being discharged in bankruptcy since the proceeds from the sale of the trust property (if it existed) would have been applied to satisfy superior creditors.  There is also some question regarding Plaintiff's scope of damages. On April 3, 2002, Premier sent the debtor a settlement letter advising that it would accept $60,000 in full and complete satisfaction of the debt (PC0687).

### 5.   **Redlands Air Conditioning/Jack D. Hardee**

**Claims**:   Premier complains that Defendant failed to protect and enforce its interests which prevented Premier's judgment from being satisfied when the debtor sold one property and refinanced another.

**Response.** My examination of the public records establish that the property sold (5104 Tennis Court Circle) was the debtor's homestead at the time of sale.   It was acquired by Mr. Hardee in 1981 and sold as his homestead on December 6, 1999.  Plaintiff was therefore not entitled to receive any proceeds from the sale. Premier's judgment was never a lien on the refinanced property (513 Richlyne Street) because it was owned jointly by Mr. Hardee and his wife and the judgment held by Premier was entered against Jack D.

Page 6 of 19

Hardee alone.  The property was originally owned by Mrs. Hardee who transferred title into joint names.  Under Florida law Premier's judgment lien would never attached to property held by the entireties because Mr. Hardee and his wife each held an indivisible interest in the whole.

### 6.   **Lenear Gibson**

**Claim:**  Premier claims that Defendants failed to fulfill their duty to engage in collection activity including a wage garnishment which damaged Premier in the sum of $2,900.

**Response:**  The judgment was entered against the husband only. Even if he resided in Florida his wages would be exempt from garnishment under Florida law (chapter 222.11). In April 2005 the Plaintiff retained new counsel who commenced Garnishment proceedings. The debtor filed an affidavit that his wages were exempt. It does not appear from the court records which I examined that the Plaintiff succeeded in securing its Garnishment. Premier misdirected this file to Penzell because at the time of its transmittal the debtor had moved to Georgia (PC0852&0877).   If Premier was desirous of securing a wage garnishment it should have secured counsel in Georgia.

### 7.   **Velma's Golden Needle, Inc. /Butler, Clifford, Jr. and Velma**

**Claim:**  Premier complains that Penzell failed to re-record a Final Judgment against the individual defendants which extinguished

Premier's lien and enabled the debtors to sell their real property which had equity of $82,500.

**Response:** The records provided by Premier establish that the property (18530 N.W. 23rd Avenue) was, in fact, the debtors' homestead (PC0510 and PC0511). Plaintiff suffered no loss because homestead property is exempt from the claims of unsecured judgment creditors. The Florida Constitution establishes that judgments are not liens on homestead property. Therefore, even if Penzell renewed the judgment lien Plaintiff would still not be entitled to share in the proceeds of the sale since its judgment lien did not attach to this property.

Victor Rones on behalf of the Defendant notified the plaintiff that this was a no-asset case and closed his file (KPPA0729). Accordingly, exclusive of the homestead property, there did not appear to be any other assets available to satisfy Premier's judgment.

## 8. **Brancaccio, Carmen d/b/a Golden Razor Barber Salon**

**Claim:** Premier claims that Defendant failed to re-record or renew a final judgment which extinguished its lien and enabled the debtor to refinance realty. Premier contends that had the judgment been properly recorded it would have recovered $28,190.06 from the refinance.

**Response:** Premier's documents establish the following:

(1) Penzell properly recorded the judgment in 1987 and re-recorded in 1994 and 2001; (2) The judgment was entered against Mr.

Page 8 of 19

Brancaccio; (3) The refinanced property was owned by Mr. and Mrs. Brancaccio. Under Florida law Premier's judgment would not attach to this "entireties" property because each spouse had an undivided interest in the whole; (4) Premier's documents establish that the debtor's property was homestead (PC0005 and PC00060). For these reasons, Premier's lien never attached to this property and it was therefore not entitled to receive any proceeds from its refinance.

### 9.   Ramdata/Ramos, Richard -

Claim: Premier complains that Defendant failed to timely file a Proof of Claim in Bankruptcy which resulted in Premier's claim being disallowed. Premier suggests that because its claim was disallowed the debtor was able to refinance his home which had equity of $99,375.

