UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PREMIER CAPITAL, LLC,           )
                                )
          Plaintiff,            )
                                )        Civil Action No.
     v.                         )        03-CV-12497-NG
                                )
BEVERLY JOHNSON PENZELL, d/b/a  )
Law Office of Kris E. Penzell,  )
et al.,                         )
                                )
          Defendants.           )

PLAINTIFF/DEFENDANT-IN-COUNTERCLAIM
PREMIER CAPITAL, LLC'S OPPOSITION TO
DEFENDANT BEVERLY JOHNSON PENZELL'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

Each cause of action asserted in this action is replete
with disputed, triable issues of material fact.
Accordingly, pursuant to Rule 56(e), Federal Rules of Civil
Procedure, plaintiff/defendant-in-counterclaim Premier
Capital, LLC ("Premier"), by its attorney, opposes the
Motion for Summary Judgment of defendant/plaintiff-in-
counterclaim Beverly Johnson Penzell ("Penzell") as Personal
Representative of the Estate of Kris E. Penzell.  In
addition to this Memorandum of Law, Premier submits
deposition testimony, appended to the Affidavit of its
counsel of record, and the Affidavits of its duly-authorized
agent, Richard Gleicher ("Gleicher Aff."), and expert
witness herein, Richard B. Storfer, Esq. ("Storfer Aff.").

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Premier is a Delaware limited liability corporation, with offices in Wilmington, Massachusetts. Premier is in the business of buying, selling, and liquidating distressed financial assets, including court judgments related to such judgments. Gleicher Aff., para. 4. Beverly Johnson Penzell is defendant individually and in her capacity as Personal Representative of the Estate of the late Florida attorney (and her husband) Kris E. Penzell. (She will be referred to in both capacities herein as "Penzell".)

Kris E. Penzell represented Barnett Bank and its successor, NationsBank, N.A., in collection matters brought in Florida state courts. On December 23, 1998, the Law Office of Kris E. Penzell ("Penzell Law Firm") and NationsBank, N.A., entered into a contingency fee agreement respecting such matters. Penzell Affidavit In Support of Motion For Summary Judgment ("Penzell Aff.") para. 2 and Ex. 1.

Kris E. Penzell died on March 8, 2000, and Penzell became Personal Representative of his estate. <u>Id.</u>, para. 1. The Penzell Law Firm remained open, with Penzell acting in an "administrative" role. Affidavit of Thomas James Morrissey In Opposition to Motion For Summary Judgment ("Morrissey Aff."), Ex. A, Deposition of Beverly Johnson Penzell at 18. Two Florida attorneys were appointed

2

inventory attorneys, charged by statute with winding down the affairs of the Penzell Law Firm: Victor K. Rones (appointed March 24, 2000) and his successor, Susan I. Noe (appointed April 29, 2002).  Affidavit of Joseph W. Corrigan in support of defendant's Motion For Summary Judgment ("Corrigan Aff."), Exs. C and K.

Working at the Penzell Law Firm after her husband's death, Penzell returned file materials to his former clients.  Morrissey Aff., Ex. A, Penzell Dep. at 32-33.

BofA succeeded to NationsBank, N.A.'s interests in the collection matters referenced in the 1998 Agreement. Gleicher Affidavit, para. 25.  On September 19, 2001, BofA and Premier entered into a Loan Sale Agreement in which, among other things, BofA conveyed to Premier all of its right, title and interest in 19 Florida court judgments in which the Penzell Law Firm represented BofA and/or its predecessors (the "Florida litigation matters").  Corrigan Aff., Ex. J., Affidavit of Paul W. George at 52-53, 85-86, 88.

In October, 2001, BofA advised Penzell of the sale to Premier.  Morrissey Aff., Ex. A, Penzell Dep. at 81-82.  She took no action.  Id. at. 85-86.  Notwithstanding such inaction, she believed BofA (and its predecessors) owed her late husband money.  Id. at 112.  Penzell did not deem Premier a client of the Penzell Law Firm as a result of

BofA's sale to Premier, id. at 98; and, as she disclosed
much later, all of the money involved her late husband's
work for entities other than Premier.  Id. at 123; Gleicher
Aff., para. 23 and Ex. B.  Yet she believed the fee
agreement with BofA required Premier to pay such money.
Morrissey Aff., Ex. A, Penzell Dep. at 116.

