UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PREMIER CAPITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 03-CV-12497-NG |
| | ) | |
| BEVERLY JOHNSON PENZELL, d/b/a | ) | |
| Law Office of Kris E. Penzell, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

AFFIDAVIT OF THOMAS JAMES MORRISSEY IN SUPPORT OF
PLAINTIFF/DEFENDANT-IN-COUNTERCLAIM
PREMIER CAPITAL, LLC'S OPPOSITION TO
DEFENDANT BEVERLY JOHNSON PENZELL'S
MOTION FOR SUMMARY JUDGMENT

MIDDLESEX, ss:

I, THOMAS JAMES MORRISSEY, being duly sworn, do hereby
depose and state that:

1.    I am counsel of record for plaintiff/defendant-in-
counterclaim Premier Capital, LLC ("Premier"), and make this
Affidavit in order to place before the Court the below-
referenced transcripts of deposition testimony, and other
documents, in connection with Premier's Opposition to the
Motion For Summary Judgment of defendant Beverly Johnson
Penzell ("Penzell").

2.    Exhibit A consists of excerpts from the Deposition
of defendant Beverly Johnson Penzell, conducted September
25-26, 2007.

3.    Exhibit B consists of excerpts from the Deposition
of Penzell's expert witness, Jerald A. Freshman, Esq.

4.   Exhibit C consists of portions of "Defendant and Plaintiff-In-Counterclaim Beverly Johnson Penzell's Answers to Premier Capital, LLC's First Set of Interrogatories To Penzell as Personal Representative of the Estate of Kris E. Penzell".

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY this 14th day of November, 2007.

/s/Thomas James Morrissey
Thomas James Morrissey, as
Counsel of Record,
Premier Capital, LLC
BBO# 547077

*Exhibit A*

1    Q.    Any contact with the client, for example?

2    A.    Absolutely.  I knew them.

3    Q.    Any billing-related work?

4          MR. CORRIGAN:  Objection, form.  What do

5    you mean by billing-related work?

6    Q.    As part of your support work, were you

7    engaged in activity involving having the firm paid for

8    its work, as part of your support work?

9    A.    Yes, sir, in an administrative and

10   secretarial role I did whatever the inventory attorney

11   needed me to do.

12   Q.    And that might include billing-related

13   matters?

14   A.    Yes, sir.

15   Q.    Anything else by way of support work in

16   general terms?

17   A.    Answering the telephones, making calls.  I

18   don't know what else.

19         MR. CORRIGAN:  Tom, can we take two minutes

20   here?

21         (Short break)

22   Q.    Was the support work that you have

23   described that you did for Boatman done under the

24   auspices of Penzell & Associates Inc.?

25   A.    No, sir.

```
1           Q.      What sort of files did you throw out?
2           A.      Old files.
3           Q.      How old?
4           A.      Closed files.
5           Q.      When you say "old files," what do you mean?
6           A.      Old closed files that had been, you know,
7    from the seventies.
8           Q.      Anything else?
9           A.      I can't remember, sir.
10          Q.      Was there some -- did that involve
11   notifying clients whose work was in the files?
12          A.      Yes, sir.
13          Q.      How did you do that?
14          A.      I called them.
15          Q.      What was the purpose of the call?
16          A.      To make sure that it was all right if I
17   could throw them out and/or maybe there was some by
18   letters, people that -- certain files that had to do with
19   real estate matters, purchase and sale of, you know, of a
20   home or business or something that just may have had a,
21   you know, something that they might need.  The inventory
22   attorneys, you know, depending on what they thought I
23   should do I brought to their attention what we found and
24   I returned some files to people, you know.
25          Q.      What sort of files did you return?
```

1    A.    People who had bought a house thought maybe

2  they would need my husband's file on their home when they

3  sold it again.

4    Q.    Real estate transactions?

5    A.    Yes.

6    Q.    Apart from that, any other files that were

7  returned?

8    A.    I think there could have been one that was

9  a -- somebody was an original piece of work of writing, a

10  script for a movie.  I didn't think I should throw it

11  away.

12    Q.    Any others that you can recall having

13  returned?

14    A.    I don't recall anything further.

15    Q.    What sort of file materials did you throw

16  out?  Did they include judgments?

17    MR. CORRIGAN:  Objection, form.  Are you

18    asking what she personally did or what the office

19    did?

20    Q.    Well, as part of this process in which you

21  were involved that led to the disposal of files, did

22  those file materials include such things as court

23  documents?

24    A.    My husband's legal files would have court

25  documents in there, yes, sir, pleadings, and we threw out

1          A.    Yes, sir.

2          Q.    Moving now to paragraph 15 of the

3    affidavit.

4          A.    Uh-huh.

5          Q.    If you don't mind, I will read it for you.

6          A.    Sure.

7          Q.    "In October 2001, parentheses, a year and a

8    half after my husband's death, closed parentheses, I

9    learned that certain accounts of Bank of America,

10   including certain collection accounts formerly handled by

11   my husband's firm were sold to Premier Capital, LLC,

12   Premier Capital, a company incorporated in Delaware and

13   headquartered in Massachusetts."

14              How did you learn of such sale?

15         A.    How did I learn of such sale?

16         Q.    Right.

17         A.    I would get a call from the bank every once

18   in a while to identify that a certain file was sold.

19         Q.    And did such a call occur with respect to

20   the transaction that you refer to in paragraph 15 between

21   Bank of America and Premier Capital?

22         A.    I am sorry, say that again.  What's the

23   question?

24         Q.    Did such a phone call occur in October 2001

25   with Bank of America --

82

1      A.    Yes, I don't remember the ---

2      Q.    -- as to the transaction involving Bank of

3  America and Premier?

4      A.    It would be different times that I would

5  hear about a certain file or another.

6      Q.    Well, I guess the question has to do

7  specifically with the transaction you refer to in

8  paragraph 15 of your affidavit, that is to say, the sale

9  of certain accounts of Bank of America, as you phrase it,

10  from Bank of America to Premier Capital.

11      A.    Right, uh-huh.

12      Q.    How did you learn about it?

13      A.    I got a phone call from the bank.

14      Q.    Did that occur in October of 2001?

15      A.    I believe so, yes.

16      Q.    And who from the bank contacted you?

17      A.    One of the officers of the bank.  I don't

18  remember.

19      Q.    What did the bank officer say?

20      A.    Pardon?

21      Q.    What did he or she say?

22      A.    That there was a sale.

23      Q.    Did the bank officer identify who the

24  purchaser was?

25      A.    I think there were -- there was more than

1    I understand your testimony, the sole basis for your

2    having learned that was the phone call that you have

3    described?

4        A.    Yes.  Yes, sir.

5        Q.    What, if anything, did you do subsequent to

6    that call with regard to the collection accounts that you

7    were told had been sold?

8        A.    I didn't do anything.  I waited.

9        Q.    What did you wait for?

10       A.    I waited for -- I didn't do anything.  I

11   just took the information and, okay, now I will see what

12   life's going to bring next.  I didn't know.

13       Q.    Did you have any conversation with anyone

14   about this phone call with the bank?

15       A.    I don't remember.

16       Q.    Did you speak with Mr. Rones about it?

17       A.    I don't remember.

18       Q.    Did you communicate in writing with Bank of

19   America at any point in time regarding the sale referred

20   to in paragraph 15?

21       A.    I don't believe so.

22       Q.    Did you, again, subsequent to October 2001

23   -- or strike that.

24              In October of 2001, but subsequent to this

25   telephone call, did you initiate any contact with the

1    purchaser?

2        A.    No.

3        Q.    Why not?

4        A.    I wouldn't have known where to find them.

5        Q.    Because their headquarters in Massachusetts

6    had not been disclosed?

7        A.    This seems to me this is just a description

8    of the company rather than -- you know, I didn't know. I

9    only knew -- I think I only knew the words Premier

10   Capital. They wouldn't have said LLC or Inc. or any of

11   that. This seems like a formality of describing the

12   company. I don't know.

