UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 03-CV-12497

| | |
|---|---|
| PREMIER CAPITAL, LLC | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BEVERLY JOHNSON PENZELL, | ) |
| d/b/a Law Office of Kris E. Penzell | ) |
| and BEVERLY JOHNSON | ) |
| PENZELL, as Personal | ) |
| Representative of the Estate of | ) |
| Kris E. Penzell | ) |
| Defendants. | ) |

**AFFIDAVIT OF JOSEPH W. CORRIGAN, ESQ.
IN SUPPORT OF REPLY BRIEF IN FURTHER
SUPPORT OF SUMMARY JUDGMENT**

I, Joseph W. Corrigan, being duly sworn depose and say as follows:

1.    I am counsel for defendant Beverly Johnson Penzell, in her capacity as Personal

Representative of the Estate of Kris Penzell.

2.    Attached hereto as Exhibit 1 are true and accurate copies of designated excerpts

of the Deposition of Richard Storfer dated September 26, 2007.

3.    Attached hereto as Exhibit 2 are true and accurate copies of designated excerpts

of the 30(b)(6) Deposition of Premier Capital, LLC, by Richard Gleicher dated October 27, 2004

and Exhibit 15 to that deposition.

4.    Attached hereto as Exhibit 3(a) is a true and accurate copy of a Notice of Chapter

7 Bankruptcy in the Arroyave Bankruptcy, produced by Premier during discovery from its

"Arroyave" Working file.

5.     Attached hereto as Exhibit 3(b) is a true and accurate copy of a letter from Juan Martinez to John Cummings dated May 17, 2004, produced by Premier during discovery from its "Arroyave" Working file.

6.     Attached hereto as Exhibit 3(c) is a true and accurate copy of a letter from John Cummings to Juan Martinez dated May 19, 2004 and its attachments, all produced by Premier during discovery from its "Arroyave" Working file.

7.     Attached hereto as Exhibit 3(d) is a true and accurate copy of Premier's Proof of Claim in the Arroyave Bankruptcy dated September 22, 2004, produced by Premier during discovery from its "Arroyave" Working file.

8.     Attached hereto as Exhibit 3(e) is a true and accurate copy of a letter from John Cummings to Alan L. Goldberg dated January 10, 2005, produced by Premier during discovery from its "Arroyave" Working file.

9.     Attached hereto as Exhibit 4 is a true and accurate copy of a business record of Premier entitled "Legal Costs Form Report" for the Arroyave matter, produced by Premier during discovery.


Signed under the pains and penalties of perjury, this 30th day of November, 2007.


/s/ Joseph W. Corrigan_____
Joseph W. Corrigan

# EXHIBIT 1

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CASE NO. C.A. 03-CV-12497

PREMIER CAPITAL, LLC,

        Plaintiff,

-vs-

BEVERLY JOHNSON PENZELL, d/b/a
Law Office of Kris E. Penzell
and BEVERLY JOHNSON PENZELL, as
Personal Representative of the
Estate of Kris E. Penzell,

        Defendants.
_____/

DEPOSITION OF RICHARD STORFER

Wednesday, September 26, 2007
1:30 p.m. - 5:50 p.m.

9155 S. Dadeland Blvd., Suite 1014
Miami, Florida 33156

Reported By:
MARGARET PHILLIPS, Court Reporter
Notary Public, State of Florida
Klein, Bury, Reif, Applebaum & Associates
Miami Office
Phone - (305) 373.8404

1                 MR. MORRISSEY:  Object to form.

2     BY MR. CORRIGAN:

3          Q.    The question, sir, was:  Isn't it true, as

4     you sit here today, aside from your anecdotal experience

5     in your own practice, you have no way of being able to

6     testify as to whether or not these debtors at issue in

7     this case, the 19 underlying debtors, would have paid the

8     liens at issue?

9          A.    No, I never met the people.

10         Q.    Isn't it also true, sir, that if they paid

11    the liens it would have been prior, in many of these

12    instances, to Premier's interest in these liens?

13         A.    We would have to go through each one one by

14    one, but it looks like some of them did refinance before

15    it was assigned, yes.

16         Q.    So, in any event, as to those assignments

17    and refinancings that would have occurred under your

18    testimony and your anecdotal evidence, Premier wouldn't

19    have seen those anyway?

20         A.    I guess, I don't know.  I'd have to go back

21    and look through each one.  But, sure, it makes sense.

22    If it gets assigned in October and they refinance in

23    April (indicating).

24         Q.    To the extent any of these alleged

25    refinancings occurred prior to Premier's purchase of

whether or not your report relates to that.

        A.    I have no idea how Premier plans to tie in
my expert testimony to the proving of their case.

        Q.    **Sir, does your report contain --**

        A.    No, I don't speak to the conversion.

        Q.    **-- any analysis of a claim on the part of**
**Premier and damages on the part of Premier as a result of**
**a cause of action for conversion?**

        A.    Well, yes.

        Q.    **It does?**

        A.    I mean, my report speaks to potential
damages.  Now, the underlying cause of action that gives
rise to those damages, that is what needs to be proved in
court.  That is Premier's responsibility.

        Q.    **So you are not espousing any opinions here**
**today as to liability?**

        A.    Not as it relates to conversion, no.

        Q.    **Are you expressing any opinions as it**
**relates here today as to negligence?**

        A.    No.  You haven't asked me any.

        Q.    **Actually, I have.  I asked you whether or**
**not there was a cause of action for malpractice and I**
**think you said there wasn't.**

        A.    Right.

        Q.    **Would you agree that is a negligence cause**

115

1    of action?

2          A.     Yes.

3          Q.     Would you agree that there are no other

4    causes of action for negligence in the complaint?

5          A.     That is correct.

6          Q.     Do you espouse opinions relative to

7    negligence in your report?

8          A.     Yes -- well, in terms of just simply for

9    failing to fulfill their duties to Premier, yes, but I

10   don't come out and say on the Lenear Gibson they were

11   negligent because they didn't do this.

12              My report is that Premier was damaged

13   because, for instance, in Lenear Gibson they didn't

14   pursue a wage garnishment.

15         Q.     Can you tell me why you would prepare a

16   report that addresses issues of what I would characterize

17   as malpractice claims when that is not an issue in the

18   case?

19         A.     Because I was asked to.

20         Q.     Because you were told to do that?

21         A.     Yes.

22         Q.     And, in fact, that report was prepared for

23   you.  Correct?

24         A.     Well, it was prepared with me.  But I had

25   to type it.

office?

