UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
PREMIER CAPITAL, LLC,          )
      Plaintiff,               )
                              )
      v.                       )     Civil Action No. 03cv12497-NG
                              )
BEVERLY JOHNSON PENZELL,       )
d/b/a Law Office of Kris E.    )
Penzell, et al.,               )
      Defendants.              )
_____)
GERTNER, D.J.
```

### MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY JUDGMENT AND MOTION TO AMEND COMPLAINT
May 8, 2008


I.  **INTRODUCTION**

Plaintiff Premier Capital ("Premier"), a Delaware limited liability corporation with offices in Wilmington, MA, brings this action against Beverly Penzell ("Penzell") in her individual capacity and as representative of her late husband's estate. Penzell's husband, Kris Penzell, was a creditors' rights attorney in Miami, FL, and had provided collection services and obtained judgments against various debtors for Bank of America ("BOA") and its predecessors in interest until his death in March 2000.  In September 2001, BOA transferred its interest in 19 of those judgements to Premier.  The instant case arises from Penzell's retention of the case files relating to the 19 judgments following their sale to Premier.  Count I of Premier's Complaint sounds in conversion; Count II alleges a violation of Mass. Gen.

1

Laws ch. 93A.  Penzell has filed a counterclaim, alleging breach of contract, quantum meriut, and violation of Mass. Gen. Laws ch. 93A.

There are two motions presently pending before the Court. First, Premier seeks to amend its complaint in order to add claims for breach of contract, intentional misrepresentation, negligent misrepresentation, and negligence.  For the reasons laid out below, Premier's Motion to Amend the Complaint (document # 47) is DENIED.  Second, Penzell moves for summary judgment on Premier's conversion and Mass. Gen. Laws ch. 93A claims. Penzell's Motion for Summary Judgment (document # 50) is GRANTED.

II.  **FACTS**[1]

From the late 1970s and early 1980s, Kris E. Penzell, through his law practice, the Law Office of Kris E. Penzell, P.A., worked as a creditors' rights attorney in Miami, FL.  Kris Penzell died on March 8, 2000, and his wife, defendant Penzell, was appointed personal representative of his estate.  The probate matter is currently pending in the 11th Judicial Circuit of Florida.  In conjunction with the probate matter, on March 24,

---

[1] Premier has not controverted any of the facts asserted by Penzell in her concise statement of material facts.  "Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of te motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."  Local Rule 56.1.

2000, an administrative judge appointed Victor Rones as inventory attorney to oversee the winding down of Kris Penzell's legal practice.  Penzell stayed on at the law office in an administrative capacity.

During the 1980s and early 1990s, Kris Penzell provided collection services to Barnett Bank, a banking association chartered in Jacksonville, FL.  In that capacity, he obtained 14 of the 19 judgments that are at issue in this case.  Exh. D to Corrigan Aff. (document # 53-5).  Barnett Bank later merged with NationsBank, N.A., a North Carolina bank.  In December 1998, Kris Penzell entered into a contingency fee agreement ("1998 Agreement") with NationsBank, agreeing to prosecute certain collection matters in Florida, including the 14 judgments obtained on behalf of Barnett Bank.  Exh. 1 to Penzell Aff. (document # 54-2).  Pursuant to the 1998 Agreement, Kris Penzell was entitled to 30% of any amount collected on the matters referred to him by NationsBank.  Id.  If the agreement were terminated by NationsBank without cause, Penzell would collect the 30% contingency fee on matters in which payment agreements with the debtor had been reached and fees at a rate of $110.00/hour for matters in which no payment agreement had been reached with the debtor.  Id.  After entering into the 1998 Agreement, in 1999 he obtained three more of the judgments at issue in this litigation.  Exh. E to Corrigan Aff. (document #

53-6).  Prior to September 2001, two additional judgments were obtained by Victor Rones in his role as inventory attorney.  Exh. F to Corrigan Aff. (document # 53-7).  Despite having performed periodic collection work on the files, Kris Penzell was unable to find any assets to satisfy any of the 19 judgments.