Response: Premier suffered no loss because the property was the debtor's homestead at the time of the refinance. Premier's documents establish the debtor applied for an obtained a homestead exemption for taxes (PC0040). The criteria for homestead exemption for taxes are identical to the requirements under Article X, Section 4 of the Florida Constitution. The refinance would not have been affected even if Premiers claim had not been disallowed because the property was homestead.

### 10.   Wisteria Branch/William Gerald

Claim:    Premier contends that it directed but Penzell failed to pursue a wage garnishment and attach realty in Louisiana. Premier contends that it suffered damages because it did not

Page 9 of 19

collect wages and the debtor was able to transfer the real estate to his parents.

**Response:** Plaintiff knew at the time it transmitted this file to Penzell that the debtor resided and owned real property in Louisiana. Defendant notified Plaintiff that the debtor's deposition revealed that he had moved to Louisiana and was currently working in that jurisdiction. Premier's documents establish that it decided to undertake its own title search to determine whether the debtor owned property in Louisiana and also to determine if it wanted to retain counsel in that jurisdiction to domesticate its judgment and pursue a potential fraudulent transfer action (PC0127). It appears that Premier suffered damages as a result of its own inaction.

11. **Bradley Boat Repairs/Bradley, Andrew and Therese**

**Claim:** Premier contends that Defendant's failure to pursue collection activities against the husband and wife resulted in damages to Premier. Mr. Bradley had been dropped as a party defendant to the civil lawsuit because he had filed bankruptcy. The bankruptcy action was dismissed and Premier complains that Defendant failed to re-institute an action against him and failed to pursue post judgment garnishment proceeding against his wife.

**Response:** Plaintiff's damages are too speculative to warrant recovery. Its transmittal letters to Penzell and internal documents establish that it had investigated but was unable to locate real estate in Florida and was aware that Mr. Bradley resided outside of

the United States (perhaps in the Bahamas (PC0120). Mrs. Bradley's wages were exempt from Garnishment as her verified petition reflects she was, in fact, head of the household (KPPA3060). Premier suffered no damages because there is no showing that post judgment collection efforts would have resulted in recovery in this case.

12. **Design Home Remodeling/Edelstein, Harold and Grilla, Louis**

**Claim:** Premier complains that one of the two judgment debtors died on May 29, 1999 and there was no record that Penzell filed a timely claim against the debtor's estate.

**Response:** There was no showing that any assets were available in the probate estate and there was therefore is no record to show that had Penzell undertaken collection efforts he would have been able to recover in this case. This is especially true since the judgment was exceedingly old (1987) and there was no description of any assets in transmittals and correspondence between the parties. Moreover, Premier had an obligation in its contract with the lender for the sale of assets to exercise due diligence and was required to examine all documents in the public records. Had it fulfilled its duty it would have ascertained that no proof of claim had been filed in the probate proceeding. Plaintiff's examination of the probate file would have revealed that the claim was not viable. Plaintiff could therefore have mitigated its damages by not accepting this file.

### 13.  **Martinez, Hiram**

**Claim:**  Plaintiff suggests that Plaintiff's failed to pursue post judgment collection activity which damaged Plaintiff up to the ceiling amount of the current judgment balance of $82,298.59.

**Response:** There was no factual predicate to support the claim that post judgment collection activity would have resulted in recovery in this case.  Indeed, there is nothing in the files to suggest that there were any assets available to satisfy this judgment.  Plaintiff acknowledges that it did a state search but was unable to locate real estate (PC1116) and that most of the corporations in which the individual debtor was a principal had been dissolved (PC1109).  Moreover, on May 17, 2001, Defendant deposed the judgment debtor but was unable to locate assets and for this reason advised Plaintiff that he was returning the file to "inactive status" (KPPA0804).

### 14.  **Lloy, Antonio**

**Claim:** Premier criticizes Penzell for failing to pursue post judgment collection activity.  The October 14, 1988 judgment was in the original amount of $20,831.16.  Premier claims the current balance is $55,439.42.