At no point in time, however- neither in 2001, 2002,
2003, or 2004, indeed not until well after Premier brought
the instant action- did Penzell submit a bill to Bof A, or
to Premier, for the money she alleges was owed her late
husband.  Gleicher Aff., para. 14, 22-23.

Premier, meanwhile, learned from review of files bought
from BofA that the Penzell Law Firm represented BofA in the
Florida litigation matters.  Gleicher Aff., para. 7.  In
November, 2001, Premier made its first phone call to
Penzell, Morrissey Aff., Ex. A, Penzell Dep. at 140-144.

In this call, Penzell advised Premier that the 1998
Agreement required Premier to pay the Penzell Law Firm 30%
of any future recovery on matters worked on by her late
husband.  Id. at 142-143; Gleicher Aff., para. 8-9.  Penzell
later conceded in answers to Premier's interrogatories that
"[t]he fee agreement between the Penzell law office and BofA
was terminated by the bank's sale of its interest and
obligations  in loan workout and collection matters to
Premier" in "September, 2001."  Morrissey Aff., Ex. C at 13.

On January 11, 2002, Premier asked Penzell for a copy
of any BofA-Penzell Law Firm fee agreement. Penzell faxed
Premier the 1998 Agreement. Morrissey Aff., Ex. A., Penzell
Dep. at 150; Gleicher Aff., para. 10. Premier also
requested, and she provided, documents relating to Arroyave,
a Florida judgment then at issue in the debtors's bankruptcy
proceeding. Morrissey Aff., Ex. A, Penzell Dep. at 150;
Gleicher Aff., para.

Premier reviewed the 1998 Agreement and concluded that
it did not govern Premier's relationship with Penzell. Id.,
para. 13. The Penzell Law Firm had not entered its
appearance in the pending bankruptcy proceeding involving
the Arroyave judgment; Premier therefore retained its own
bankruptcy counsel on an hourly basis, and entered into a
partial settlement with that debtor. Id., para. 11.

During early to mid-2002, Premier and Penzell exchanged
numerous communications in which she expressed a willingness
to work on the Florida litigation matters for Premier and,
indeed, purported to provide such services. For example, on
August 6, 2002, employing (as was her practice) Penzell Law
Firm letterhead, Ms. Noe provided a status report to Premier
on the matters, reviewing past work and suggesting
collection steps going forward. Corrigan Aff., Ex. G, Noe
Dep. Ex. 8.

Seeking Premier's business, Penzell requested, and Premier provided, a draft contingency fee agreement for her review. Morrissey Aff., Ex. A, Penzell Dep. at 232-234. Neither Penzell (nor Ms. Noe, who also reviewed it) responded to Premier with comments on the draft agreement. Gleicher Aff., para. 16.

Indeed, Penzell became unresponsive to Premier's requests for status reports and other information during 2002-03. Gleicher Affidavit, para. Premier concluded that Penzell was not taking action in the Florida litigation matters. Id., para. Premier accordingly demanded return of the files related to such matters. See, e.g., Corrigan Aff., Penzell Dep. Ex. 24. Penzell insisted to Premier that her firm had a retaining lien on the files, even though she did not deem Premier to be her client. Id.

Without the files, and in light of Penzell's claim of lien, Premier could not refer the Florida litigation matters to successor counsel. Gleicher Aff., para. 19. Accordingly, Premier brought the instant action in Middlesex Superior Court on August 21, 2003. In its Complaint, Premier asserted causes of action in conversion and for violation of M.G.L. c.93A. Penzell subsequently removed the action to this Court.

In late 2004, Premier learned that inventory attorneys had been involved in winding down the affairs of the Penzell

Law Firm.  Premier accordingly made demand upon Mr. Rones
and Ms. Noe for return of the Premier files.  Ms. Noe (and,
later, Mr. Rones) sought "guidance" from the 11th Judicial
Circuit Court, Miami-Dade County, Florida.  In her Motion in
that Court, Ms. Noe referred to Premier's demand; stated,
"because there was no completed collection on these cases,
there is an attorney's lien on each file by Kris E. Penzell,
P.A."; and sought "direction" from the Court.  In its "Order
Providing Direction" dated December 10, 2004,  the Court
ordered copies of the files returned to Premier, without
prejudice to Penzell's pending claims for fees.