13       Q.    But in the telephone call it was simply

14   Premier Capital?

15       A.    I had no idea where the company was.

16       Q.    Did you undertake an effort to find that

17   out?

18       A.    No.

19       Q.    Why not?

20       A.    I was -- I don't know why.

21       Q.    Did you have any other conversation with

22   Bank of America or anyone at the bank regarding that sale

23   subsequent to the telephone call that you refer to?

24       A.    I don't believe so.

25       Q.    Do you recall communicating with Bank of

1   to the sale to Premier?

2          A.     No.

3          Q.     Why not?

4          A.     Because the attorney wasn't hired by

5   Premier Capital.

6          Q.     At some point in time after you received

7   this phone call from the bank did you form an

8   understanding as to how the sale from Bank of America to

9   Premier affected the Penzell law firm client relationship

10  with Bank of America?

11         A.     Could you repeat that again?

12         Q.     After you received the phone call from the

13  bank -- it might be a slightly different question.

14                After you received this phone call from the

15  bank in October of 2001 notifying you of the Bank of

16  America/Premier transaction, did you form an

17  understanding as to the status of the Penzell law firm's

18  relationship with Bank of America?

19                MR. CORRIGAN:  Objection, form.  As to

20         those accounts?

21         Q.     Yes, as to those accounts.

22         A.     That is what I was saying.  I didn't think

23  one thing had to do anything with the other.

24         Q.     Just as to those accounts.

25         A.     The question is did I form an understanding

1    simply those collection matters.

2         A.    All right.

3         Q.    If you had any belief or claim as to other

4    matters I'm not interested and obviously that's not what

5    we are not here to talk about.

6         A.    That is good.

7         Q.    So addressing only those matters, prior to

8    the telephone call that you testified about in October

9    of 2001, you had an understanding, did you not, that Bank

10   of America owed the Penzell Law Firm money -- is that

11   right?

12        A.    Yes, sir.

13        Q.    -- with respect to those matters --

14        A.    Yes, sir.

15        Q.    -- conveyed to Premier?

16        A.    Uh-huh.

17        Q.    And is it your testimony that certain of

18   Bank of America's predecessors also owed money at some

19   point in time for legal services performed by your

20   husband as to those accounts?

21        A.    Yes.

22        Q.    And which entities would those be?

23        A.    Well, sir, if a file came in when it was

24   Barnett Bank and while Barnett Bank still owned those

25   files, Barnett Bank owed my husband fees.

1    Q.    Did you work on a document that sets forth

2  all the money owed, claimed to be owed to the various

3  accounts as combined in one document?

4    A.    Is there one document?  I don't think so.

5  There are separate bills.

6    Q.    But you can't recall any document that sets

7  forth the amounts owed on each of the accounts?

8    A.    I don't think so.

9    Q.    Can you recall working on any such

10  document?

11    A.    If I don't think it exists then how can I

12  work on it?

13    Q.    OK.  Thank you.  Is it your belief today

14  that Premier owes money for legal services performed by

15  your husband on those accounts?

16    A.    Yes, sir.

17    Q.    I believe you testified that the basis for

18  that is that Premier's the owner of the files.  Is that

19  correct?

20    A.    Yes, sir.

21    Q.    Any other basis for your belief in that

22  regard?

23    A.    Any other basis for it?  I'd say yes.

24    Q.    What would that be?

25    A.    The basis would be that the bank told me

123

1    performed by -- any work performed by the Penzell Law

2    Firm for Premier?

3            A.    Can you repeat that?

4            Q.    Let me withdraw the question and be very

5    careful about this.  Do you claim as part of your

6    counter-claim that Premier owes the Penzell Law Firm

7    money for services, if any, provided by the Penzell Law

8    Firm for Premier after October 2001?

9            A.    No.

10                 (The document was marked for identification

11           as Plaintiff's Exhibit No. 4.)

12           Q.    Ms. Penzell, let me show you what's been

13    marked as Exhibit 4 to your deposition and ask you to

14    take a look at that.

15                 MR. SUSSMAN:  OK.

16           Q.    Going back briefly to your answers to

17    interrogatories we were discussing, what is the date of

18    your signature to those interrogatories?

19           A.    February 23, 2006.

20           Q.    And with respect to the questions that I

21    asked you regarding the answer at the bottom of page 5,

22    the contractual duty and so on, that series of

23    questions ---

24           A.    The breach occurred when Premier failed to

25    pay.

136

1    which appear, as I understand your testimony ---

2         A.    No.

3              MR. SUSSMAN:  Tom, this is the third time

4         we have said the same thing.  We are with you.  We

5         are on it.

6         A.    Old Barnett -- OK.

7         Q.    If you could take a look at Exhibit B, to

8    the best of your understanding having found this document

9    according to your testimony in 2006, is this the sole

10   page of Exhibit B?

11        A.    I believe it is, yes.  I believe there is

12   only one page.  I have seen this document a lot.

13        Q.    "This document" being Exhibit B?

14        A.    Exhibit B I know about.  I have used and

15   worked.  I was guided by this.

16        Q.    How have you used it?

17        A.    By knowing which files to work on.

18        Q.    And if those files were on the list what

19   would that mean in terms of your work?

20        A.     If the files are on the list that means

21   they are to be worked depending on the bank's and the

22   attorneys' common agreement on what nature, you know,

23   degree of aggressiveness at that particular time would

24   be.

25        Q.    What about matters not listed in Exhibit B?

140

1        Q.    OK, thanks.  At some point in time did you

2   have contact with Premier Capital after October 2001?

3        A.    Yes, sir.  I have.

4        Q.    When was the first such contact?

5        A.    It was sometime in the end of 2001.  I

6   don't have my finger on the date.  It was somewhere

7   November (indicating).

8        Q.    During that calendar year?

9        A.    In that last quarter of the year, yes,

10  November, I think, maybe early December.  It was in that

11  period of time.

12       Q.    Was that a telephone contact?

13       A.    It was a telephone call.

14       Q.    Who initiated it?

15       A.    Nick Maimonis.

16       Q.    Was it your understanding that he was with

17  Premier?

18       A.    That is what he told me.

19       Q.    What else did he say?

20       A.    He called asking for Kris Penzell and I

21  found out who he was and I told him that Kris Penzell had

22  passed away, that he was my husband, I was personal

23  representative of his estate and I was in the office

24  working with the inventory attorneys.

25       Q.    Did you convey anything else to him in that

141

1    conversation?

2         A.    Yes.   I told him that I knew that as owner

3    of the files his company owed my husband fees as I had

4    been advised by everybody, including the bank.

5         Q.    **Which bank advised you that you were owed**

6    **fees?**

7         A.    Which bank?   The only bank we are talking

8    about.

9         Q.    **Which is Barnett, NationsBank, Bank of**

10   **America?**

11        A.    Barnett wasn't in existence in 2001, sir.

12   I am not sure if it was NationsBank or Bank of America.

13   I told you I don't know when they were what, but it was

14   that bank, yes.

15        Q.    **What did Mr. Maimonis say to you?**

16        A.    It was a long time ago, but he was calling

17   about information on the files and I told him that, you

18   know, if he wanted to hire the inventory attorney he

19   could do that, fully prepared, as I had been advised by

20   Victor, to step in the shoes and continue the file and

21   protect Kris's fees, to see the file to fruition, if the

22   client wanted.   And now Premier Capital was the client

23   and I knew Victor was not going to do one moment of

24   anything on a file that he didn't have authority to work

25   on.   I mean, that was huge.