     A.    Well, I am not going to make a -- I can't make -- you are asking me to make a weird general statement like that.

     Q.    **I agree it is a very weird statement.  I'm trying to wrap my own brain around it.**

     A.    But certainly in this particular instance, they are entitled to those files.

     Q.    **OK.  You believe under the facts and circumstances of this case --**

     A.    Yes.

     Q.    **-- regardless of whether or not Premier Capital was a client of the Law Office of Kris Penzell, that it is entitled to the Law Office of Kris Penzell's files and in fact can bring a rightful claim of conversion?**

     A.    I mean, I don't know what the Florida Bar rules are with regard to this.  But there are Florida Bar rules with regards to what responsibilities the law firm has in providing the information to the client, whether that means to actually give the physical file from their cabinet is one thing, or do they make copies or can they send by fax or can they send by e-mail, I don't know.  I don't know the answer to that question.

     Q.    **OK.**

1      Q.    To the extent Premier had all of that by

2   virtue of its purchase of the information from Bank of

3   America --

4      A.    Right.

5      Q.    -- what would that do vis-a-vis its claim

6   for conversion as to those files in Kris Penzell's file?

7      A.    Well, it certainly seems that a portion of

8   the documents that they were complaining about could have

9   been obtained from the public record.  Absolutely.

10     Q.    In fact, you indicated earlier with respect

11  to your files that I requested it is all public

12  information.  Right?

13     A.    The pleadings.  The pleadings.  Absolutely.

14     Q.    So we have now established the docket

15  information, the pleadings are no longer information

16  Premier needed from Ms. Penzell's files?

17     A.    You would have to speak to Premier about

18  that.  I have no idea.

19     Q.    Well ---

20     A.    I mean, I don't know how they conduct their

21  business in terms of how they review a file, decide, you

22  know, settlement information, decide how they are going

23  to move forward.

24        I don't know what they review in order to

25  come to those conclusions.

164

country is not necessarily a bar to filing a lawsuit
against him as you can get service by publication if he
is unable to be found.

        But I believe Premier's theory on this
particular file is relative to the inaction of filing
suit against Mr. Bradley after his bankruptcy proceeding
has been dismissed.

        Q.    OK.  Is that reflected anywhere in your
report?

        A.    Yes.  The bankruptcy proceeding, however,
was dismissed and suit was not reinstituted against him.

        Q.    Sir, wasn't it possible for Premier to have
engaged other counsel to perform work and preserve its
rights at that period of time other than the Law Office
of Kris Penzell?

        A.    Sure.

        Q.    In fact, it could have retained you?

        A.    Sure.

        Q.    In fact, it did retain you?

        A.    Sure.

        Q.    And it retained you in September of 2004?

        A.    OK.  I don't remember the exact date but
that certainly seems reasonable.

        Q.    I'll show you what we have previously
labeled as Gleicher Number 28, sir, and I ask you to take

1  a look at that document.

2          A.    OK.

3          Q.    And I misspoke when I said September 2004

4  because it appears that there is --

5          A.    It was even earlier.

6          Q.    -- work you performed as early as May 2004.

7  Is that correct, sir?

8          A.    Yes.

9          Q.    Tell me, sir, what information was in the

10 Law Office of Kris Penzell's file that prevented you from

11 doing work in May 2004 prior to the return of the files.

12 When I say return, I again mean it pejoratively, in

13 December 2004.

14         A.    None.

15         Q.    In fact, you didn't need anything out of

16 those files.   Correct?

17         A.    Apparently not to file that garnishment.

18         Q.    And does it stand to reason that if Premier

19 could hire you to perform work in May of 2004 that it

20 could have hired you in October of 2001?

21         A.    That is something you have to speak to

22 Premier about.   I don't know.

23         Q.    Could they have hired you in October

24 of 2001?

25         A.    Yes.   Certainly they could have asked me to

1    be their lawyer in 2001.  I would have been happy to do

2    it.

3         Q.    Was there anything about the fact that the

4    Law Office of Kris Penzell had a prior entry of

5    appearance on the case, OK --

6         A.    Yes.

7         Q.    -- that would have prevented you from

8    performing the work you performed on this file?

9         A.    In that -- no, obviously not, because I did

10   it.

11        Q.    And, would you agree with me, sir, that as

12   to all the 19 files at issue in this case, that there

13   would have been nothing to prevent someone like yourself

14   or another attorney, other than the Law Office of Kris

15   Penzell, from performing work on these files?

16        A.    No, not if it is post-judgment.  Post-

17   judgment you don't need a substitution -- you don't need

18   a stipulation for substitution of counsel.  Anyone could

19   have stepped in.

20        Q.    So to the extent that Premier waited after

21   they purchased these judgments and no meeting of the

22   minds existed between October 2001 and I think you and I

23   talked about the failure of the meeting of the minds up

24   until Attorney Morrissey's letter in June 2003, that is

25   nearly a two-year period of time, sir.  Premier certainly

1    could have gone and hired other counsel to do work in the

2    interim.  Correct?

3              MR. MORRISSEY:  Objection.

4         A.    They could have but it is a business

5    decision that obviously Premier felt that it wasn't the

6    right thing to do at that time.  That's something you'd

7    have to speak to Premier about.

8         Q.    **All right.  Well, to the extent that there**

9    **were acts or omissions that Premier claims needed to be**

10   **performed, and Premier was aware of those acts and**

11   **omissions between October 2001 and June 2003, to the**

12   **extent that it didn't elect to hire counsel, would you**

13   **agree with me, sir, that Premier did so at its own risk?**

14             MR. MORRISSEY:  Objection.

15        A.    That is too hypothetical a question.  I

16   mean, you have to take into consideration the efforts of

17   having to hire new counsel when you believe you already

18   have counsel.  That is my own business acumen being

19   discussed in a set of facts that I had nothing to do

20   with.  I cannot give that opinion.

21        Q.    **How is it, sir, that Premier claims that it**

22   **had counsel when the correspondence clearly reflects no**

23   **agreement had been reached?**

24        A.    Well, again, you are asking me to guess as

25   to what the writer of that particular correspondence that

1          A.    No.  I think it is just a general omission,

2     it's a general failure to work the file.

3          Q.    And again, I think we have established that

4     there was no substitution of counsel required in post-

5     judgment matters?

6          A.    Right.

7          Q.    So if Premier wanted to hire other counsel

8     in light of what you claim may or may not have been an

9     activity by the law office, it could have done so?

10          A.    Yes.  Yes.

11          Q.    To the extent it didn't do so, that is an

12     issue with respect to damages and mitigation?