Subsequent to the execution of the 1998 Agreement, Bank of America ("BOA") acquired the assets of NationsBank.  In late 1999, Kris Penzell and BOA entered into a new agreement ("1999 Agreement"), which stated that the 1998 Agreement would govern their relationship going forward for all matters referred after December 23, 1998.[2]  Exh. A to Corrigan Aff. 72-86 (document # 53-2).  The 1999 Agreement also contained a settlement agreement and release pertaining to 14 judgments obtained by Kris Penzell on behalf of Barnett Bank prior to December 1998; the effects of

---

[2] Premier asserts that it did not receive copies of the complete 1999 Agreement until September 24, 2007.  The late disclosure of the 1999 Agreement is one of the bases of Premier's motion to amend the complaint.

4

release language are hotly contested by the parties.[3]  Five additional matters were referred to Penzell after December 1998.

In September 2001, BOA solicited bids for 84 "distressed" judgments.  The 19 judgments at issue here were among them. Plaintiff Premier, a company in the business of buying, selling, and liquidating distressed financial assets, was the successful bidder and paid $136,657.37 for the 84 judgments, which represented approximately 3% of the outstanding $4,518,193.04 balance on the judgments.  Exh. I to Corrigan Aff. 2 (document # 53-10).  On September 19, 2001, Premier and BOA executed a Loan Sale Agreement, which provides in relevant part:

> **3.1.1 Bill of Sale.**  On the Closing Date, Seller shall deliver to Buyer a Bill of Sale and Assignment of Loans . . . which Bill of Sale and Assignment of Loans shall sell, transfer, assign, set-over, quitclaim and convey to Buyer all right, title and interest of Seller in and to (i) each of the Loans sold . . . [and] the Loan Documents[4] and any Collateral Documents. . . .

---

[3] The language of the settlement and release refers to certain "Old Barnett Matters," accounts referred to Kris Penzell for the provision of collection-related legal services prior to the 1998 Agreement.  Exh. A to Corrigan Aff. 72 (document # 53-2).  The release further states that all matters referred to Kris Penzell after December 23, 1998, would be governed by the terms of the 1998 Agreement with NationsBank (referred to as the "New Agreement") and that collection activities would continue on certain matters referred prior to December 1998, listed on Exhibit B to the agreement.  Id.  Thirteen of the 14 Old Barnett Matters at issue here are listed on Exhibit B; the remaining five loans were referred after December 1998.  Exhs. D, E & F to Corrigan Aff (documents # 53-5-7).

[4] According to the terms of the Loan Sale Agreement, "Loan Documents" consist of "Collateral Documents, Evidence of

**3.4 Pending Legal Proceedings.**  With respect to any Loan that is, as of the Transfer Date, the subject of litigation, arbitration, bankruptcy, foreclosure or other legal proceeding, Buyer agrees that it shall, to the extent applicable, at its own cost, within thirty (30) days after the Transfer Date, (i) notify the Clerk of Court, any foreclosing trustee and all counsel of record in each such proceeding of the transfer of the Loan from Seller to Buyer, (ii) file pleadings to relieve Seller's counsel of record from further responsibility in such litigation (unless said counsel has agreed, with Seller's written consent, to represent Buyer in said proceedings at Buyer's expense), and (iii) remove Seller as a party in such action and substitute Buyer as the real party-in-interest, and change the caption thereof accordingly.  In connection therewith, after the Transfer Date, Buyer shall have sole responsibility to obtain all Transfer Documents[5] then in the possession of any such counsel or foreclosing trustee and to determine the appropriate direction and strategy for such litigation or other legal proceeding, excluding any government loan insurance program. . . .

**6.4 Contingency Fee Agreement.**  This sale includes Loans that are subject of a contingency fee agreement or arrangement with counsel representing Seller.  Buyer shall purchase such Loans subject to and shall assume all obligations of the contingency fee agreement or arrangement.