**Response:**  The underlying judgment resulted from a foreclosure in which there was a deficiency decree.  Penzell had the judgment docketed.  Premier's main screen (PC08820) confirms that it had used due diligence but could not locate any assets.    It

acknowledged that mail came back unclaimed.   Premier acknowledged
that it was having difficulty locating the debtor:

> Your last correspondence to BofA stated this guy was a skip.   Our
> 3/19/02 Demand letter came back as Unclaimed... (PC0879)

In 2001 Penzell attempted to depose the debtor but was unable to
locate him.   Defendant notified Premier of this fact and advised
that he had done an updated search which did not disclose assets.
For this reason, Penzell's office recommended that the matter be
closed as a no-asset case (PC0898).   No documents show that the
debtor acquired any assets between May 2001 and the present date.
Premier had suggested the debtor might have an interest in several
Florida corporations. There was no showing that the corporations
had any assets or that assets from these entities would be
available to satisfy the outstanding judgment held by the
Plaintiff.   Premier has failed to demonstrate any conduct by
Penzell which resulted in damage.   It appears that all parties
attempted but were unable to locate the debtor after investigation
and due diligence.   No real estate or other assets were located.
Even though it appears that this loan was uncollectible, there is
also a question regarding Plaintiff's scope of damages.   It
notified the debtor that it was willing to accept $7,000 in full
and complete satisfaction of this claim (PC0910) which contradicts
its claim that it has been damaged up to the ceiling amount of the
current judgment balance.

15.  **Kenworthy, Thomas W.**

**Claim:**  Premier criticizes Penzell for failing to pursue post-judgment collection activity.  The judgment was obtained on July 8, 1986 in the amount of $5,855.51 and Premier claims the current balance is $17,030.09.

**Response:**       The claim is too speculative to support Premier's claim for damages. Plaintiff has offered no documentation or information which would establish or even suggest that had Penzell pursued collection efforts he would have succeeded in recovering all or a portion of the amount owed.  In connection with the collectibility of this loan, Premier records show the debtor was an 86 year old debtor who had no assets (PC 13490).  Another entry in this document of 3-18-2002 provides:

> DOB is 1917; CB shows 32k in outstanding revolving balances all are either charged off or seriously delinquent.

Notwithstanding the fact that Plaintiff demands the current balance of the judgment, this document also establishes that Plaintiff notified Penzell that it was desirous of settling the matter for $5,000 (PC1349), a fact reconfirmed in a demand letter sent by Premier to the debtor on March 18, 2002.

Penzell recorded the judgment, filed a Writ of Execution and attempted to take the debtor's deposition in aid of execution but was unable to locate him.  Further, undersigned has discovered that in 2005 Premier attempted but was unable to locate this debtor.

16. **Jeni Jayson**

**Claim:**    Premier complains that the debtor was able to sell realty at 435 N.E. 210 Terrace, Miami, Florida in February of 1996 as a result of Defendant's failure to protect Premier's rights under the judgment and pursue collection activity.    At the time of sale the judgment balance was $11,045.85.

**Response:**    Undersigned examined the public records which establish that the judgment was recorded by Penzell on December 15, 1989. Since the sale described by Plaintiff's expert was completed within seven years, Plaintiff's claim that debtor was able to sell real property as a result of Penzell's failure to protect Plaintiff's interest is without merit.    Florida Statute 55.10(1) establishes that a judgment recorded between July 1987 and June 1994 remains a lien on real property for a period of seven years from the date of the recording. Moreover, the only reference in Plaintiff's documents to real estate owned by the debtor was her homestead property which she owned with her husband (PC0770). Homestead property owned by the entireties cannot be attached by the Plaintiff.

17. **Mazon, Domingo and Maria/M & R Latin American, Inc.**

**Claim:**    Premier claims that on August 8, 2003, the debtor sold real estate located at 7340 S.W. 158th Avenue, Miami, Florida as a direct result of Defendant's failure to protect Premier's rights under the judgment and pursue post judgment collection activity. It claims damages in the current judgment amount of $222,844.72 on

the judgment dated June 18, 1989 in the original amount of $85,827.08.