    After receiving the files in December 2004, Premier
determined that Penzell's years of keeping them from Premier
had damaged Premier's interests by diminishing the value of
the Florida judgments.  In several instances, for example,
judgments would have been paid but for Premier's inability
to engage new counsel to represent it and deal with debtors
and their counsel.  Affidavit of Richard Storfer In
Opposition to Motion For Summary Judgment ("Storfer Aff."),
para.

    The files Penzell returned in December, 2004, contained
approximately 12 copies of the 1998 Agreement.  Gleicher
Aff., para. 24.  In addition, the files held numerous
documents to which Premier had not had access, including
letters in several matters from Mr. Rones in which he

advised BofA that he was suspending further collection activity in the matters.  Id.

More documents material to this action were to come. On September 24, 2007, Premier learned for the first time that the 1998 Agreement—in every previous Penzell communication and District Court filing, the document she insisted was controlling-had been superceded by a "Settlement Agreement and General Release" dated December 6, 1999, between BofA and "Kris Penzell, P.A. and Kris Penzell, individually" ("1999 Agreement").  Corrigan Aff. Ex. A, Penzell Dep. Ex. 4.  In it (see discussion infra), Kris E. Penzell released the very claims for payment which his Personal Representative made the basis of her retaining lien and continues to assert as a counterclaim in this case.

Penzell testified that she used the 1999 Agreement extensively in her work at her husband's firm.  Morrissey Aff., Ex. A, Penzell Dep. at 136.

In light of this eleventh-hour disclosure, Premier moved to amend its Complaint to add claims for breach of contract and negligent and intentional misrepresentation. The motion is sub judice.

ARGUMENT

In her motion, Penzell contends that there is no triable issue of material fact and she is entitled to judgment as a matter of law with respect to each element of

8

Premier's conversion and M.G.L. c.93A claims.  (She ignores altogether Premier's proposed new contract and tort claims in its motion to amend.)  Numerous disputed issues of material fact, and triable issues, with respect to each element of each cause of action Premier has asserted and proposes to assert, preclude entry of judgment in her favor.

    A.  Her Claimed "Lien" Baseless, Penzell Wrongfully Kept the Florida Litigation Matter Files From Premier.

    "An attorney's retaining line on a client's papers and files is a possessory lien that the attorney holds until the fee has been paid or until adequate security for payment has been posted.  Derived from the common law, the existence of the lien does not depend on any agreement between the lawyer and the client.  The Flash, 277 F. 25, 29 (2d Cir. 1921) (retaining lien 'established on general principles of justice') . . .  A retaining lien is a passive one: it . . . rests wholly upon the right to retain possession until the bill is paid.  The pressure exerted by a retaining lien is directly proportional to the client's need and desire for the things in the attorney's possession."  Andrew Hall & Asso. v. Ghanem, 679 So2d 60, 61-62 (Fla. App. 4 Dist. 1996) (citations omitted).  "The retaining lien covers the balance due for all legal work done for the client."  JLA Invest. Corp. v. Colony Ins. Co., 922 So.2d 249, 251 (Fla. App. 2 Dist. 2006) (emphasis added).

However, "[t]he right of an attorney to retain the 'papers, money, securities and other property' . . . in the lawyer's possession, is not unlimited.  If the attorney retains funds in excess of what he is subsequently determined to be entitled to, he may be liable for a wrongful conversion."  <u>Daniel Mones, P.A.</u> v. <u>Smith</u>, 486 So.2d 559, 564 (Fla. 1986) (Boyd, C.J., dissenting) (citations omitted); <u>see also</u> <u>Adams, George, Lee, Schulte & Ward</u> v. <u>Westinghouse</u>, 597 F.2d 570, 573 (5th Cir. 1979) (attorney's improper assertion of retaining lien "<u>would be a conversion by the lawyer of property belonging to his client</u>") (emphasis added).

Penzell largely ignores the 1999 Agreement in her motion, and understandably: it vitiates her entitlement to a retaining lien.  First, under it Penzell releases BofA from, <u>inter</u> <u>alia</u>, "all claims, demands, causes of action, expenses, including, but not limited to reasonable attorney's fees and disbursements Penzell has sustained or may hereinafter sustain, which relate to" the Florida litigation matters.