142

1    Q.    Just so I understand this, ma'am, you were
2  communicating to Mr. Maimonis about work, if any, on the
3  Premier files followed a conversation you had with Mr.
4  Rones.  Is that right?
5              MR. CORRIGAN:  Objection, form.
6              You can answer if you understand.
7    A.    I -- yes.  I had conversations with Mr.
8  Rones that if a file was being sold he wasn't going to
9  work the file anymore.
10    Q.    Anything else that you can recall having
11  been discussed by either yourself or Mr. Maimonis in this
12  conversation?
13    A.    I told him -- I'm not sure if it was that
14  conversation or one soon after -- that the fees were
15  30 percent.
16    Q.    And by fee, do you mean contingency fee?
17    A.    Contingency fees, yes.
18    Q.    That 30 percent would apply in the event
19  Premier engaged the Penzell Law Firm?
20    A.    That was if any collection occurred on
21  those files that my husband -- it was a liability that
22  owed him 30 percent on whatever money was collected on
23  those files.
24    Q.    What was the basis of that position?
25    A.    The basis of what?

143

1    Q.    That position by you that if any collection

2  occurred.

3    A.    It was very common knowledge of how things

4  worked in my husband's office when he was alive and

5  after.  Nothing changed.

6    Q.    Was there ---

7    A.    And this fee agreement that we are talking

8  about, the 1999 fee agreement, is the one that I was told

9  by Bank of America after my husband passed was the

10  operative agreement and that's the agreement I knew

11  about, the agreement I saw.  It is the agreement I knew

12  the lawyers were looking at.  This is the agreement that

13  operated on all his files.

14           MR. CORRIGAN:  You meant the 1998

15       agreement?

16           THE WITNESS:  The 1998 agreement.

17           MR. CORRIGAN:  The '98 agreement?

18           THE WITNESS:  The 1998, December 23, 1998,

19       Noe 2, Rones 3 exhibit.

20           MR. CORRIGAN:  You said '99 agreement.

21           THE WITNESS:  I am so sorry.  Thank you for

22       that.  The 1998 agreement.  I don't want to

23       confuse matters.  It is very clear for me.

24  BY MR. MORRISSEY:

25    Q.    And was your message to Mr. Maimonis in

144

1    this conversation that that 30 percent would apply to any

2    subsequent recovery on the files at any point in time

3    after your call with him?

4         A.    Yes.

5         Q.    So this would apply prospectively, was your

6    understanding, right, that 30 percent would apply to

7    future recoveries, if any?

8         A.    Yes.

9         Q.    And I believe -- anything else that you can

10   recall from that initial call?

11        A.    The initial phone call?

12        Q.    Yes.

13        A.    I don't think I recall anything more.

14        Q.    And I believe you stated that there was in

15   fairly short order another phone call?

16        A.    There were a lot of phone calls from Nick

17   Maimonis.

18        Q.    Let's stick with the period, to use your

19   framework, in late 2001, the last quarter of 2001 was

20   that call that you just testified about.

21        A.    Uh-huh.

22        Q.    Were there other phone calls?

23        A.    There could have been one or two, probably

24   a couple more phone calls probably, you know, maybe

25   around five, if I had to guess.  I don't know if there is

1          A.    Well, sure.

2          Q.    **What was the gist of what he was telling**

3  **you?**

4          A.    I remember particularly that he called me

5  on January 11th, 2002 and he said, "Could you fax me the

6  Arroyave judgments and the fee agreement?"

7                So I went to Denise and I said, "There are

8  two judgments on Arroyave?"  I mean, I didn't know that.

9  I knew of one of them.  So she pulled them out and in

10 10 minutes I faxed it to him, the fee agreement, this

11 1998 fee agreement.

12         Q.    **That was the agreement you faxed him?**

13         A.    Two Noe and 3 Rones, right, and the two

14 judgments on Arroyave.

15         Q.    **Did he say why he needed those materials?**

16         A.    He was really kind of -- he must have

17 called me before that because he called and said send me

18 those and I said OK and I went and got them and sent them

19 to him, faxed it to him.

20         Q.    **Any other discussion at that point in time**

21 **on January 11th, 2002 about Arroyave or was that the gist**

22 **of it?**

23         A.    That was really the gist of it.

24         Q.    **And you, in fact, sent those documents to**

25 **him?**

232

1          A.    It is two e-mail messages from Nick
2    Maimonis to me.
3          Q.    **I stand corrected, you are right.**
4                **And they are on different dates.  Is that**
5    **correct?**
6          A.    Yes, one is April 8, 2003 and the other is
7    April 17, 2003.  And I didn't have a computer at that
8    time.  I didn't know this came in, and I certainly
9    couldn't download anything.  I didn't know how to do
10   that, have the capability of it.
11         Q.    **Do you recall having received via e-mail**
12   **from Mr. Maimonis a purported draft fee agreement?**
13         A.    Yes, he did.  It was soon after this I
14   think we were able to get it.
15         Q.    **When you say soon after that, do you mean**
16   **the rough time frame of April of 2003?**
17         A.    I believe so.
18         Q.    **Do you recall having reviewed that document**
19   **when you received it?**
20         A.    I gave it to Ms. Noe to look at.  I read
21   it.
22         Q.    **You read it?**
23         A.    I did read it after she had it.
24               MR. CORRIGAN:  So we are clear, there is a
25         document in front of her.  That's not the document

233

1          we are talking about.

2                THE WITNESS:  This is empty.  There is no

3          attachment to it.

4                MR. SUSSMAN:  It references a fee

5          agreement.

6                MR. MORRISSEY:  It references a fee

7          agreement and I asked her whether she had received

8          a purported fee agreement and you said you had.

9                THE WITNESS:  Yes, sometime after that.

10    BY MR. MORRISSEY:

11         Q.    And you shared that with Ms. Noe?

12         A.    Absolutely.  She is the attorney.

13         Q.    And you read it yourself?

14         A.    I did read it.

15         Q.    Did you have a discussion with Ms. Noe

16    about it?

17         A.    Yes.  She was livid.  She was upset.

18         Q.    Why so?

19         A.    Because it was insulting.  It didn't have

20    any -- it just required her to file reports and guarantee

21    how much money the attorney was going to collect for

22    Premier Capital before she took a deposition.  It was

23    absurd.

24         Q.    When you use the word "it," are you

25    referring to this draft that you received?

234

1        A.    This fee agreement.  Premier Capital had a

2    form retainer agreement he was supposed to be sending the

3    attorney and this is what she got.

4        Q.    **She made these remarks to you?**

5        A.    Absolutely.

6        Q.    **And did she say anything else about it?**

7        A.    She wouldn't work for you.

8        Q.    **By "you," who do you mean?**

9        A.    Susan Noe, based on that agreement, she

10   would not work for Premier Capital.

11       Q.    **Just so you know when you use you, I**

12   **thought you meant me.**

13       A.    I am so sorry.  I apologize.

14             MR. MORRISSEY:  Off the record.

15             (Discussion off the record)

16   BY MR. MORRISSEY:

17       Q.    **Did you ever communicate with Mr. Maimonis**

18   **about your and Ms. Noe's review of the draft agreement?**

19       A.    I believe so.

20       Q.    **When did you do so?**

21       A.    I don't remember.  I believe it was a phone

22   call and I told him that she wasn't going to work under

23   that agreement.

24       Q.    **Was it roughly in that April 2003 time**

25   **period?**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CASE NO. C.A. 03-CV-12497

PREMIER CAPITAL, LLC,

                    Plaintiff,

        -vs-

BEVERLY JOHNSON PENZELL, d/b/a
Law Office of Kris E. Penzell
and BEVERLY JOHNSON PENZELL, as
Personal Representative of the
Estate of Kris E. Penzell,

                    Defendants.
_____/

            DEPOSITION OF JERALD A. FRESHMAN


            Thursday, September 27, 2007
              10:09 a.m. - 1:00 p.m.