13          A.    It's relevant, sure.

14          Q.    Isn't it the case, though, sir, that

15     Premier ---

16          A.    Under Florida law?

17          Q.    Under any law.

18          A.    Well, I don't know.  I don't know other

19     law.  I only know Florida.

20          Q.    Isn't it the case that Premier's own files

21     reflected that they simply weren't able to find assets

22     for the debtor?

23          A.    I do believe I read in a couple of the

24     files that there were some issues with no assets, but

25     just not finding assets is not a bar to executing on a

# EXHIBIT 2

ORIGINAL

```
                              VOLUME:  I
                               PAGES:  1 - 147
                            EXHIBITS:  14 - 17
```

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

PREMIER CAPITAL, LLC
      Plaintiff

                             CIVIL ACTION
      Vs.                        NO. 03-CV-12497

BEVERLY JOHNSON PENZELL, D/B/A
LAW OFFICE OF KRIS E. PENZELL
AND BEVERLY JOHNSON PENZELL,
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF KRIS E. PENZELL
      Defendants

- - - - - - - - - - - - - - - -x

        30(B)(6) DEPOSITION OF PREMIER CAPITAL, LLC

BY RICHARD GLEICHER taken on behalf of the Defendants

pursuant to the Federal Rules of Civil Procedure, before

Carole M. Wallace, Certified Shorthand Reporter and

Notary Public, at the offices of Posternak, Blankstein &

Lund, LLP, 800 Boylston Street, Boston, Massachusetts

02199, on Wednesday, October 27, 2004, commencing at

10:38 a.m.

      HENNESSEY CORP. D/B/A ROBERT H. LANGE CO.
 50 Congress Street - Boston, Massachusetts   02109
 Tel: (617) 523-1874         Fax: (617) 523-7343

```
 1    Q   What did you have better?

 2    A   Her word.

 3    Q   Did you ever have a conversation with Beverly

 4        Penzell in your life?

 5    A   We had numerous correspondence.

 6    Q   Okay.  I asked you -- Please answer the question

 7        that I ask.

 8    A   No, I never had a conversation with Beverly Penzell.

 9    Q   You have never had a conversation with her?

10    A   I'm not here in my individual capacity.  I'm in my

11        capacity as Premier Capital, most knowledgable.

12    Q   I understand that, but I want to find out what

13        communications you personally had versus ones

14        Premier Capital had.

15    A   That's fine.  I want to make the record as clear as

16        possible so we don't misinterpret it later.

17                    MR. MORRISSEY:  You are asking about his

18        --

19                    MS. SAVOIE:  I think I'm entitled to ask

20        him about his personal communications.  And we'll

21        move from there.

22    Q   For purposes of this deposition I am not going to

23        concede that Beverly Penzell is an attorney or has

24        held herself out as an attorney; so when I refer to
```

1    Q   When you go through the files, you can tell me what

2         exactly would have been done to collect each amount

3         to add up to the 853,000?

4    A   I'm not sure if I have all the files.  If I had all

5         the files and access to all the information, I could

6         tell you.  I'm not sure you have everything what you

7         have here, so I couldn't make that commitment to

8         you.

9    Q   It has been represented to me by your attorneys that

10       all the Penzell matters have been tendered over to

11       us, in Premier's possession have been tendered over

12       to us and an exhaustive search for files was done.

13    A   If I have all the information that is available to

14       me that was available to Premier, given enough time,

15       I could probably do that.

16    Q   When you say this 853,000 is a conservative estimate

17       of money Ms. Penzell should have collected under the

18       contingent fee agreement and matters subject to this

19       lawsuit, would you please tell me what contingent

20       fee agreement you are referring to.

21    A   The agreement that Bank of America signed by Kris

22       Penzell as the attorney, that he would undertake

23       certain collection matters.

24              MS. SAVOIE:  Can we this get marked.

1                    [Exhibit 15 marked for identification]

2    Q    I show you what has been marked as Exhibit 15 and

3         ask you if you can take a look at that.

4    A    I believe this is the document that I'm referring

5         to, but I couldn't tell you with a hundred percent

6         certainty.

7    Q    What would help you?

8    A    If I saw the originals or if I saw it in the files.

9    Q    I will represent to you that this -- Do you see at

10        the bottom of the document PC 0074?

11   A    Yes.

12   Q    And every document is numbered.

13   A    Yes.

14   Q    I will tell you that is my office's designation of

15        identification of documents produced in this

16        litigation by Premier Capital to my office, so that

17        your attorney sent me this document in response to a

18        document production requesting among other things a

19        copy of the contingent fee agreement between Kris

20        Penzell or the law office of Kris Penzell and Bank

21        of America and its predecessors.

22   A    I hear what you are saying.

23   Q    So that this designation at the bottom, if you

24        assume that this is in fact the document that was

| | | |
|---|---|---|
| 1 | | produced by Premier's counsel to me, then based upon |
| 2 | | that assumption would you say this is the contingent |
| 3 | | fee agreement that you referred to in your answer, |
| 4 | | in your previous answer? |
| 5 | A | No. |
| 6 | Q | Do you have any reason to believe that it's not? |
| 7 | A | Yes. |
| 8 | Q | What is that? |
| 9 | A | It's the, it's the fax heading on this document that |
| 10 | | says January 11, 2002, 11:27 a.m.  It was faxed from |
| 11 | | Kris Penzell somewhere, and this seems to have come |
| 12 | | from Kris Penzell's office.  And what I'm referring |
| 13 | | to is when I, when I initially went to Oklahoma to |
| 14 | | look at the Bank of America files, there was one of |
| 15 | | these in the files.  And based on this letterhead, I |
| 16 | | can safely say this is not what, a copy of a |
| 17 | | document that I was looking for.  This may be a copy |
| 18 | | of something that came from Ms. Penzell.  Having |
| 19 | | said that, I'm not so sure it is different.  It |
| 20 | | might be the same document. |
| 21 | Q | I think we can clear that one up.  In each of the |
| 22 | | files that I looked at or many of the files that I |
| 23 | | looked at that were produced by Premier, there was |
| 24 | | also a copy of a contingent fee agreement within |

1   Q   My question doesn't limit your choice.

2   A   I disagree with that choice as well.

3   Q   Could you characterize in your own words what

4       Premier's position is on the question of whether and

5       to what extent Premier owes money to the estate of

6       Kris Penzell or the law office of Kris Penzell for

7       services that Kris Penzell performed on these files.

8       I think we both know what files I am referring to.

9   A   The question is not about the files, that's not the

10      issue.  The issue is agreements and contracts

11      between Bank of America and Kris Penzell, Kris

12      Penzell who is defined as the attorney.  That's the

13      agreement.