---

Indebtedness and the Loan File."  Exh. J to Corrigan Aff. 11 (document # 53-11).  The "Loan File," in turn, is defined as "all documents in the possession of Seller relating to any Loan. . . ."  <u>Id.</u> at 11-12.

[5] Pursuant to the Loan Sale Agreement "Transfer Documents means the Bill of Sale and Assignment, Limited Power of Attorney and such other documents as Seller, in its sole and absolute discretion, deems appropriate for the transfer of its right, title and interest in and to the Loans purchased by Buyer pursuant to its Assignment."  Exh. J to Corrigan Aff. 13 (document # 53-11).

Exh. J to Corrigan Aff. (document # 53-11).   During the course of
this litigation, Penzell conceded in answers to interrogatories
that "[t]he fee agreement between the Penzell law office and
[BOA] was terminated by the bank's sale of its interest and
obligations in loan workout and collection matters to Premier."
Exh. C to Morrissey Aff. 13 (document # 62-2).

     Sometime in the last quarter of 2001, Nick Maimonis, a
representative of Premier, contacted Penzell and informed her
that Premier had purchased the 19 judgments.   According to
Penzell, she advised Maimonis that Kris Penzell was her husband,
that he had passed away, and that she was not an attorney.
Penzell Aff. 2 (document # 54).   She also informed Maimonis that
she was the personal representative of her husband's estate and
that she was working with an inventory attorney to wind down her
husband's law practice.   Id.   Penzell further asserted that
Premier owed her husband's estate fees for work done on the 19
judgments prior to the sale to Premier.   Exh. A to Corrigan Aff.
24 (document # 53-2).

     Following its purchase of the judgments, Premier began
writing the underlying debtors and offering to settle the
outstanding judgments for a significantly reduced value.   On
January 11, 2002, Maimonis contacted Penzell for the purpose of
obtaining copies of two judgments regarding the matter of
NationsBank v. Arroyave and a copy of the 1998 Agreement.

Penzell forwarded copies of the requested documents to Premier on the very same day.  Later, Maimonis contacted Victor Rones and suggested that Premier would consider retaining Rones to perform collection work on the judgments.  Rones told Maimonis that he would consider doing the work after seeing a proposed fee agreement.  Maimonis called Rones a second time and requested an update.  Rones indicated that Premier would either have to retain Rones or hire another attorney to perform the collection work.

On April 29, 2002, Susan Noe replaced Rones as inventory attorney.  At some point, Premier did send Noe a draft contingency fee to review in April 2003, but no agreement was ever reached.  It is undisputed that Premier never retained the Law Office of Kris Penzell nor either of the inventory attorneys appointed to wind down Kris Penzell's practice.

Later, Penzell learned that Premier had succeeded in collecting over $25,000 on the <u>Arroyave</u> matter, in part by subordinating previously obtained judgments, including one of the 19 judgments obtained by Kris Penzell.  Exh. 4 to Penzell Aff. (document # 54-5).  Premier did not disclose the settlement (obtained on January 15, 2002) to Penzell, nor did it pay any contingency fee to the Penzell estate.

In 2002, Premier began requesting periodic updates on the status of the collection files associated with the judgments.  In August 2002, Noe provided Premier with a comprehensive summary of

the status of the various collection cases on Penzell Law Office letterhead and stated: "We are prepared to accept these cases upon these terms and would like an opportunity to discuss same with you upon your receipt and review of the enclosed status." Exh. G. to Corrigan Aff. 23-34 (document # 53-8).  Though there was no fee agreement between the parties, Premier responded with a letter requesting additional information on "the matters you are currently working for us."  Exh. A to Corrigan Aff. 86 (document # 53-2).

On June 4, 2003, Premier demanded that Penzell turn over the collections files associated with the 19 judgments.  Exh. A to Corrigan Aff. 91-93 (document # 53-2).  In a letter, Premier's counsel stated that he was aware that Penzell was asserting a retaining lien against the files in order to obtain fees due and owing to the estate on the files purchased by Premier.  Id.  He also acknowledged that Premier did not have an attorney-client relationship with Kris Penzell's law office.   Id.