**Response**: Undersigned has examined the public records and determined that the property referred in the report was the debtor's homestead at the time it was sold and therefore exempt from the unsecured judgment claim of Premier. As referenced above, judgment liens do not attach to homestead property and, as a result, Premier would have no entitlement to proceeds from the sale of this property. For this reason, Plaintiff suffered no damages as a result of this transaction. Moreover, Premier confirmed in its referral letter to Penzell that "our efforts at determining assets came up empty, although they may still have an interest M.R. Latin America, Inc. (PC1370). Undersigned examined the documentation provided by Premier and Penzell but was unable to find any description or suggestion that assets existed which would be available for satisfaction of all or a portion of the judgment. As a result, a suggestion that post judgment collection efforts would have been successful in satisfying all or a portion of the judgment is not supported by the documents provided. There is also some question regarding scope of damages since Premier is seeking the current judgment amount on March 19, 2002, it notified the debtor that it was willing to accept $50,000 as full and final satisfaction of the debt (PC1396).

18. **Supernet Online, Inc.**

**Claims:**    Premier claims that Defendant's failure to pursue post judgment collection activity damaged the Plaintiff in the current balance of the judgment of $64,094.81.

**Response:**    There does not appear to be any factual basis to support Plaintiff's claim for damages in this cause.    There is no suggestion that Penzell failed to record or renew the judgment. There were no documents contained in the files of any of the parties to establish or even suggest that assets were available to satisfy all or a portion of the judgment.    In fact, when Premier referred this matter to Penzell it provided

> "please conduct a debtor's exam and establish if we have any assets
> that we can execute on.  Our due diligence has come up with nothing
> thus far." (emphasis added)(PC0250)

The internal document created by Premier (PC 0251) establishes that it was not able to find assets for this debtor.    Indeed, on April 2, 2002, in the same transmittal it acknowledged

> "2 debtors, 1 defunct company, Ayaya is ch7d, mangue is prime for
> ch 7. Judgment was entered against mangue and there is no
> particulars in asset files. Mangue's cb is all poor and has a first
> mtg that is in fcls in 1997.

It is important to note that Plaintiff was willing to accept $12,000 as full and complete satisfaction of this claim in May 2002 (PC0267).    In the box provided for "Repayment Sources/Plan"(PC 0251) on the same screen, Premier concedes that the credit was poor and it was unable to confirm employment.    There does not appear to be any factual basis to support Plaintiff's contention that had

Defendant pursued collection activity it would have resulted in full satisfaction or satisfaction of a portion of the judgment balance.

   19.  **Rios, Ricardo, Gross, Ben:**

   **Claim:**  The judgment was secured in 1984 and Plaintiff claims that one of the judgment debtors died on March 15, 1990 and there were no record of a claim having been filed against the debtor's estate.   Premier also criticizes Penzell for failing to pursue collection activity for which it claimed it was damaged up to the ceiling of the current judgment balance.

   **Response:**  Premier was required under its agreement with the bank to exercise due diligence and examine all documents in the public records. Had it fulfilled its duty it would have ascertained that no proof of claim had been filed in the probate estate of the debtor.    Plaintiff  could  have  mitigated  its  damages  by  not accepting this file.   Plaintiff's duties are set out in paragraph 9.2 of the agreement with the lender.    There were no assets revealed in the documents provided.    In fact, Premier's internal documents establish that it had conducted its own investigation and was unable to locate assets for either defendant and, in fact, it determined that it had exhausted its information and "est recovery at 1k until we hear back from attorney." (PC013A).   Plaintiff's documents also establish that it was unable to positively identify that the individuals who Premier were investigating were in fact the judgment debtors in the within cause.   For these reasons, there

is no factual predicate to support Plaintiff's contention that had Penzell pursued post judgment collection activity it would have recovered in all or a portion of the outstanding judgment amount.

Dated this 17th day of October, 2005.

**Undersigned reserves the right to revise, correct, add to or supplement this written report under Rule 26(e)(1) of the Federal Rules of Civil Procedure.**

JERALD A. FRESHMAN, ESQ.
Fla. Bar #161860
FRESHMAN FRESHMAN & TRAITZ, P.A.
9155 S. Dadeland Blvd.
Dadeland Centre, Suite 1014
Miami, Florida 33156
Phone:  (305) 670-1400
Fax:     (305) 670-1410