Penzell concedes that the 1999 Agreement covers "18 of the 19 judgments at issue in this case" {Penzell Memorandum of Law at 4).  Further, <u>all</u> of the moneys she demands from Premier (except for the Arroyave "settlement", discussed below) related to work done for BofA and/or BofA's

predecessors, as she conceded at her deposition.  Morrissey
Aff., Ex. A, Penzell Dep. at 123.  At no point, Penzell
insisted, was Premier a client of her late husband's firm.
Id. at 98.  Plainly, under Andrew Hall & Asso. and related
cases, Penzell cannot lawfully claim that Premier owes her
money, and accordingly was not entitled to assert a
retaining lien over the files in the Florida Litigation
Matters.

Second, Penzell's alleged lien was baseless because she
ignored the 1999 Agreement's termination provisions.  The
latter required her to settle accounts quickly with BofA.
Penzell acknowledges that the 1999 Agreement terminated in
2001.  Morrissey Aff., Ex. C, Penzell Answers to
Interrogatories at 13.

Section VI(D) of the 1999 Agreement required Penzell
"upon termination" to "provide [BofA] with a written invoice
for each terminated Matter showing the number of hours
expended on each terminated Matter at the hourly rate of
$110.00 per hour," unless BofA elected otherwise, or a
payment agreement was in place with a judgment debtor at
termination.

Penzell took no such action vis-à-vis BofA.  She
submitted no invoices, nor did she make a claim of any kind
with the BofA for moneys allegedly owed.  Indeed, Penzell
submitted no bill to Premier (or BofA) between October,

2001, and March, 2005.  Under the 1999 Agreement, Penzell's
remedy, if any, involved BofA and not Premier.  For this
reason, too, her assertion of a retaining lien on the files
was unlawful. [1]

Finally, Penzell asserts a retaining lien in the
Arroyave matter.  Arroyave involved a Florida state court
judgment obtained by Kris E. Penzell.  Arroyave subsequently
filed for bankruptcy protection.  Section II(D) of the 1999
Agreement provides: "[I]f a debtor files for bankruptcy
protection, the Attorney will immediately notify [BofA] in
writing and will thereafter file a Notice of Appearance."
Section II(D) also required the Penzell Law Firm to file a
Proof of Claim and "Motion For Relief From Stay".

Penzell and her firm did none of these things.  Indeed,
Premier quickly determined that the Penzell Law Firm was not
competent to represent it in bankruptcy, and thus hired an
attorney whom it paid on an hourly basis.  Gleicher Aff.,
para. 11.  (That attorney entered into a partial settlement
of Premier's judgment claim.  Id.)

There is, at a bare minimum, a disputed issue of
material fact regarding whether Penzell was entitled to
assert a retaining lien on the Premier files.

---

[1]  By asserting a counterclaim in this action, Penzell also forewent as a matter of law any
entitlement she may have had to a retaining lien on the Premier litigation matters.  See
Fingar v. Brown & May Realty, Inc., 807 So.2d 202 (Fla. App. 4 Dist. 2002), cited in
Foreman  v. Behr, 866 So.2d 705 (Fla. App. 2 Dist. 2003).

B.   Under its Loan Sale Agreement with BofA, Premier Owned, and Penzell Should Have Yielded, the Files in the Florida Litigation Matters.

Penzell relies on Dowda and Fields, P.A. v. Cobb, 452 So.2d 1140 (Fla. App. 5 Dist. 1984) for the notion that Penzell could retain the Premier files because Premier was not its client.  Dowda is inapposite, for two reasons. First, the court found the defendant attorney had valid possessory and charging liens on the contents of his client's files.  As discussed supra, Penzell had no such valid lien(s).

Second, Penzell's analysis ignores the BofA-Premier Loan Sale Agreement of September, 2001, in which Premier purchased all right, title and interest in the Florida litigation matters from BofA.  There is a disputed, material issue of fact and law concerning the effect of the Loan Sale Agreement.  Finally, this is especially true given Penzell's concession that the Loan Sale Agreement terminated the Penzell Law Firm's agreement with BofA.

Section VII of the 1999 (and 1998) Agreement states in part: "[I]f this Agreement is terminated as set forth above, the Attorney [i.e., Penzell] shall return all original files and documents to Bank along with a complete set of all pleadings filed in the case within thirty" days of termination.  By Penzell's admission during her deposition,

she took no action of any kind after the 1999 Agreement was
terminated (as she admits) by the BofA-Premier sale.