        9155 S. Dadeland Blvd., Suite 1014
              Miami, Florida 33156



Reported By:
MARGARET PHILLIPS, Court Reporter
Notary Public, State of Florida
Klein, Bury, Reif, Applebaum & Associates
Miami Office
Phone - (305) 373.8404

1    APPEARANCES:

2        On behalf of the Plaintiff:
         THOMAS JAMES MORRISSEY, Esquire
3        164 STRATMORE ROAD, SUITE 25
         P. O. BOX 1336
4        BROOKLINE, MASSACHUSETTS 02446
         617-787-3434

5
         On behalf of the Defendants:
6        JOSEPH W. CORRIGAN, Esquire
         POSTERNAK BLANKSTEIN & LUND
7        800 BOYLESTON STREET
         PRUDENTIAL TOWER
8        BOSTON, MASSACHUSETTS 02199
         617-973-6151

9

10   ALSO PRESENT

11       Beverly Penzell

12                        -   -   -

13

14                     I N D E X

     Jerome A. Freshman. . . . . . . . . . . . . . 3
15

16

17   Plaintiff's Exhibit 1. . . . . . . . . . . . .3

18   Plaintiff's Exhibit 2. . . . . . . . . . . 17

19   Plaintiff's Exhibit 3. . . . . . . . . . . 78

20

21

22

23

24

25

1        Deposition taken before MARGARET PHILLIPS,

2   Court Reporter and Notary Public in and for the State of

3   Florida at Large, in the above cause.

4                        -  -  -

5   Thereupon,

6                   JERALD A. FRESHMAN,

7   having been first duly sworn or affirmed, was examined

8   and testified as follows:

9           MR. MORRISSEY:  Joe, before we get going I

10          have with me for marking a copy of Mr. Freshman's

11          report that's derived from the fax version I have

12          got.  Do you have an objection?

13          MR. CORRIGAN:  I have a better version if

14          you want.

15          MR. MORRISSEY:  If you have a better

16          version that would be better.

17          (The document referred to was marked for

18          identification as Plaintiff's Exhibit No. 1.)

19          MR. MORRISSEY:  Stipulations, Joe?

20          MR. CORRIGAN:  I think we can do the usual

21          stipulations.

22                   DIRECT EXAMINATION

23   BY MR. MORRISSEY:

24      Q.   **Sir, can you state your full name?**

25      A.   Jerald, J-e-r-a-l-d, A. Freshman.

4

1    Q.    And your address, sir?

2    A.    My professional address is 9155 South

3 Dadeland Boulevard, Suite 1014, Miami, Florida, 33156.

4    Q.    Showing you what's been marked as

5 Exhibit 1, sir, which I will represent to you is the most

6 recent iteration of the notice of deposition, I will ask

7 you if you have seen that before?

8    A.    Yes.

9    Q.    Is that, in fact, the notice of deposition

10 sent to you regarding your testimony here today?

11    A.    Yes, it is.

12    Q.    You are, in fact, here to give deposition

13 testimony.  Is that correct?

14    A.    That is correct.

15    Q.    In what capacity are you testifying today?

16    A.    I am testifying as an expert on behalf of

17 the defendants, Beverly Penzell and all other defendants

18 in this cause.

19    Q.    Are you -- there are, are there not, sir,

20 formally speaking, two defendants, Ms. Penzell in her

21 capacity as personal representative of the estate of Kris

22 E. Penzell and Ms. Penzell, individually.  Is that right?

23    A.    Yes, that's correct.

24    Q.    Are you testifying on behalf of both

25 defendants?

1      A.    I am testifying -- I would assume that my
2  testimony would cover both as set forth in my report.  I
3  am testifying as an expert in the field of debtors' and
4  creditors' rights as to whether there was any deficient
5  performance of activities, legal activities.
6          Q.    **Have you ever been deposed before, sir?**
7          A.    Yes, I have.
8          Q.    **How many times?**
9          A.    I would say half a dozen.
10         Q.    **So you are familiar with the drill?**
11         A.    Yes, I am.
12         Q.    **Have you ever testified as an expert?**
13         A.    Yes, I have.
14         Q.    **How many times?**
15         A.    I would say four or five times.
16         Q.    **Now, are those four or five occasions**
17  **included within the six occasions you mentioned a moment**
18  **ago?**
19         A.    Yes.
20         Q.    **And in what --**
21         A.    In fact, I'd correct that.  I'd say about a
22  dozen times I have testified as an expert, sir, in my
23  34-year practice.  I apologize.
24         Q.    **A dozen times?**
25         A.    Yes.

1    Q.    And that would make slightly more than a
2    dozen times total?

3    A.    I would say a dozen probably is the right
4    number over 34 years or so. I don't really think about
5    how many times I have testified, but looking at it
6    probably a dozen.

7    Q.    Regarding what issues have you testified
8    previously as an expert?

9    A.    I have testified in the area of lender
10   liability, area of attorneys' fees and commercial
11   disputes.   Those are the cases, more in the field of
12   financial creditors' rights is really my focus so that
13   would be the area.

14   Q.    And generally speaking, when you refer to
15   lender liability, what do you mean?

16   A.    I have represented or I have been retained
17   by lending institutions when they have been sued for
18   breach of duties of good faith, failure to fund on loan
19   commitments, you know, those types of cases, failure to
20   exercise good faith in connection with lending practices,
21   those kinds of cases, often been retained by lending
22   institutions.

23   Q.    And, again, generally speaking, when you
24   have testified about issues concerning attorneys' fees
25   what has that involved?

1   A.    Commercial disputes where there was an

2  issue about attorneys' fees.  I would testify sometimes

3  on behalf of the plaintiff and sometimes on behalf of the

4  defendants with regard to attorneys' fees.

5   **Q.    And would those issues concerning**

6  **attorneys' fees include, for example, the reasonableness**

7  **of attorneys' fees?**

8   A.    That's correct.  The reasonableness --

9  there would be entitlement and then if you get to the

10  issue of entitlement you get to the reasonableness of the

11  fee, so I have been retained as an expert in both of

12  those areas.

13   **Q.    And in dealing with issues of attorneys'**

14  **fees have you dealt with attorneys' fees as it relates to**

15  **cost of collection on behalf of a lender, for example?**

16   A.    I don't know if I understand your question.

17  I am sorry.

18   **Q.    How about -- I will ask you another.**

19   **Have you ever had occasion to testify**

20  **regarding attorneys' fees as an expert where there is a**

21  **claim of a lien involved?**

22   A.    As an expert on a claim of lien involved.

23  I testified as an expert in the case of a mortgage lien,

24  and liens include -- I don't mean to be too broad --

25  workers' compensation liens, construction liens and

1    mortgage liens.  So I have testified in connection with

2    mortgage liens.

3        Q.    How about retaining liens asserted by

4    attorneys?

5        A.    No.  No, I have not.

6        Q.    Have you ever been employed by either of

7    the defendants in this case before?

8        A.    Before this case, no.

9        Q.    As an expert?

10        A.    No.

11        Q.    How about in any other capacity?

12        A.    No.

13        Q.    Could you state, sir, your educational

14    background beginning with college?

15        A.    Sure.  I was a business major, graduated

16    from George Washington University.  I went to the

17    University of Miami law school and graduated in 1973 cum

18    laud, and I have been practicing law, admitted to the

19    Florida Bar and the Federal Bar since 1973.

20        Q.    Any other state Bars apart from Florida?

21        A.    No.

22        Q.    Have you been engaged in the practice of

23    law continuously since 1973?

24        A.    Yes.

25        Q.    You stated that you were admitted to

1   various federal courts.  Which ones?

2        A.    The Southern District.

3        Q.    Of Florida?

4        A.    Florida, yes, and that's the only one I am

5   admitted to.

6        Q.    Have you had occasion over the years to

7   participate in any continuing legal education programs?

8        A.    Yes, I have.

9        Q.    Can you describe that generally?

10       A.    Well, I have actually authored and lectured

11  for the Florida Bar in the area of debtors' and

12  creditors' rights here in Florida on three occasions, in

13  1979, 1981 and 1988 or '89, where I specifically wrote on

14  the topic of debtors' and creditors rights in Florida.