14              Now Premier bought a bunch of loans from

15      Bank of America.  It took those loans agreeing to

16      honor whatever contingent fee agreements were in

17      place; and if Mr. Penzell performed services on

18      behalf of Premier that Premier benefitted and

19      Premier approved of, Mr. Penzell is entitled to be

20      compensated for those services.  If Mr. Penzell

21      performed services on behalf of Bank of American and

22      didn't benefit Premier and was supposed to get

23      compensated by Bank of America, then I would say

24      Kris Penzell would owe, Bank of America would owe

```
 1        Mr. Penzell the money.

 2    Q   So your understanding of the transfer of assets

 3        between Bank of America and Premier is that Bank of

 4        America agreed to pay off its attorneys' fees for

 5        what work was done while Bank of America was

 6        handling these loans?

 7    A   No.

 8    Q   Wasn't that what you just told me?

 9    A   Not at all.

10    Q   What is your understanding of the agreement by which

11        Bank of America transferred these loans to Premier

12        with regard to the payment of Attorneys' fees?

13    A   My understanding is whatever it says in the loan

14        sale agreement that Bank of America, that we signed

15        our name to it that says these are our

16        responsibilities and duties, those are the

17        responsibilities and duties we undertook.

18    Q   If what you signed your name to is that you are

19        responsible for obligations arising under the

20        existing contingent fee agreement, is that your

21        understanding of what the agreement says?

22                  MR. MORRISSEY:  Objection.

23    A   That's not my understanding.

24    Q   What is your understanding?
```

```
 1        you went out to Oklahoma to look at the documents.

 2    A   If you would call it an investigation, I would feel

 3        more comfortable with that.

 4    Q   You went to investigate prior to the purchase being

 5        consummated, I take it.  Do you know when this loan

 6        transaction took place?

 7    A   Sometime in the fall of 2001.

 8    Q   Do you know when you took this trip to Oklahoma?

 9    A   If that's correct, maybe late summer of 2001.

10    Q   Was it your understanding that when you looked at

11        this contingent fee agreement, that Premier would be

12        assuming the rights and obligations under this

13        agreement?

14    A   Yes, that is my understanding.

15                     [Interruption]

16    Q   When you were reading this contingent fee agreement,

17        you were reading it with the view in mind that

18        Premier would likely, if they consummated the

19        transaction, become bound by this agreement, is that

20        right?

21    A   I was reading it with the view that I hoped that

22        this agreement would be in force and effect and I

23        would hope that we would be able to continue with

24        our relationship that Bank of America or Nations
```

1      Bank had with Mr. Penzell.

2   Q  Why don't we show you what was marked as Exhibit 2,

3      the Loan Sale Agreement.  Could you please look at

4      page 10, paragraph 6.4 entitled Contingent Fee

5      Agreements.  First of all before we get to that

6      provision, would you identify the document.

7   A  This is a Loan Sale Agreement between Bank of

8      America and Premier Capital, LLC for, dated

9      September 19, 2001, for the sale of loans that are

10     identified as Loan Pool 101 and listed in the loan

11     schedule.

12  Q  It says Judgments and in parentheses National.  Is

13     it your understanding that these loans were all, had

14     all been reduced to judgment?

15  A  No.

16  Q  Do you know what percentage of these loans had been

17     reduced to judgment?

18  A  At the time no, nor do I know now, but I'm sure

19     there were some that were reduced to judgment.

20  Q  Would you say the majority of them were?

21  A  If I had to make a guess, I would say yes.

22  Q  Would that be your best estimate as you sit here

23     today that the majority of the loans that Premier

24     purchased were reduced to judgment at the time?

# CONTINGENCY FEE AGREEMENT

This Contingency Fee Agreement ("Agreement") is entered into this _23_ day of _December_, 199_8_, by and between NationsBank, N.A. ("Bank") and _____ Kris Pennell _____ (the "Attorney").

I.   FEES AND COSTS.

   A.    Fees.

   The Attorney's fees for matters forwarded pursuant to this Agreement and the Contingency Attorney Referral attached hereto as Exhibit A ("Matters") shall be wholly contingent upon collection and shall be at the rate of thirty percent (30%) contingency basis on all amounts collected, unless otherwise designated in writing by Bank.

   B.    Costs.

   In no event shall the Attorney incur any reasonable expenses in excess of $250.00 with respect to any matter without the Bank's prior approval.  Costs shall include actual costs incurred in connection with the preparation and prosecution of the Matter and must be within the limits set forth in the Bank's Procedures for Outside Counsel, which are hereby incorporated by reference.  Costs shall be billed each month and identified as to each corresponding Matter.

   C.    Application of Collected Funds.

   In the event that the Attorney collects any funds as the result of prosecution of a Matter, the Firm shall be entitled to apply said funds as follows:  (i) first, to reimbursement of any costs incurred and not previously reimbursed, (ii) second, to reimburse Bank for any costs already billed and paid by Bank, (iii) third, to the Attorney to pay the thirty percent (30%) contingency fee, and (iv) to the Bank.

   D.    Remittance of Funds.

   The Attorney shall be responsible for collection of all monies due from debtors on all Matters subject to this Agreement.  The Firm shall be permitted to deduct the agreed costs and contingency fees from the funds collected and must remit the remaining balance of all such funds collected to Bank no later than fifteen (15) days from receipt of each payment in the Attorney's office. The Attorney shall provide the Bank with a full accounting of each such remittance at the time of payment



EXHIBIT

15

10-27-04

PC0074

thereof. In addition to the above, the Attorney shall provide to the Bank a monthly accounting of all monies received and all payments made with respect to each Matter during the prior month. In the event the Bank directly receives funds on a Matter, Bank agrees to process such payment and forward to the Firm the appropriate contingency fee within thirty (30) days from receipt thereof.

II.    WORK TO BE PERFORMED.

Each Matter subject to this Agreement may require one or more of the following types of collection efforts. In addition, other methods of collection may be required. The time deadlines indicated below in Section II of this Agreement can be modified with the express consent of the Bank.

A.    Review Credit File and Determine Litigation Probability.

Within thirty (30) days of receipt of the Matter, the Attorney will review the credit and collateral files applicable to each Matter and will prepare a written summary report to reflect the status of the file and the Bank's position. This review includes a recommendation as to whether action, including litigation, against the collateral and/or the obligors is feasible. If it is determined that the debt is uncollectable or that the costs to collect the debt outweigh the benefits of collection, the Attorney agrees to return the file to the Bank at no charge.

B.    Demand On Debtor.

The Attorney will make formal written demand on the debtor for payment of the indebtedness within forty-five (45) days of receipt of the Matter.