Penzell, acting on the advice of the inventory attorneys and her own probate counsel, refused to release the files on the grounds that the estate had not been paid for any of the work done on the cases and advised Premier that she was asserting a retaining lien over the files.  To date, Penzell's estate has not received any fees for services performed in the 19 cases at issue.

9

Premier filed this action on August 21, 2003. In order to protect the estate's interests and to avoid breaching any fiduciary duties, Penzell and the inventory attorneys submitted the question regarding the files to the 11th Judicial Circuit in and for Miami-Dade County, requesting permission to turn over copies of the files to Premier. After a hearing in early December 2004 – in which Premier participated and was represented by counsel – the Florida court ordered the estate to turn over copies of the files to Premier. Exh. M to Corrigan Aff. (document # 53-14). The court also noted that there was no agreement between Kris Penzell (or his estate) and Premier for the provision of legal services. Id. Copies of all 19 case files were produced on December 16, 2004.

Shortly after the files were turned over, Penzell filed a counterclaim against Premier for the fees allegedly owed for services performed on the cases. On March 7, 2005, Penzell informed Premier by letter that the total amount she believed was owed to Kris Penzell's estate was $63,932.10 (plus $10,000 in consequential damages). Exh. A to Gleicher Aff. 9 (document # 63-2).

On January 21, 2005, Premier filed a motion to amend the complaint in this action, seeking to add claims sounding in breach of contract, intentional misrepresentation, negligent misrepresentation, and negligence, and to add as parties

10

inventory attorneys Rones and Noe.  The Court denied the motion, holding that "even if there were a basis to join them, the existence and relationship of these attorneys to the defendant were known by the fall of 2004; this motion should have been brought six months sooner."  Significantly, in the proposed amended complaint, Premier abandoned its conversion claim, asserting, "To the best of Premier's understanding . . . Ms. Penzell no longer retains any of the files, and certain factual allegations of the Complaint in this action no longer obtain." Def.'s Mtn. to Amend Compl. 5 (document # 16).

Premier now asserts its original conversion claim and argues that because of Penzell's retention of the files it was unable to refer the judgments to successor counsel and collect on certain debts.  However, at his deposition, Premier's expert, Richard Storfer, testified that he had performed collection services on some of the judgments at issue on behalf of Premier.  Exh. P to Corrigan Aff. 15-16 (document # 53-17).  Storfer testified that Ms. Penzell's retention of the files did not prevent him from doing work on the judgments, such as filing a garnishment.  Id. Moreover, he testified that because the cases were reduced to judgment, no substitution of counsel needed to occur: "Post-judgment you don't need a substitution – you don't need a stipulation of counsel.  Anyone could have stepped in."  Id. Penzell's expert, Jerald Freshman, further testified that Premier

11

failed to establish that assets were dissipated or that
opportunities for collection were lost because of the alleged
conversion of the files.  Freshman also testified that in each
instance, the property on which Premier claims it could have
asserted a lien was actually exempt property under Florida law,
making it unavailable for execution by Premier.


III. **DISCUSSION**

    A.   **Premier's Motion to Amend**

    As an initial matter, Premier seeks to amend its complaint
to add claims for breach of contract, intentional
misrepresentation, and negligent misrepresentation based on the
fact that it was not made aware of the 1999 Agreement until
September 2007.  Premier's Motion to Amend Complaint (document #
47) is DENIED for the following reasons.

    First, the Court denied a similar motion approximately three
years ago.  Premier filed its first motion to amend in January
2005, seeking to add the two inventory attorneys who, in the
words of the Court, "did not have an attorney client relationship
with it, and as such, [were] irrelevant to plaintiff's claims."
Order of March 28, 2005.  Premier also sought to add claims for
breach of contract (based on the 1998 Agreement), intentional
misrepresentation, negligent misrepresentation, and negligence.