   At a minimum, there are triable issues of material fact
regarding the effect of the Loan Sale Agreement, and of the
1999 Agreement's termination, upon Penzell's claim of
ownership of the files.  Premier has contended all such
files belong to it, and expects to prevail on this issue at
trial.

   C.  There Are Disputed Issues of Material Fact, and
Ample Issues For Trial, Respecting Premier's Damages Claims.

   Premier's damages claim, undisputedly, concerns post-
judgment collection.  Penzell relies in her motion upon the
testimony of her expert, Jerald A. Freshman, to defeat
Premier's claims.  Premier has engaged an expert of its own,
Richard A. Storfer.

   Mr. Freshman does no work in the field of post-judgment
collection.  See generally Morrissey Aff., Ex. B, Freshman
Dep. (qualifications of Mr. Freshman).  In contrast, Mr.
Storfer specializes in this area of practice.  Storfer Aff.,
para. 2.

   Mr. Storfer shall testify that Penzell's inaction
during the period 2001-December, 2004, impaired the value of
the Florida judgments at issue in this case.  For purposes
of Premier's Rule 56(e) Opposition, Mr. Storfer's Affidavit
focuses on judgments in which debtors owned real estate, and

14

sold or refinanced such realty during the period in which
Penzell retained the files and prevented collection action.
In his experience in the post-judgment collection field, Mr.
Storfer asserts that judgments are paid in full, even on
realty subject to homestead exemption under Florida law, at
least 95 per cent of the time.  Storfer Aff., para. 5.  The
aggregate amount of Premier's damages respecting this
smaller group of judgments is $506,330.92.  Id., para. 14.

At trial, Premier will show to a substantial certainty
that Penzell's conversion of the Florida litigation matters,
conduct based on her groundless claim of lien(s),
substantially damaged Premier.

D.  Premier's Claims Under M.G.L. c.93A Involve Triable
Issues, and Cannot Be Resolved Under Rule 56.

Penzell focuses much of her argument here on
jurisdictional issues which this Court fully and fairly
adjudicated in denying Penzell's Motion to Dismiss For Lack
of Personal Jurisdiction.  Premier will not rehearse those
arguments here, except to note that Penzell directed
numerous communications to Massachusetts in 2001-2003 which
were unfair and deceptive (if not indeed fraudulent).  The
factual record, as summarized supra, is replete with such
communications.

Perhaps the most significant such communication
occurred in January, 2002, when Penzell faxed to Premier the

15

1998 Agreement, claiming it supported her retaining and charging liens on the Florida litigation matters and files. Over five years later, Penzell belatedly produced the 1999 Agreement, under which the Penzell Law Firm had released the very claims Penzell for years asserted against Premier to justify her claim of lien(s).

Penzell's conduct surrounding the 1999 Agreement is but one instance of unfair and deceptive conduct. Another concerns Penzell's acknowledgement that the BofA-Premier Loan Sale Agreement terminated BofA's agreement with Penzell- even as she took no action following such termination with respect to fee settlement or return of BofA files and property, as the 1999 Agreement required. Indeed, had Penzell simply performed under the 1999 Agreement, the entire Premier-Penzell dispute would never have arisen.

Still a third instance involves Penzell's claim for fees. Here, she has been a moving target: initially claiming in January, 2002, to be owed 30 per cent of any future recovery; later shifting to demand fees incurred by Kris E. Penzell for Premier's predecessors; and failing, until the egregiously late date of March, 2005, to account for what she claims to be owed. If Penzell had been candid and clear from the beginning, and if, again, she had complied with the 1999 Agreement's termination provisions, this dispute would never have occurred.

Premier's c.93A claim is singularly ill-suited for summary disposition.

CONCLUSION

For all of these reasons, Premier requests that the Court deny Penzell's Rule 56 Motion in its entirety so that this matter may proceed to trial.

PREMIER CAPITAL, LLC

By its attorney,

/s/Thomas James Morrissey
Thomas James Morrissey
BBO# 547077
164 Strathmore Rd., Suite 25
Post Office Box 1336
Brookline, MA 02446
Dated: November 14, 2007    Tel.: (617) 787-3434