15       Q.    What form did this writing take?

16       A.    It was actually a book, continuing

17  education rights book.  I wrote a chapter in each of

18  those books.

19       Q.    Do you know who the publisher was?

20       A.    I have one of the books.  I can bring it

21  in.  I don't know.

22       Q.    I would be interested in taking a look at

23  it.

24       A.    If you have a second I can bring it in.

25       Q.    Sure.  Why don't you bring it in?

1              (Short break)

2              THE WITNESS:  Chapter 2 is my chapter.

3         Q.    Mr. Freshman, we are not going to mark the

4    tome that you have handed to me but it is entitled Basic

5    Debtors' and Creditors' Rights in Florida, is it not?

6         A.    That is correct.

7         Q.    And it contains several chapters, one of

8    which appears to be at least co-authored by you?

9         A.    Correct.

10        Q.    And it pertains to available remedies?

11        A.    That is correct.

12        Q.    Generally speaking, what were you writing

13   about in this chapter?

14        A.    Notes, invoices, garnishments, attachments,

15   equitable liens, self-help repossessions, bank's rights

16   to set-off, exemptions to garnishments and rights of

17   debtors, unfair collection tactics.  I think the chapter

18   is more than 120 pages, so there were a host of things

19   that I wrote about.

20        Q.    Including post-judgment remedies?

21        A.    Let's see.  No.  This did not include post-

22   judgment.  There was another chapter by somebody else on

23   post-judgments.

24        Q.    OK.  Fair enough.  In the same book?

25        A.    In the same book.

1    Q.    And you mentioned you had lectured on the

2    subject of creditors' rights?

3         A.    Right.   Several times in several different

4    cities.   The Florida Bar would ask people who had written

5    on their behalf to lecture and I had an opportunity to

6    lecture on debtors' and creditors' rights.

7         Q.    On several occasions?

8         A.    On several occasions.

9         Q.    What was the rough time frame of those

10   lectures?

11        A.    How long did they last?

12        Q.    No.   Just during what period of time.

13        A.    Oh, in the eighties.

14        Q.    Anything subsequent to that by way of

15   lectures on these subjects?

16        A.    No.   I figured I had done it three times, I

17   would give some of these young bucks a chance.

18             MR. CORRIGAN:   Pass the torch.

19             THE WITNESS:   Pass the torch, right.

20        Q.    Have you ever been the subject of any

21   disciplinary proceeding in your practice?

22        A.    No.

23        Q.    Has your license to practice law ever been

24   suspended?

25        A.    No.

1    Q.    Could you summarize your education,

2  beginning with law school, if you had employment during

3  your law school period?

4    A.    I was a marketing major -- I am sorry, I

5  thought you said college.  With regard to law school what

6  was your question?  I'm sorry.

7    Q.    Did you have employment during law school?

8    A.    Yes, I did.

9    Q.    What was that employment?

10   A.    In the summer of my second year I worked at

11  the public defender's office, and in the summer of my

12  senior year I worked for a commercial litigation law

13  firm, actually commercial law firm, did all varieties of

14  commercial work called, Pallot, P-a-l-l-o-t, Poppell,

15  P-o-p-p-e-l-l, Goodman, G-o-o-d-m-a-n, and Shapo,

16  S-h-a-p-o.

17   Q.    And subsequent to law school did you move

18  on to full-time legal employment?

19   A.    I did.

20   Q.    What was the first such employment?

21   A.    I worked for the firm that I had clerked

22  for.

23   Q.    That is the second firm -- the firm you

24  mentioned?

25   A.    That's correct.

1  **Q.   How long were you with them?**

2  A.   I was with them approximately three years.

3  **Q.   As an associate?**

4  A.   Correct.

5  **Q.   And did you move on to another position?**

6  A.   I formed my own firm with my brother in

7  September of 1976.  I formed with my brother.  It was

8  called Freshman, Mandel, at that time, and Freshman.

9  **Q.   How long were you practicing in that form?**

10  A.   Well, the firm -- the genesis of the firm

11  from Freshman, Mandel became Freshman, Freshman and some

12  other names, Freshman, Freshman & Michelson, Freshman,

13  Freshman and Traitz.  Now it is back to Freshman &

14  Freshman.

15       The firm had different names but the two

16  components, my brother and myself, have been practicing

17  continuously since 1976 together as a law firm.

18  **Q.   And continue to do so today?**

19  A.   That's correct.

20  **Q.   Do you have a specialization in your**

21  **practice?**

22  A.   I do.  I do commercial litigation.

23  **Q.   Could you describe that for me?**

24  A.   I represent lenders.  I represent

25  creditors.  I get involved in some construction

1  litigation, contract disputes, but the predominance of my

2  practice relates to creditors' rights representing

3  lenders predominantly or creditors.

4         Q.    By lenders do you mean banks?

5         A.    Banks.  Over the years it has been banks,

6  savings and loans.  I have done some work for the FDIC.

7  I have done some work when there was a savings & loan

8  association crisis, the RTC had retained me.  So I

9  represented a variety of lenders over the years.

10        Q.    How much work did you do for the RTC?

11        A.    Quite a bit.  I had over two or three

12 hundred cases for them.

13        Q.    What time frame?

14        A.    Back in '89, '90, '91, that area.

15        Q.    At some point did that work begin to

16 dissipate?

17        A.    Yes.  What happened is the RTC went out of

18 existence.

19        Q.    That would be one good reason for that to

20 happen.

21        A.    Yes.

22        Q.    Were you working on behalf of the FDIC

23 during the same period?

24        A.    No, it was earlier that I did work for the

25 FDIC.  It was for -- with a failed commercial bank.  The

1    RTC was predominantly failed savings and loan

2    associations.

3         Q.    Do you have any RTC cases still?

4         A.    No, those closed out back in the early

5    nineties.

6         Q.    Have you ever represented any successor in

7    interest to the RTC?

8         A.    No.

9         Q.    Apart from what you mentioned by way of

10   specialization, do you do any other work in your

11   practice?

12        A.    I would describe it as general commercial

13   litigation.  What I don't do is real estate.  I don't do

14   divorce.  I don't do criminal.  I am pretty well focused

15   on commercial litigation.

16             MR. MORRISSEY:  Off the record.

17             (Discussion off the record)

18        Q.    Are there matters where you represent

19   clients that are pending in some form of judicial

20   proceeding today?

21        A.    Oh, sure.

22        Q.    How many such matters can you estimate?

23        A.    I would say at least between 30 and 40, I

24   would think.

25        Q.    That are pending now?

1        A.    Pending litigation.

2        Q.    Are any -- included in that number, are

3   there any actions that are in the post-judgment phase?

4        A.    Post-judgment.  No.

5        Q.    Are you being compensated for your

6   activities as an expert in this case?

7        A.    Yes, I am.

8        Q.    By whom are you being paid?

9        A.    I am being paid by the insurance company.

10       Q.    Do you know what the insurance company is?

11       A.    Actually, it's through their counsel,

12   Mr. Corrigan.  I haven't had direct communications with

13   the insurance company.

14       Q.    Mr. Corrigan is not paying you?

15       A.    No.  I have gotten a check from the

16   insurance company.

17       Q.    Which insurance company?

18       A.    I can look.

19             MR. CORRIGAN:  Off the record.

20             (Discussion off the record)

21       Q.    Back on.  Is it Hanover?

22       A.    Yes.

23       Q.    Are you being paid on an hourly basis?

24       A.    I am.

25       Q.    Are you charging an hourly rate?

1     A.    I am.

2         Q.    What is that rate?

3     A.    I have to look at tell you.  I don't

4     recall.  It's $250 an hour.

5         Q.    Did that compensation include the

6     preparation of report?

7     A.    Yes, it did.

8         Q.    Do you anticipate, sir, being available to

9     testify at the trial in this action in Boston?

10    A.    Yes.

11        Q.    If we could place this before you, sir, a

12    document that has been marked as Exhibit 2.