C.    Litigation.

Within ninety (90) days of receipt of the Matter, if the Bank expressly determines that litigation should be filed against the debtor, the Attorney will investigate the facts necessary to prepare the lawsuit, file the lawsuit and prepare and file an initial set of discovery requests.

D.    Bankruptcy.

If a debtor files for bankruptcy protection, the Attorney will immediately notify the Bank in writing and will thereafter file a Notice of Appearance. With the permission and assistance of the Bank, the Attorney will file a Proof of Claim, even if the bankruptcy

2

PC0075

notice indicates that the Matter is a "no asset" case, and Motion For Relief From Stay as required under the circumstances.

E.    Post-Judgment Collection Efforts.

Once a final judgment has been entered against a debtor, the Attorney agrees to initiate appropriate post-judgment proceedings, including, but not limited to, recording judgments in the appropriate jurisdictions, post-judgment discovery, garnishment proceedings, obtaining writs of execution and other proceedings as may be appropriate in the applicable jurisdiction.

III.    STATUS REPORTS.

The Attorney shall keep the Bank informed of the status of each Matter by timely sending the Bank a copy of all correspondence and pleadings involved in each Matter. In addition upon request, the Attorney shall provide the Bank a status report on any or all Matters that the Attorney is handling in the form attached as Exhibit B.

IV.    SETTLEMENTS.

In the event that the debtor in a particular Matter indicates a willingness to resolve the Matter for less than the full amount of the debt owed to Bank, the Attorney may settle such Matter only with the written consent of Bank.

V.    COUNTERCLAIMS.

In the event a counterclaim should be filed against the Bank in any Matter, the Attorney shall immediately notify Bank of the same and Bank shall have the right to elect to transfer the Matter to another counsel of Bank's choice. On such transfer, the Firm shall provide Bank with a written invoice showing the number of hours expended on the Matter at an hourly rate of $110.00 per hour, and Bank may elect to either (i) pay the invoice in full satisfaction of the Attorney's claims as to the Matter, or (ii) pay the Attorney a reduced contingency fee of fifteen percent (15%) of all funds collected by Bank following transfer. In the event a counterclaim which has resulted in a transfer is later resolved, Bank may elect to return the Matter to the Attorney at the Attorney's regular contingency rate, and to the extent Bank has paid the Attorney an hourly fee as set forth above, the amount of said hourly fee paid shall be deducted from the contingency amount upon any later collection of Bank's claim. In the event the Matter remains

3

PC0076

with the Attorney, the manner in which the counterclaim shall be
handled shall be determined on a case by case basis.

## VI.     TERMINATION.

### A.     For Cause.

In the event the Attorney fails to timely or fully remit any amount due
to Bank, or fails to do any other act required by this Agreement or fails
to perform said act in a timely manner, Bank may at any time notify
the Firm in writing of its concerns and objections. The Firm shall have
thirty (30) days from the date of such notice to take corrective action.
If, at the end of the thirty (30) day period, all problems have not been
resolved to Bank's full satisfaction, Bank shall have the unilateral
right, in its sole and absolute discretion to terminate this Agreement
by notice to the Firm in writing, and to withdraw any and all files
Bank deems necessary to effect the termination.

### B.     Without Cause.

At any time after one (1) year following the date of this Agreement,
Bank may terminate this Agreement for any reason or for no reason at
all. Notice of termination shall be in writing and shall be effective
thirty (30) days after receipt.

### C.     Bank Recall.

From time to time, Bank may recall a Matter for any reason or no
reason at all from Attorney and reserves the right to take such action.
In such instances, the Attorney agrees to return all original files and
documents related to the recalled Matter within fifteen (15) days from
notification. If a matter is recalled, Attorney will be compensated as
indicated in paragraph D below.

### D.     Payment Upon Termination.

Upon termination as set forth in Section A above, the Attorney shall be
entitled to compensation as follows: (i) as to any Matters in which a
payment agreement has been previously reached with the debtor, the
Attorney shall be entitled to collect its agreed contingency fee and all
funds collected under such payment agreement; and (ii) as to Matters
in which no payment agreement has been reached prior to termination,
the Attorney shall provide the Bank with a written invoice for each
terminated Matter showing the number of hours expended on each

4

terminated Matter at the hourly rate of $110.00 per hour and as to each individual Matter Bank may thereupon elect to either (i) pay said invoice in full satisfaction of the Firm's claims to each terminated Matter or (ii) pay the Attorney at a reduced contingency fee of fifteen percent (15%) of all funds collected by Bank, if any, following termination.

Upon termination as set forth in Sections B and C above, the Attorney shall be entitled to compensation as follows: (i) as to any Matters in which a payment agreement has been previously reached with the Debtor, the Attorney shall be entitled to collect its agreed contingency fee and all funds collected under such payment agreement; and (ii) as to Matters in which no payment agreement has been reached prior to termination, the Attorney shall provide the Bank with a written invoice for each terminated Matter showing the number of hours expended on each terminated Matter at the hourly rate of $110.00 per hour, and as to each individual Matter Bank may pay said invoice in full satisfaction of the firm's claims to each terminated Matter.

E.    Attorney's Right To Terminate.

The Attorney has the right to terminate this Agreement by providing Bank with ninety (90) days' written notice of such termination. However, upon any such termination initiated by the Attorney, contingency fees for payment made after a termination date are waived.

VII.   RETENTION AND RETURN OF FILES

When a Matter is completed through collection or when collection efforts are abandoned, the Attorney shall maintain all records related thereto for a period of five (5) years.  If this Agreement is terminated as set forth above, the Attorney shall return all original files and documents to Bank along with a complete set of all pleadings filed in the case within thirty (30) days from the date of termination.

VIII.  OTHERS MATTERS

A.    Matters Outside Attorney's Service Area:

In the event  Attorney is unable to handle a particular matter due to a defendant being located outside Attorney's usual service area, Attorney shall immediately contact Bank in writing to advise Bank of the circumstances.  Bank shall thereupon have the option of authorizing attorney to employ the assistance of legal counsel in the area where

5

the defendant is located, subject to the Bank's prior written approval. In no event shall the Bank be responsible for fees beyond the agreed contingency fees set forth herein above and any proposed agreement with outside counsel engaged by Attorney shall be subject to prior written approval by Bank.

B.    Geographic Areas.

The Attorney will handle matters under this Agreement in the following areas: _____

The Attorney acknowledges that this Agreement is not an agreement for exclusive representation of the Bank by the Attorney in the Geographic Area and that the Bank reserves the right to send matters in the Geographic Area to other attorneys.