The Court denied the motion, stating, "[T]his motion should have

been brought six months sooner." Order of March 28, 2005. In its present motion, Premier seeks once again to add almost identical claims to the complaint based on the late disclosure of the 1999 Agreement. The Court, however, already considered and rejected these arguments in 2005, and the disclosure of the 1999 Agreement does not alter the Court's previous determination (see below). Allowing a significant amendment to the complaint at this stage in the litigation would unnecessarily delay final resolution of a case that is already over four years old.

Second, the 1999 Agreement – which, Premier argues, gives rise to new claims – stated that the 1998 Agreement would prospectively govern the relationship between BOA and Kris Penzell. Thus, the 1999 Agreement did not create any additional contractual obligations – if there are any at all – between Penzell and Premier. Moreover, the settlement and release contained in the 1999 Agreement, to the extent that they are relevant at all, merely purport to limit the attorney's fees to which Kris Penzell was entitled for work completed on behalf of Barnett Bank prior to December 1998. The late disclosure of the settlement and release is more aptly characterized as a discovery matter than grounds for asserting new claims. As such, because Premier has had full use of the 1999 Agreement for purposes of opposing Penzell's summary judgment motion and may invoke its language in defending against Penzell's counterclaim, the Court

13

sees no need to allow an amendment to the complaint at this late date.

B.    **Summary Judgment Standard of Review**

Next, Penzell moves for summary judgment on Premier's conversion and Mass. Gen. Laws ch. 93A claims.  Considering the "facts and the reasonable inferences therefrom in the light most favorable to the nonmoving party," Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 94 (1st Cir. 2007), summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation."  Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir. 2005).

C.    **Premier's Conversion Claim**

Premier's first claim sounds in conversion.  Premier alleges that as a result of Penzell's retention of the 19 case files, it

14

was unable to refer the matters to successor counsel and collect on the judgments.

Under Florida law, conversion is defined as "an act of dominion wrongly asserted over, and inconsistent with, another's possessory rights in personal property."[6] Joseph v. Chanin, 940 So. 2d 483, 486 (Fla. 4th DCA 2006) (quoting Goodwin v. Alexatos, 584 So. 2d 1007, 1011 (Fla. 5th DCA 1991)).  The most sensible place to begin evaluating Premier's conversion claim is determining whether or not Premier in fact had a possessory or ownership interest in the property at the time of the alleged conversion.  See Warshall v. Price, 629 So. 2d 903, 904 (Fla. 4th DCA 1993).

Because the files at issue were generated pursuant to an attorney-client relationship governed by Florida law, the Court

---

[6] Throughout their briefs, the parties cite to cases from Florida and Massachusetts, though Florida cases predominate. Penzell claims that since the elements of conversion are the same under Massachusetts and Florida law, this Court does not need to conduct a choice of law analysis.  See also Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 n.5 (1st Cir. 1993).  The Court nonetheless provides this brief analysis for the sake of clarity.  A federal court sitting in diversity applies the choice of law rule of the state where it is located.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Massachusetts takes a functional approach to choice of law questions that "is explicitly guided by the Restatement (Second) of Conflicts of Laws (1971)," which generally applies a multi-factor interest balancing test.  Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co., 60 Mass. App. Ct. 492, 496 (2004). Insofar as Massachusetts and Florida have conflicting law on conversion (neither party contends that they do), Florida law should clearly control here, as the bulk of conduct at issue took place in Florida and revolves around 19 Florida judgments.

looks to that state's case law to determine the underlying ownership interests at play here. Happily, it appears that Florida law provides a rather straightforward answer to the question at hand.

In <u>Dowda & Fields, P.A. v. Cobb</u>, 452 So. 2d 1140 (Fla. 5th DCA 1984), a case with facts remarkably similar to those in this case, a creditor's attorney obtained a judgment against a debtor on a promissory note. <u>Id.</u> at 1141-42. When the debtor appealed the judgment, the creditor fired the original attorney. <u>Id.</u> at 1142. The attorney subsequently filed notice that he intended to assert a charging lien on the judgment for unpaid attorney's fees and refused to turn over his case file, arguing that the contents of the file were his personal property. <u>Id.</u> The creditor moved the trial court to dismiss the charging lien and alleged that the attorney was asserting an invalid retaining lien on the case file. <u>Id.</u> The trial court found the charging lien to be proper, but ordered the attorney to deliver his entire office file (with the exception of intra-office notices and memoranda) to the creditor's successor counsel. <u>Id.</u> The attorney appealed.