13    A.    All right.

14            (The document referred to was marked for

15            identification as Plaintiff's Exhibit No. 2.)

16            MR. MORRISSEY:  Are these organized in any

17            particular way?

18            MR. CORRIGAN:  They are by witness.

19    A.    Yes.

20        Q.    Have you seen that before, sir?

21    A.    Yes, I have.

22        Q.    What is it?

23    A.    This is a report that I prepared in this

24    case that I am now appearing as a witness.

25        Q.    When you say "prepared," what do you mean?

1    What did you do?

2          A.     I reviewed certain documents that I

3    describe in this report and I formulated an opinion and I

4    wrote an opinion with regard to issues in the case.

5          Q.     OK.   Apart from reviewing the documents

6    that you indicated are referenced in the body of the

7    report, did you do anything else by way of preparing it?

8          A.     Sure.  I think I mentioned in the report

9    that I also researched certain pertinent law as it

10   pertains to the issues in the case.

11         Q.     Anything else?

12         A.     My reference in my letter describes all the

13   resources that I had used to rely on in preparing my

14   report.

15         Q.     Apart from counsel for defendants, did you

16   speak with anyone in regard to preparing the report?

17         A.     No.

18         Q.     Did you speak with Ms. Penzell?

19         A.     No.  For the record, the first time I met

20   Ms. Penzell was actually this morning.  I saw her in the

21   office for the depositions but I introduced myself today

22   for the first time.

23              MR. CORRIGAN:  That is my fault.  I

24         apologize.

25              THE WITNESS:  That is OK.

1    Q.    Do you know what Penzell & Associates, Inc.

2   is?

3    A.    No.

4    Q.    Have you done any work with Penzell &

5   Associates, Inc.?

6    A.    No.

7    Q.    And in preparing the report, does that

8   include writing the report?

9    A.    Yes.

10   Q.    You state, sir, from time to time or you

11  stated in your deposition that from time to time in your

12  report you refer to documents that you reviewed in

13  forming and setting forth and writing an opinion.  Right?

14   A.    Right.

15   Q.    Did you visit any courthouse to look at

16  court records in connection with the pending litigation?

17   A.    No, I didn't.

18   Q.    I take it you may have seen copies of such

19  records in various files.  Right?

20   A.    That's correct.  I did get some documents

21  that were sent to me but I did not go to the Dade County

22  courthouse to independently go through the court files.

23   Q.    Were you relying, therefore, on the

24  documents you received?

25   A.    Yes.

1     Q.    Did you perform any independent analysis of
2  the veracity of the documents you received?
3     A.    My recollection is there were some stamps
4  on certain documents that established their authenticity.
5  They weren't certified documents but they did have
6  certain stamps and markings that appeared to me to
7  establish that they were authentic documents, but I
8  didn't independently corroborate that.
9     Q.    The date of this report, sir, is 2005.  Is
10 that right?
11    A.    October 17th, 2005.
12    Q.    Have you revised your report at all since
13 that time?
14    A.    No.
15    Q.    Do the opinions as set forth in your report
16 remain your opinions today?
17    A.    Yes, they do.
18    Q.    They have not been revised in any way?
19    A.    No.
20    Q.    You have not had occasion to prepare
21 another written version of this report since that time?
22    A.    No.
23    Q.    I wonder if I could draw your attention to
24 the first paragraph on page 1 under the heading,
25 background, of the report that is Exhibit 2 to your

1    deposition.

2           A.    Uh-huh.

3           Q.    I believe you will see that the next to the

4    last sentence states, and it is fairly short so I'll

5    read, quote:  "Plaintiff's principal complaint is that

6    the defendants failed to engage in certain collection

7    activities which resulted in damage to the plaintiff."

8    Do you see that?

9           A.    Sure.

10          Q.    What is the basis of that statement?

11          A.    I will summarize that for you.  As I looked

12   at the complaint and the report of your expert, it

13   appeared that the plaintiff was complaining about the

14   failure to either re-record judgments that resulted in

15   property being resold or mortgages encumbering the

16   property or garnishment proceedings not being followed

17   such that wages that could have been available were not

18   garnished and, therefore, available to pay off all or a

19   portion of the creditors' claim.

20                So that was -- the genesis of the complaint

21   is that there was insufficient collection activities by

22   Penzell.

23          Q.    So your review of Mr. Storfer's report, if

24   I understand your testimony, caused you to form an

25   assessment of what the gravamen, as it were, of the

1   plaintiff's complaint is.  Is that right?

2        A.    I read the complaint also, but I saw that.

3   You know, my report was really geared toward the issue of

4   damages and I was essentially saying I am not giving an

5   opinion with regard to the issues of liability, but with

6   regard to the issue of damages on the occasions that are

7   described in my report, the property was exempt from

8   claims of creditors and, therefore, assuming something

9   was done wrong, which I am not assuming, but even if you

10  make that assumption, the property was exempt from the

11  claims of the plaintiff as a creditor.

12       Q.    Fair enough.  Let me show you what I

13  believe was marked yesterday at Mr. Storfer's deposition

14  as Exhibit 6 and ask if you have seen that before.

15       A.    OK.  Yes, I have seen it.

16       Q.    What is it?

17       A.    It's a complaint that was filed in the

18  Commonwealth of Massachusetts State Court, Premier

19  Capital, LLC versus Beverly Johnson Penzell, and there is

20  a style to the case.

21       Q.    I will represent to you, sir, that the

22  Commonwealth of Massachusetts has since been replaced by

23  the federal court caption because the action was removed

24  by the defendants.

25       A.    All right.

1      Q.    I believe it is also the case that the copy

2   before you lacks the exhibits, but, in any event, sir, if

3   you could move through that document to what's identified

4   as Count 1.

5      A.    Uh-huh.

6      Q.    Do you see that, sir?

7      A.    I have read the -- briefly read the

8   complaint I have.

9      Q.    That count purports to set forth a cause of

10  action in conversion.  Is that right?

11     A.    That's the title below Count 1, yes, sir.

12     Q.    As part of your work on this case as an

13  expert, did you have occasion to review the law of

14  conversion?

15     A.    With regard to my report, no, but I do --

16  the answer is no.

17     Q.    And there is also a second count, is there

18  not, sir?

19     A.    Yes.

20     Q.    And there is a Count 2 there and what

21  appears to be a statutory reference.  Is that right?

22     A.    Yes.  There's an MGLC, I saw a 93A,

23  sections two and eleven.  That's the heading below

24  Count 2.

25     Q.    Are you familiar with what that is?

1    A.    I don't know, no.  It appears to be some

2 sort of State of Massachusetts statute but I don't know.

3    **Q.    I will represent to you, sir, that it**

4 **references a Massachusetts statute that provides for a**

5 **cause of action under certain circumstances and the right**

6 **to damages.**

7         **As part of your report, did you have**

8 **occasion to review that statute and formulate an opinion**

9 **with regard to Premier's damages, if any, under it?**

10    A.    No.

11    **Q.    Thank you.  Are you aware, sir, that there**

12 **is a counter-claim in this case?**

13    A.    I have not read the counter-claim.  I am

14 aware something was filed, but I have not read what the

15 counter-claim is.

16    **Q.    Are you offering in your report or here**

17 **today, for that matter, any opinion with respect to the**

18 **counter-claim?**

19         MR. CORRIGAN:  Objection.  Form.

20    A.    I don't know what it says.  If it is within

21 the purview of what I am saying here today in my report

22 the answer would be yes.  Otherwise, no, I haven't read

23 it so I don't know what it says.

24    **Q.    So you aren't aware of the nature of the**

25 **damages in the counter-claim?**

1          A.     No.

2          Q.     Referring from time to time in your report

3     to Premier's damages, is it fair for me to conclude that

4     Premier's damages are being assessed by you completely

5     independently of the counter-claim?