C.    Liability.

The Attorney will review the Bank's file and submit an accurate report based on the documents contained in the file. Since the file review is limited to the documents available in the Bank's file, the Attorney will not represent that the information is complete. Unless specifically engaged, the Attorney is not expected to search records or public filings not contained in the Bank's file. Unless expressly noted in the report, the report submitted is not a legal opinion on the perfection or priority of the Bank's lien on the collateral.

D.    Hold Harmless.

The Attorney agrees to comply with all laws, federal, state or local and, without limitation, the Fair Debt Collection Practices Act. The Attorney agrees to indemnify, release and hold the Bank harmless from any and all damages, claims, liability, debts, causes of action, claims for relief or loss of any kind, including all attorneys' fees, legal costs and expenses, arising from the Attorney's acts or omissions, the Attorney's violation of any law or the Attorney's negligence. The Attorney also holds the Bank harmless from the acts of the Attorney's servants, employees, agents, agencies or independent contractors. The Bank agrees to indemnify, release and hold the Attorney harmless from any and all damages, claims, liability, debts, causes of action, claims for relief or loss of any kind, including all attorney's fees, legal costs and expenses arising from the Bank's acts or omissions, Bank's violation of any law or Bank's negligence. Bank also holds the Attorney

6

PC0079

harmless from the acts of Bank's servants, employees, agents, agencies or independent contractors.

E.    Full and Complete Agreement.

This Agreement represents the full and complete understanding of the parties with respect to the subject matter hereof. This fully integrated Agreement shall supersede all prior and contemporaneous negotiations, discussions, representations, agreements and accords that are not expressly incorporated herein.

F.    Successors and Assigns.

This Agreement shall inure to the benefit of each of the parties hereto shall be fully binding upon them and their respective heirs, personal representatives, and successors. In no event shall this Agreement be assignable by the Attorney.

G.    Applicable Law.

This Agreement has been negotiated, executed and delivered, and shall be deemed to have been made in the State of North Carolina, and the validity of this Agreement, its construction, its interpretation and enforcement and the rights of the parties hereunder, shall be determined under, and governed by and construed in accordance with the laws of the State of North Carolina.

H.    Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original. Said counterparts shall constitute but one in the same instrument and it shall be binding upon each of the undersigned individually as fully and completely as if all had signed but one instrument.

I.    Severability

To the extent that any provision in this Agreement is held to be unenforceable, the remaining portions of the Agreement shall continue to have full force and effect and shall be interpreted to achieve the overall intentions of the parties hereunder.

PC0080

J.    Time is of the Essence

The Attorney agrees and acknowledges that time is of the essence to this Agreement.

NationsBank, N.A.

By: _____
Name: _____
Title: _Senr. Consel_

_KRIS E. PENZELL P.A._
Name of Law Firm

By: _____
Name: _KRIS PENZELL_
Title: _PRESIDENT_

i:\mayo\cont-fee\forms\penzell

8

PC0081

# EXHIBIT 3

WORKING

Arroyave, Efrain & Robin
BookValue$17,062
BofA1 acct# 2950603

Arroyave, Efrain & Robin
BookValue$46,646
BofA1 acct# 3664716

# EXHIBIT A

FORM B9A-1 (Chapter 7 Individual or Joint Debtor No Asset Case)(1/09/02)    Case Number 02 - 14026

# UNITED STATES BANKRUPTCY COURT
## Southern District of Florida

## Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines

A chapter 7 bankruptcy case concerning the debtor(s) listed below was filed on 04/25/02.

You may be a creditor of the debtor. **This notice lists important deadlines.** You may want to consult an attorney to protect your rights. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address where the judge assigned to the case is chambered.
**NOTE: THE STAFF OF THE BANKRUPTCY CLERK'S OFFICE CANNOT GIVE LEGAL ADVICE.**

## See Reverse Side For Important Explanations and SDFL Local Court Requirements.

| | |
|---|---|
| **Debtor name:**<br>Efrain Arroyave<br>**Other names used by debtor:**<br><br>**Address:**<br>6770 SW 124 St<br>Miami, FL 33156 | **Joint Debtor:**<br>Robin Arroyave<br>**Other names used by joint debtor:**<br><br>**Address of joint debtor:**<br><br>CLERK<br>USBC<br>SDFL<br>**F I L E D**<br>04/30/02 |
| **Case Number:**<br>02 - 14026 - BKC - RAM | **Social Security and/or Taxpayer ID Nos.:**<br>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<br>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 |
| **Attorney for Debtor(s) (or Pro Se Debtor) name and address:**<br>James Alan Poe Esq<br>8500 SW 92 St #202<br>Miami, FL 33156<br>Telephone number: 305-592-0002 | **Bankruptcy Trustee (name and address):**<br>Alan L Goldberg<br>111 SW 3 St #701<br>Miami, FL 33130<br>Telephone number: 305-372-1100   FAX<br>305 372-0188 |

## Meeting of Creditors:

Date: **May 28, 2002**    Time: **11:30 am**    Location: Claude Pepper Federal Bldg.<br>51 S.W. First Ave Room 102<br>Miami, FL 33130

**WARNING:** Without further notice or hearing the court may dismiss your case for failure of the debtor to timely pay filing fee installments, failure to appear at the meeting of creditors or failure of the debtor to timely file required schedules, statements or lists.

## Deadlines:

Papers must be *received* by the bankruptcy clerk's office by the following deadlines:

**Deadline to File a Complaint Objecting to Discharge of the Debtor *or* to Determine Dischargeability of Certain Debts:**
07/29/02

**Deadline to Object to Trustee's Report of Abandonment: See explanation on reverse.**
**Deadline to Object to Exemptions: Thirty days after the conclusion of the meeting of creditors or within thirty days of any amendment to the list or supplemental schedules.**

## Creditors May Not Take Certain Actions:

The filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be penalized.