On appeal, the Florida District Court of Appeal for the 5th District reversed the trial court ruling and held that the attorney was not obligated to turn over his case file to the creditor, writing in relevant part:

16

> Attorneys normally maintain an office file relating to
> matters involving professional services performed for a
> particular client as to a particular matter.  This is
> commonly referred to as that client's file but it only
> relates to that client and the file and its contents is
> the personal property of the attorney.  The attorney's
> file may or may not contain documents or other property
> of the client.  The attorney's file may also contain
> information about a client's affairs concerning which
> the attorney may have an ethical duty to communicate to
> successor counsel.  <u>There is no evidence or other
> indication that the attorney's file in this case
> contained property of the client.</u>  The client's
> promissory note had been reduced to final judgment and
> the litigation is over except for the appeal.  No
> reason has been offered why appellants' office file is
> needed by the client or successor counsel in order to
> defend the appeal, nor can we imagine one.

<u>Id.</u> at 1142 (emphasis added); <u>see also</u> <u>Potts v. State</u>, 869 So. 2d

1223, 1225 (Fla. 2004); <u>Long v. Dillinger</u>, 701 So. 2d 1168, 1169

(Fla. 1997); <u>Dumas v. Marrero</u>, 854 So. 2d 531, 532 (Fla. 5th DCA

2004) (client "not entitled . . . to that part of his attorney's

file related to the performance of professional services, as

those documents are the property of the attorney, not the

client").

As applied to the instant case, <u>Dowda</u> seems rather clearly

to suggest that Premier had neither a possessory nor an ownership

interest in the contents of the files at the center of the

present controversy.  Indeed, there is no evidence in the record

suggesting that Penzell's files contained property belonging to

either BOA or Premier.  This lack of evidence is especially

telling in light of the fact that Premier has been in possession

of the files since at least December 16, 2004.  And, as in <u>Dowda</u>,
all of the debts at issue here had been reduced to judgment; all
of the relevant documents were publicly available.[7]  Thus, it
appears that under Florida law, the contents of the 19 files were
the property of the Law Offices of Kris Penzell, negating any
claim of conversion by Premier.

Premier's attempts to distinguish <u>Dowda</u> on legal and factual
grounds are unavailing.  First, contrary to Premier's assertion,
the existence of the valid charging lien in <u>Dowda</u> did not affect
the underlying ownership of the contents of the attorney's case
files.  In <u>Dowda</u>, as in this case, the ownership inquiry was
antecedent to determining the validity of the attorney's
<u>retaining</u> lien; the attorney's interest in the proceeds of any
judgment – in the form of a <u>charging lien</u> – had no impact
whatsoever on the question of ownership in the first instance.

Second, Premier argues that its ownership interest in the
files is evidenced by the Loan Sale Agreement between BOA and
Premier, in which Premier purchased all right, title, and

---

[7] In fact, at his deposition, Premier's expert testified to
the following:
> Q: Tell me, sir, what information was in the Law Office
> of Kris Penzell's file that prevented you from doing
> work in May 2004 prior to the return of the files.
> When I say return, I again mean it pejoratively, in
> December 2004.
> A: None.
Exh. P to Corrigan Aff. 15 (document # 53-17).

interest in the 19 judgments at issue.[8]  This, of course, presumes that BOA owned the contents of Penzell's files. However, Dowda clearly suggests that Penzell, not BOA, was at all relevant times the rightful owner of the contents of the files. The Loan Sale Agreement did not create any ownership rights, as BOA could not convey what it did not own.