6          A.     That's correct.

7          Q.     So you are not, in characterizing Premier's

8     damages, taking into account any claims by Ms. Penzell by

9     way, for example, of set-off in the counter-claim?

10         A.     No.   That is not within the scope of my

11    report.

12         Q.     Fair enough.

13                Going back, sir, to your -- I will give you

14    a moment.

15         A.     That is fine.

16         Q.     Going back to the first page of Exhibit 2,

17    your report --

18         A.     Yes.

19         Q.     -- under number four there is a reference

20    to among what you have, quote-unquote, relied on are

21    contracts between Premier and the lenders for the sale of

22    assets which were assigned to Premier --

23         A.     Right.

24         Q.     -- which are the subject of the instant

25    litigation.   What contracts are you referring to?

1      A.    That would be the contract between Premier

2  and the predecessor holders of these judgments.  I think

3  it was Barnett Bank and then Barnett Bank's successor,

4  which could have been NationsBank, it could have been

5  Bank of America.

6      **Q.    I believe the reference as I view it in my**

7  **copy is to contracts, plural.  Was it one or more than**

8  **one?  Do you recall?**

9      A.    I think there were a bundle of -- oh,

10 contracts.  I think there were more than one contract

11 that I looked at.

12     **Q.    Let me show you what was marked at**

13 **Ms. Penzell's deposition as Number 25 and ask if you have**

14 **seen that before.**

15     A.    What was your question?

16     **Q.    Have you seen that document before?**

17     A.    I don't recall specifically.  The copy I am

18 looking at is signed by the buyer and not by the seller.

19 I don't remember if it was duly executed by both or if it

20 wasn't.

21     **Q.    How about the body of that document, sir?**

22 **Do you recognize it?**

23     A.    I recognize certain provisions.

24     **Q.    OK.**

25     A.    In frankness, I don't remember all of the

1   terms.  I reviewed it more than two years ago or

2   approximately two years ago.

3        Q.    Do you recall having reviewed a contract

4   between Bank of America and Premier Capital?

5        A.    I believe that I did, yes.

6        Q.    Apart from such a contract between Premier

7   and Bank of America, any other contracts you can recall

8   reviewing for your report?

9        A.    No.  Let me give this back to you.

10       Q.    I wonder if I could place before you what

11   was marked as the fourth exhibit to Ms. Penzell's

12   deposition and ask you to take a look at that.

13       A.    I'm sorry, what was your question?

14       Q.    Have you seen that before?

15       A.    I don't recall seeing that.

16       Q.    And I will show you a third and final one,

17   sir, marked -- two depositions, Exhibit 3 to Mr. Rones'

18   and Exhibit 2 to Ms. Noe.

19       A.    I might have but I don't specifically

20   recall seeing it.

21       Q.    Thanks.  Are you familiar, sir, with

22   Florida law as it concerns the assignability of claims

23   for legal malpractice?

24       A.    Yes.

25       Q.    What's the nature of your familiarity with

1    that?

2         A.    Well, I have read what I consider to be the

3    seminal Florida Supreme Court decision on that issue

4    which is the Stern's case.

5         Q.    **That's a 1997 decision, sir, is that right?**

6    **Or, pardon me, 2007 decision?**

7         A.    Yes.  That sounds right.  Let me see if I

8    have a copy of the case with me.

9              MR. CORRIGAN:  Off the record.

10             (Discussion off the record)

11        A.    I have reviewed that case and, in my

12   opinion, that case is the seminal case that establishes

13   the law here in Florida that legal malpractice claims are

14   not assignable.

15        Q.    **Is it your understanding that Stern changes**

16   **what had been the law in that area in the State of**

17   **Florida?**

18        A.    I think it clarified it.  I think there was

19   some question.  I think under exceptional circumstances

20   there was a question whether assignments could ever occur

21   and the Supreme Court in Sterns closed the door forever,

22   in my opinion, that because there is personal services

23   and it would invade on the attorney-client relationship

24   and create a multiplicity of lawsuits that the Court felt

25   was not appropriate, a marketplace of malpractice

1    lawsuits, the Florida Supreme Court, as clear as I can

2    see a Court enunciating a rule established in this case

3    that assignments of legal malpractice is not permitted.

4         **Q.    I believe you testified earlier that your**

5    **opinions as set forth in the report marked as Exhibit 2**

6    **have not changed since 2005.**

7         A.    Correct.

8         **Q.    In any way -- does Stern in any way change**

9    **your analysis with respect to what you set forth in your**

10   **report?**

11        A.    It actually is not incorporated and my

12   report really relates to the issue of damages, but the

13   question about assignability of notes and whether someone

14   who has a note that has been assigned or transferred to

15   them has a right to bring a malpractice case came up

16   recently and I was asked to give thought about that.

17             So it really goes to a different issue, if

18   I could.  It goes to the issue of standing to bring a

19   malpractice case.  My report really was directed to the

20   issue of damages.

21        **Q.    Insofar as your report has to do with**

22   **damages, Stern may not be directly involved in that?**

23        A.    Right.  Stern goes to another question,

24   whether -- the issue of whether the creditor even has the

25   right to bring the action.  As I read Stern the answer

1    would be no.

2         Q.    Looking at page 2 of your report, sir --

3         A.    Yes.

4         Q.    -- there is a reference to a certain legal

5    matter that is one of the roughly twenty at issue in this

6    case.

7         A.    Uh-huh.

8         Q.    And you have captioned it as Chaka Kiambu

9    and Idella.  Do you see that?

10        A.    I do.

11        Q.    And you have a summary of characterization

12   of Premier's claim in the first paragraph of that sub-

13   heading number one.  Correct?

14        A.    Yes, I do.

15        Q.    And you go on to set forth what you caption

16   the response.  Your response I assume is your opinion?

17        A.    That's correct.

18        Q.    And there is a reference to homestead?

19        A.    Yes.  There is.

20        Q.    And if you wanted to take a moment in fact

21   to read that paragraph up until, I suppose, number two, I

22   will just ask a couple of questions about that.

23             MR. CORRIGAN:  I will be right back.  You

24        can keep going.

25        Q.    Do you see that?

1     A.    Correct.

2     Q.    With respect to this matter, Multi-Care

3 Medical Supplies/Cocia as with the previous matter Chaka

4 Kiambu, am I correct to conclude that your analysis of

5 the homestead exemption is the same?

6     A.    It is.  The only caveat I would make, Chaka

7 was a refinance and Multi-Care Medical was an actual sale

8 of the property.  But the fact that the homestead rule

9 applied in both of those cases is the meaningful point

10 but I did want to make note of the exceptions of

11 different facts.

12    Q.    Is that a material distinction?

13    A.    I wanted you to be aware of the variety of

14 where the homestead exemption comes in.  It comes in not

15 only in the sale of the property but if you're

16 refinancing the property as well.

17    Q.    But the rights of the debtor are the same

18 under either scenario?

19    A.    That is correct.  And, again, you get to

20 that point in time where you have that force field which

21 prevents the judgment from attaching to the real estate.

22    Q.    Do you, sir, have a bankruptcy practice?

23    A.    No.

24    Q.    Have you ever been involved as an attorney

25 representing a creditor in bankruptcy court?

1    A.    I have been down to bankruptcy court once

2    or twice, but it is not my practice, and I was generally

3    going down there to get release of automatic stays if I

4    was representing a lender and I start a foreclosure but I

5    am not an expert in bankruptcy.

6         Q.    **Ever filed a proof of claim?**

7         A.    Yes.

8         Q.    **Ever attended a 341 exam?**

9         A.    No.

10        Q.    **Have you ever been involved, again, as an**

11   **attorney in adversary proceedings in the context of a**

12   **bankruptcy?**

13        A.    Not as first counsel.  I was present in a

14   case where a bank tried to prevent a loan from being

15   discharged in bankruptcy, but I wasn't lead counsel.  I

16   was present at the matter, I watched it proceed, so I

17   understand what the concept is, but I wasn't first chair.