### Please Do Not File A Proof of Claim Unless You Receive a Notice To Do So.

| | |
|---|---|
| **Address of the bankruptcy clerk's office where assigned judge is chambered: (Papers should be filed at this location).**<br>U.S. Bankruptcy Court<br>51 S.W. 1st Ave. Room 1517<br>Miami, FL 33130<br>Telephone: 305-536-5216 | Case filing information and unexpired deadline dates can be obtained free of charge by calling the Voice Case Information System:(305)536-5979, (305)536-5696, (305)536-5972, (305)536-5973 or (800)473-0226. |
| **Hours Open:** Monday - Friday 9:00 AM - 4:30 PM<br>Closed all Legal Holidays<br>Court Web Site: www.flsb.uscourts.gov | **Clerk of the Bankruptcy Court:** Karen Eddy<br>**For:** Judge Robert A. Mark<br>**Date:** 04/30/02 |

**3**

15366

# EXHIBIT B

LAW OFFICES

# FOWLER WHITE BURNETT P.A.

MIAMI • FORT LAUDERDALE • WEST PALM BEACH • ST. PETERSBURG

STUART H. ALTMAN
PATRICIA D. AMADUCCI
IVETTE L. ARANGO
RICHARD S. BANICK
ALDO G. BARTOLONE, JR.
DAVID O. BATISTA
HELENEMARIE M. BLAKE
ROBERT F. BOUCHARD
EDWARD J. BRISCOE
PETER M. BROOKE
MORTON P. BROWN
MICHAEL B. BUCKLEY*
HENRY BURNETT
WILLIAM R. CLAYTON
RICHARD R. COCHRAN
JAMES D. DECHURCH
CHARLES G. DE LEO
RICHARD E. DOUGLAS
MICHAEL J. DRAHOS

BRIAN D. ELIAS
MICHAEL FELDENKRAIS
SAMANTHA J. FITZGERALD
JOHN H. FRIEDHOFF
BRENDA A. FRIEDMAN
DAVID A. FRIEDMAN
MICHAEL ALEXANDER GARCIA
PATRICK E. GONYA, JR.
HELAINE S. GOODNER
HOWARD W. GORDON
ALAINE S. GREENBERG
JUNE GALKOSKI HOFFMAN
JAMES N. HURLEY
ELIZABETH P. JOHNSON
RORY ERIC JURMAN
ALLAN R. KELLEY
CHRISTOPHER E. KNIGHT
DONALD E. KUBIT
JAN M. KUYLENSTIERNA

FRED K. LICKSTEIN
JENNIFER N. LUCY
LISA R. MAHONEY
TATYA A. MALKKI
JUAN C. MARTINEZ
SANDRA McCLURE
PATTI A. MEEKS
PETER J. MELARAGNO
BRADLEY L. MIRKIN
DON MOORE
JAMES P. MURRAY
RONALD G. NEIWIRTH
STEVEN SLOANE NEWBURGH
STEVEN A. OSHER
MORRIS D. PATAKY
J. MICHAEL PENNEKAMP
ALAN J. PERLMAN
TODD I. ROSENBERG
RONALD L. ROTH

MARC J. SCHLEIER
TIMOTHY O. SCHRANCK
BARRY N. SEMET
RONALD D. SHINDLER
SARA SOTO
FRANCES SPINTHOURAKIS
STEVEN E. STARK
JOEL STEWART
JOHN C. STRICKROOT
NORMAN I. WEIL
JASON L. WEISSMAN
T. ROGER WHITE, JR.
HAYES G. WOOD
RICHARD A. WOOD

*OF COUNSEL

BANK OF AMERICA TOWER
SEVENTEENTH FLOOR
100 SOUTHEAST SECOND STREET
MIAMI, FLORIDA 33131
TELEPHONE (305) 789-9200
FACSIMILE (305) 789-9201

WWW.FOWLER-WHITE.COM

CODY FOWLER (1892-1978)
MORRIS E. WHITE (1892-1988)
JAMES L. HURLEY (1920-1989)

May 17, 2004

John D Cummings
Premier Capital, Inc.
226 Lowell Street
Wilmington, MA  01887

> VIA FACSIMILE
> AND FIRST CLASS MAIL

Re:    **Efrain Arroyave and Robin Arroyave**
    **Adversary Proceeding**
    **Case No. 04-1183 BKC-RAM-A**

Dear John:

I am in receipt of the complaint filed against Premier Capital, LLC by Alan Goldberg, Trustee in the above-referenced matter. I have previously been involved with this file when Nick Maimonis was with Premier Capital, and I am fairly familiar with the matter.

In essence, the Trustee claims that Premier Capital, either directly or indirectly through Bank of America, received two payments from the debtor (totaling $25,600) on January 31, 2002, and that such payments were made within 90 days of the filing of the petition in bankruptcy. I am not sure whether you are familiar with Section 547 of the United States Bankruptcy Code, which provides that a Trustee may recover payments made within 90 days of the petition date to creditors under certain circumstances. This is what the Trustee claims here.

Nick J. Maimonis
Premier Capital, LLC
Page 2

Our response deadline is May 21, 2004 (this coming Friday).  Please contact me on Monday or Tuesday so that we may discuss an appropriate response to the complaint.  I look forward to talking to you soon.

Best regards,

Juan C. Martinez

JCM/drs
[jcs] W:\90096\LETTR121.JCM

# EXHIBIT C

# *Premier Capital, LLC.*

---

May 19, 2004


VIA FACSIMILE
(305) 789-9201

Fowler, White & Burnett, P.A.
Attn: Atty. Juan Martinez
Bank of America Tower
100 SE 2nd St., 17th & 18th Floors
Miami, FL 33131

**RE:     Arroyave**

Dear Juan:

Here is a copy of the two checks, along with our deposit slip for the monies being sought by the trustee. The dates on the check are 1/23/02, which puts us 92 days out from the day he filed BK. Even if you use the date we deposited them, 1/24/02, it is still 91 days out. Hopefully this is enough to get the trustee to drop his suit. What are our options to seek damages against the trustee if we have to go into court and spend the money to defend this suit when it appears that we are outside of the preference period?

I will have an answer for you on Rowan ASAP.

If you have any questions, please contact the undersigned directly.

Very truly yours,


John D. Cummings, Jr.
Account Manager
jcummings@ziplip.com

---



PREMIER CAPITAL, IN.
LLC-B0FA1B
226 LOWELL ST., UNIT B
WILMINGTON, MA 01887

Sovereign Bank

DATE 1-24-02

DOLLARS
20000 00
5600 00

CHECKS
1 63-643
2 63-643

$ 25600.00

$ 2560000

---

MORTGAGE INFORMATION SERVICES, INC.
MIRAMAR OFFICE, ESCROW ACCOUNT
8910 MIRAMAR PKWY., STE. 308
MIRAMAR, FL 33025

FIRST UNION NATIONAL BANK
63-643/670  998

77269
77269

CHECK NO.

640906

--Five Thousand Six Hundred and 00/100 ---- Dollars

DATE January 23, 2002

AMOUNT $ 5,600.00

PAY TO THE ORDER OF BANK OF AMERICA

VOID AFTER 60 DAYS

⑈077269⑈ ⑆067006432⑆ 200000 2750 29 ⑈

---

MORTGAGE INFORMATION SERVICES, INC.
MIRAMAR OFFICE, ESCROW ACCOUNT
8910 MIRAMAR PKWY., STE. 308
MIRAMAR, FL 33025

FIRST UNION NATIONAL BANK
63-643/670  998

77265
77265

CHECK NO.