Because the Court concludes that summary judgment is appropriate on the grounds that Premier has not produced any evidence to show that it in fact had any ownership interest in the contents of Penzell's files, the Court need not delve further into the conversion inquiry and, in particular, whether Penzell had a valid retaining lien.  Nonetheless, the Court notes, without deciding, that even if Premier did have a valid claim of ownership to the contents of the files, Penzell would likely prevail on that ground as well, as neither Kris Penzell nor his estate ever received compensation for legal work done in connection with the judgments.[9]

_____

[8] The Court notes that it is not clear from the Loan Sale Agreement whether Premier in fact purchased any documents that were not in the possession of BOA at the time of the sale. Contrary to Premier's arguments, the Loan Sale Agreement between it and BOA, while giving Premier all right, title, and interest in the 19 judgments, contains no express provisions pertaining to the contents of Penzell's files, since all of the loans at issue had been reduced to judgment and there were no ongoing legal proceedings.  See supra note 4.

[9] While it may well be true — though the Court makes no such determination here — that the 1999 Agreement and release limit the amount of attorney's fees to which Penzell may rightly lay

19

D.    **Premier's Mass. Gen. Laws ch. 93A Claim**

Premier also contends that numerous communications directed to Massachusetts by Penzell since 2001 violated Massachusetts General Law chapter 93A.  Chapter 93A proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws c. 93A, § 2; Play Time, Inc. v. LDDS Metromedia Commc'ns, Inc., 123 F.3d 23, 32 (1st Cir. 1997).

This claim is easily resolved at the summary judgment stage. Viewing the facts in the light most favorable to Premier, as the Court must do here, there is no question that the alleged conduct took place primarily and substantially outside of Massachusetts. See Mass. Gen. Laws ch. 93A, § 11 ("No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and

---

claim, undisputed documents in the record show that Kris Penzell (or the inventory attorneys) performed significant services in connection with the judgements pursuant to the terms of the 1998 Agreement following the execution of the 1999 release.  No attorney's fees have ever been paid for those services. Moreover, it is of no moment that there was never an attorney-client relationship between Penzell and Premier.  An attorney's lien inheres in the property itself; though it is borne of the attorney-client relationship, it is not dependent on it.  Cf. Nichols v. Kroelinger, 46 So. 2d 722, 724 (Fla. 1950) (attorney may enforce lien on judgment even though judgment has passed into the hands of non-client).  Thus, the fact that BOA subsequently sold the judgments does not negate the existence of the lien on the property.

substantially within the commonwealth"). Section 11 "provides an exemption from 93A liability, available as a defense, rather than a jurisdictional prerequisite to suit." Roche v. Royal Bank of Canada, 109 F.3d 820, 829 (1st Cir. 1997) (quoting Kansallis Fin. Ltd. v. Fern, 40 F.3d 476, 481 (1st Cir. 1994)). Under § 11, "the burden is on defendants to show that their misconduct occurred primarily and substantially outside Massachusetts," since the statute provides the grounds as a defense rather than a jurisdictional requirement. Id. (citing, inter alia, Mass. Gen. Laws ch. 93A, § 11). Penzell has met this burden, even viewing the record in the light most favorable to Premier.

Courts look to three factors when determining whether actionable conduct occurs primarily and substantially in Massachusetts: 1) where the defendant committed the deception; 2) where the plaintiff was deceived and acted upon the deception; and 3) the situs of plaintiff's losses due to the deception. Id. (citing Clinton Hosp. Ass'n v. Corson Group, Inc., 907 F.2d 1260, 1265-66 (1st Cir. 1990)). Viewing the undisputed facts of this case in light of the three factors identified by the First Circuit, it is clear that the conduct alleged by Premier occurred primarily and substantially outside of Massachusetts. See Bushkin Assoc., Inc. v. Raytheon Co., 393 Mass. 622, 637-39 (1985) (no ch. 93A liability based solely on telephone call made in Massachusetts to plaintiff in New York, where any loss was

21

incurred in New York); <u>Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.</u>, 25 Mass. App. Ct. 302, 311 (1988).