18        Q.    **When was that case, roughly?**

19        A.    Probably in the last 10 years.

20        Q.    **In connection with your representing**

21   **creditors such as lenders, does it occasionally occur**

22   **that a debtor of such a client in fact files a petition**

23   **for bankruptcy protection?**

24        A.    Yes, it does.

25        Q.    **What would happen in the course of your**

1    practice upon such an event?

2         A.    I would refer the matter to a bankruptcy

3    attorney.  I don't practice bankruptcy law.

4         Q.    Would such bankruptcy attorney or attorneys

5    be some person not associated with your firm?

6         A.    That's correct.

7         Q.    You don't have it before you, but that

8    James Ward matter that's on page four, number three,

9    heading number three under your format.

10        A.    Yes.

11        Q.    And turning to the second sentence under

12   response -- actually, let me give you a moment, if I

13   could, to review that response before I ask you a

14   question about it.

15        A.    OK.  Hold on one second.  OK.

16        Q.    Have you had a chance to review that, sir?

17        A.    I have.

18        Q.    Turning to the second sentence under the

19   response, I quote:  "Plaintiff has failed to enunciate

20   any grounds which would have prevented the debt from

21   being discharged," unquote.

22              In coming to that conclusion, sir, what did

23   you review?

24        A.    Well, I reviewed the complaint and the

25   report of the expert and the documents out of Premier's

*Exhibit C*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

C.A. 03-CV-12497

| | |
|---|---|
| PREMIER CAPITAL, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BEVERLY JOHNSON PENZELL, | ) |
| d/b/a Law Office of Kris E. Penzell | ) |
| and BEVERLY JOHNSON | ) |
| PENZELL, as Personal | ) |
| Representative of the Estate of | ) |
| Kris E. Penzell | ) |
| | ) |
| Defendants. | ) |

### DEFENDANT AND PLAINTIFF- IN-COUNTERCLAIM
### BEVERLY PENZELL'S ANSWERS TO PLAINTIFF PREMIER CAPITAL, LLC'S
### FIRST SET OF INTERROGATORIES TO PENZELL AS PERSONAL
### REPRESENTATIVE OF THE ESTATE OF KRIS E. PENZELL

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Beverly Johnson

Penzell ("Ms. Penzell") hereby responds, in her capacity as Personal Representative of the Estate

of Kris E. Penzell, to Plaintiff Premier Capital, LLC's First Set of Interrogatories Addressed to

Defendant and Plaintiff-in-Counterclaim Beverly Johnson Penzell, as Personal Representative, as

follows:

### GENERAL OBJECTIONS

1.    Ms. Penzell objects to each of the interrogatories to the extent that they request

information protected by the attorney-client privilege or the work product doctrine.

2.    Ms. Penzell objects to each interrogatory to the extent it requests information

which Ms. Penzell is not obligated to provide, pursuant to Fed. R. Civ. P. 33.  In particular, Ms.



PLAINTIFF'S
EXHIBIT
BP 3
mg 9-25-07

Penzell objects to each of the interrogatories to the extent they do not seek admissible evidence or information not reasonably calculated to lead to the discovery of admissible evidence.

3.     Ms. Penzell reserves the right to supplement the answers to these interrogatories prior to the time of trial.

4.     Ms. Penzell objects to these interrogatories to the extent they improperly characterize events and the Defendant's role in them.

5.     Ms. Penzell objects to the Definitions and Instructions to the extent that they exceed the scope of Fed. R. Civ. P. 26 and 33.

6.     Ms. Penzell objects to the interrogatories on the grounds that they exceed, together with subparts, the limit set forth in Rule 33(a) of the Federal Rules of Civil Procedure.

8.     These general objections are specifically incorporated into Ms. Penzell's answers to the specific interrogatories set forth below.

## INTERROGATORIES AND ANSWERS

1.     Please identify your name, date of birth, social security number, home address, work address, home telephone number, and work telephone number.

**OBJECTION:**

Ms. Penzell objects to Interrogatory No. 1 for the reasons set forth in the General Objections above and, in addition, because it is unclear, vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Ms. Penzell further objects to producing private information such as home telephone number and social security number as these items are not relevant in any regard to Plaintiff's claims and designed solely to harass Ms. Penzell.   Subject to and without waiving these objections, Ms. Penzell responds as follows:

Specifically, certain communications prepared by Mr. Maimonis either incorrectly state the understanding between the parties, attempt to evidence conversations that never occurred or simply misrepresent the factual record. The Penzell law office never agreed to accept any files from Premier or conduct any future collection activity from the time it was first contacted by Premier to date, because Premier refused to produce a new contingency fee agreement for approval by the inventory attorney working with the Penzell law office to wind up Kris E. Penzell's Estate.

12.     Please state whether you contend that the Agreement has been terminated, including in your response: (a) the date of such termination; (b) the means of such termination, whether by written notice, operation of law, or otherwise; (c) any witness with knowledge of such termination; and (d) identifying all documents constituting, reflecting, or relating in any way to such termination.

**OBJECTION:**

Ms. Penzell objects to Interrogatory No. 12 for the reasons set forth in the General Objections above and, in addition, because it is unclear, vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Penzell further objects to the extent the interrogatory seeks information protected by the work product doctrine. Subject to and without waiving these objections, Ms. Penzell responds as follows:

**ANSWER:**

The fee agreement between the Penzell law office and BofA was terminated by the bank's sale of its interest and obligations in loan workout and collection matters to Premier. The sale occurred in September, 2001. Upon the death of Attorney Penzell in March 2000, the Penzell law office operated under the direction of the Florida court through its appointment of

Ms. Penzell as personal representative of the Estate of Kris E. Penzell and Attorney Victor Rones and later Attorney Susan Noe, as inventory attorneys for the Penzell law office.

13.    Please state whether any party, including, without limitation, BofA or Premier, made any payment of any nature whatsoever to you, Mr. Penzell, Rones, Noe, and/or the Penzell Law Firm, including in your response whether such payment(s) were made pursuant to the Agreement, including, without limitation, the termination provisions of the Agreement.

**OBJECTION:**

Ms. Penzell objects to Interrogatory No. 13 for the reasons set forth in the General Objections above and, in addition, because it is unclear, vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Ms. Penzell further objects to the extent the interrogatory places no time limitations on the scope of the request and it is impermissibly overbroad. Subject to and without waiving these objections, Ms. Penzell responds as follows:

**ANSWER:**

With regard to the files that are at issue in this lawsuit, no payments have been made.

14.    Please state whether you or the Penzell Law Firm at any time submitted to any party, including, without limitation, NationsBank, BofA, or Premier, pursuant to the Agreement, any invoice(s) or other record(s) of time devoted to legal services by such firm, whether respecting the Florida Litigation Matters or otherwise; identifying in your response: (a) the date(s) of such invoice(s); (b) any witness with knowledge of such invoice(s), including any person(s) who prepared them; and (d) all documents constituting, reflecting, or relating in any way to any and all such invoice(s).

further objects to the extent the interrogatory seeks information protected by the work product doctrine. Subject to and without waiving these objections, Ms. Penzell responds as follows:

**ANSWER:**

Ms. Penzell and her attorneys have not yet determined which documents will be introduced into evidence at trial in this matter, but will seasonably supplement this response prior to the time of trial.

Signed this 15th day of February 2006, under the pains and penalties of perjury,

Beverly Johnson Penzell,
Personal Representative of the Estate of Kris E. Penzell

AS TO OBJECTIONS:

BEVERLY JOHNSON PENZELL,
By her attorneys,

Catherine J. Savoie, BBO# 544599
Joseph W. Corrigan, BBO #647393
POSTERNAK BLANKSTEIN & LUND LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-8004
(617) 973-6100

Steven Sussman, BBO# 48800
6 Beacon Street, Suite 400
Boston, MA 02108
(617) 973-4800

February 23, 2006