640906

--Twenty Thousand and 00/100 ---- Dollars

DATE January 23, 2002

AMOUNT $ 20,000.00

PAY TO THE ORDER OF BANK OF AMERICA

VOID AFTER 60 DAYS

⑈077265⑈ ⑆067006432⑆ 200000 2750 29 ⑈

# EXHIBIT D

Vlogged

# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA  www.flsb.uscourts.gov

## PROOF OF CLAIM

| Name of Debtor:<br>Efrain Arroyave<br>Robin Arroyave | Case Number<br>02-14026 - BKC - RAM |
|---|---|

BOFAMC

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. (See Local Rule 3001-1(B))

IMPORTANT: THIS CLAIM FORM SHOULD ONLY BE USED BY THE CREDITOR WHOSE NAME IS PRINTED ON THIS CLAIM FORM.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Premier Capital LLC<br>Name and Address where notices should be sent:<br><br>Premier Capital LLC<br>226 Lowell Street<br>Wilmington MA 01887-3074<br><br>Telephone Number: 978-661-9000 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. |
|---|---|

FILED BY
U.S. BANKRUPTCY CT.
SO. DIST. OF FLA.
MIAMI OFFICE
SEP 27 2004

| Account or other number by which creditor identifies debtor:<br>(If SS# only list last 4 digits of SS#): 2950603 | Check here if<br>this claim | ☐ replaces<br>☐ amends    a previously filed claim, dated _____ |
|---|---|---|

| 1. Basis for Claim | |
|---|---|
| ☐ Goods sold<br>☐ Services performed<br>☑ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☐ Other _____ | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of SS #: _xxx-xx-_ _____ _____<br>Unpaid compensation for services performed<br>from _____ to _____<br>(date)   (date) |

| 2. Date debt was incurred: 2/14/97 | 3. If court judgment, date obtained: 4/17/98 |
|---|---|

4. Total Amount of Claim at Time Case Filed: $ 26,570.29 _____ + _____ + _____ = 26,570.29
(Unsecured Nonpriority)   (Secured)   (Unsecured Priority)   (Total)

Complete items 5, 6, and 7 (as applicable) to further describe the amount(s) you indicated in item 4.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5. Secured Claim.<br>☐ Check this box if your claim is secured by collateral (including a right of setoff).<br>Brief Description of Collateral:<br>☐ Real Estate ☐ Motor Vehicle<br>☐ Other_____<br><br>Value of Collateral:   $_____<br><br>Amount of arrearage and other charges at the time the case was filed included in secured claim, if any: $_____<br><br>6. Unsecured Nonpriority Claim $ 26,570.29<br>☐Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority. | 7. Unsecured Priority Claim.<br>☐ Check this box if you have an unsecured priority claim<br>Amount entitled to priority $_____<br>Specify the priority of the claim:<br>☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).<br>☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).<br>☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).<br>☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).<br>☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).<br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).<br>*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after date of adjustment. |
|---|---|

| 8. Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br>9. Supporting Documents: Attach legible copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. Supporting documents should not exceed 5 pages (See reverse for instructions).<br>10. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. Research and/or copy charges will apply for future copy requests of claims. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

| Date<br>9/22/04 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Melissa Nadeau Bookkeeper |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

bankruptcy clerk's office where judge assigned to case is chambered.

021733        35317021777016

# EXHIBIT E

# *Premier Capital, LLC.*

*Arroyave, Efrain & Robin*
*BOFA18*

January 10, 2005

Via First Class Mail

**Alan L Goldberg**
111 SW 3 St #701
Miami, FL 33130

RE:     **Arroyave, Efrain & Robin**
        **Chapter 7 Case No.: 02-14026-BKC-RAM**

Dear Atty. Goldberg:

Some time ago Premier agreed to release it's claim and judgment lien in the above referenced matter for the amount of $63,000.00. Since that time we have yet to receive the proceeds or any other communication relating to this matter.

Today I received notice of the Application of Fee's from Jason Slatkin in this matter. It made note that the trustee had $93,894.37 on hand in this case. Can you please confirm that in fact Premier will be paid it's agreed upon settlement with your office in the amount of $63,000.00 and when we can expect to receive it.

I would appreciate your time and assistance in preparing a response. We do have counsel of record on this matter, Juan Martinez, but would prefer to keep our legal expenses to a minimum in light of the fact we are accepting a discounted amount on our claim. Please submit payment on our claim to the below address:

Premier Capital, LLC
Attn: John D. Cummings, Jr.
226 Lowell St.
Wilmington, MA 01887

If you have any questions, please contact the undersigned directly.

Very truly yours,

John D. Cummings, Jr.
Account Manager
jcummings@ziplip.com

# EXHIBIT 4

# Legal Costs Form Report

**Loan ID  2950603**          **Pool  BofA1**      **Client  BofA18 / Bank of America**

**Arroyave, Efrain**

| Date | Amount | Attorney ID | Check Number | CCode | Invoice No | Comments |
|---|---|---|---|---|---|---|
| 12/23/2005 | $4,791.56 | Martinez | 2485 | A | JXM-17123-065693-338481 | Per Agreement between JDC & Frank Cosmen pay 50% of original invoice amount of $9,583.11 |
| 10/7/2005 | $61.25 | Martinez | 2290 | A | 340393 | |
| 8/26/2005 | $271.25 | Martinez | 2268 | A | JXM-17123-065693-338481 | |
| 8/13/2004 | $752.79 | Martinez | 1430 | A | JXM-17123-065693-316824 | |
| 2/6/2004 | $53.13 | Fine | 1373 | A | Letter 1/6/04 | Fine & Licitra |
| 11/14/2003 | $200.00 | Martinez | 1357 | A | Letter 10/08/03 | |
| 8/1/2003 | $148.28 | Martinez | 1297 | A | Letter 7/8/03 | |
| 4/11/2003 | $100.00 | Martinez | 1268 | A | 3/5/03 | |
| 12/13/2002 | $1,882.55 | Martinez | | A | ltr 12/5/02 | |
| 11/13/2002 | $314.00 | Martinez | | A | 3668.3 | |
| 10/8/2002 | $147.36 | Martinez | | A | Ltr 10/3/02 | |
| 9/13/2002 | $527.37 | Martinez | | | ltr 8/2/02 | |

**Total Paid**          $9,249.54          **Payment Count**    12