First, though this Court found sufficient ties with Massachusetts to sustain personal jurisdiction over Penzell, <u>see</u> Order of March 7, 2004, the connection is simply too tenuous to support liability under ch. 93A.[10]  Kris Penzell's law practice focused solely on matters of Florida law.  Defendant Penzell is a lifelong resident of Florida and has resided there at all times relevant to this litigation.  Moreover, Penzell's business dealings in Massachusetts, such as they were, consisted solely of the communications with Premier that are at issue here. Penzell never sought out business in Massachusetts; her connection to the state was merely an unintended consequence of Premier's purchase of the judgments.

Second, while it is true that Premier maintains its principal place of business in Massachusetts, its allegations pertain wholly to its business dealings in Florida and collections on judgments that are governed by Florida law.  Thus, the weight given to the second factor of the <u>Clinton Hospital</u> test is minimal.

---

[10] The Court notes the First Circuit's observation in <u>Roche</u>: "The choice of law test and the 'primarily and substantially' test, though similar in many respects, are not identical.  That a judge should reach opposite results in applying these two tests in a single case is no sign of error."  109 F.3d at 827 n.7.  The same is true of the relationship between § 11 and the test for personal jurisdiction.

Finally, this case very clearly centers around 19 judgments obtained in Florida courts.  Any losses resulting from Penzell's conduct were incurred there.  In sum, all signs point to Florida; no version of the facts in the summary judgment record can possibly sustain a finding of liability under Massachusetts unfair business practices statute.[11]

Moreover, despite numerous and vociferous allegations to the contrary, Premier simply has not produced any evidence suggesting that Penzell conducted herself in a deceitful or deceptive way so as to be actionable under Massachusetts law.  One of the only pieces of evidence submitted by Premier in support of its claim that Penzell acted deceptively consists of a letter sent by inventory attorney Noe to Premier providing a status update on all of the files in Penzell's possession.  Exh. G to Corrigan Aff. 23-24 (document # 53-8).  While the letter does contain the "Law Offices of Kris Penzell" letterhead, the body of the letter makes clear that it is to serve as a "status summary" of the files and invites Premier to negotiate a new fee arrangement for

---

[11] The Court recognizes that it rejected a similar argument at the motion to dismiss stage.  At that time, the Court concluded that allegations in the complaint raised the possibility that the deceptive conduct took place primarily and substantially in Massachusetts.  The development of the record through discovery, however, has revealed that this is not the case.

the cases going forward.[12]  Id.  Nowhere does the letter suggest that there is an ongoing attorney-client relationship.  Indeed, it is undisputed that Penzell and Premier never had such a relationship.[13]  Absent such a relationship, it is difficult to conceive how Premier could reasonably rely on Penzell for legal services.

Premier's remaining allegations pertain to Penzell's late disclosure of the 1999 Agreement, which, as discussed above, is more properly framed as a discovery issue than grounds for a cause of action, and Penzell's claim for attorney's fees, which is the primary subject of Penzell's counterclaim.  These are not proper grounds for ch. 93A liability.

It seems clear that a great deal of confusion ensued in the wake of BOA's sale of the 19 judgments and the death of Kris Penzell.  Both parties made attempts to clarify the nature of their relationship and define the extent of their respective obligations; those attempts failed.  Confusion, however, is not the same as deception.

---

[12] The letter, signed by inventory attorney Noe, ends with the following note: "We are prepared to accept these cases upon these terms and would like an opportunity to discuss same with you upon your receipt and review of the enclosed status."  Id. Thus, the letter makes clear that there was no ongoing attorney-client relationship.

[13] Premier itself concluded that the terms of the 1998 Agreement did not govern its relationship with Penzell.  Gleicher Aff. 4 (document # 63-2).

24

IV.   **CONCLUSION**

For the reasons stated above, Premier's Motion to Amend the Complaint (document # 47) is DENIED; Penzell's Motion for Summary Judgment (document # 50) is GRANTED.

**SO ORDERED.**

**Date: May 8, 2008**           /s/ NANCY GERTNER
                                **NANCY GERTNER, U.S.D.C.**

25